## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Kenneth Grossman, Cedar Street Fund ) <br> and Cedar Street Offshore Fund, Individually ) <br> and on Behalf of All Others Similarly Situated, ) <br> ) <br>       Plaintiffs, ) <br>       v. ) <br> ) <br> Merrill Lynch & Co., Inc., Michael A. O'Hanlon, ) <br> and Steven R. Garfinkel, ) <br>       Defendants. ) | **CLASS ACTION COMPLAINT** <br> **FOR VIOLATION OF THE** <br> **FEDERAL SECURITIES LAWS** <br> <br> **JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiffs allege the following based upon the investigation of Plaintiffs' counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by DVI, Inc. ("DVI" or the "Company"), as well as regulatory filings and reports, securities analysts reports and advisories about the Company; and press releases and media reports about the Company. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

### NATURE OF THE ACTION AND SUMMARY OF ALLEGATIONS

1.     Plaintiffs bring this action individually and for a class consisting of:

> all persons other than Individual Defendants who purchased or otherwise acquired the securities of DVI between November 7, 2001 and August 13, 2003, inclusive (the "Class Period"), and who were damaged thereby, seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      DVI describing itself as an independent specialty finance company for healthcare

providers worldwide, providing lines of credit for working capital backed by healthcare receivables and

loans and leases to finance the purchase of diagnostic imaging and other therapeutic medical equipment

directly and through vendor programs.

3.      In light of DVI's August 25, 2003, announcement that it had filed for Chapter 11 Bankruptcy,

DVI is not named as a Defendant herein.

4.      Throughout the Class Period, O'Hanlon and Garfinkel ("Individual Defendants") issued positive

statements regarding DVI's business and operations, and overall growth in the Company's business.

For example, Individual Defendants claimed that DVI had *"tremendous earnings power and*

*sufficient capital and liquidity to support [its] future domestic growth"*,[1] and that *"[w]e are*

*much more than just disciplined lenders."*[2]  Moreover, Individual Defendants represented that

DVI's financial results reported in publicly disseminated press releases and SEC filings were accurate

and reliable, and a fair presentation of DVI's business.

5.      Unbeknownst to the Class, however, Defendants engaged in a fraudulent scheme to

deceive the public as to the true financial condition of DVI.

6.      Defendants omitted disclosing material adverse facts, including, but not limited to:

the Company's failure to write down the value of certain impaired assets; its failure to properly account

---

[1]  Press Release, DVI, Inc., *DVI Reports First Quarter Earnings of $5.1 Million, $0.33 Per Share; Company Focusing Resources on Core Business Strengths*, Business Wire (October 31, 2002).

[2]  Press Release, DVI, Inc., *DVI First Quarter Exceeds Expectations; Originations of $330 Million Up 79%; Net Income $6.2 Million and Per Share at $0.40*, PR Newswire (November 7, 2001).

for and report non-recurring transactions; its failure to adopt adequate internal controls; and its material overstatement of its assets and earnings. As a result of Defendants' fraudulent scheme, DVI stock became artificially inflated during the Class Period, trading as high as $20.99 per share on June 17, 2002, thereby causing damages to Class Period purchasers of DVI securities.

7.      The truth began to emerge on May 20, 2003, when DVI revealed that its auditors, Deloitte & Touche LLP had resigned over a material dispute concerning the accounting treatment for a series of transactions at DVI's Corpus Christi Radiology Facility from September 2001 to June 2002. Contrary to DVI's representations, Deloitte & Touche later indicated that its discovery of material accounting issues was not limited to Corpus Christi transactions, but also weakness in DVI's internal controls. Thereafter, on August 1, 2003, DVI revealed that it would not be able to make interest payments on its 9 7/8 percent Senior Notes due to severe liquidity constraints, that the Company had depleted ***all*** availability in its credit facilities, and that the SEC had rejected the Company's filing of a Form 10-Q for the third quarter of fiscal 2003.

8.      On August 13, 2003, after the market closed, DVI issued a press release revealing DVI's intention to file for Chapter 11 Bankruptcy protection and that the Company had not yet secured debtor-in-possession financing. The Company blamed its dire situation on the "recent discovery of apparent improprieties in its prior dealings with lenders involving misrepresentations as to the amount and nature of collateral pledged to lenders."[3]  In the same release, DVI announced that DVI's Chief Financial Officer, Defendant Steven Garfinkel, had been placed on administrative leave. Immediately

---

[3]  Press Release, DVI, Inc., *DVI to Seek Bankruptcy Protection*, Business Wire, (August 13, 2003).

following this announcement, on August 14, 2003, the New York Stock Exchange suspended trading

of DVI stock and Senior Notes, pending delisting.

9.       As detailed below, Defendants' dissemination of materially false and misleading

information which artificially inflated DVI's stock price and caused harm to purchasers of DVI

securities during the Class Period, constitutes violations of the Securities Exchange Act of 1934.

## JURISDICTION AND VENUE

10.      Claims are asserted under Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§

78j(b) and 78t(a)], and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. § 240.10b-5].

This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of

the Exchange Act [15 U.S.C. § 78aa].

11.      Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28

U.S.C. § 1391(b).  Many of the acts charged herein, including the preparation and dissemination of

materially false and misleading information, occurred in substantial part in this District.  Additionally,

DVI maintains its chief executive offices and principal place of business within this District.

12.      In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the

means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate

telephone communications and the facilities of the national securities markets.

## PARTIES

13.      Plaintiffs Kenneth Grossman, Cedar Street Fund and Cedar Street Offshore Fund, as set

forth in their certification, which is attached hereto as Exhibit A, and incorporated by reference herein,

purchased both the common stock and debt of DVI during the Class Period and have been damaged

thereby.

14.     DVI is a Delaware corporation with its principal executive offices located at 500 Hyde

Park, Doylestown, Pennsylvania 18901.  DVI filed for Chapter 11 Bankruptcy protection on August

25, 2003, and for this reason, and for this reason alone, is not named as a defendant herein.

15.     Defendant Michael A. O'Hanlon was, at all relevant times, DVI's President and Chief

Executive Officer, and a Director of DVI.

16.     Defendant Steven R. Garfinkel was, at all relevant times, DVI's Executive Vice President

and Chief Financial Officer.

17.     Defendant Merrill Lynch & Co., Inc., a corporation headquartered in New York, was, at all

relevant times, a financial advisor to the Corporation, the lead underwriter in managing DVI's

securitizations, and in a position to control DVI's financial operations.

18.     By their positions with the Company, the Individual Defendants had access to the adverse

undisclosed information about its business, operations, products, operational trends, financial

statements, markets and present and future business prospects via access to internal corporate

documents (including the Company's operating plans, budgets and forecasts and reports of actual

operations compared thereto), conversations and connections with other corporate officers and

employees, attendance at management and Board of Directors meetings and committees thereof and

via reports and other information provided to them in connection therewith.

19.     It is appropriate to treat the Defendants as a group for pleading purposes and to presume that

the false, misleading and incomplete information conveyed in the Company's public filings, press

releases and other publications as alleged herein are the collective actions of the narrowly defined group

of Defendants identified above.  Each of the above officers of DVI, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements, and financial condition, as alleged herein.  Said Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware or recklessly disregarded that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

20.     As officers, controlling persons, and financial advisors, of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, traded on the New York Stock Exchange during the Class Period, and was governed by the provisions of the federal securities laws, Defendants each had a duty to disseminate promptly accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information.  Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

21.     Defendants participated in the drafting, preparation, and/or approval of the various public reports and other communications complained of herein and were aware of, or recklessly disregarded,

the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature.  Because of their Board membership, and/or executive, managerial, and/or financial advisor positions with DVI, each of the Defendants had access to the adverse undisclosed information about DVI's business prospects and financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about DVI and its business issued or adopted by the Company materially false and misleading.

22.     By their positions of control and authority as officers, directors, and/or financial advisors of the Company, these Defendants were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period.  Each Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, each Defendant is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

23.     Each Defendant is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of DVI common stock by disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme: (i) deceived the investing public regarding DVI's business, finances, financial statements and the intrinsic value of DVI common stock; and (ii) caused Plaintiff and other members of the Class to purchase DVI securities at artificially inflated prices.

