**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE DVI, INC. SECURITIES | : | CIVIL ACTION |
| LITIGATION | : | |
| | : | |
| | : | NO. 03-5336 |

<u>**MEMORANDUM & ORDER**</u>

Davis, J.                                                                              May 31, 2005

## I.      INTRODUCTION

This case is one of three related civil actions pending before this Court arising out of the

bankruptcy of DVI, Inc.  <u>See</u> <u>WM High Yield v. O'Hanlon</u>, No. 04-3423 (E.D. Pa. filed July 19,

2004); <u>Fleet Nat'l Bank v. Boyle</u>, No. 04-1277 (E.D. Pa. filed March 24, 2004).  Presently before

the Court are Defendants' Motions to Dismiss (Doc. Nos. 104, 105, 106, 107, 108, 109, 110,

112, 114, 115, 117, 119, 120, 121, 122, and 123) ("Mots. to Dismiss"), Plaintiffs' combined

Response in Opposition (Doc. No. 139) ("Pls.' Opp."), and Defendants' Replies thereto (Doc.

Nos. 152, 153, 156, 157, 158, 159, 160, 161, 162, 163, 164, 165, 166, and 168) ("Defs.'

Replies").  For the reasons set forth herein, Defendants' Motions to Dismiss are granted in part

and denied in part.

## II.     FACTUAL BACKGROUND AND PROCEDURAL HISTORY

This putative class action is brought on behalf of "all persons, other than Defendants . . .

who purchased or otherwise acquired the securities of DVI between August 10, 1999 and August

13, 2003, both dates inclusive (the 'Class Period')" who were allegedly damaged by Defendants'

violations of the federal securities laws with regard to the reporting of DVI Inc.'s financial

1

condition and results of operations, which artificially inflated the prices of DVI's publicly-traded securities.  (Compl. ¶¶ 3-4.)  Defendants in this action are: (1) DVI Executives Michael O'Hanlon, former President and Chief Executive Officer of DVI, a director of subsidiary DVI FS, and Member of DVI's Executive Committee; Stephen Garfinkel, former Executive Vice President and Chief Financial Officer of DVI and Member of the DVI Executive Committee; Richard Miller, Executive Vice President of DVI, President of subsidiary DVI FS, and a Member of the DVI Executive Committee; Anthony Turek, Executive Vice President, Chief Credit Officer, and a Member of the Executive Committee of DVI; John Boyle, Vice President and Chief Accounting Officer of DVI; and Terry Cady, Senior Vice President of DVI and President and Director of subsidiary DVI BC; (2) Members of DVI's Board of Directors Gerald Cohn, a Member of the Compensation and Credit Committees and an employee of DVI; Harry Roberts, a Member of the Compensation Committee, a Director of other DVI companies, and an employee of DVI; William Goldberg, a Member of the Audit and Compensation Committees; John McHugh, a Member of the Audit Committee; Nathan Shapiro, a Member of the Audit Committee; and (3) outside entities Deloitte & Touche, DVI's Auditor; Merrill Lynch & Co., Inc., DVI's Underwriter/Lender; Oncure Technologies Corp., an owner of radiology/oncology facilities; PresGar Imaging LLC, an owner and operator of imaging facilities; Radnet Management, Inc., a manager of medical imaging centers; Dolphin Medical Inc., an owner of cancer treatment centers; and Canadian Imperial Bank of Commerce Trust Company (Bahamas) Limited ("CIBC"), as trustee of trusts for the benefit of the grandchildren of A.N. Pritzker, a

substantial DVI shareholder with board representation.[1]

Nonparty DVI is a now-bankrupt public Delaware corporation that operated primarily as a finance company for healthcare providers, through its subsidiaries, DVI FS and DVI BC. (Compl. ¶ 25.)  DVI FS and DVI BC secured the financing they provided to borrowers with liens on substantially all of a healthcare provider's assets, as well as a provider's accounts receivable. (Id.)  As part of its financing business DVI also bundled together and transferred its loans and leases, and the accompanying security documents, to an Issuer, via a process called "securitization."  The Issuer subsequently issued and sold Securitization Notes to investors, secured by a pledge of the assets or other collateral of the original lease or loan.  (Compl. ¶ 71.) Securitization restricted DVI's ability to repurchase, substitute, or prepay contracts in the securitization pools.  (Compl. ¶ 73.)  The practical effect of securitizations was that they improved DVI's balance sheet and provided it with immediate income.  (Compl. ¶ 71)  However, the success of the entire financing structure was dependant on the credit-worthiness of the underlying borrowers.   Plaintiffs allege, in part, that DVI, through the Defendants, abused this securitization process, was lax in its credit policies, and both failed to disclose and actively misrepresented these practices, artificially inflating the stock price and, ultimately, bringing about DVI's demise.

Plaintiffs allege that beginning in at least 1999 and continuing until DVI's August 2003 bankruptcy filing, the Defendants "engaged in numerous schemes to artificially inflate DVI's securities prices by concealing and delaying disclosure of substantial accounting irregularities at

---

[1] Adopting the language used by the parties, named executives and board members may be collectively referred to as "the Individual Defendants," while Oncure, PresGar, Radnet and Dolphin may be collectively referred to as "the Special Relationship Entities."