7

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

24.     Plaintiffs bring this action for themselves and as a class action pursuant to Federal Rule

of Civil Procedure 23(a) and (b)(3) for a class, including:

> all those who purchased or otherwise acquired the securities of DVI
> between November 7, 2001 and August 13, 2003, inclusive, and who
> were damaged thereby;

and excluding Merrill Lynch, Individual Defendants, the officers and directors of the Company, at all

relevant times, members of their immediate families and their legal representatives, heirs, successors or

assigns, and any entity in which Individual Defendants have or had a controlling interest.

### NUMEROSITY

25.     The members of the Class are so numerous that joinder of all members is impracticable.

As of April 2003, approximately 15.1 million shares of DVI common stock were outstanding and were

actively traded on the New York Stock Exchange.  As of August 14, 2003, DVI's common stock is

trading on the OTC US Market.  While the exact number of Class members is unknown to Plaintiffs at

this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are

hundreds or thousands of members in the proposed Class.  Record owners and other members of the

Class may be identified from records maintained by DVI or its transfer agent and may be notified of the

pendency of this action by mail, using the form of notice similar to that customarily used in securities

class actions.

### TYPICALITY

26.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of

the Class are similarly affected by Individual Defendants' wrongful conduct in violation of federal law

that is complained herein.

### ADEQUATE REPRESENTATION

27.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

### COMMON QUESTIONS EXIST AND PREDOMINATE

28.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

        (a)     whether Individual Defendants' acts alleged herein violated the federal securities laws;

        (b)     whether Individual Defendants' statements made to the investing public during the Class Period misrepresented or omitted material facts about the business, operations and financial statements of DVI; and

        (c)     whether the members of the Class have sustained damages therefrom and the proper measure of damages.

### SUPERIORITY

29.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

### SUBSTANTIVE ALLEGATIONS

9

**Materially False and Misleading Statements Made During the Class Period**

30.      The Class Period begins on November 7, 2001.  On that date, DVI issued a press release over

PR NEWSWIRE in which they announced DVI's financial results for the first quarter of fiscal 2002,

reported "strong performance" by DVI and stated that the Company is "on track for a record year."

Press Release, DVI, Inc., *DVI First Quarter Exceeds Expectations; Originations of $330 Million*

*Up 79%; Net Income $6.2 Million and Per Share at $0.40*, PR Newswire (November 7, 2001).   In

the release, Individual Defendants stated, in relevant part, as follows:

> Net income for the first quarter was $6.2 million, or $0.40 diluted
> earnings per share.  These results compare to $6.5 million, or $0.42
> diluted earnings per share, for the same quarter in the prior fiscal year,
> which benefitted from $16.6 million of pre-tax income from Corvis
> Corporation deferred loan fees and revaluation of Corvis warrants held
> at that time.
>
> Loan origination and medical receivable commitments this quarter
> increased 79% to $330 million from $184 million in the first quarter last
> fiscal year.  The strong growth in new loan originations and
> commitments was across the board with Domestic equipment at $209
> million, up 45%; International at $49 million, up 137%; and Business
> Credit at $59 million, up 201%.

*Id.*

Defendant O'Hanlon attributed DVI's exceptional results to the Company's purportedly strong

fundamentals and continued expansion:

> "Our strong performance this quarter, bolstered by improving
> healthcare fundamentals, is accelerating our momentum.  By every
> measure, our strong first quarter performance puts us on track for a
> record year.  Financing state-of-the-art medical equipment, providing
> working capital secured by medical accounts receivable and the growth
> of our international business are all justifying expectations and fueling
> the Company's strong growth engine.  The outlook for the healthcare
> sector is very encouraging, and I have never been more excited about

the potential of our business."

Mr. O'Hanlon continued, "Our unique healthcare expertise gives us a special advantage.  We perform like a bank, but we think like a healthcare provider.  ***We are much more than just disciplined lenders***; we are regarded as partners by the healthcare community.  This approach ensures strong, long-term relationships, delivers solid financial performance, and increases our expectations for a very successful year." [Emphasis added.]

*Id.*

31.    On November 14, 2001, DVI filed with the SEC its quarterly report on a Form 10-Q for the first quarter of fiscal 2002, in which Individual Defendants' stated, in relevant part, as follows:

The accompanying consolidated financial statements have been prepared pursuant to the rules and regulations of the Securities and Exchange Commission.  Accordingly, they do not include all of the information and footnotes required by generally accepted accounting principles (GAAP) for complete financial statements.  The consolidated financial statements should be read in conjunction with the financial statements and notes thereto included in our latest annual report on Form 10-K for the fiscal year ended June 30, 2001.

In the opinion of management, the consolidated financial statements contain all adjustments, consisting only of normal recurring adjustments, considered necessary for a fair presentation of the consolidated balance sheets as of September 30, 2001 and June 30, 2001, the consolidated statements of operations for the three month periods ended September 30, 2001 and 2000, the consolidated statement of shareholders equity for the period from June 30, 2000 through September 30, 2001 and the consolidated statements of cash flows for the three month periods ended September 31, 2001 and 2000.

DVI, Inc., *Quarterly Report* (Sept. 30, 2001).

DVI also reported DVI's assets, liabilities, shareholder equity, and net earnings as follows:

                        September 30, 2001              June 30, 2001

| Total Shareholders' Equity | $225,517 | $222,225 |
|---|---|---|
| Total Liabilities and Shareholders' Equity | 1,548,979 | 1,477,691 |
| | | |
| Total Assets | 1,548,979 | 1,477,691 |

|  | Three Months ended September 30, | |
|---|---|---|
|  | 2001 | 2000 |
| Net Earnings | $6,160 | $6,482 |

*Id.*

32.     On January 2, 2002, DVI  issued a press release over PR NEWSWIRE entitled "DVI Closes $430 Million Asset-Backed Securitization" in which DVI announced that the Company had completed its largest ever equipment lease asset-backed securitization, $406 million of which was offered to the public:

> DVI, Inc. (NYSE: DVI) announced the successful completion of a $429.6 million equipment lease asset-backed securitization.  This transaction represents the largest transaction in our history.  DVI has completed 29 successful asset-backed securitizations, and since the initial transaction in 1991, the Company has placed $3.9 billion of such asset-backed notes in the market.  The securitized assets are comprised of loans and leases secured by medical equipment.
>
> The $406 million public portion of this transaction was led by Merrill Lynch and co-managed by Banc One Capital Markets, Inc.  Both Fitch, Inc. and Moody's Investor Service, Inc. rated each of the securitization classes of notes, with 88% of the notes rated AAA or its equivalent.

Press Release, DVI, Inc., *DVI Closes $430 Million Asset-Backed Securitization,* PR Newswire (January 2, 2002).

Defendant Garfinkel commented on the securitization as follows, in relevant part:

> Steven R. Garfinkel, Executive Vice President and Chief Financial Officer, commented, "DVI is pleased with the execution of this securitization transaction and the positive reception of its asset-backed notes in the market. *We continue to enter the asset-backed securitization market as a part of our balanced use of capital markets to meet our growth requirements.* The equipment securitization market continues to be one of the most stable and viable markets for term debt." [Emphasis added.]

*Id.*

33.    On January 9, 2002, DVI issued a press release entitled "DVI Gains $100 Million Commercial Paper Conduit Facility; Three Year Facility to Support Medical Receivables Financing Unit" in which Individual Defendants announced that a DVI subsidiary had entered into a new credit facility to expand its available funding.  In the release, Individual Defendants stated, in relevant part, as follows:

> DVI, Inc. (NYSE: DVI), the world's leading independent healthcare financier, announced today that it closed a three-year $100 million commercial paper conduit facility for its subsidiary, DVI Business Credit Corporation.

Press Release, DVI, Inc., *DVI Gains $100 Million Commercial Paper Conduit Facility; Three Year Facility to Support Medical Receivables Financing Unit*, PR Newswire (January 9, 2002).

Defendant O'Hanlon touted the credit facility as consistent with DVI's growth strategy:

> Michael A. O'Hanlon, President and CEO of DVI, noted, "Structuring a CP conduit financing arrangement for our medical receivables financing unit is a significant accomplishment . . . *This new facility certainly answers any questions about funding the aggressive growth planned by DVI for this segment.*" [Emphasis added.]