DVI so that they could consume DVI's dwindling assets while they searched for either a fix or an escape hatch." (Compl. ¶ 7.) More specifically, Plaintiffs allege that the Defendants (a) refused to write down between $58 million and over $100 million of impaired assets, and instead engaged "in the deceptive practices of 'rewriting', 'swapping', and 'buying out' impaired loans and leases, with new loans and leases in order to conceal the need for material asset write-downs;" (b) double-pledged collateral or pledged "ineligible collateral on lines of credit and securitization transactions, which as of May 2003, totaled approximately $78 million;" (c) consistently refused "to adhere to numerous recommendations by Deloitte to implement adequate internal controls or comply with those in place, to among other things, identify impaired assets and identify creditworthiness of borrowers;" (d) materially overstated "its revenues, cash availability, assets and earnings," and understated "liabilities and expenses;" and (e) failed "to adequately disclose the fact that the Company continually experienced severe cash shortages throughout the Class Period." (Compl. ¶ 9.) Plaintiffs allege that said schemes, while likely started by those within the company, were of such "nature and magnitude" "that they could only have been accomplished with the knowledge, substantial participation and involvement of [the Special Relationship Entities, Deloitte & Touche, Merrill Lynch, and the Pritzkers]. (Compl. ¶ 8.) Plaintiffs further allege that the Individual Defendants (a) devised and implemented "practices to avoid taking loan loss reserves such as rewriting contracts, using special relationship entities to take over delinquent facilities and improperly making additional loans for the purpose of making payments on delinquent accounts;" (b) pledged "ineligible collateral to DVI's lenders and [double-pledged] collateral to more than one lender to increase available capital;" (c) overstated income "by recognizing income on contracts subject to forbearance

4

knowing they were uncollectible;" and recognized income "on contracts more than 180 days delinquent, despite Deloitte's criticisms of this practice; [recognized] income on suspended contracts; [manipulated] on and off balance sheet transactions with no business justification;" (d) ignored "established credit procedures with regard to certain borrowers and [made] large loans with no legitimate business purpose to cover up serious financial problems;" and (e) initiated, participated in, and/or approved these practices "to deceive the Class Members about DVI's true financial condition." (Compl. ¶ 11.)

Throughout the perpetration of the allegedly fraudulent scheme, DVI's financial statements were audited by Defendant Deloitte & Touche LLP ("Deloitte"), which issued unqualified opinions on DVI's financial statements "throughout the Class Period." (Compl. ¶ 14(a).) Deloitte resigned in May 2003 over an accounting dispute "concerning the accounting treatment for a series of transactions at DVI's Corpus Christi Radiology Facility from September 2001 to June 2002." (Compl. ¶ 14(b).) Deloitte further indicated that DVI's accounting improprieties were not limited to the Corpus Christi Facility and cited material weaknesses in the Company's internal controls. (Id.)

Likewise, throughout the Class Period, Merrill Lynch & Co. was a financial advisor, underwriter of securitizations, and a substantial lender to DVI. Plaintiffs allege that Merrill generated several million dollars in fees for itself and then "[r]ecognizing that DVI was a house of cards on the brink of collapse, Merrill Lynch concocted a fraudulent scheme . . . to use collateral pledged to others and proceeds from securitization pool #32 as a means of securing and/or paying off Merrill's loans to DVI. Prior to DVI's bankruptcy petition, Merrill Lynch was paid in full or substantially paid on its line of credit to DVI . . . .  As a result, Merrill Lynch was

apparently able to cash out shortly before the DVI house of cards came crashing down, leaving those in the investing public, who Merrill solicited, holding worthless DVI paper." (Compl. ¶ 12.)

Following Deloitte's May 2003 resignation and the SEC's rejection of the Company's Form 10-Q for the third quarter of fiscal year 2003, on August 1, 2003, DVI revealed "that it would not be able to make interest payments on its 9 7/8 percent Senior Notes due to severe liquidity constraints, that the Company had depleted *all* availability in its credit facilities." (Id.) On August 13, 2003, DVI disclosed that it intended to file for Chapter 11 bankruptcy protection in light of "recent discovery of apparent improprieties in its prior dealings with lenders involving misrepresentations as to the amount and nature of collateral pledged to lenders." (Compl. ¶ 15.)

On October 14, 2003, the Bankruptcy Court appointed an Examiner, R. Todd Neilson (the "Examiner"), to investigate the circumstances surrounding DVI's demise. (Compl. ¶ 195.) The Examiner investigated "DVI's operations, financial condition, accounting policies, and allegations of irregularities, among other things" (Compl. ¶ 196) and "uncovered numerous, serious problems." (Comp. ¶ 197.)

On September 20, 2004, Plaintiffs filed their Third Amended Complaint alleging violations of the federal securities laws against the Individual Defendants, Deloitte, Merrill, CIBC, and the four Special Relationship Entities, with whom DVI entered into transactions allegedly to improperly obfuscate delinquent or troubled loans. (Compl. ¶ 48.)