*Id.*

34.    On January 14, 2002, DVI filed with the SEC a registration statement on a Form S-3, signed by Individual Defendants O'Hanlon and Garfinkel, to register 1,297,170 shares of DVI common

13

stock.  In the "Risk Factors" section of the filing, Individual Defendants failed to disclose material risks

concerning the Company's accounting irregularities, its lack of internal controls, and the Company's

practice of misrepresenting the amount and nature of collateral pledged to its lenders in order to secure

financing.  Instead, Individual Defendants represented the risk as follows:

> In order to sustain the growth of our financing business, we depend
> upon funding provided by banks and other lenders under "warehouse"
> credit facilities.  We continuously use warehouse financing to fund loans
> to our customers.  **The funds we obtain through warehouse credit
> facilities are pursuant to full recourse short-term borrowings
> secured primarily by the underlying equipment, medical
> receivables and other collateral pledged to us by our customers.**
> We typically repay these warehouse borrowings with proceeds we
> receive when we permanently fund our equipment and other loans using
> securitizations or other financing techniques. [Emphasis added.]

DVI, Inc., Registration Statement (January 14, 2002).

35.     On February 4, 2002, the Wall Street Transcript published the transcript of an interview with

Defendant O'Hanlon in which he stated, in relevant part, as follows:

> "We had our best quarter ever in receivables with our recent quarter
> ending December 31st.  In a typical quarter we probably fund about $30
> million worth of receivables.  In this particular quarter, we doubled that
> as far as commitments are concerned.  It is a growing business.  This
> year, we expect to have fundings of approximately $200 million, which is
> a fair amount of our overall business.  We expect that this fiscal year,
> which ends on June 30th, to produce total new business fundings on a
> global basis of $1.25 billion.  Receivables are an important part of our
> product mix, and one in which we see tremendous growth opportunities
> over the next couple of years."
>
> Looking forward, O'Hanlon states, "I think over the next several
> quarters we really see some tremendous opportunities for us to really
> improve the performance of the company.  I think our investors will be
> pretty happy with what they see over the next several quarters."

14

*Company Interview, Michael A. O'Hanlon, DVI, Inc.*, The Wall Street Transcript (February 2002).

36.     On February 13, 2002, DVI issued a press release over PR NEWSWIRE entitled "DVI

Second Quarter Net Income at $6.3 Million - $0.41 EPS...", in which Individual Defendants stated, in

relevant part, as follows:

>          Net income for the second quarter was $6.3 million, or $0.41 per
>          diluted share, compared with $1.2 million or $0.09 diluted earnings per
>          share including a net non-cash, pre-tax charge of $5.4 million, or $0.22
>          per diluted share, related to revaluation of Corvis Corporation warrants
>          and loan repayment in the prior fiscal year period.
>
>          New loan origination and medical receivable commitments during the
>          second quarter of fiscal 2002 increased 19% to $305 million compared
>          with $256 million in the second quarter of fiscal year 2001.  New
>          business growth was recorded in all areas, with domestic equipment
>          finance representing $31 million of the $49 million improvement.

Press Release, DVI, Inc., *DVI Second Quarter Net Income at $6.3 Million - $0.41 EPS; New Loan
Origination and Commitments Increase 43% for First Half*, PR Newswire (February 13, 2002).

In the release, Defendant O'Hanlon again emphasized DVI's "firm foundation", dependability, and

growth, stating in relevant part as follows:

>          "We are very excited about the DVI performance this quarter and for
>          the first half of this fiscal year.  Clearly, we are on track for a year of
>          outstanding results in our core business based upon the new business
>          generated through the first half.  The strong relationships developed by
>          DVI over our 15 years of financing healthcare providers exclusively
>          helps drive this record level of new business.  ***Healthcare providers
>          around the world turn to DVI because we have nurtured a
>          business climate of trust and dependability.***"  [Emphasis added.]
>
>          Mr. O'Hanlon added, "Our optimism for the next several years rests
>          upon a firm foundation – the worldwide demand for new high-
>          technology medical equipment.  This demand comes, in part, from the
>          expanding applications for the latest diagnostic equipment used to
>          identify medical problems in our growing and aging population.  I truly

believe DVI is in the right place at the right time."

*Id.*

37.    On February 14, 2002, DVI filed with the SEC its quarterly report on a Form 10-Q for the

second quarter 2002 in which Individual Defendants confirmed the Company's previously announced

results and stated:

> The accompanying consolidated financial statements have been prepared
> pursuant to the rules and regulations of the Securities and Exchange
> Commission.  Accordingly, they do not include all of the information and
> footnotes required by accounting principles generally accepted in the
> United States of America (GAAP) for complete financial statements.
> The consolidated financial statements should be read in conjunction with
> the financial statements and notes thereto included in our latest annual
> report on Form 10-K for the fiscal year ended June 30, 2001.
>
> In the opinion of management, the consolidated financial statements
> contain all adjustments, consisting only of normal recurring adjustments,
> considered necessary for a fair presentation of the consolidated balance
> sheets as of December 31, 2001 and June 30, 2001, the consolidated
> statements of operations for the three and six month periods ended
> December 31, 2001 and 2000, the consolidated statements of
> shareholders' equity for the period from June 30, 2000 through
> December 31, 2001, and the consolidated statements of cash flows for
> the six month periods ended December 31, 2001 and 2000.  The results
> of operations for the three and six month periods ended December 31,
> 2001 are not necessarily indicative of the results of operations to be
> expected for the fiscal year ending June 30, 2002.

DVI, Inc., Quarterly Report (December 31, 2001).

Individual Defendants represented DVI's assets, liabilities, shareholder equity, and net earnings as
follows:

|  | December 31, 2001 | June 30, 2001 |
| --- | --- | --- |
| Total Shareholders' Equity | $232,138 | $222,225 |

| Total Liabilities and Shareholders' Equity | 1,610,286 | 1,477,691 |
|---|---|---|
|  |  |  |
| Total Assets | 1,610,286 | 1,477,691 |

|  | Three Months ended December 31, | | |
|---|---|---|---|
|  | 2001 | | 2000 |
| Net Earnings | $6,273 | | $1,243 |

*Id.*

38.     On March 25, 2002, DVI issued a press release over PR NEWSWIRE entitled "DVI Raises

$25 Million of New Capital" in which DVI announced that it had completed an offering of 7.5 percent

convertible notes for total proceeds of $25 million.  In the release, Individual Defendants stated, in

relevant part, as follows:

> DVI, Inc. (NYSE: DVI), a leading independent healthcare financier,
> announced it has completed the sale of $25 million of its subordinated
> convertible notes to a single international investor.  DVI agreed with the
> investor that the proceeds from the issue would be used to support the
> growth in DVI's medical equipment financing operations in selected
> foreign countries.
>
> The newly issued notes bear interest at 7.5% per year, and mature in
> 2009.  DVI may call the notes after four years at a premium.  The notes
> are convertible into share of common stock of DVI at an initial
> conversion price of $20.00 per share, subject to customary anti-dilution
> provisions.  DVI entered into a separate registration rights agreement
> covering the shares available upon conversion of the notes.

Press Release, DVI, Inc., *DVI Raises $25 Million of New Capital*, PR Newswire (March 25, 2002).

17

In the release, Defendant O'Hanlon touted the offering as a major step toward boosting DVI's continued growth: "This is a very important and necessary step to increasing the capital base of DVI to support the expected growth in our business across all markets.  This initiative demonstrates our ability to raise new capital in the current environment...".  *Id.*

39.     On May 13, 2002, DVI issued a press release over PR NEWSWIRE entitled "DVI Reports Third Quarter and Nine Month Results" in which Individual Defendants stated that DVI's financial results were impaired as a result of unstable economic conditions in Argentina.  In the release, Individual Defendants commented, in relevant part:

> For the quarter ended March 31, 2002, the Company reported a net loss of $9.2 million, or $0.64 per diluted share, compared to net earnings of $5.0 million, or $0.33 diluted earnings per share for the same period in its previous fiscal year.  The current year results reflect $15.7 million in charges relating to the Company's operations in Argentina and the impairment of its investments in Corvis Corporation and Claimsnet.com.