## III.   LEGAL STANDARD

When determining a Motion to Dismiss pursuant to Rule 12(b)(6), the court may look only to the facts alleged in the complaint and its attachments. Jordan v. Fox Rothschild, O'Brien

& Frankel, 20 F.3d 1250, 1261 (3d Cir. 1994).  Dismissal for failure to state a claim is appropriate when it clearly appears that plaintiff can prove no set of facts in support of the claim which would entitle him to relief.  See Conley v. Gibson, 355 U.S. 41, 45-46 (1957); Robb v. City of Philadelphia, 733 F.2d 286, 290 (3d Cir. 1984).  Such a motion tests the legal sufficiency of a claim while accepting the veracity of the claimant's allegations.  See Markowitz v. Northeast Land Co., 906 F.2d 100, 103 (3d Cir. 1990); Sturm v. Clark, 835 F.2d 1009, 1011 (3d Cir. 1987); Winterberg v. CNA Ins. Co., 868 F. Supp. 713, 718 (E.D. Pa. 1994), aff'd, 72 F.3d 318 (3d Cir. 1995).  A court, however, need not credit conclusory allegations or legal conclusions in deciding a motion to dismiss.  See General Motors Corp. v. New A.C. Chevrolet, Inc., 263 F.3d 296, 333 (3d Cir. 2001); Morse v. Lower Merion School Dist., 132 F.3d 902, 906 (3d Cir. 1997); L.S.T., Inc. v. Crow, 49 F.3d 679, 683-84 (11th Cir. 1995).  A claim may be dismissed when the facts alleged and the reasonable inferences therefrom are legally insufficient to support the relief sought.  See Pennsylvania ex rel. Zimmerman v. PepsiCo., Inc., 836 F.2d 173, 179 (3d Cir. 1988).

## IV.    DISCUSSION

### A.    Counts I - IV:  Section 10(b) Claims

#### 1.    Section 10(b) and Rule 10b-5 Legal Standards

Defendants move to dismiss Counts I, II, III, and IV of the Complaint, which assert securities fraud claims against all of the Defendants, except CIBC, pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  Count I asserts a Section 10(b) claim against the Individual Defendants; Count II makes the same assertion against the Special Relationship Entities; Count III makes the same assertion against Merrill Lynch; and Count IV

makes the same assertion against Deloitte & Touche.

Section 10(b) of the Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security, . . . any manipulative device or contrivance in contravention of such rules and regulations as the Commission may prescribe."  15 U.S.C. § 78j(b).  "Section 10(b) is enforced through Rule 10b-5, which [among other things] creates a private cause of action for investors harmed by materially false or misleading statements."  In re Alpharma, Inc. Sec. Litig., 372 F.3d 137, 147 (3d Cir. 2004).  Rule 10b-5 makes it illegal for any person,

> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

### 2.    Rule 10b-5(b) Claims

Plaintiffs contend that the Individual Defendants (Compl. ¶ 444), Merrill Lynch (Compl. ¶ 477),  and Deloitte (Compl. ¶ 492) violated Rule 10b-5(b).  The Special Relationship Entities are not alleged to have made any misstatements or omissions and are too far removed from the statements at issue to be held liable therefor.

To state a securities fraud claim under Section 10(b) and Rule 10b-5(b), a plaintiff must plead that a defendant (1) made a misrepresentation or omission of material fact; (2) with scienter; (3) in connection with the purchase or sale of a security; (4) upon which plaintiff reasonably relied; and (5) that plaintiff's reliance was the proximate cause of their injury.  In re

Alpharma, 372 F.3d 137, 147 (3d Cir. 2004) (citation and quotation marks omitted).

Further, Plaintiffs must meet the heightened pleading requirements of the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4 et seq. ("PSLRA"), which is applicable to actions brought under Section 10(b), as well as the heightened pleading requirements of Federal Rule of Civil Procedure 9(b), which applies to averments of fraud.

The PSLRA was enacted in 1995 to curb abuses in private class action securities litigation. See H.R. Conf. Rep. No. 104-369, at 32-37 (1995), reprinted in 1995 U.S.C.C.A.N. 730, 730-32. It implemented a host of procedural and substantive reforms, including "more stringent pleading requirements to curtail the filing of meritless lawsuits." In re Advanta Sec. Litig., 180 F.3d 525, 532 (3d Cir.1999) (quoting H.R. Conf. Rep. No. 104-369, at 37). Under the PSLRA, a Rule 10b-5(b) claim must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, state with particularity all facts on which that belief is formed." Moreover, to properly plead scienter the complaint must, "with respect to each act or omission[,] . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b). "The requisite 'strong inference' of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." In re Burlington Coat Factory, 114 F.3d 1410, 1418 (3d Cir. 1997) (citation omitted). "Plaintiffs pleading scienter through motive and opportunity must support their allegations with 'facts stated with particularity' that 'give rise to a strong inference of scienter.'" In re Alpharma Inc. Sec. Litig.,

372 F.3d 137, 149 (3d Cir. 2004) (citations and internal quotation marks omitted).  To properly plead scienter through conscious misbehavior or recklessness, Plaintiffs  must allege at least recklessness, that is, "an extreme departure from the standards of ordinary care."  In re Burlington Coat Factory, 114 F.3d at 1418 (citation and quotation marks omitted).

Further, Federal Rule of Civil Procedure 9(b) requires that plaintiffs allege with particularity the "who, what, when, where and how" elements necessary to establish the alleged misstatement or manipulation.  See Advanta, 180 F.3d at 525, 537 (3d Cir. 1999).