> * Due to the loss in the third quarter, DVI must recognize the anti-dilutive effect of 1.6 million shares to calculate the loss for the quarter of $0.64 per diluted share.  For comparison, the calculation is also shown including the 1.6 million shares to calculate a diluted earnings per share of $0.42 for the quarter had earnings not included the net charges for the Argentinean exposure and the impairment on investments.

Press Release, DVI, Inc., *DVI Reports Third Quarter and Nine Month Results*, PR Newswire (May 13, 2002).

Despite DVI's losses in the third quarter, Defendant O'Hanlon reassured investors of the Company's continued success:

> "The charges for the Argentinean operation and the impairment of investments were not unexpected and are the result of continued economic decline in two unrelated markets. We have provided details on both of these matters in a previous release."
> Mr. O'Hanlon commented further, "DVI is having a very good year, driven by strong

business activity in a healthcare environment that continues to expand dramatically. New loan origination and credit commitments for the quarter of $331 million increased 22% this quarter compared to the third quarter last fiscal year. For the nine months to date, total originations were an impressive $967 million, up 33% over the same period last fiscal year. The outlook for the healthcare sector is excellent, and DVI intends to take full advantage of the growing opportunities to build its earnings base and expand its unique market position."

*Id.*

As a result of DVI's losses in Argentina and its purported need for additional time to analyze and disclose the impact of its exposure in the country, the Company failed to file its third quarter report with the SEC within the prescribed period.

40. On May 20, 2002, DVI filed with the SEC its quarterly report for the third quarter of 2002 in which Individual Defendants stated, in relevant part, as follows:

> The accompanying consolidated financial statements have been prepared pursuant to the rules and regulations of the Securities and Exchange Commission. Accordingly, they do not include all of the information and footnotes required by generally accepted accounting principles (GAAP) for complete financial statements. The consolidated financial statements should be read in conjunction with the financial statements and notes thereto included in our latest annual report on Form 10-K for the fiscal year ended June 30, 2001.
> In the opinion of management, the unaudited consolidated interim financial statements contain all adjustments, consisting only of normal recurring adjustments, considered necessary for a fair presentation of the interim periods presented.

DVI, Inc., Quarterly Report (March 31, 2002).

Individual Defendants represented DVI's assets, liabilities, shareholder equity and net earnings as follows:

|  | March 31, 2002 | June 30, 2001 |
|---|---|---|
| Total Shareholders' Equity | $232,587 | $222,225 |

19

| Total Liabilities and Shareholders' Equity | 1,638,010 | 1,477,691 |
|---|---|---|
| | | |
| Total Assets | 1,638,010 | 1,477,691 |

Nine Months ended

| | March 31, 2002 | | March 31, 2001 |
|---|---|---|---|
| Net Earnings | $3,191 | | $12,677 |

*Id.*

41.     On September 27, 2002, DVI issued a press release announcing DVI's fourth quarter and year-end results for fiscal 2002.  In the release, Individual Defendants reported a $7.3 million loss in the fourth quarter, or $0.50 per diluted share, and a $4.1 million loss for the full year, or $0.28 per diluted share.  Defendant O'Hanlon commented on the quarter and year-end results as follows:

> "Charges in the quarter reflect prudent adjustments to current values of investments, repossessed property and to bolster reserves.  Also included in the quarter was a charge to reflect our interest in certain healthcare companies and a charge in our Third Coast Capital unit, which we are positioning for possible sale.  Some of these investments represent situations where we have retained, rather than liquidated, our position in these companies based upon our assessment of the potential value they offer our shareholders.  Excluding these mostly non-cash charges, the Company had a good year and our business prospects remain healthy."

> Mr. O'Hanlon commented further, "The outlook for the healthcare business sector is very favorable and one in which DVI will continue to grow.  We are a dominant player in the healthcare financing market with the ongoing support of our clients, lenders and vendors.  Nonetheless, we recognize the need to re-evaluate periodically all our business activities and to focus our capital and other resources on our core and most profitable business areas.  As part of our future growth strategy,

> we will de-emphasize some areas, while providing more support to
> areas such as DVI Business Credit.  We also plan to take advantage of
> the exciting opportunities available to us through the operations of
> healthcare companies in which DVI has an interest.  I am convinced that
> DVI is well positioned to continue its growth in the new fiscal year."

Press Release, DVI, Inc., *DVI Reports Fourth Quarter and Year-End Results* (Sept. 27, 2002).

42.     On October 31, 2002, DVI issued a press release over BUSINESS WIRE entitled "DVI

Reports First Quarter Earnings of $5.1 Million, $0.33 Per Share; Company Focusing Resources on

Core Business Strengths".  In the release, Individual Defendants stated, in relevant part, as follows:

> DVI, Inc. (NYSE: DVI), an independent specialty finance company for
> healthcare providers worldwide, today announced results for the first
> quarter ended September 30, 2002.
>
> For the first quarter ended September 30, 2002, the Company reported
> net income of $5.1 million, or $0.33 per diluted share. compared with
> net income of $6.2 million or $0.40 per diluted share for the first quarter
> ended September 30, 2001.  The Company's book value per share at
> September 30, 2002, increased to $15.85.  Loan origination volume
> was $278.4 million for the quarter.

Press Release, DVI, Inc., *DVI Reports First Quarter Earnings of $5.1 Million, $0.33 Per Share;
Company Focusing Resources on Core Business Strengths*; Business Wire (October 31, 2002).

In the release, Defendant O'Hanlon credited DVI's stronghold on the domestic market for its success:

> "Our core domestic business possesses a unique and powerful market
> position.  Our mission is to redirect our resources from less productive
> areas and allocate them to this proven growth vehicle.  We began this
> initiative at the end of our last fiscal year, and our efforts continued in the
> first quarter.  As we carry out this transition from DVI's lower
> contribution businesses, we expect to see measurable improvements."
>
> Mr. O'Hanlon continued, "We are committed to sustaining and
> enhancing the solid trends in our core domestic business.  Our initiatives
> include:  –  Utilizing the strong cash flow in our core business to support
> our domestic business model;

* * *

In closing, Mr. O'Hanlon added, **"It is clear that we have tremendous earnings power and sufficient capital and liquidity within DVI to support our future domestic growth.  We are hard at work executing strategies to redirect resources from underperforming areas to our domestic large-ticket equipment and medical receivables businesses.  We are committed to demonstrating our resolve in this realignment of our business and are comforted by the fact that we have a solid core business that supports execution of intelligent improvements over a realistic time frame that preserves business relationships and the very best of our strong business platform.  We are making real progress, and I continue to be excited and confident about the future of our company."** [Emphasis added.]

*Id.*

43.    On October 15, 2002, DVI filed with the SEC its annual report on a Form 10-K.  The

Form 10-K contained a report from DVI's independent auditors, Deloitte & Touche LLP concerning

the Company's financial statements contained therein, which stated as follows:

> We have audited the accompanying consolidated balance sheets of DVI, Inc. and its subsidiaries (the "Company") as of June 30, 2002 and 2001, and the related consolidated statements of operations, shareholders' equity and cash flows for each of the three years in the period ended June 30, 2002.  These financial statements are the responsibility of the Company's management.  Our responsibility is to express an opinion on these financial statements based on our audits.

> We conducted our audits in accordance with auditing standards generally accepted in the United States of America.  Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement.  An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements.  An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation.  We believe that our audits provide a reasonable basis for our opinion.

22

> In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of DVI, Inc. and its subsidiaries as of June 30, 2002 and 2001, and the results of their operations and their cash flows for each of the three years in the period ended June 30, 2002 in conformity with account principles generally accepted in the United States of America.

DVI, Inc., Annual Report (June 30, 2002).

Individual Defendants represented DVI's assets, shareholder equity, and net earnings as follows:

|  | Year ended June 30, | | |
|  | 2002 | | 2001 |
| --- | --- | --- | --- |
| Net Earnings (Loss) | ($ 4,088) | | $18,435 |
|  |  | | |
| Shareholders' Equity | 229,645 | | 222,225 |
|  |  | | |
| Net Financed Assets | 1,419,320 | | 1,248,978 |

*Id.*

44.    On November 13, 2002, DVI filed with the SEC its quarterly report for the first quarter

2003 in which Individual Defendants stated, in relevant part, as follows:

> The accompanying consolidated financial statements have been prepared pursuant to the rules and regulations of the Securities and Exchange Commission.  Accordingly, they do not include all of the information and footnotes required by accounting principles generally accepted in the United States of America ("GAAP") for financial statements.  The consolidated financial statements should be read in conjunction with the financial statements and notes thereto included in our latest annual report filed on Form 10-K for the fiscal year ended June 30, 2002.