In sum, to survive the instant Motions to Dismiss, Plaintiffs must identify: (1) specific misrepresentations or omissions of material fact, (2) the reason or reasons why the statements are misleading, and (3) specific facts that demonstrate who made them, when they were made, what was said, and that they were made either (a) with motive and opportunity to commit fraud (b) knowingly or (c) recklessly.  If Plaintiffs have insufficient knowledge to so do, they must make sufficient allegations on information and belief and aver that more specific information is in the exclusive control of the Defendants.  See Marra v. Tel-Save Holdings, Inc., 1999 WL 317103, at *5 (E.D. Pa. May 18, 1999).

Defendants argue that (1) Plaintiffs have not properly identified actionable statements attributable to specific Defendants; (2) Plaintiffs' allegations of fraud are insufficient under the Rule 9(b) and the PSLRA; and (3) the Complaint does not adequately plead the scienter element of a Rule 10b-5(b) claim.

### a.      Attribution of misstatements or omissions to defendants

Under Rule 10b-5(b), "plaintiffs must first establish that the defendants made a materially false or misleading statement, or that the defendants omitted to state a fact such that other

statements of fact actually made were rendered materially misleading." Marra v. Tel-Save

Holdings, Inc., 1999 WL 317103, at *4 (E.D. Pa. May 18, 1999).  Therefore, as a first step in

determining whether Plaintiffs have sufficiently pled a violation of Rule 10b-5(b), the Court must

determine whether the relevant Defendants have made statements for which they may be held

liable.

### i.    Invocation of the Group Pleading Doctrine as to Individual Defendants

The Individual Defendants argue that Plaintiffs have not properly attributed statements to

them because the group pleading doctrine, on which Plaintiffs rely, is not valid in the Third

Circuit subsequent to the enactment of the PSLRA.

Plaintiffs' Count I 10b-5 claim alleges that the Individual Defendants as a group are liable

for false or misleading statements and omissions contained in several different press releases

issued by DVI and in DVI's quarterly and annual earnings reports that were filed with the SEC.

To attribute the alleged misleading statements and omissions to the specific Individual

Defendants, Plaintiffs allege the following:

> It is appropriate to treat the Individual Defendants **as a group for pleading purposes** and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of Individual Defendants identified above.

(Compl. ¶ 46 (emphasis added).)

Under the group pleading doctrine, the identification of the individual sources of

statements is unnecessary when the fraud allegations arise from the misstatements or omissions

in documents, such as annual reports, prospectuses, registration statements, press releases or

other "group-published information" that presumably constitute the collective actions of those individuals involved in the day-to day affairs of the corporation.  In re Aetna Inc. Sec. Litig., 34 F. Supp. 2d 935, 949 (E.D. Pa. 1999).  While the Third Circuit has not yet addressed the question, the majority of district courts in this Circuit to address the issue have held that the group pleading doctrine did not survive the PSLRA.  See The Winer Family Trust v. Queen, 2004 WL 2203709, at *6 (E.D. Pa. Sept. 27, 2004); Jones v. Intelli-Check, Inc., 274 F. Supp. 2d 615, 646 (D.N.J. 2003); In re Digital Island Sec. Litig., 223 F. Supp. 2d 546, 553 (D. Del. 2002); P. Schoenfeld Asset Mgmt. LLC v. Cendant Corp, 142 F. Supp. 2d 589, 620 (D.N.J. 2001); Marra v. Tel-Save Holdings, Inc., 1999 WL 317103 (E.D. Pa. May 18, 1999) (all holding that the group pleading doctrine does not survive the PSLRA).[2]  Courts holding that the doctrine does not survive have reasoned that "to permit a judicial presumption as to particularity simply cannot be reconciled with the statutory mandate that plaintiffs must plead specific facts as to each act or omission by the defendant."  Marra, at *5.

        In light of the prevailing case law in this Circuit and the strong policy reasons elucidated therein, the Court concludes that Plaintiffs cannot rely on the group pleading doctrine to plead a Rule 10b-5 claim.

                    **ii.     Allegations of Statements or Omissions made on
                            "Information and Belief"**

        Absent group pleading, Plaintiffs must attribute at least one statement to each of the Defendants against whom a violation of Rule 10b-5(b) is alleged.  The PSLRA does permit a

_____

[2] But see In re U.S. Interactive, Inc., 2002 WL 1971252, at *4 (E.D. Pa. Aug. 23, 2002); In re Rent-Way Sec. Litig., 209 F. Supp. 2d 493, 517-18 (W.D. Pa. 2002); In re Aetna Inc. Sec. Litig., 34 F. Supp. 2d 935 (E.D. Pa. 1999) (all holding that the group pleading doctrine *does* survive the PSLRA).

plaintiff who alleges that a defendant made a misstatement or omission to so assert on information and belief, but requires that "the complaint . . . state with particularity all facts on which that belief is formed." 15 U.S.C.A. § 78u-4(b)(1). In the Third Circuit, pleadings made on information and belief satisfy the PSLRA when a plaintiff pleads with particularity sufficient facts to support alleged beliefs. Cal. Pub. Employees' Ret. Sys. v. The Chubb Corp., 394 F.3d 126 (3d Cir. 2004).

### iii. Defendants who have not made Statements cannot be Liable under 10b-5(b)

Absent group pleading, a review of the Complaint elucidates that Plaintiffs have not pled with the requisite particularity that Individual Defendants Turek, Cady, and Miller made any statements or signed any Company documents. Plaintiffs assert that these Defendants are liable for statements "based on their preparation [and/or] review . . . of false Company documents." (Pls.' Opp. at 45.) These Defendants argue that (1) Plaintiffs have failed to demonstrate that they are "primary" participants in any violations and (2) as a matter of law, they cannot be held liable for aiding and abetting primary violators.