> In the opinion of management, the unaudited consolidated interim financial statements contain all adjustments, consisting only of normal recurring adjustments, considered necessary for a fair presentation of the

interim periods presented.

DVI, Inc., Quarterly Report, Consolidated Balance Sheets (September 30, 2002).

Individual Defendants represented DVI's assets, liabilities, shareholder equity, and net earnings as follows:

|  | September 30, 2002 | June 30, 2002 |
|---|---|---|
| Total Shareholders' Equity | $235,080 | $229,645 |
| Total Liabilities and Shareholders' Equity | 1,677,003 | 1,672,045 |
|  |  |  |
| Total Assets | 1,677,003 | 1,672,045 |

| | Three Months ended September 30, | | |
|---|---|---|---|
| | 2002 | | 2001 |
| Net Earnings | $5,073 | | $6,160 |

*Id.*

45.     On November 14, 2002, DVI issued a press release over BUSINESS WIRE announcing

DVI's completion of a $462 million equipment lease asset securitization, the largest in the Company's

history.  In the release, Individual Defendants stated, in relevant part:

> To date, DVI has completed 31 asset-backed securitizations, and since the initial transaction in 1991, the Company has placed $4.8 billion of such asset-backed notes in the market.  **The securitized assets are comprised of loans and leases secured by medical equipment.** [Emphasis added.]

Press Release, DVI, Inc., *DVI Closes $462 Million Asset-Backed Securitization*, Business Wire (November 15, 2002).

In the release, Defendant Garfinkel commented on the transaction as follows:

24

"We are especially pleased with this transaction and together with an earlier transaction, it made 2002 a record year with $917 million placed. This transaction was completed during a period impacted by several market distractions, including the political elections and Federal Reserve Bank action on interest rates.  This reconfirms our favorable opinion regarding the stability and reliability of the ABS market, which continues to be a cornerstone in our financing structure.  This new milestone transaction completes the cycle for our securitizations for this calendar year and offers DVI early momentum for 2003."

*Id.*

46.     On February 13, 2003, DVI issued a press release over BUSINESS WIRE entitled "DVI Second Quarter Net Income at $5.2 million with EPS of $0.35" reporting $5.2 million net income in the second quarter of fiscal 2003, or $0.41 per diluted share.  In the release, Defendant O'Hanlon stated as follows:

"DVI is having a good year.  In November 2002, we successfully completed a $462 million asset-backed securitization, which is the largest in our history.  We are encouraged by the continued growth in earnings and returns in our domestic equipment financing business, which are being achieved despite a very soft U.S. economy.  This growth highlights the value DVI derives from its sole focus on the healthcare sector, where we benefit from the stable and steady growth enjoyed by that market segment."

Mr. O'Hanlon commented further, ... "We are optimistic that we will accomplish all our operating objectives and that our strong position in healthcare financing will continue to offer DVI a base to further extend our profitable growth." [Emphasis added.]

Press Release, DVI, Inc., *DVI Second Quarter Net Income at $5.2 Million With EPS of $0.35*, Business Wire (February 13, 2003).

47.     On February 14, 2003, DVI filed with the SEC its quarterly report for its second quarter of fiscal 2003 in which Individual Defendants stated, in relevant part, as follows:

The accompanying consolidated financial statements have been prepared pursuant to the rules and regulations of the Securities and Exchange Commission.  Accordingly, they do not include all of the information and footnotes required by accounting principles generally accepted in the United States of America ("GAAP") for complete financial statements. The consolidated financial statements should be read in conjunction with the financial statements and notes thereto included in our latest annual report filed on Form 10-K for the fiscal year ended June 30, 2002.

In the opinion of management, the unaudited interim financial statements contain all adjustments, consisting only of normal recurring adjustments, considered necessary for a fair presentation of the interim periods presented.

DVI, Inc., Quarterly Report, *Note 1: Basis of Presentation* (December 31, 2002).

Individual Defendants represented DVI's assets, liabilities, shareholder equity, and net earnings as follows:

|  | December 31, 2002 | June 30, 2002 |
|---|---|---|
| Total Shareholders' Equity | $ 245,288 | $ 229,645 |
| Total Liabilities and Shareholders' Equity | 1,671,848 | 1,672,045 |
|  |  |  |
| Total Assets | 1,671,848 | 1,672,045 |

|  | Three Months ended December 31, | | |
|---|---|---|---|
|  | 2002 | | 2001 |
| Net Earnings | $5,237 | | $6,273 |

DVI, Inc., Quarterly Report, Consolidated Balance Sheet (December 31, 2002).

48.    On March 21, 2003, DVI issued a press release over BUSINESS WIRE announcing the

closing of a $75 million credit facility to support DVI's medical receivables subsidiary, DVI Business

Credit Corporation.  Defendant O'Hanlon commented on the transaction as follows:

> "This financing arrangement for our medical records accounts
> receivables unit adds significant additional funding capacity for our
> receivables financing business. Through this commitment, Nomura has
> demonstrated that it is a knowledgeable and committed financing
> partner."

Press Release, DVI, Inc., *DVI Credit Corporation Closes $75 Million Credit Facility*, Business Wire
(March 21, 2003).

49.     On May 12, 2003, DVI issued a press release reporting DVI's financial results for the third

quarter of fiscal 2003.  In the release, Individual Defendants reported $3.0 million net income, or $0.20

per diluted share, for the quarter.  Defendant O'Hanlon commented on DVI's performance as follows:

> "We are making good progress in executing our previously announced
> strategic initiatives designed to focus attention on our core domestic
> healthcare business and address our Third Coast Capital and
> international operations.  These actions are intended to materially reduce
> financial leverage, while significantly improving profitability and liquidity.
> I am satisfied with our financial results this quarter and with the progress
> we are making in implementing our major strategic initiatives."

> \* \* \*

> Commenting on the Company's outlook, Mr. O'Hanlon noted, "The
> healthcare industry remains vibrant and strong, and there continues to be
> an opportunity to improve our market share in this sector.  This optimism
> is supported by a stable to improving reimbursement environment, a
> growing base of medical science utilizing high-tech medical equipment
> and explosive growth in the aging of our population."

Press Release, DVI, Inc., *Third Quarter Net Income at $3.0 Million - $0.20 EPS*, Business Wire
(May 12, 2003)

50.     On May 14, 2003, DVI issued a press release announcing the closing of another credit facility,

this time valued at $100 million, to be available for DVI's wholly-owned subsidiary, DVI Financial

Services Inc., to finance loans and leases of medical equipment.  In the release, Individual Defendants

stated as follows:

> This credit facility, issued by West LB AG, New York Branch, will provide interim, or warehouse, financing for DVI's domestic medical equipment leasing business with permanent financing generated from the proceeds of periodic asset-based securitization transactions.  West LB will provide this financing through its Paradigm Funding LLC commercial paper conduit program.

Press Release, DVI, Inc., *DVI Closes New $100 Million Credit Facility; New Facility to Finance Medical Equipment Leasing Business*, Business Wire (May 14, 2003).

Defendant O'Hanlon commented on the significance of the credit facility on DVI's business:

> We are very pleased to have West LB as one of our new funding sources.  This additional credit capacity will play a key role in the growth of our core domestic business.  We look forward to a long term and profitable working relationship with West LB and its parent organization.

*Id.*

## THE TRUTH BEGINS TO EMERGE

51.    The truth began to emerge on May 20, 2003, when DVI filed with the SEC its quarterly report for the third quarter of fiscal 2003 and disclosed a material disagreement with its auditor, Deloitte & Touche, LLP, with respect to DVI's accounting of a series of transactions at its Corpus Christi facility from September 2001 to June 2002.  In the report, Individual Defendants stated, in relevant part, as follows:

> The accompanying consolidated financial statements have been prepared pursuant to the rules and regulations of the Securities and Exchange Commission.  Accordingly, they do not include all of the information and footnotes required by accounting principles generally accepted in the United States of America ("GAAP") for complete financial statements. The consolidated financial statements should be read in conjunction with the financial statements and notes thereto included in our latest annual report filed on Form 10-K for the fiscal year ended June 30, 2002.