While the Third Circuit has not yet held whether a person can be a primary violator of Section 10(b) on the basis of substantial participation in the creation of a company's statements, most courts have adopted a "bright line" test for primary participation, that is, in order to be liable, a person must actually make the material misstatement or omission, which must be attributed to him or her when disseminated. See Wright v. Ernst & Young LLP, 152 F.3d 169, 174 (2d Cir. 1998) (holding that "secondary actors . . . may no longer be held primarily liable under § 10(b) for mere knowledge and assistance in the fraud"); Shapiro v. Cantor, 123 F.3d

717, 720 (2d Cir. 1996) (quoted in <u>Ravens v. Republic N.Y. Corp.</u>, 2002 WL 1969651, at *11

(E.D. Pa. 2002)) ("Secondary actors" can only be primary violators when they make material

misstatements or omissions that they "know or should know" will reach investors.); <u>Sec. Exch.

Comm'n v. Lucent Technologies Inc.</u>, 2005 WL 771228, at *12 (D.N.J. April 6, 2005) ("this

Court concludes that the 'bright line' test is the appropriate standard").  In so holding, the <u>Lucent</u>

court reasoned, "Not only is this test consistent with the statutory language of Section 10(b), but

it more clearly delineates which types of behavior will give rise to primary liability versus

secondary liability."  2005 WL 771228, at *12.  This Court finds the above-cited cases more

persuasive than the line of reasoning Plaintiffs urge the Court to adopt.  The "substantial

participation" test[3] not only undercuts the Supreme Court's holding in <u>Central Bank</u>, discussed

below, but it does not follow the language of Rule 10b-5(b), which requires that one make a

"statement or omission" in order to be liable.

The remaining question is whether signatories to financial statements can be held to have

adopted that document as a statement.  While the Third Circuit has not addressed this question, at

this stage of the litigation, the Court will permit claims to proceed on that basis, assuming that

Plaintiffs have sufficiently pled the other elements of their securities fraud claim.  <u>See</u> <u>In re

Reliance Sec. Litig.</u>, 135 F. Supp. 2d 480, 503 (D. Del. 2001) (finding that signing financial

statements constitutes a statement); <u>but see</u> <u>In re Aetna Inc. Securities Litigation</u>, 34 F. Supp.2d

935, 949 (E.D.Pa.1999) (affirming the dismissal of complaint against outside directors where no

particularized involvement in the company's operations was alleged).

---

[3] <u>See, e.g.</u>, <u>Howard v. Everex Sys., Inc.</u>, 228 F.3d 1057, 1061-62 (9th Cir. 2000) (discussing and adopting
the substantial participation test).

Applying the rubric above, Plaintiffs have sufficiently pled that Defendants O'Hanlon and Garfinkel made statements by virtue of press releases and as signatories of financial documents filed with the Securities and Exchange Commission ("SEC") (See Compl. ¶¶ 76, 77, 83, 84, 85, 86, 87, 89, 90, 96, 97, 99, 100, 101, 102, 104, 105, 112, 113, 116, 118, 119, 123, 124, 125, 128, 130, 133, 134, 138, 145, 146, 148, 150, 151, 153, 154, 156, 158); Defendants Boyle, Cohn, Roberts, Goldberg, McHugh, and Shapiro made statements as signatories of financial filings (See Compl. ¶¶ 77, 90, 105, 138); Defendant Deloitte & Touche made statements by virtue of audit opinions provided in conjunction with financial filings (See Compl. ¶¶ 78, 94, 110, 144); and Defendant Merrill Lynch has made statements by virtue of its prospectuses for DVI securitizations (See Compl. ¶¶ 334, 335, 336, 337, 340).

In light of the conclusions above regarding group pleading and the "bright line" test for participation, Defendants who have not been alleged to have made any statements, Defendants Turek, Cady, and Miller, cannot be held liable therefor and Plaintiffs' Rule 10b-5(b) claim against them in Count I must be DISMISSED.

Because this Court adopts the bright line standard for attributing statements to the Defendants, it need not address Defendants' argument that Plaintiffs are seeking to hold these Defendants liable for aiding and abetting DVI's alleged violation of the securities laws in contravention of the holding of Central Bank of Denver v. First Interstate Bank of Denver, 511 U.S. 164 (1994). In Central Bank, the Supreme Court held that there is no private right of action for aiding and abetting a violation of § 10(b). 511 U.S. at 177. The Court stated that § 10(b) "does not itself reach those who aid and abet . . . [but] prohibits only the making of a material misstatement (or omission) or the commission of a manipulative act." Id. This court need not

reach whether <u>Central Bank</u> is implicated in Plaintiffs' Rule 10b-5(b) claim, as, as discussed <u>supra</u>, only claims against "primary" actors—those who made statements—survive and heightened pleading requirements of the PSLRA, under which group pleading does not survive and the bright line standard for attribution is the most appropriate one.