In the opinion of management, the unaudited consolidated interim financial statements contain all adjustments, consisting only of normal recurring adjustments, considered necessary for a fair presentation of the interim periods presented.

* * *

**Note 11.Corpus Christi Radiology Facility**

The Company has been reviewing the accounting treatment applied in these financial statements and in prior financial statements to a series of transactions involving a radiology facility located in Corpus Christi, Texas.  It is possible that, after it completes that review, the Company may change its accounting treatment for those transactions.  **If that change were made, the Company's total assets and shareholder's equity would decrease by approximately $2.6 million and $1.8 million, respectively.  In addition, net income would be reduced by approximately $121,000 and $360,000, for the three and nine months ended March 31, 2003, respectively.**

We retained Deloitte & Touche, our independent accountants, to review the financial statements contained in this report, and they have performed the review we requested of them.  They have advised us that because the matter described in this footnote has not been resolved, their review "is not complete".  Their letter to that effect is attached as an exhibit to this report.  **Since Deloitte performed the review that we requested, we do not accept their characterization.  We interpret the comment, in light of their other advice to us, to mean they are not in a position to agree or disagree with the accounting treatment we have applied to the Corpus Christi Center transactions referred to above.** [Emphasis added.]

DVI, Inc., Quarterly Report (March 31, 2003).

52.    On June 4, 2003, the Company announced in a press release that Deloitte & Touche LLP had resigned as DVI's auditors[4], but it was not until June 9, 2003, that DVI revealed the reasons

---

[4]  Press Release, DVI, Inc., *DVI In Process of Selecting New Author*, Business Wire (June 4, 2003)

therefor included the Company's accounting for the transactions at the Corpus Christi facility, as well as

DVI's lack of internal controls relating to its monitoring of non-performing and impaired assets, and its

accounting and reporting procedures for non-recurring transactions.  Individual Defendants stated in

relevant part as follows:

> Reference is made to the second paragraph of Note 11 to the interim
> financial statements included in the Company's quarterly report on Form
> 10-Q.  For the period ended March 31, 2003 (the "Form 10-Q"), as
> filed with the SEC on May 20, 2003, and to the letter, dated May 20,
> 2003, from Deloitte to the Company and filed as an exhibit to the Form
> 10-Q, for a description of a disagreement between Deloitte and the
> Company regarding the status of the review performed by Deloitte in
> respect of the interim financial statements included in the Form 10-Q.
> Deloitte has advised the Company that its review is not complete; the
> Company disagrees with Deloitte's position.  **Deloitte told the
> Company that the only aspect of its review that was not
> completed to its satisfaction related to the accounting treatment
> for a series of transactions that occurred between September
> 2001 and June 2002, and were reflected in the Company's audited
> financial statements at and for its fiscal year ended June 30,
> 2002.  Deloitte had requested that the Company generate
> additional documentation (such as affidavits of third parties) that
> would help determine whether the accounting treatment for the
> series of transactions should be revised.  The Company believes
> Deloitte's review was completed when Deloitte had examined and
> analyzed all documentation that existed on the date the Form 10-
> Q was filed.**
>
> The accounting treatment for the transactions in question that is reflected
> in the interim financial statements included in the Form 10-Q is the same
> treatment reflected in the Company's audited financial statements at and
> for the fiscal year ended June 30, 2002.  Deloitte has not advised the
> Company to change the accounting treatment for that series of
> transactions; however, if the accounting treatment were changed, **the
> effect on the Company's balance sheet would be a reduction in
> shareholders' equity of approximately $1.8 million**.  Shareholders'
> equity at March 31, 2003 was $250.7 million.

Subsequent to the filing of the Form 10-Q, Deloitte advised the Company that it believed an amendment to the Form 10-Q should be filed (i) to more prominently disclose Deloitte's position that its review had not been completed and (ii) to delete the second paragraph of Note 11 to the interim financial statements included in the Form 10-Q, in which the Company explained its disagreement with Deloitte's position. Since the Company disagrees with Deloitte's contention that Deloitte did not review the interim financial statements included in the Form 10-Q, it did not make the amendment proposed by Deloitte.

On May 29, 2003, Deloitte requested that the Company's Audit Committee take action to generate additional information regarding the nature and business purpose of the transactions referred to in the first paragraph of Note 11 to the interim financial statements contained in the Form 10-Q. Deloitte informed the Company that the requested information would be used to decide whether the accounting treatment for the transaction referred to above should be revised. The Audit Committee promptly began the suggested information-gathering process and, at Deloitte's recommendation, retained independent counsel to assist it in that process. The information-gathering process has continued since Deloitte's resignation.

* * *

In connection with its audit of the Company's financial statements at and for the year ended June 30, 2002, **Deloitte advised the Company that it had identified weaknesses in internal controls, which included two reportable conditions. One reportable condition, which was deemed a material weakness, related to the Company's monitoring of non-performing assets and the Company's assessment of impaired assets. The other reportable condition related to weaknesses in the Company's accounting and financial reporting policies and procedures for non-systematic (non-recurring) transactions.** Deloitte's recommendations for resolving these reportable conditions principally comprised reviewing or adopting written policies and procedures and assigning responsibilities for implementation within the organization. Subsequently, the Company took actions to address these reportable conditions, and believes they have been appropriately resolved. [Emphasis added.]

Press Release, DVI, Inc., *DVI, Inc. Files 8-K Relating to Deloitte & Touche LLP Resignation*, Business Wire (June 9, 2003).

In reaction to this news, the price of DVI common stock closed on June 4, 2003 at $7.10 per share, down $0.81 or 10.24 percent from its previous day's closing price.

53.     On June 19, 2003, DVI filed with the SEC a Form 8-K/A, attaching Deloitte & Touche's letter of resignation, which stated, contrary to Individual Defendants' representations, that the incomplete aspects of Deloitte & Touche's review was not limited to one matter.  The letter explained, in relevant part, as follows:

> We indicated that the principal outstanding issues in our review related to certain transactions occurring from March 1999 through October 2002 and the accounting for certain investments resulting from such transactions which, to the best of our knowledge, continued to be held by the Company through the date of our resignation.  We further indicated that the resolution of these and certain other accounting matters could give rise to additional issues to be considered.  **We did not indicate that the series of transactions referred to by the Company were the only aspect of our review that was not complete.**  Management and the Board of Directors were fully informed that our review was not complete prior to the filing by the Company of the Form 10-Q with the SEC on May 20, 2003. [Emphasis added.]

DVI, Inc., Form 8-K/A (June 2, 2003), Exhibit 16.1, Letter dated June 17, 2003, from Deloitte & Touche LLP to the Commission, pl.

54.     On June 27, 2003, DVI filed with the SEC a Form 10-Q/A for the third quarter 2003 and a Form 8-K/A amending the Company's original quarterly report filed on May 20, 2003.  In the amended filings, the bad news concerning DVI's operations continued to emerge as Individual Defendants revealed that the SEC had rejected its Form 10-Q, explaining in relevant part, as follows:

> The Company has been advised that the staff of the Securities and Exchange Commission (the "staff") has taken the position that this **report is deficient because the interim financial statements contained in this report have not been reviewed by an independent public accountant[.]** [Emphasis added.]

DVI, Inc., Current Report, p.1 (June 2, 2003).

* * *

> The Company is continuing to consider the need to change the accounting treatment for the transactions referred to in Note 11 to the interim financial statements contained in this report.  **If that change were made, the Company's total assets and shareholders' equity as of March 31, 2002 would decrease by approximately $1,806,000, or 0.11% and $1,082,000, or 0.47% respectively.  In addition, net income would be reduced by approximately $1,419,000, a decrease of approximately 44.47%.** [Emphasis added.]

DVI, Inc., Quarterly Report, p.2 (March 31, 2003).

The market's reaction to DVI's disclosure was swift and drastic as the price of DVI common stock closed at $4.30 per share, down $1.54 or 26.37 percent from its previous day's closing price.