### b.   Demonstrating that the statements were fraudulent or misleading

#### i.   Relaxing the Heightened Pleading Standard.

Plaintiffs assert that their averments of fraud are entitles to a relaxed pleading standard. (Pls. Opp. at 28-32.)  The Third Circuit has noted, even in cases brought under the PSLRA, that in applying Rule 9(b), and its particularity requirement for pleading fraud, "courts should be 'sensitive' to situations in which 'sophisticated defrauders' may 'successfully conceal the details of their fraud.'  Where it can be shown that the requisite factual information is peculiarly within the defendant's knowledge or control, the rigid requirements of Rule 9(b) may be relaxed."  <u>In re Rockefeller Center Properties, Inc. Sec. Litig.</u>, 311 F.3d 198, 216 (3d Cir. 2002) (citation omitted).  While Defendants argue that a "relaxed pleading standard" does not apply to claims under the PSLRA, their reliance on <u>In re NAHC, Inc. Sec. Litig.</u>, 306 F.3d 1314, 1328 (3d Cir. 2002), is misplaced.[4]  <u>Cf.</u> <u>In re Suprema Specialties, Inc. Sec. Litig.</u>, 334 F. Supp. 2d 637, 648 (D.N.J. 2004); <u>Jones v. Intelli-Check</u>, 274 F. Supp. 2d 615 (D.N.J. 2003).

"However, in order to obtain the benefit of this relaxed standard in the Third Circuit,

---

[4] In <u>NAHC</u>, the Third Circuit held only that Rule 9(b) does not <u>require</u> a relaxed pleading standard in securities fraud actions brought under the PSLRA; in the sense that the PSLRA requires particularity in pleading scienter, it conflicts with, and supercedes, Rule 9(b)'s provision permitting state of mind to be averred generally. 306 F.3d at 1328.  Further, following its decision in <u>NAHC</u>, the Third Circuit highlighted the permissibility of a relaxed standard in <u>In re Rockefeller Center Properties, Inc.</u>, discussed above.  311 F.3d at 216.

plaintiffs must plead that the information missing from their complaint is in the exclusive control

of defendants, and must also plead the extent of their efforts to obtain the information prior to

filing their complaint." Id. As in Jones, Plaintiffs in this case have made no such allegations in

their Complaint. Moreover, Plaintiffs had access to far more information than the majority of

securities litigation plaintiffs by virtue of the lengthy and thorough investigation of the

Bankruptcy Examiner. Accordingly, "their claims are not entitled to a relaxed pleading

standard." Jones, 274 F. Supp. 2d at 629.

> **ii.    Plaintiffs have adequately pled a number of false and misleading statements made with scienter**

Plaintiffs have set forth the statements they allege to be misleading at pages 34-68

(Compl. ¶¶ 75-160) and pages 130-138 (Compl. ¶¶ 326-351) of their Complaint. As required,

the Complaint identifies to whom each statement is attributable, what was said, when it was said,

and demonstrates why it was misleading. Plaintiffs also assert facts sufficient to satisfy the

pleading standard requirement that the statement be misleading and be made with at least

extreme recklessness. (Compl. ¶¶ 288-306 (Individual Defendants); 344, 350 (Merrill); 376-400

(Deloitte).)

Plaintiffs also seek to demonstrate scienter through evidence of motive and opportunity.

As discussed, supra, "Plaintiffs pleading scienter through motive and opportunity must support

their allegations with 'facts stated with particularity' that 'give rise to a strong inference of

scienter.'" In re Alpharma Inc. Sec. Litig., 372 F.3d 137, 149 (3d Cir. 2004) (citations and

internal quotation marks omitted). However, because this Court concludes that Plaintiffs have

sufficiently alleged scienter through their assertions that Defendants were at least highly reckless,

17

the Court need not reach whether Plaintiffs have established scienter through motive and opportunity.

Therefore, the Court concludes that Plaintiffs' Rule 10b-5(b) claims may proceed against the following Defendants: O'Hanlon, Garfinkel, Boyle, Cohn, Roberts, Goldberg, McHugh, Shapiro, Deloitte, and Merrill.

### 3.    Plaintiffs' Rule 10b-5(a) and (c) Market Manipulation Claims

Plaintiffs assert that even where a Defendant did not make a false or misleading statement, he may still be held liable as a "secondary actor" where he committed primary violations of the securities laws through manipulative or deceptive acts pursuant to Rule 10b-5(a) and (c). See 17 C.F.R. § 240.10b-5; Sec. Exch. Comm'n v. U.S. Envt'l, 155 F.3d 107, 111 (2d Cir. 1998); In re Global Crossing, Ltd. Sec. Litig., 322 F. Supp. 2d 319, 336 (S.D.N.Y. 2004).

Third Circuit case law on claims brought under Rule 10b-5(a) and (c) is sparse. To state a claim, a plaintiff must plead (1) that in connection with the purchase or sale of securities (2) defendant engaged in deceptive or manipulative conduct; (3) that plaintiff reasonably relied on the stock price affected by the deceptive or manipulative conduct; (4) that plaintiff's reliance proximately caused plaintiff's damages; and (5) that defendant acted with the requisite scienter. See GFL Advantage Fund, Ltd. v. Colkitt, 272 F.3d 189 (3d Cir. 2001); In re Global Crossing, Ltd. Sec. Litig., 322 F. Supp. 2d 319, 336 (S.D.N.Y. 2004); Jones v. Intelli-Check, 274 F. Supp. 2d 615 (D.N.J. 2003). Further, because the second element is an averment of fraud, plaintiffs must comply with Federal Rule of Civil Procedure 9(b)'s requirement of particularity and, therefore, must specify what deceptive or manipulative acts were performed and what effect the scheme had on the market for the securities at issue. See In re Blechs Sec. Litig., 961 F. Supp.