55.     On July 16, 2003, DVI issued a press release over BUSINESS WIRE further disclosing that DVI had defaulted under the Indenture on its 9 7/8 percent Senior Notes for failure to file a quarterly report for the third quarter 2003.  In the release, Individual Defendants stated as follows:

> DVI, Inc. (NYSE: DVI) received a Notice of Default from U.S. Bank National Association, the Trustee under the Indenture, dated as of January 27, 1997, between DVI and the Trustee (the "Indenture) relating to DVI's 9 7/8% Senior Notes due 2004 (the "Notes"), indicating that DVI failed to satisfy its obligation under Section 703(1) of the Indenture to file its quarterly report on Form 10-Q for the period ended March 31, 2003.

* * *

> If the Trustee does not rescind the Note of Default promptly, DVI expects to address this issue by either challenging the validity of the Trustee's Notice of Default or seeking a waiver or modification from the holders of Notes representing not less than a majority in principal amount of the outstanding Notes, or both.

33

> Pursuant to the Indenture, DVI will have 60 days from the date of the
> Notice of Default to cure the purported noncompliance with the
> Indenture.  Neither the Trustee nor the holders of the Notes may
> exercise any remedies until after the 60-day cure period has elapsed.

Press Release, DVI, Inc., *DVI Receives Notice of Default on Senior Notes*, Business Wire (July 16, 2003).

Again, the market reacted adversely to the news of DVI's default, causing the price of DVI common stock to plummet another 10 percent or $0.47 to close at $4.23 per share on the same day. On July 17, 2003, the Company announced that the notice of default had been rescinded and that BDO Seidman, LLP had been retained as DVI's new independent auditor.

56.     On August 1, 2003, DVI shocked investors when it issued a press release over BUSINESS WIRE announcing that DVI would not be able to make interest payments on its Senior Notes.  In the release, Individual Defendants stated, in relevant part, as follows:

> DVI, Inc. (NYSE: DVI) announced today that it will not make the
> scheduled interest payment due today on its 9 7/8% Senior Notes due
> 2004.  Under the terms of the Indenture governing the notes, the failure
> to make the interest payment may be cured by DVI within 30 days.
>
> **DVI's inability to make the interest payment due on the notes is a
> result of the severe liquidity constraints DVI is currently facing.
> DVI's liquidity began to tighten as certain of its lenders reduced
> advance rates following the announcement of credit rating
> downgrades.  DVI's liquidity problems were further exacerbated
> as the result of a shortfall in the amount of qualifying collateral
> supporting its borrowings under its principal bank lending facility.
> The shortfall has triggered a default under the facility.  DVI is
> currently in discussions with its bank lenders to resolve these
> issues.**
>
> DVI intends to consider all alternatives available to it to secure funds to
> make the interest payment due on the notes and improve its liquidity.
> DVI and its financial advisors had already commenced discussions with

34

various prospective lenders and other sources of funding and has received several proposals for both short term and long term solutions. However, there are several conditions that must be met to conclude these transactions, including completion of due diligence and negotiation of mutually acceptable documentation.  No assurances can be provided that any of the transactions contemplated will be consummated in the next 30 days or at all.  Even if DVI is able to complete a limited short term financing transaction of the type discussed with certain potential lenders, it will face significant future challenges, including the need to refinance or re-negotiate various credit agreements.

The failure of DVI to obtain additional financing or resolve the defaults with respect to its bank lending facilities and notes could have a serious adverse effect on DVI's business and on the value of DVI's debt and equity securities. [Emphasis added.]

Press Release, DVI, Inc., *DVI Announces Failure to Make Interest Payment*, Business Wire (August 1, 2003).

In reaction to DVI's press release, the price of DVI stock fell 40.48 percent from its previous day's trading to close at $2.50 per share on August 1, 2003.

57.     On August 4, 2003, after the market closed, DVI further shocked the market with the news that neither DVI nor its subsidiaries had remaining availability on **any** of their credit facilities and that the Company was actively considering filing for Chapter 11 Bankruptcy protection.  In the release, Individual Defendants stated, in relevant part:

DVI, Inc. (NYSE: DVI) announced today that neither it nor any of its wholly-owned subsidiaries has any remaining availability under its or their various credit facilities.  Defaults exist under a number of these facilities, some of which entitle the applicable debtholders to accelerate the respective indebtedness owed under some of the facilities.  DVI is discussing waivers or grants of forbearance with these lenders, while at the same time seeking to address its near-term liquidity requirements through new short-term borrowings or asset sales.

DVI is actively pursuing various alternatives in order to address its

35

> situation.  These alternatives include recapitalization, sale of its entire
> business or some or all of its assets, and a Chapter 11 bankruptcy filing.
>
> The failure of DVI to obtain additional funding or resolve any existing or
> future defaults with respect to its bank lending facilities and other debt or
> the commencement of bankruptcy proceedings could have a serious
> adverse effect on DVI's business and on the value of DVI's debt and
> equity securities.

Press Release, DVI, Inc., *DVI Seeking to Address Liquidity Constraints*, Business Wire (August 4, 2003).

Again, the price of DVI stock plummeted in reaction to its announcement.  On August 5, 2003, the price per share of DVI stock closed at $0.93, down 33.57 percent from its previous day's trading.

58.     The statements referenced above in paragraphs 27 through 55 were materially false and misleading when made because they failed to disclose the following facts, among others:

1.     the Company had failed to timely write down the value of certain assets that were non-performing or had become impaired, thereby overstating net income;

2.     contrary to its express representations, the Company did not have sufficient earnings potential nor liquidity to sustain its operations;

3.     contrary to its express representations, the Company's reported results were not prepared in accordance with GAAP and did not fairly present the financial condition of the Company;

4.     the Company lacked adequate internal controls to properly account for and report non-systematic (non-recurring) transactions; and

5.     that the Company's reported positive results were attributable in material part to improper accounting rather than strong business activity in its medical receivables unit, financing state-of-the-art medical equipment, or growth of its international business.

36

59.     On August 13, 2003, the last day of the Class Period, Individual Defendants or DVI  issued a

press release over BUSINESS WIRE after the market had closed announcing its intention to file for

Chapter 11 Bankruptcy protection, and that Defendant Garfinkel had been suspended from his duties ad

DVI's Chief Financial Officer.  In the release, DVI, citing severe financial difficulties and accounting

irregularities, stated in relevant part, as follows:

> DVI, Inc. (NYSE: DVI) today announced that it will seek to make a
> filing under Chapter 11 of the United States Bankruptcy Code in the
> next few days.  DVI has not currently secured debtor-in-possession
> financing.  In addition, DVI's chief financial officer, Steven Garfinkel, has
> been placed on administrative leave and Anthony Turek and John Boyle
> have been assigned the functions of the office of chief financial officer.
> Despite extensive discussion with potential funding sources, DVI was
> unable to arrange for the funding required to continue operations.  **Its
> attempts to address its problems through a sale or recapitalization
> have been hindered by the recent discovery of apparent
> improprieties in its prior dealings with lenders involving
> misrepresentations as to the amount and nature of collateral
> pledged to lenders.**  An investigation into those improprieties has been
> commenced by DVI's audit committee but is not yet complete.
> [Emphasis added.]

Press Release, DVI, Inc., *DVI to Seek Bankruptcy Protection*, Business Wire (August 13, 2003).

In reaction to DVI's announcement, the price per share of DVI stock fell from $0.80 to $0.30 per

share, representing a one-day decline of 62.50 percent.

60.     Immediately following this announcement, on August 14, 2003, the New York Stock

Exchange suspended trading of DVI's common stock and Senior Notes, pending delisting.

61.     On August 25, 2003, DVI filed for Bankruptcy protection as a result of "unsuccessful

diversification strategy, unsuccessful integration of business units, decreased profitability, concerns

regarding near-term liquidity requirements and the recent discovery of possible accounting irregularities."

On that same day, Defendant O'Hanlon resigned as the Company's Chief Executive Officer.

62.     Sometime after DVI's Chapter 11 filing, undersigned contacted the Company's officials, who explained that the reason for DVI's imploding was the bank's discovery that Merrill Lynch, together with Garfinkel, had caused DVI to give Merrill Lynch additional collateral concealed from the public, the discovery of which had triggered the bank's decision to freeze DVI's access to its borrowing lines. Merrill Lynch was at all times privy to nonpublic information about the company's financial situation, including the conflict of its undisclosed additional collateral, and actively concealed these from the investing public for Merrill's own interests.