18

569, 579-80 (S.D.N.Y. 1997).

Plaintiffs argue that they have stated with sufficient specificity the fraudulent acts engaged in by all of the Defendants under 10b-5(a) and (c).  Indeed, given the massive fraudulent scheme set forth by Plaintiffs in their Complaint, (see Pls. Opp. at 5-11) it appears that they have set forth sufficient facts to survive a Motion to Dismiss as to all Defendants on the basis of Rule 10b-5(a)/(c) liability.  Therefore, Defendants' Motions to Dismiss are DENIED as to Counts I, II, III, and IV.

### 4.     The OnCure Defendants' Statute of Limitations Assertion

Defendants OnCure and Goffman ("the OnCure Defendants") argue that Plaintiffs' claim against them in Count II hinges entirely on the allegation that OnCure's March 1999 purchase of a Corpus Christi facility was designed to facilitate DVI's fraud by allowing DVI to cover-up "problems at Corpus Christi" and avoid a write-down.  (OnCure Dismiss at 15.)  This allegedly fraudulent transaction took place in March 1999, more than five years prior to the filing of this action against the OnCure Defendants on June 14, 2004.  The OnCure Defendants further argue that to the extent Plaintiffs allege fraudulent conduct other than the Corpus Christi transaction, that Plaintiffs are barred by the statute of limitations because they were on inquiry notice outside of the limitations period.

Prior to enactment of the Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, 116 Stat. 745 (2002), the limitation period required that actions under Rule 10b-5 be "brought within one year after the discovery of the facts constituting the violation and within three years after such violation."  See 15 U.S.C. §78i(e).  The Sarbanes-Oxley Act, which became effective July 30, 2002, extends that period and provides that "in a private right of action that involves a claim of

19

fraud, deceit, manipulation or contrivance in contravention of a regulatory requirement concerning the securities laws" an action may be brought "not later than the earlier of—(1) two years after the discovery of the facts constituting the violation; or (2) five years after such violation."  28 U.S.C. § 1658(b).  OnCure argues that, while Count II is barred under either limitations period, it is the pre-Sarbanes-Oxley period that applies. (OnCure Dismiss at 16.)

Plaintiffs argue (1) that their assertions relate to conduct other than the Corpus Christi transaction; (2) that because DVI's course of conduct was continuing, that the Court should permit them to base their action on conduct occurring outside the applicable limitations period; (3) that they were not on inquiry notice; and (4) that the Sarbanes-Oxley limitations period applies.  (Pls. Opp. at 214-219.)

The Third Circuit has adopted the "continuing violation doctrine" only in the context of employment discrimination/civil rights cases.  See, e.g., Cardenas v. Massey, 269 F.3d 251, 257-58 (3d Cir. 2001).  Therefore, this Court declines to extend the continuing violation doctrine to a totally distinct area of the law.  Without the benefit of the continuing violation doctrine, it is clear that on Sarbanes-Oxley's effective date, July 30, 2002, the cause of action for the March 1999 Corpus Christi transaction had expired and could not be revived by the extended limitations period of the Act.  See Lieberman v. Cambridge Partners, LLC, 2004 WL 1396750, at *3 (E.D. Pa. June 21, 2004) (it is impermissible to utilize the limitation period enacted by the Sarbanes-Oxley Act to revive claims that were time-barred when the Act took effect).  Therefore, Plaintiffs may not maintain claims based upon any causes of actions arising from the Corpus Christi transaction or to which the same limitations period is applicable and which arose prior to July 30, 1999.

The question of whether Plaintiffs were on inquiry notice with regard to their other claims against the OnCure Defendants prior to July 19, 2003, however, cannot be resolved without making findings of fact.  Therefore, the Court declines to dismiss Count I against them under Rule 12(b)(6) on that ground.  See In re Lucent Technologies, Inc. Sec. Litig., 217 F. Supp. 2d 529, 542 (D.N.J. 2002).

### B.       Counts V and VI:  Section 20(a) Claims

#### 1.       Count V - Individual Defendants

Section 20(a) of the Exchange Act establishes liability for "controlling persons" based upon violations of Section 10(b).  Copland v. Grument, 1998 WL 256654, at *7 (D.N.J. Jan. 9, 1998).  A plaintiff must allege (1) a violation by a controlled person or entity; (2) control of the violating person or entity by the defendant; and (3) culpable participation by the defendant in the primary violation.  In re Ravisent Sec. Litig., 2004 WL 1563024, at *15 (E.D. Pa. July 13, 2004). 15 U.S.C. § 78t.

In Count V, Plaintiffs allege that the "Individual Defendants controlled the Company within the meaning of Section 20(a)."  (Compl. ¶ 513).  Defendants have moved for dismissal of this claim on the grounds that there cannot be liability under § 20(a) where Plaintiffs have failed to allege a primary violation under § 10(b).  This argument fails both because, as discussed above, Plaintiffs have sufficiently stated a § 10(b) claim against the Individual Defendants and because Plaintiffs have sufficiently alleged a violation of § 10(b) by nonparty DVI, Inc.  (See Compl. ¶¶ 512.)  Moreover, because Plaintiffs have sufficiently alleged a § 10(b) claim against all of the Individual Defendants, Plaintiffs have likewise established the culpable participation element of a § 20 claim.  Finally, various Individual Defendants also assert that Plaintiffs have

not adequately pled that they are "controlling persons."  These arguments likewise fail.