## UNDISCLOSED ADVERSE INFORMATION

63.     The market for DVI's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, DVI's common stock traded at artificially inflated prices during the Class Period.  The artificial inflation continued until at least August 13, 2003.  Plaintiff and other members of the Class purchased or otherwise acquired DVI securities relying upon the integrity of the market price of DVI's securities and market information relating to DVI, and have been damaged thereby.

64.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of DVI's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, including, **inter alia**:

38

1.      that the Company's financial statements were not prepared in accordance with GAAP and/or in accordance with the federal securities laws and SEC regulations concerning fair reporting;

2.      that the Company had violated GAAP and its own accounting policies by failing to write down non-performing or impaired assets;

3.      that the Company's seeming growth was, in material part, the result of improper accounting;

4.      that the nature and amount of collateral pledged to the Company's lenders to secure hundreds of millions of dollars in credit facilities was actually different than what the Company represented; and

5.      that the Company lacked material internal controls to properly maintain its operations.

65.    At all relevant times, the material representations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiffs and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about DVI's business, prospects and operations.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of DVI and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at artificially inflated

prices, thus causing the damages complained of herein.

**FALSE FINANCIAL STATEMENTS ISSUED DURING THE CLASS PERIOD**

66.     Individual Defendants represented that DVI's Class Period financial statements were prepared in accordance with GAAP.  As set forth herein, these representations were materially false and misleading because Individual Defendants caused DVI to issue false and misleading financial statements that misrepresented and/or artificially and improperly inflated the Company's operating results during the Class Period.

67.     As investors came to learn, DVI had been inflating its financial results and condition throughout the Class Period by overstating its assets and shareholder equity (thereby artificially decreasing its expenses and increasing its reported income).  Because of these accounting improprieties, DVI's financial statements were, contrary to its express representations contained in its quarterly and annual reports filed with the SEC, not prepared in accordance with Generally Accepted Accounting Principles.  GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time.  As set forth in Financial Accounting Standards Board ("FASB") Statements of Concepts ("Concepts Statement") No. 1, one of the fundamental objectives of financial reporting is that it provide accurate and reliable information concerning an entity's financial performance during the period being presented.  Concepts Statement No. 1, paragraph 42, states:

> Financial reporting should provide information about an enterprise's financial performance during a period.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' and creditors' expectations about future enterprise

40

performance, those expectations are commonly based at least partly on evaluations of past enterprise performance.

68. DVI has already admitted that its independent auditors concluded that the Company overstated its assets by $2.6 million and shareholder equity by $1.8 million, thereby materially inflating its results of operation and financial condition which materially misled investors about its past performance. As set forth in SEC Rule 4-01(a) of SEC Regulation S-X, "[f]inancial statements filed with the [SEC] which are not prepared in accordance with [GAAP] will be presumed to be misleading or inaccurate." 17 C.F.R. § 210.4-01(a)(1). Management is responsible for preparing financial statements that conform with GAAP. As noted by the AICPA professional standards:

> financial statements are management's responsibility . . . . [M]anagement is responsible for adopting sound accounting policies and for establishing and maintaining internal control that will, among other things, record, process, summarize, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. The entities transactions and the related assets, liabilities and equity are within the direct knowledge and control of management
>
> . . . . Thus, the fair presentation of financial statements in conformity with Generally Accepted Accounting Principles is an important and integral part of management's responsibility.

*Statement on Auditing Standards #1*; AU §110, paragraph .02

## ADDITIONAL SCIENTER ALLEGATIONS

69. As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of

41

such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding DVI, their control over, and/or receipt and/or modification of DVI's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning DVI, participated in the fraudulent scheme alleged herein.

70.     As a result of Defendants' scheme to deceive investors as to DVI's true financial condition, thereby causing the value of the Company's securities to become artificially inflated, Defendants were able to complete a $25 million offering of DVI's convertible Senior Notes, as well as enable them to obtain $175 million in credit facilities during the Class Period.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD-ON-THE-MARKET DOCTRINE

71.     At all relevant times, the market for DVI's securities was an efficient market for the following reasons, among others:

1.       DVI's stock met the requirements for listing, and was listed and actively traded on the New York Stock Exchange, a highly efficient and automated market;

2.       As a regulated issuer, DVI filed periodic public reports with the SEC and the New York Stock Exchange;

3.       DVI regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

42

4.      DVI was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

72.     As a result of the foregoing, the market for DVI's securities promptly digested current information regarding DVI from all publicly available sources and reflected such information in DVI's stock price.  Under these circumstances, all purchasers of DVI's securities during the Class Period suffered similar injury through their purchase of DVI's securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

73.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint.  Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Individual Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of DVI who knew that those statements were false when made.

43

**FIRST CLAIM**
**VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AGAINST AND**
**RULE 10b-5 PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS**

74.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

75.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of DVI's securities; and (iii) cause Plaintiffs and other members of the Class to purchase DVI's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Individual Defendants, and each of them, took the actions set forth herein.

76.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for DVI's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All Individual Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

77.     In addition to the duties of full disclosure imposed on Defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, Individual Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of

44

the SEC as embodied in SEC Regulation S-X (17 C.F.R. Sections 210.01 et seq.) and Regulation S-K

(17 C.F.R. Sections 229.10 et seq.) and other SEC regulations, including accurate and truthful

information with respect to the Company's operations, financial conditions and earnings so that the

market price of the Company's securities would be based on truthful, complete and accurate

information.

78.     Defendants, individually and in concert, directly and indirectly, by the use, means or

instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous

course of conduct to conceal adverse material information about the business, operations and future

prospects of DVI as specified herein.

79.     Defendants employed devices, schemes and artifices to defraud, while in possession of material

adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein

in an effort to assure investors of DVI's value and performance and continued substantial growth, which

included the making of, or the participation in the make of, untrue statements of material facts and

omitting to state material facts necessary in order to make the statements made about DVI and its

business operations and future prospects in the light of the circumstances under which they were made,

not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course

of business which operated as a fraud and deceit upon the purchasers of DVI's securities during the

Class Period.

80.     Each of Defendants' primary liability, and controlling person liability, arises from the following

facts: (i) Defendants were high-level executives and/or directors, or financial advisors of, at the

Company during the Class Period and members of the Company's management team or had control

45

thereof; (ii) each of the Defendants, by virtue of his responsibilities and activities as a senior officer and/or director or financial advisor of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of the Defendants enjoyed significant personal contact and familiarity with the other Individual Defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of the Defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

81.     Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such Individual Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing DVI's operating condition and future business prospects from the investing public and supporting the artificially inflated prices of its securities.  As demonstrated by Defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, the Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

82.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of DVI's securities was artificially inflated

during the Class Period.  In ignorance of the fact that market prices of DVI's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Individual Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Individual Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and other members of the Class acquired DVI securities during the Class Period at artificially high prices and were damaged thereby.

83.    At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiffs and the other members of the Class and the marketplace known of the true financial condition and business prospects of DVI, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their DVI securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

84.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

85.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM
## VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT
## AGAINST THE DEFENDANTS

86.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth

herein.

87.     Defendants acted as controlling persons of DVI within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.  Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent issuance of the statements or cause the statements to be corrected.

88.     In particular, each of the Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had, and exercised, the power to control or influence the particular transactions giving rise to the securities violations as alleged herein.

89.     As set forth above, Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

        **WHEREFORE**, Plaintiffs pray for relief and judgment, as follows

(a)      Determination that this action is a proper class action and appointing Plaintiffs as Lead

Plaintiffs and their counsel as Lead Counsel for the Class and certifying them as class representatives

under Rule 23 of the Federal Rules of Civil Procedure;

(b)      Awarding compensatory damages in favor of Plaintiffs and the other Class members

against all Individual Defendants, jointly and severally, for all damages sustained as a result of Individual

Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)      Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in

this action, including counsel fees and expert fees; and

(d)      Such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiffs hereby demands a trial by jury.

_____
                                          Attorney for Plaintiffs

Dated:  September 22, 2003

Clinton A. Krislov
Krislov & Associates, Ltd.
Civic Opera Building, Suite 1350
20 North Wacker Drive
Chicago, Illinois   60606

49