To establish that a defendant is a control person, "a plaintiff must demonstrate that 'the defendant had actual power or influence over the allegedly controlled person.'"  In re Mobile Media Sec. Litig., 28 F. Supp. 2d 901, 940 (D.N.J. 1998) (citation omitted).  "The pleading of facts that 'support a reasonable inference that [defendants] had the potential to influence and direct the activities of the primary violator' will survive a motion to dismiss."  In re Loewen Group Inc. 2004 WL 1853137, at *26 (E.D. Pa. Aug. 18, 2004) (citation omitted).  The Complaint alleges that the Individual Defendants possessed control over the company due to their executive, managerial and/or directorial positions in the company.  (Compl. ¶ 513.)  It also alleges that the Individual Defendants exercised the control to cause the company to commit securities fraud.  (Id. at 514.)  These allegations of "actual power" or "influence" over the company are sufficient to survive a Motion to Dismiss.  See In re Ravisent Technologies, Inc. Sec. Litig., 2004 WL 1563024, at *15 (E.D. Pa. July 13, 2004).  Therefore, Defendants' Motions to Dismiss Count V are DENIED.

## 2.    Count VI - CIBC

In Count VI, Plaintiffs allege that "the Pritzker Defendants possessed . . . the power to direct . . . the management and policies of DVI, through their involvement in the financial matters of DVI" through ownership of voting securities, status as controlling shareholder, lending relationships, close, personal relationships with DVI officers and directors, and through their self-appointed representative on the Board, Defendant Cohn.  (Compl. ¶ 523).  Defendant CIBC has moved for dismissal of this claim on the grounds that (1) Plaintiffs have failed to sufficiently allege control of DVI by CIBC; and (2) Plaintiffs have failed to sufficiently allege culpable

22

participation by CIBC in the primary violation.

Plaintiffs assert claims against CIBC by alleging culpable action by the "Pritzker Defendants." In fact, no Pritzker is a Defendant in this action and allegations asserted against the Pritzker Defendants appear to be an attempt to use group pleading, rejected supra, to attach liability to CIBC. Plaintiffs' Complaint alleges nothing specific about CIBC other than that it holds in trust for the benefit of the grandchildren of A.N. Pritzker a 17.5% percent block of DVI's stock and $7.6 million in DVI's convertible notes. Defendant CIBC's status as a minority shareholder and creditor, alone, are not sufficient to "demonstrate that 'the defendant had actual power or influence over the allegedly controlled person'" under Section 20. In re Mobile Media Sec. Litig., 28 F. Supp. 2d at 940.

Moreover, the Complaint does not allege any communications between CIBC and DVI that could have provided CIBC with non-public information about DVI's financial condition, let alone communication that would give rise to a reasonable inference that Defendant CIBC culpably participated in the primary violations by DVI.

For these reasons, Defendant CIBC's Motion to Dismiss Count VI is GRANTED.

## V.    CONCLUSION

For the foregoing reasons, Defendants' Motions to Dismiss are GRANTED with respect to Count III (as it pertains to securities purchased prior to July 19, 2001) and Count VI, and DENIED with respect to Counts I, II, III (as it pertains to purchases on or subsequent to July 19, 2001), IV, and VI. An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE DVI, INC. SECURITIES | : | CIVIL ACTION |
| LITIGATION | : | |
| | : | |
| | : | NO. 03-5336 |

## ORDER

_____AND NOW, this   31st   day of May, 2005, upon consideration of Defendants'

Motions to Dismiss (Doc. Nos. 104, 105, 106, 107, 108, 109, 110, 112, 114, 115, 117, 119, 120,

121, 122, and 123), Plaintiffs' combined Response in Opposition (Doc. No. 139), and

Defendants' Replies thereto (Doc. Nos. 152, 153, 156, 157, 158, 159, 160, 161, 162, 163, 164,

165, 166, and 168), it is hereby ORDERED that Defendants' Motions to Dismiss are GRANTED

in part and DENIED in part.  It is further ORDERED as follows:

1.      Defendants' Motions to Dismiss Count I of the Complaint are DENIED;

2.      Defendants' Motions to Dismiss Count II of the Complaint are DENIED;

3.       Defendants' Motions to Dismiss Count III of the Complaint are DENIED as they

pertain to purchases on or subsequent to July 19, 2001, and GRANTED as they

pertain to securities purchased prior to July 19, 2001;

4.      Defendants' Motions to Dismiss Count IV of the Complaint are DENIED;

5.      Defendants' Motions to Dismiss Count V of the Complaint are DENIED; and

6.       Defendant's Motion to Dismiss Counts VI is GRANTED.

The Clerk of Court is hereby directed to terminate the pending Motions to Dismiss (Doc.

Nos. 104, 105, 106, 107, 108, 109, 110, 112, 114, 115, 117, 119, 120, 121, 122, and 123) in this matter.

_____**BY THE COURT:**


___/s/_____
**Legrome D. Davis, J.**