IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE:                                    :        CIVIL ACTION
DVI INC. SECURITIES LITIGATION            :
                                          :        NO. 2:03-CV-05336-LDD

<u>MEMORANDUM AND ORDER</u>

Presently before the Court are Lead Plaintiffs' Motion for Class Certification (Doc. No

406); Certain Defendants' Supplemental Motion in Opposition to Class Certification (Doc. No.

433); Defendants Clifford Chance LLP and Clifford Chance US LLP's Opposition to Class

Certification (Doc. No. 436); Defendants' Joint Brief in Opposition to Class Certification (Doc.

No. 438); Defendant Merrill Lynch and Co., Inc.'s Opposition to Class Certification (Doc. No.

440); Lead Plaintiffs' Omnibus Reply in Support of Class Certification (Doc. No. 451); Lead

Plaintiffs' Supplemental Brief in Further Support of Class Certification (Doc. No. 502) and

Defendant Merrill Lynch and Co., Inc.'s Supplemental Brief in Further Opposition to Class

Certification (Doc. No. 509)**,** Notice by Clifford Chance LLP and Clifford Chance US LLP of

Recent Authority (Doc. No. 556), Plaintiffs' Supplemental Appendix in Support of Class

Certification (Doc. No. 568), Defendant Clifford Chance LLP and Clifford Chance US LLP's

Reply Memorandum of Law in Opposition to Lead Plaintiffs' Response to Clifford Chance

Notice of Recent Authority Re: Class Certification (Doc. No. 579) and Lead Plaintiffs' Surreply

to Clifford Chance's Reply Memorandum of Law in Opposition to Lead Plaintiffs' Response to

Clifford Chance's Notice of Recent Authority (Doc. No. 593).  Oral argument on the motion for

class certification was held on July 10, 2007.

After careful review of the parties' submissions and arguments, and for the reasons

detailed below, Lead Plaintiffs' Motion for Class Certification is GRANTED.

I.      FACTUAL AND PROCEDURAL HISTORY

Diagnostic Ventures, Inc. ("DVI") was a medical equipment finance company that financed the working capital needs of medical providers by providing credit secured by healthcare receivables.  Founded in 1986, its common stock began trading on the New York Stock Exchange ("NYSE") in 1992.  In January 1997, DVI issued $100 million of 9 7/8% senior notes ("1997 Notes") that were also traded on the NYSE.  In December 1998, DVI issued an additional $55 million of 9 7/8% senior notes ("1998 Notes", and, together with the 1997 Notes, the "Senior Notes").  The 1998 notes were identical in all respects to the 1997 Notes, except that they were traded on the over-the-counter market rather than the NYSE.

On August 13, 2003, DVI announced that it would be filing for Chapter 11 bankruptcy protection, and filed on August 23, 2003.  The company has since been dissolved.  On September 23, 2003, Cedar Street Fund, Cedar Street Offshore Fund and Kenneth Grossman (together, "Lead Plaintiffs"), individually and on behalf of all others similarly situated, filed a class action lawsuit against various defendants alleging violations of federal securities laws related to the demise of DVI.  After holding a hearing and reviewing the filings of various putative lead plaintiffs, this Court issued an order on November 25, 2003 consolidating various similar cases, appointing Cedar Street Fund, Cedar Street Offshore Fund and Kenneth Grossman as lead plaintiffs, and approving their choice of lead counsel and liaison counsel.

In their Fifth Amended Complaint ("FAC"), Lead Plaintiffs assert a class action alleging that DVI's demise and ultimate bankruptcy were caused by a massive, multi-party scheme designed to artificially inflate the price of DVI securities and to defraud investors and regulators.

Lead Plaintiffs allege that in furtherance of this scheme, Defendants[1] concealed cash shortages, double-pledged collateral and pledged ineligible collateral, refused to report impaired assets and loans, refused to implement adequate accounting controls, and overstated assets and revenues while understating liabilities.  (FAC ¶¶ 9-10.)

Lead Plaintiffs therefore assert claims under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, against various officers and directors of DVI (Count I);[2] Dolphin Medical, Inc., OnCure Technologies Corp., PresGar Imaging, LLC and Radnet Management, Inc. (together, the "Special Relationship Entities") (Count II);[3] Merrill Lynch & Co., Inc. ("Merrill Lynch") (Count III);[4] Deloitte & Touche LLP ("Deloitte") (Count IV); and Clifford Chance LLP and Clifford Chance US LLP (together, "Clifford Chance") (Count V).  Lead Plaintiffs also assert claims under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), against various officers and directors of DVI (Count VI), and Thomas Pritzker, Pritzker Organization LLC and certain unnamed members of the Pritzker family (together, the "Pritzkers") (Count VII).[5]  All parties named by Lead Plaintiffs in this action are herein collectively referred to as "Defendants."

Lead Plaintiffs' allegations against the various groups of Defendants are as follows:

---

1 Defendants are herein defined as all parties against whom Lead Plaintiffs have alleged a claim in the FAC.

2  On November 2, 2007, the Court approved a final settlement between Lead Plaintiffs and Defendants Nathan Shapiro, William Goldberg and John McHugh.

3  On November 9, 2006, the Court approved a final settlement between Lead Plaintiffs and Defendants OnCure Medical Corp., Dolphin Medical, Inc. and PresGar Imaging, LLC.

4  On January 14, 2008, this Court granted preliminary approval to a settlement between Lead Plaintiffs and Merrill Lynch.

5  Unless specifically identified herein, all parties against whom Lead Plaintiffs have alleged a violation of federal securities law will be collectively referred to as "Defendants."

Lead Plaintiffs allege that DVI's officers and directors, individually and collectively, were either primarily responsible for the fraudulent acts or failed to take corrective steps despite knowledge of accounting improprieties.  (FAC ¶¶ 289-307.)

Lead Plaintiffs allege that the Special Relationship Entities were controlled by DVI, which used them to assume distressed facilities and delinquent contracts, largely through money loaned by DVI.  These entities then allegedly reprocessed the delinquent loans and ineligible collateral into new loans or securitizations, thereby concealing the impaired assets.  (Id. ¶¶ 308-25.)

Lead Plaintiffs aver that Clifford Chance, as DVI's lead corporate counsel, attained knowledge of DVI's financial situation and substantially assisted in all elements of its fraudulent scheme, including *inter alia*, drafting fraudulent public financial reports, making fraudulent disclosures related to DVI's internal controls, and deflecting inquiries from the Securities and Exchange Commission ("SEC").  (Id. ¶¶ 363-409.)

Lead Plaintiffs allege that Deloitte, as DVI's independent auditor, wrongfully issued clean audit reports for fiscal years 1999-2002 and otherwise declined to force DVI to disclose its fraudulent acts, despite knowing of its fraudulent accounting practices.  (Id. ¶¶ 424-85.)

Lead Plaintiffs allege that the Pritzkers, as DVI's largest shareholder and one of its major lenders, had significant influence over the board of directors generally and defendant Gerald Cohn, specifically.  Furthermore, Lead Plaintiffs allege that in spite of the Pritzkers' knowledge of DVI's accounting improprieties and their ability to control the company, they took no effort to influence DVI to make truthful disclosures about its financial affairs.  (Id. ¶¶ 410-423.)

II.  DISCUSSION

A.  Legal Standard

Before a class may be certified, Lead Plaintiffs bear the burden of satisfying each of the four requirements set forth in Federal Rule of Civil Procedure 23(a).  Under Rule 23(a), plaintiffs must show that (1) the proposed class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims asserted by or the defenses asserted against the named plaintiff are typical of the claims or defenses of the class, and (4) the named plaintiff will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a).  See also Beck v. Maximus, Inc., 457 F.3d 291, 297 (3d Cir. 2006). Additionally, named plaintiff must satisfy the provisions of one of the sub-parts of Rule 23(b). In this case, Lead Plaintiffs seek certification under Rule 23(b)(3), which requires the Court to find that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

"A class may be certified only if the court is 'satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied.'"  Beck, 457 F.3d at 297 (quoting Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 161 (1982)).  In undertaking this analysis, the Court is not confined to the allegations set forth in the complaint; rather, it must "probe beyond the pleadings before coming to rest on the certification question."  Johnston v. HBO Film Mgmt., Inc., 265 F.3d 178, 188 (3d Cir. 2001) (citing Falcon, 457 U.S. at 147).  This inquiry may require "courts to answer questions that are often enmeshed in the factual and legal issues comprising the plaintiff's cause of action."  Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 167 (3d Cir. 2001) (internal quotations omitted).  The Court remains mindful, however, that any analysis of the merits at the class certification stage is necessitated not by a requirement that plaintiff make some initial showing of probable success at trial; instead, a merits inquiry is

5

required, if at all, because of the unavoidable overlap with class certification issues.  See In re Linerboard Antitrust Litig., 305 F.3d 145, 152 (3d Cir. 2002) ("[A]t the class certification stage, the Court need not concern itself with whether Lead Plaintiffs can prove their allegations . . . the Court need only assure itself that Lead Plaintiffs' attempt to prove their allegations will predominately involve common issues of fact and law.").

In the context of securities fraud actions, the Third Circuit has observed that "[c]lass actions are a particularly appropriate and desirable means to resolve claims based on the securities laws, since the effectiveness of the securities laws may depend in large measure on the application of the class action device."  Yang v. Odom, 392 F.3d 97, 109 (3d Cir. 2004). Ultimately, the decision of whether to certify a class action is left to the discretion of the court. Califano v. Yamasaki, 442 U.S. 682, 703 (1979).

B.  Factors under Rule 23(a)

1.  Numerosity

In order to proceed as a class action, the proposed class must be so numerous that joinder of all plaintiffs would be impracticable.  Fed. R. Civ. P. 23(a)(1).  While the Third Circuit has not delineated a minimum threshold, it has previously noted that "[g]enerally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the [numerosity] prong of Rule 23(a) has been met."  Stewart v. Abraham, 275 F.3d 220, 226-27 (3d Cir. 2001). Additionally, courts in this district have "recognized a presumption that 'the numerosity requirement is satisfied when a class action involves a nationally traded security.'"  In re Cigna Corp. Sec. Litig., 2006 WL 2433779, at *2 (E.D. Pa. Aug. 18, 2006).

Here, Lead Plaintiffs propose a class that would include, with certain exceptions, all persons who purchased DVI common stock or Senior Notes between August 10, 1999 and

August 13, 2003 (the "Class Period"), comprising "thousands" of members.  They support this contention by producing evidence showing that at one point during the Class Period DVI had 3,409 shareholders. (Lead Pls.' Mot. for Class Certification [hereinafter "Mot. for Class Cert."] Ex. B.)  Additionally, DVI's securities were traded on the NYSE and in the over-the-counter market by institutions and individual investors who were geographically dispersed.  Defendants do not challenge Lead Plaintiff's averments as to the size and distribution of the prospective class.  Accordingly, the Court finds that the proposed class is sufficiently numerous to render joinder impractical, and thus satisfies Rule 23(a)(1)'s numerosity requirement.

2.  Commonality

Rule 23(a)(2)'s commonality requirement "will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class."  Baby Neil v. Casey, 43 F.3d 48, 56 (3d Cir. 1994).  It is not required that all claims be identical; Lead Plaintiffs need identify only one common issue.  See id.

In this case there exist several common factual and legal issues, including whether DVI's financial statements were misstated, whether its securities traded at an inflated price and whether Defendants made material misrepresentations.  (See Mot. for Class Cert. 16.)  Additionally, the issue of whether Defendants' conduct violated securities laws is common to all class members. See In re Corel Corp. Sec. Litig., 206 F.R.D. 533, 540 (E.D. Pa. 2002) ("Courts in this Circuit also have recognized that securities fraud cases often present a paradigmatic common question of law or fact of whether a company omitted material information or made a misrepresentation that inflated the price of its stock.") (internal quotation omitted).  Therefore, the Court finds, and Defendants do not dispute, that there are common issues of both law and fact such that the commonality requirement is satisfied.

7

3.  Typicality

In order to certify a class, a court must find that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P 23(a)(3). "The typicality inquiry . . . centers on whether the named plaintiffs' individual circumstances are markedly different or the legal theory upon which the claims are based differs from that upon which the claims of other class members will perforce be based."  Newton, 259 F.3d at 183 (quoting Eisenberg v. Gagnon, 766 F.2d 770, 786 (3d Cir. 1985)).  Like the commonality requirement, typicality does not require an identity of claims or even that all claims be highly similar.  In re Prudential Ins. Com. Am. Sales Practice Litig. Agent Actions, 148 F.3d 283, 311 (3d Cir. 1998).  Rather, the typicality requirement is intended to ensure that the position of the named plaintiff is not in conflict with the interests or legal theories of other class members.  See Newton, 259 F.3d at 184.

"To defeat class certification, a defendant must show some degree of likelihood a unique defense will play a significant role at trial."  Beck, 457 F.3d at 300.  Specifically,"[a] proposed class representative is neither typical nor adequate if the representative is subject to a unique defense that is likely to become a major focus of the litigation."  Id. at 301.[6]  "If a court determines an asserted unique defense has no merit, the defense will not preclude class certification."  Id. at 300.  Thus, some assessment by the Court of the merits of the asserted defenses is necessary.

---

6  The Third Circuit has noted that unique defenses bear both on Rule 23's typicality and adequacy requirements. See Beck, 457 F.3d at 296.  The instant parties have opted to address the issue under the typicality requirement, and no matter how labeled, the relevant inquiry remains the same.

Defendants argue that Lead Plaintiffs are not typical because they will be subject to unique defenses which are not broadly applicable to the class.  Specifically, Defendants argue that Lead Plaintiffs cannot utilize the fraud on the market theory to prove reliance because, rather than relying on the integrity of the market in purchasing securities, Lead Plaintiffs relied on non-public information provided by DVI insiders.  Additionally, Defendants contend that the fraud on the market theory is inapplicable because Lead Plaintiffs purchased DVI securities after the alleged fraud was disclosed or partially disclosed.  Finally, Defendants argue that Lead Plaintiffs lack standing because the decision to purchase DVI securities was made by SG Capital, an investment adviser, and not by Lead Plaintiffs themselves.

> a.   Exchange of Non-Public Information

To prevail in a securities fraud action, a plaintiff must generally prove that it relied on a material misrepresentation.  Berckeley Inv. Group, Ltd. v. Colkitt, 455 F.3d 195, 208 (3d Cir. 2006)  In Basic, Inc. v. Levinson, the Supreme Court found that reliance on a material misrepresentation may be presumed if the plaintiff can establish that the security traded in an efficient market.  485 U.S. 224, 241-45 (1988).  This presumption, however, is rebuttable.  A plaintiff cannot utilize the fraud on the market theory when it is shown that the decision to purchase the security was based on something other than the integrity of the market price.  Id. at 248.  If Lead Plaintiffs were privy to material non-public information, and relied upon that information when purchasing securities; they would be precluded from utilizing the fraud on the market presumption and would, therefore, be rendered atypical.  See In re Indep. Energy Holdings PLC, Sec. Litig., 210 F.R.D. 476, 481 (S.D.N.Y. 2002).

Here, Defendants argue that Lead Plaintiffs relied on non-public information provided by DVI insiders rather than on the integrity of the market price.  In support of this proposition, they

direct us to research notes prepared or maintained by Lead Plaintiff Kenneth Grossman.  These notes indicate, and Lead Plaintiffs concede, that Lead Plaintiffs indeed had private conversations with DVI insiders.  However, Lead Plaintiffs ardently dispute that any material non-public information was exchanged during these communications, as all the information transmitted was either already publicly available or immaterial.

We agree.  Upon reviewing Lead Plaintiffs' motion for class certification, in which they specifically described each research note and compared it to information publicly available at the relevant time, we conclude that the communications from DVI insiders were either immaterial or publicly available, having been disclosed through public conference calls, press releases, SEC filings or other publicly available materials.  (See Lead Pls.' Reply Br. 13-26, Exs. 3-13.) Accordingly, Defendants cannot show that this unique defense will become a major focus of the litigation.  See In re Indep. Energy, 210 F.R.D at 482 ("[C]ourts have consistently certified classes where there was no evidence that the named plaintiff received non-public information from a corporate officer."); Hallet v. Li & Fung, Ltd., 1997 WL 621111, at *3 (S.D.N.Y. Oct. 6, 1997) ("In general . . . the cases hold that if the plaintiff has received information from company insiders that confirms, reflects, repeats, or even digests publicly available market information, that plaintiff is an appropriate class representative.")

Additionally, Defendants have failed to establish a correlation between the alleged receipt of non-public information and securities purchases.  Of the numerous research notes that Defendants claim reflect the receipt of non-public information, only two bear any direct connection with the purchase of DVI securities.  This level of correlation is insufficient to permit a general inference that all of Lead Plaintiffs' investment decisions were predicated on insider communications, as opposed to a reliance on the market price.  While Defendants may certainly

attempt to establish Lead Plaintiffs' lack of reliance on the market price at trial, at this procedural juncture the Court cannot this defense will likely become a major focus of the litigation.  See In re Indep. Energy, 210 F.R.D. at 484 (S.D.N.Y. 2002) ("While the extent of any non-reliance on their part will certainly be a fact question to be decided at trial, it is unlikely to significantly shift the focus of the litigation to the detriment of the absent class members.")[7]

Defendants also argue that, irrespective of the alleged exchange of non-public information, the typicality requirement cannot be met because Lead Plaintiffs — unlike the majority of class members — had personal access to DVI insiders.  Though Defendants' contention finds support in case law[8], there is a significant body of authority that holds that mere communication with corporate insiders will not render a class representative atypical for class certification purposes absent the exchange of non-public information.[9]  The Court finds this view, which appears to be the majority view, more persuasive.

Our conclusion is bolstered by the fact that the 1995 Private Securities Litigation Reform Act ("PSLRA") instructs that under most circumstances, a class should be represented by the eligible investor holding the largest financial stake.  See 15 U.S.C. § 77z-1(a)(3)(B)(iii)(I).  The

---

7  Furthermore, Lead Plaintiffs have already undertaken the arduous task of comparing each representation contained in each research note with publicly available information.  Having already expended this significant effort, it is clear than any future distraction caused by the necessity to further address this issue will be minimal and unlikely to jeopardize the fair representation of the class members.

8  See Beck v. Status Game Corp., 1995 WL 422067, at *4 (S.D.N.Y. July 14, 1995) ("This defense obviously will be unique to [the plaintiff] because plaintiff makes no claim that each of the 4,000 persons who owned [defendant's] stock met with a member of the [defendant's] Board or had several conversations with a Board member."); Grace v. Perception Tech. Corp., 128 F.R.D. 165, 196 (D. Mass. 1989) ("It is beyond reality to suggest that any potential shareholder could meet with corporate officers to discuss information that was already available to the public. Personal contact with corporate officers and special meetings at the company will render a plaintiff atypical to represent the class.") (citing cases).

9  See In re WorldCom., Inc. Sec. Litig., 219 F.R.D. 267, 282 (S.D.N.Y. 2003) (citing cases); A.F.I.K. Holding SPRL v. Fass, 216 F.R.D. 567, 576 (D.N.J. 2003) (citing cases); In re Indep. Energy, 210 F.R.D. at 482 (citing cases).

largest investors of most corporations are generally institutional investors, and the PSLRA was

designed, at least in part, to "increase the likelihood that institutional investors will serve as lead

plaintiffs." S. Rep. No. 104-98, at 11 (1995); see also HR Conf. Rep. No 104-369, at 34 (1995),

U.S. Code Cong. & Admin. News 1995, pp. 679, 690, 733. Moreover, it is commonly

recognized that institutional investors, especially those with large holdings, communicate

directly with corporate officials, and Defendants concede in a different context that this likewise

occurred here. See In re WorldCom, Inc. Sec. Litig., 219 F.R.D 267, 282 (S.D.N.Y. 2003).

(Defs.' Joint Br. in Opp'n to Lead Pls.' Mot. for Class Certification [hereinafter "Defs.' Joint

Br.'] 46, n.23.) Since the PSLRA clearly contemplates that institutional investors — who are

generally understood to communicate with corporate officers — will serve as class

representatives, we decline to find that an investor will be precluded from serving as class

representative merely because of his private communications with corporate insiders about

publicly available information.[10]

### b. Post-Disclosure Purchases

The fraud on the market theory is a rebuttable presumption which can be vitiated by

"showing that the price was unaffected by the fraud or that the plaintiff would have made the

purchase regardless of the misstatement/omission." In re Safeguard Scientifics, 216 F.R.D. 577,

582 (E.D. Pa. 2003) (quoting In re Regal Comm. Corp. Sec. Litig., 1995 WL 550454, at *4 (E.D.

Pa. Sept. 14, 1995)). Thus, where an investor increased his position after a fraud was disclosed,

courts have determined that he would have made the predisclosure purchase notwithstanding the

---

10  This conclusion is further supported by the fact that the cases cited by Defendants in support of their argument in
fact predate the enactment of the PSLRA.

misstatement or omission.  Id.; Kovaleff v. Piano, 142 F.R.D. 406, 408 (S.D.N.Y. 1992); Rolex

Employees Retirement Trust v. Mentor Graphics Corp., 136 F.R.D. 658, 664 (D. Or. 1991).

In the FAC, Lead Plaintiffs allege that "the truth [about DVI's fraud] began to emerge on

May 20, 2003 when DVI revealed that Deloitte, its auditors, had resigned over a material dispute

concerning [certain] accounting treatment." (FAC ¶14(b).)  Various additional aspects of the

fraud were partially disclosed in the months thereafter, on seven different occasions between

June 4, 2003 and August 4, 2003.  Defendants argue that because Lead Plaintiffs purchased

securities after these disclosures, they are prevented from utilizing the fraud on the market

presumption and are therefore subject to unique defenses which prevent class certification.

Defendants concede, however (see Defs. Joint. Br. at 24, n.8.), that the legal authority on

this point is mixed.  See Rosen v. Textron, Inc., 369 F. Supp. 2d 204, 208-09 (D.R.I. 2005)

(collecting cases on both sides of the issue).  This Court believes the correct approach, which the

Fifth Circuit described as "generally accepted," see Feder v. Electronic Data Sys. Corp., 429

F.3d 125, 137-38 & n. 9 (5th Cir. 2005), is that post-disclosure purchases will not prevent an

investor from relying on the integrity of the market for pre-disclosure purchases.[11]  The fraud on

the market theory presumes that in efficient markets all material information, including

disclosures of past frauds, will be reflected in the security's price.  An investor who purchases a

security after the disclosure of adverse information still relies on the fact that the newly released

information will be absorbed by the market and therefore reflected in the post-disclosure price.

This later purchase does not undercut or diminish the argument that the same investor may have

purchased the security pre-disclosure relying on the fact that all information available at the time

---

11  See In re Salomon Analyst Metromedia, 236 F.R.D. 208, 216 (S.D.N.Y. 2006); Lehocky v. Tidel Techs., Inc.,
220 F.R.D. 491, 501-02 (S.D. Tex. 2004); In re Rent-Way Secs. Litig., 218 F.R.D. 101, 114 (W.D. Pa. 2003); but
see In re Safeguard Scientifics, 216 F.R.D. at 582.

was reflected in the then current price.[12]  See Feder, 429 F.3d at 138 ("Reliance on the integrity of the market prior to disclosure of alleged fraud (i.e. during the class period) is unlikely to be defeated by post-disclosure reliance on the integrity of the market. This seems particularly so after the stock price has been 'corrected' by the market's assimilation of the new information."); In re Rent-Way Sec. Litig., 218 F.R.D. 101, 114 (concluding that the fact that a proposed class representative purchased shares after the disclosure of accounting irregularities, and indeed after the representative had become a plaintiff, was "irrelevant" and did not defeat typicality).[13]

      c.  Standing

Defendant Clifford Chance also argues that Plaintiffs Cedar Street Funds and Cedar Street Offshore Fund (together, the "Funds") are subject to a unique defense — and consequently, atypical — because the Funds' investment adviser SG Capital had sole discretion to make investment decisions on their behalf.  Clifford Chance therefore contends that the Funds neither have standing to sue nor satisfy the "in connection with the purchase or sale of a security" requirement of section 10(b).  These arguments are unpersuasive.  There can be no

---

12 Defendants' argument may gain more traction if it was shown that Lead Plaintiffs continued to increase their holdings even after the securities' price remained unaltered following the disclosure of irregularities. This, at least it could be argued, would support the inference that Lead Plaintiffs would have made their purchase even knowing of accounting irregularities.  Defendants do not argue this point, however, and the facts plainly do not support it. Exhibit V to Hartmark's Report (Pls. Ex. E) shows that the price of DVI's stock dropped from approximately $8.00 in May 2003 to approximately $1.00 in the beginning of August 2003.

13 Of course, the Court recognizes that there are certain limited circumstances under which post-disclosure purchases may defeat an investor's attempt to utilize the fraud on the market presumption, such as when a disproportionately large percentage of the investor's purchases are made *after* a curative disclosure, or when a disclosure is so "forceful" that it becomes "unreasonable for an investor, or the market, to continue to be misled by the defendants' alleged misrepresentation."  In re Resource America Sec. Litig., 202 F.R.D. 177, 183 (E.D. Pa. 2001) (quoting Semerenko v. Cendant Corp., 223 F.3d 165, 181 (3d Cir. 2000)).  Neither is the case here.  Lead Plaintiff's post-disclosure purchases made up a relatively small percentage of their overall holdings, and the partial disclosures, which were made over time, were not particularly forceful.  Indeed, the full scope of DVI's financial troubles were not revealed until well after Lead Plaintiffs' final purchase, and at no time prior to DVI's August 13, 2003 bankruptcy announcement did it publicly identify any misrepresentations or accounting improprieties. Furthermore, many of the partial disclosures were couched in ameliorative terms, such as extended default-curing timeframes, that attempted to lessen the negative impact of the disclosure.

dispute that the Funds satisfy the traditional elements of standing—injury-in-fact, causation and

redressability.  See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992).  Furthermore,

we agree with the court in In re Vircuron Pharmaceuticals, Inc. Securities Litigation:

> If an institutional investor cannot be a class representative simply because
> it turned over day-to-day investment decisions to professional money
> managers or advisors, few if any institutional investors could be class
> representatives in any securities action. Such a result is contrary to the
> intentions of Congress embodied in the PSLRA that institutional investors
> should oversee more securities actions.

233 F.R.D. 421, 427 (E.D. Pa. 2006).  Clifford Chance's arguments therefore fail.

As such, we are assured that any unique defenses Lead Plaintiffs might have are unlikely

to become the major focus of this litigation.  The typicality requirement is thus satisfied.

### 4.  Adequacy

Under Fed. R. Civ. P. 23(a)(4), class representatives must also "fairly and adequately

protect the interests of the class."  This adequacy requirement compels a two part inquiry: before

a class can be certified, the Court must conclude (1) that the class representatives' interests do

not conflict with those of the class members, and (2) that class counsel is capable of adequately

representing the class.  Newton v, Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154,

185 (3d Cir. 2001) (citing Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147,157 & n. 13 (1982).

"The adequacy inquiry 'serves to uncover conflicts of interest between named parties and the

class they seek to represent.'"  Beck v. Maximus, Inc., 457 F.3d 291, 296 (3d Cir. 2006) (quoting

Amchem Products, Inc. v. Windsor, 521 U.S. 591, 625 (1997). "It 'assures that the named

plaintiffs' claims are not antagonistic to the class and that the attorneys for the class

representatives are experienced and qualified to prosecute the claims on behalf of the entire

class.'"  Id. (quoting Baby Neal v. Casey, 43 F.3d 48, 55 (3d Cir. 1994)).  The PSLRA instructs

courts to presume that the member of the purported class with the largest financial stake is most

adequate.  See In re Cendant Corp. Litig., 264 F.3d 201, 243-44 (3d Cir. 2001) (citing 15 U.S.C.

§ 78u-4(a)(3)(B)(i) & (iii)(I)).

Defendants contend that Lead Plaintiffs, Krislov & Assoc., Ltd. ("Lead Counsel") and

Chimicles & Tikellis, LLP ("Liaison Counsel", and together with Lead Counsel, "Class

Counsel") will not adequately represent the interests of the class because they (a) entered into a

fee agreement that violates Pennsylvania Rules of Professional Conduct, (b) failed to timely

produce certain documents responsive to their discovery requests, and (c) failed to disclose

certain trades by Lead Plaintiffs during the Class Period as required by the PSLRA.

### a. Fee Agreement between Lead Plaintiffs and Lead Counsel

First, Defendants argue that the original fee agreement between Lead Plaintiffs and Lead

Counsel, which gave Lead Counsel the right to approve or reject any settlement, violated

professional ethics rules requiring lawyers to abide by a client's settlement decision.  See Pa. R.

P. C. 1.2(a).  They argue that this arrangement permitted Lead Counsel, rather than Lead

Plaintiffs, to control the litigation, rendering them inadequate representatives of the proposed

class.  As a preliminary matter, the Court is not convinced that the original fee agreement, in the

context of a class action, is ethically or legally improper.  Because an attorney in a class action

has duties to all class members, not just the class representative, it is not inappropriate for class

counsel to have the ability to reject a settlement which is not fair to the class.  Moreover, this

issue is now moot as the fee arrangement has since been amended and the relevant clause

excised.  Any potential ethical impropriety is thus avoided.

### b. Failure to Timely Produce Certain Documents

Defendants also argue that Lead Plaintiffs' and Lead Counsel's failure to timely produce portions of plaintiff Kenneth Grossman's research notes raise issues of credibility, such that they are inadequate representatives of the class. While in certain situations an attorney or class representative with questionable credibility may be inadequate to represent the class, see Karnuth v. Rodale, Inc., 2005 WL 747251, at *3 (E.D. Pa. Mar. 30, 2005), that is not the case here. First, Defendants do not refute Lead Plaintiffs' point that the late documents consisted of a mere nine of a total of 747 pages of production. Second, these nine pages — part of plaintiff Kenneth Grossman's research notes — were produced the evening prior to his deposition, and were apparently omitted by accident due to an unforeseen computer problem. Though Defendants are entitled to the timely production of all materials responsive to their discovery request, this inadvertent failure to produce a handful of documents in an otherwise voluminous document production does not seriously undermine the credibility of Lead Counsel or Lead Plaintiffs. Indeed, Defendants do not allege that the materials were withheld in bad faith or that they were significantly prejudiced by the delayed production.[14] See In re Tyco Int'l Ltd., 236 F.R.D. 63, 73 (D.N.H. 2006) ("Neither plaintiff is an inadequate class representative simply because it may have inadvertently failed to timely produce a few documents in an otherwise substantial discovery request.").

c. Failure to Disclose Certain Trades in DVI

Finally, Defendants argue that Lead Plaintiffs are not adequate because Plaintiff Kenneth Grossman failed to disclose all his trades in DVI securities during the proposed Class Period, as required by the PSLRA. See 15 U.S.C. § 78u-4(a)(2). Specifically, Defendants point to the fact

---

14 It is also noteworthy that Lead Plaintiffs produced all documents shortly after being alerted to the discrepancy, further showing a lack of deceptive intent.

17

that, upon modifying the Class Period, plaintiff Kenneth Grossman failed to submit a new certification disclosing his DVI transactions during 1999 and 2000.[15]

The language of 15 U.S.C. § 78u-4(a)(2), however, does not appear to impose upon Lead Plaintiffs an ongoing obligation to update the class representative certificate. 15 U.S.C. § 78u-4(a)(2)(A) states, in pertinent part, that "[e]ach plaintiff *seeking to serve as a representative party* on behalf of a class shall . . . set[] forth all of the transactions of the plaintiff in the security that is the subject of the complaint *during the class period specified in the complaint*." (emphasis added).  The provision thus purports to cover only transactions which occurred within the class period of the complaint originally submitted by an putative class representative.  See also In re Atlas Air Worldwide Holdings, Inc. Sec. Litig., 324 F. Supp. 2d 474, 500 (S.D.N.Y. 2004) (concluding that PSLRA does not require class representatives to file a new certification each time an amended complaint is filed).  Since Lead Plaintiffs properly reported all their DVI transactions for the class period set forth in the original complaint, we do not find their failure to update this disclosure upon amending the complaint sufficient to render them inadequate.[16]

Furthermore, Defendants have not advanced, and the Court has not discovered, any interest held by Lead Plaintiffs which may be antagonistic to those of the class.  It is undisputed that Lead Plaintiffs had a significant financial stake in DVI, and that they, like all members of

---

15  In the original complaint, Lead Plaintiffs proposed a class period beginning on November 7, 2001 and running through August 13, 2003.  In connection with this complaint, Plaintiff Kenneth Grossman filed a certification disclosing all trades occurring during this period as required by the PSLRA.  The original complaint was later amended and the beginning of the class period was moved back to August 10, 1999.  Plaintiff Kenneth Grossman, however, did not resubmit a new certification that disclosed his transaction in DVI securities during 1999 and 2000.  Defendants argue that Plaintiff Kenneth Grossman's failure to disclose trades he undertook in 1999 and 2000 render him inadequate to represent the class.

16  Indeed, our conclusion is further strengthened by the fact that Lead Plaintiffs' failure to disclose the 1999 and 2000 transactions effectively understated, rather than overstated, their total loss from the alleged fraud.

18

the class, stand to benefit from a favorable resolution to this litigation.  Also, as sophisticated institutional investors they possess special knowledge and capabilities which will assist them in adequately representing the class.  We therefore find the adequacy requirement satisfied.

    C. Rule 23(b)

    In addition to satisfying the requirements of Rule 23(a), in order to certify a class a court must also find that the class action satisfies one of three categories set forth in Rule 23(b).  Here, Lead Plaintiffs seek to certify the class under Rule 23(b)(3), which requires us to find "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  To satisfy this requirement, the Third Circuit has instructed that "[i]ssues common to the class must predominate over individual issues, and the class action device must be superior to other means of handling the litigation."  Johnston v. HBO Films Management, Inc., 265 F.3d 178, 185 (3d Cir. 2001) (quoting Newton, 259 F.3d at 186-87).

    1. Predominance

    "Predominance measures whether the class is sufficiently cohesive to warrant certification.  Unlike commonality, predominance is significantly more demanding, requiring more than a common claim."  Newton, 259 F.3d at 182 (internal citations omitted).  A court must begin its analysis by considering the elements of the underlying cause of action.  Id. at 172. Here, Lead Plaintiffs have asserted a cause of action under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.[17]  "In a typical § 10(b) private action a plaintiff must

---

17  Plaintiffs have also asserted claims under Section 20(a) of the Exchange Act against certain Defendants.  With respect to these claims, Defendants do not argue that questions of law or fact common to class members do not predominate over any questions affecting only individual members.  After reviewing the specific elements of Section 20(a), this Court finds that the common issues of fact and law likewise predominate with respect to claims arising

prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc., 128 S. Ct. 761, 768 (2008).

Defendants' argument centers on the fourth element, reliance. They claim that certification is inappropriate in this case because individual issues related to the reliance of class members upon DVI's alleged misrepresentations will predominate over all other common issues. See Stoneridge Investment Partners, 128 S. Ct. at 769. ("Reliance by the plaintiff upon the defendant's deceptive acts is an essential element of the § 10(b) private cause of action."). Were Lead Plaintiffs forced to individually prove that each class member detrimentally relied on the alleged fraudulent statements, we would agree that individual issues indeed predominate over class issues. See Basic, 485 U.S. at 242. ("[r]equiring proof of individualized reliance [and injury] from each member of the proposed plaintiff class effectively would . . . prevent[ ] [plaintiffs] from proceeding with a class action, since individual issues then would . . . overwhelm[ ] the common ones.")

However, Lead Plaintiffs seek to avoid establishing reliance for each individual member by invoking one of two presumptions established by the Supreme Court. The first, commonly known as the "fraud on the market" theory, operates to create a rebuttable presumption of reliance as to "an investor who buys or sells securities at the price set by the market [since that investor] does so in reliance on that market." See Basic, Inc. v. Levinson, 485 U.S. 224, 247 (1988). The second, articulated in Affiliated Ute Citizens of Utah v. United States, provides that in cases "involving primarily a failure to disclose, positive proof of reliance is not a prerequisite

under that section.

20

to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision." 406 U.S. 128, 153 (1972).

                a. Fraud on the Market

      Under the fraud on the market theory, Lead Plaintiffs need not individually show that they, or any member of the class, knew of or relied upon the alleged misrepresentations. "Instead, lead plaintiffs are accorded the presumption of reliance based on the theory that in an efficient market the misinformation directly affects the stock prices at which the investor trades and thus, through the inflated or deflated price, causes injury even in the absence of direct reliance." In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1419 n.8 (3d Cir. 1997) (citing Basic, 485 U.S. at 241-242. To invoke the fraud on the market theory, however, Lead Plaintiffs must first establish that the securities at issue traded in an open and efficient market. Id. (citing Hayes v. Gross, 982 F.2d 104, 107 (3d Cir.1992)); Peil v. Speiser, 806 F.2d 1154, 1161 (3d Cir.1986)). "[I]n an open and developed securities market, the price of a compan's stock is determined by the available material information regarding the company and its business." Basic, 485 U.S. at 241 (quoting Peil, 806 F.2d at 1160-61).

      Similarly, the Third Circuit has defined an "efficient" market as one where "information important to reasonable investors . . .  is immediately incorporated into stock prices." In re Burlington, 114 F.3d at 1425 (citation omitted.).  In determining whether the market for DVI's common stock and Senior Notes are efficient the Court will consider several different factors: whether these securities (1) traded on a public exchange; (2) had large trading volumes; (3) were followed by market analysts; (4) had several market makers; (5) could be and were registered on SEC Form S-3; and (6) responded quickly to the release of company-specific information.  See

<u>Cammer v. Bloom</u>, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989).  Additionally, the Court will

assess the (7) size of market capitalization of DVI; (8) size of the public float for the security;

and (9) ability to short sell the security, <u>see</u> <u>Krogman v. Stereitt</u>, 202 F.R.D. 467, 477-78 (N.D.

Tex. 2001), and (10) the level of autocorrelation, <u>see</u> <u>In re Polymedica Corp. Sec. Litig.</u>, 453 F.

Supp. 2d 260, 276-77 (D. Mass. 2006).  Both Defendants and Lead Plaintiffs have put forth

several expert reports to analyze these ten factors.[18]  Each factor will be discussed below, and an

efficiency analysis will be performed for both the common stock and the Senior Notes, as the

proposed class is comprised of purchasers of both of these securities.

<u>DVI's COMMON STOCK</u>

(1) Open Market

Courts have routinely held that securities traded on the NYSE, such as DVI's common

stock, trade in an efficient market. <u>See, e.g.</u>, <u>Oran v. Stafford</u>, 226 F.3d 274, 282 (3d Cir. 2000)

(describing the NYSE as "open and developed [where] the price of a company's stock is

determined by all available material information regarding the company and its business");

<u>Freeman v. Laventhol & Horwath</u>, 915 F.2d 193, 199 (6th Cir. 1990)) ("[I]t appears that

securities traded in national secondary markets such as the New York Stock Exchange . . . are

well suited for application of the fraud on the market theory.  The high level of trading activity

ensures that information from many sources is disseminated into the marketplace and

consequently is reflected in the market price.  This is the premise upon which the fraud on the

market theory rests."); <u>In re Laidlaw Sec. Litig.</u>, 1992 WL 68341, at *10 n.8 (E.D. Pa. 1992)

---

18  Lead Plaintiffs' expert Michael L. Hartzmark submitted an original and rebuttal report discussing market efficiency for DVI's common stock and Senior Notes .  <u>See</u> Pls. Ex. E, F.  Defendants' primary expert Robert F. Whitelaw also submitted an original and rebuttal expert report which also assessed the efficiency of DVI stock and notes.  <u>See</u> Defs. Ex. B, R.  Additionally Geert Bekaert submitted an expert report on Defendants' behalf responding to Hartzmark's original report, Defs. Ex. T, and Jean Helwege submitted a report discussing the efficiency of the market for DVI senior notes, Defs. Ex. Z.

("[T]he fraud on the market theory is particularly applicable to a large national market such as the NYSE.").

While Defendants are correct that trading on a national exchange is not a *per se* indicator of market efficiency, see Bell v. Ascendant Solutions, Inc., 422 F.3d 307, 315-16 (5th Cir. 2005), the fact remains that neither Defendants nor this Court have been able to locate a single case where the market for a NYSE-traded security was deemed inefficient.  Accordingly, the fact that DVI common stock was traded on the NYSE strongly favors a finding of market efficiency.

(2) Trading Volume

High trading volume is often seen as indicative of efficiency because "many investors are executing trades on the basis of newly available or disseminated corporate information." Cammer, 711 F. Supp. at 1286.  The Cammer court held that "average weekly trading of two percent or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; one percent would justify a substantial presumption."  Id.  Lead Plaintiffs contend that during the proposed Class Period, the average weekly trading volume of DVI stock was 1.70% of outstanding shares.  (Mot. for Class Cert. Ex. E, ¶ 18.) (hereinafter the "Hartzmark Report __")  Defendants argue, however, that this figure is misleading because it (a) does not account for a "well accepted adjustment for double counting of volume that results because of trades of market makers" (Defs.' Joint Br. Ex. T ¶ 19.) (hereinafter, the "Bekaert Report __") and (b) includes the 10 week period following the resignation of Deloitte, during which trading volume was atypically high.[19]

---

19  With respect to this factor, as well as analyst coverage and cause and effect, Defendants cite to various statements previously made by Lead Plaintiffs in research notes and marketing materials that undercut their current contention that the market for DVI's common stock was efficient.  Though these arguments are relevant to the Court's consideration of the issues presented, they are not dispositive.  In determining if there is an efficient market for DVI's common stock, the Court must make a legal determination based on the arguments of counsel and

While recognizing that the inclusion of a highly volatile period surrounding Deloitte's resignation may skew the average weekly trading volume, the complete exclusion of this entire 10 week period (during which DVI released a great deal of material information) does not appear justified.  Furthermore, even if both adjustments suggested by Defendants are accepted as valid, the average weekly trading volume of DVI's common stock was still nearly 1%.[20]  Under Cammer, a 1% average weekly trading volume justifies a substantial presumption that a security trades in an efficient market.  Accordingly, Lead Plaintiffs can be afforded, at a minimum, a substantial presumption that the market for DVI's common stock was efficient.

### (3)  Analyst Coverage

Extensive coverage by securities analysts likewise indicates market efficiency, since the price of a company's security is often affected by analysts' reports of information learned through their own investigation and analysis.  See Crammer, 711 F. Supp. at 1286.  Defendants argue that DVI lacked significant independent analyst coverage because (a) there were insufficient analysts covering the company, (b) the analysts that did cover the company did not closely follow or review the company and (c) the analysts were not independent.

During the Class Period, at least three analysts covered DVI (see Defs.' Joint Br. Ex. B ¶ 20.) (hereinafter, the "Whitelaw Report __") and over 80 analyst reports were published relating to DVI.[21]  Although three analysts is a relatively low number[22], it must be considered in the

supported by expert witness reports.  The prior statements made by Lead Plaintiffs are anecdotal evidence, and as such are given less deference by the Court.

20  According to the Defendant's expert, Robert F. Whitelaw, the trading volume of DVI's common stock during the Class Period was 1.46%, if the double counting of market markers is excluded, and 0.97%, if the 10 week period of heighten volatility is also excluded.  (Defs.' Joint Br. Ex. B ¶ 19.)

21  Dr. Hartzmark originally counted 36 expert reports during the Class Period.  See Hartzmark Report Ex. II.  However, in discovery produced after Dr. Hartzmark submitted his expert report, Lead Plaintiffs learned that at least 80 reports were published during the Class Period. See Pls. Rebuttal Br. at 68 n.45.

context of the total number of reports published and the other information generally available about the company.  <u>Cheney v. Cyberguard Corp.</u>, 213 F.R.D. 484, 499 (S.D. Fla. 2003) (noting that in reviewing the sufficiency of analyst coverage, "a significant number of news items indicating that information regarding [a company] may have been widely distributed, which would support a finding of efficiency").  Here, on at least 190 days during the Class Period, there was public disclosure about DVI in the form of news items, analyst reports, and press releases. (Hartzmark Report App. F.)  In light of the amount of publicly available information and the number of reports issued, the analyst coverage of DVI was sufficient to favor a finding of market efficiency.

Additionally, U.S. Bancorp Piper Jaffray, Inc. and CIBC World Markets Corp., who published the majority of the analyst reports, were sufficiently independent such that the Court's reliance on their reports in evaluating this factor is proper.  Defendants claim that CIBC World Markets Corp. lacked independence because a related entity, Canadian Imperial Bank of Commerce, also served as the trustee of several trusts — which held 17.5% of DVI's outstanding stock — benefitting the Pritzkers, DVI's largest shareholder.  They also claim that U.S. Bancorp Piper Jaffray, Inc. ("Piper Jaffray") lacked independence because it acted as co-underwriter for the 1998 Notes and "likely" received substantial investment banking fees as a result of this issuance.  Additionally, Defendants claim that plaintiff Kenneth Grossman contacted a U.S. Bancorp Piper Jaffray, Inc. analyst to ask for a report related to DVI to be rewritten.

---

22  According to Defendants, academic research indicates that the mean number of analyst covering a stock is 6.54 (Bekaert Report ¶ 20)

These allegations are insufficient to persuade the Court that these analysts' coverage should be disregarded. Both Piper Jaffray and CIBC are large securities firms, which like many others, provide a wide range of services to diverse clients and generate significant revenue. The mere fact that these firms bore *some* connection to DVI or its shareholders does not render their analyst reports irrelevant, and we cannot infer, based on this record, that these stand-alone transactions were so significant as to have affected the accuracy of the analyst reports.

### (4)  Number of Market Makers

Because market makers are used only for securities traded on the NASDAQ or in the over-the-counter market, this factor is not relevant for our purposes.

### (5)  Eligibility to File on SEC Form S-3

The SEC permits publicly-listed companies meeting certain criteria to register their new securities issuances on Form S-3. See Krogman v. Sterritt, 202 F.R.D. 474, 476 (N.D. Tex. 2001). Form S-3, which incorporates by reference a company's prior public securities filings, "is predicated on the [SEC's] belief that the market operates efficiently for these companies, i.e., that the disclosure in Exchange Act reports and other communications by the registrant, such as press releases, has already been disseminated and accounted for by the market place." Crammer, 711 F. Supp. at 1284 (quoting SEC Securities Act Release No. 6331, 46 FR 41,902, *reprinted in* Fed.Sec.L.Rep. (CCH) Spec.Regs. No. 926, extra ed. (Aug. 13, 1981)). During the Class Period, DVI was eligible to file, and did in fact file, Form S-3 for its issuances of common stock on August 31, 2001 and January 14, 2002. Accordingly, this factor weighs in favor of efficiency.[23]

---

23  Defendants attempt to discount the importance of this factor, arguing that the requirements to attain S-3 eligibility have become less rigorous since Cammer. Though the S-3 requirements have indeed been somewhat relaxed, courts have nevertheless continued to consider this issue as a valuable factor in an efficiency analysis. See Krogman, 202 F.R.D. at 476; Griffin v. GK Intelligent Systems, Inc., 196 F.R.D. 298, 304 (S.D. Tex. 2000); Serfaty v. Int'l Automated Sys., 180 F.R.D. 418, 422 (D. Utah 1998).

(6)  Cause and Effect

In considering the efficiency of the market for a security, courts often focus on whether the security's price reacted quickly to significant corporate events and disclosures.  The <u>Cammer</u> court found this "cause-and-effect" factor to be "the essence of an efficient market and the foundation for the fraud on the market theory."  <u>Cammer</u>, 711 F. Supp. at 1287.  Many courts have subsequently agreed and have held this factor to be the most important.  <u>See</u> <u>Krogman</u>, 202 F.R.D. at 477; <u>In re 2TheMart.com, Inc.</u>, 114 F. Supp. 2d 955, 964 (C.D. Cal. 2000).  The parties and their experts therefore devote considerable time to discussing changes in the price of DVI stock and how those changes were, or were not, affected by disclosures of DVI-specific news.

First, to assess the correlation between price fluctuations and news releases, Lead Plaintiffs' expert performed an event study in which DVI's stock price was tracked over a period of time and significant price changes were compared with public disclosures.  A proper event study must take into consideration changes in stock price caused by broader market factors as well as information endemic only to a particular security.  Thus, Lead Plaintiffs' expert compared changes in DVI's price with changes in the S&P 500, the stock price of similarly sized companies, and DVI's competitors.  The expert discovered that of the 34 days during the Class Period when DVI stock saw statistically significant returns, about 59%, or 20 of those days, coincided with news releases.  (Hartzmark Report ¶¶ 33-36.)

Defendants question this event study, arguing that (1) the inclusion of DVI's competitors into this model is unusual and may have led to hard-to-interpret abnormal returns, (2) the study first identified statistically relevant price movements and then thereafter idenitifed corresponding

news events, (3) there were several instances in which the price of DVI stock took a day or more to reflect news releases, and (4) there were a large number of days during which DVI stock experienced a significant change despite no identifiable public disclosures.

Each of Defendants' issues may be reconciled.  First, the event study's inclusion of DVI's competitors was reasonably used to account for market- and sector-specific forces affecting the price of DVI stock.  In at least one instance the inclusion of DVI's competitors was necessary to explain a significant price change in DVI stock.[24]  Indeed, the reasonableness of Lead Plaintiffs' model is reinforced by the similar results produced using Defendants' own model.[25]

Second, Lead Plaintiffs' method of first identifying those days with significant stock returns and then identifying news events to explain the price change is a reasonable method of demonstrating the cause-and-effect relationship associated with an efficient market.  Defendants' expert Geert Bekaert ("Mr. Bekaert") argues that the data analysis sequence should be switched — as in one should first identify a news event and then look for a notable change in price — in order to properly evaluate market efficiency.  (Bekaert Report ¶ 10.)  We disagree.  The type of event study criticized by Mr. Bekaert is precisely the type generated by Robert Whitelaw ("Dr. Whitelaw"), another one of Defendants' experts (See Whitelaw Report ¶¶ 15-16.)  Furthermore, a study that first focused on news events and only then attempted to analyze price fluctuations would be ambiguous: if a stock price was seemingly unaffected on the date of a news release,

---

24  On May 9, 2000, Defendants' event study model indicates that there was a net market return of 10.04% with no associated news event.  Lead Plaintiffs' model, however, does not show a significant market return on this day because by incorporating DVI's competitors, the model take into account a 28% decline in the stock price on a rival following negative public disclosure.

25  Specifically, Dr. Whitelaw identified that of the 56 days that had statistically significant stock returns, 33 days were accompanied by the release of news.  This is approximately 59%.

one would not be able to discern whether this was due to market inefficiency or simply investor indifference to that particular news event.

Third, Defendants' contention that Lead Plaintiffs' study is unreliable because DVI's stock price sometimes took several days to incorporate new information is meritless. After reviewing the relevant exhibits, this Court found that on the vast majority of occasions the information was incorporated into the stock price on the same day. Even in the rare instances where it took slightly longer, it nevertheless adjusted within two days, a time period viewed by other courts as sufficiently indicative of a cause-and-effect relationship. See Lehocky v. Tidel Techs, Inc., 220 F.R.D. 491, 506 (S.D. Tex. 2004).

Fourth, Defendants argue that the market was inefficient because there were no identifiable news events on at least 40% of the days when DVI's stock price saw statistically significant movement. Theoretically, in a perfectly efficient market there should be no significant price movements without some identifiable news event. However, as a court we cannot decide efficiency based purely on theory, but must make a determination in the context of the real world. "Efficiency is a relative concept, a matter of degree." In re Enron Corp. Sec., 2006 WL 4381143, at *76 (S.D. Tex. 2006). Lead Plaintiffs cite two broad-based studies which found that only about one-third of statistically significant changes in the stock price of publicly traded companies are actually associated with identifiable news or events. (Hartzmark Rebuttal Report ¶ 39.) Because approximately 60% of the changes in DVI's stock price can be linked to identifiable news events, the Court finds that this level of correlation strongly suggests a relatively efficient market. Accordingly, this factor weighs in favor of efficiency.

(7) Market Capitalization

"Market capitalization, calculated as the number of shares multiplied by the prevailing share price, may be an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations." <u>Krogman</u>, 202 F.R.D. at 478.  The market capitalization of DVI during the Class Period ranged between $300 million to $12 million, following DVI's negative disclosures.  (Hartzmark Report ¶ 39.)  During most of the Class Period, DVI's market capitalization was well above the median for all companies trading on the NYSE, AMEX or NASDAQ.  (Hartzmark Report ¶ 40.)  This level of market capitalization weighs in favor of market efficiency.  <u>See</u> <u>Krogman</u>, 202 F.R.D. at 478 (finding the fact that a company's market capitalization was in the top 60% of its sample group, derived from NYSE, AMEX, and NASDAQ listings, weighed in favor of market efficiency).  Although DVI was classified as a "small cap" company and its market capitalization was lower than the NYSE-specific median, its rather high market capitalization as compared to the broader survey of publicly traded companies weighs in favor of a finding of market efficiency.

(8) Public Float

The public float, defined as the percentage of a security held by the public as opposed to company insiders, is also a relevant indicator of market efficiency.  <u>Id.</u>  "Because insiders may have private information that is not yet reflected in stock prices, the prices of stocks that have greater holdings by insiders are less likely to accurately reflect all available information about the security."  <u>Id.</u>  Lead Plaintiffs claim that DVI's public float was approximately 75% during the Class Period.  (<u>See</u> Hartzmark Report ¶ 43.)  Defendants claim it was only 67.7 %.  (Defs.' Joint Br. 45.)  Neither party, however, has provided any information that puts these numbers in comparative perspective.  <u>Cf.</u> <u>Krogman</u>, 202 F.R.D. at 478 (finding a public float of 46% to

30

weigh against market efficiency), and Cheney v. Cyberguard Corp., 213 F.R.D. 484, 502

(finding a public float of 95% indicative of an efficient market).  Thus, we cannot find that this

factor weighs either for or against efficiency.[26]

(9) Short-Selling Interest and Arbitrage Opportunities

Courts have also recognized that "[o]ne way information gets absorbed into the market

and reflected in stock price is through arbitrageurs."  In re PolyMedica Corp. Sec. Litig., 432

F.3d 1, 9 (1st Cir. 2005).  Arbitrageurs[27] exploit mis-pricing in the market by engaging in

transactions such as short-selling, a technique used by investors who try to profit from a stock's

falling price.[28]  Effectively, the market relies upon such arbitrageurs to immediately attempt to

profit from newly-disclosed information, "thereby causing the stock to move into a price which

reflects the latest public information concerning the stock, where it is no longer possible to

generate profits."  Id.  Thus, where short-selling opportunities — which require arbitrageurs to

compete against one another — are limited, it may be indicative of an inefficient market.

Defendants claim that during the Class Period investors were unable to short-sell DVI

stock, noting that its average short interest was only 0.40% of its total shares outstanding, as

compared with an average of 1.77% for NYSE-traded stocks as a whole.  (Whitelaw Report ¶

---

26  Additionally, this Court rejects Defendants' contention that high levels of stock ownership by institutional investors suggest an inefficient market.  See O'Neil v. Appel, 165 F.R.D. 479, 503 (W.D. Mich. 1996) (noting that pricing inefficiencies are more likely to be found where a company's stock is *not* widely held by institutional investors).

27  Arbitrage is "[t]he simultaneous buying and selling of identical securities in different markets, with the hope of profiting from the price difference in those markets."  In re PolyMedica Corp. Sec. Litig., 453 F. Supp. 2d 260, 273 fn. 11 (D. Mass 2006) (quoting Black's Law Dictionary 112 (8th ed.2004)).

28  "Short selling is accomplished by selling stock which the investor does not yet own; normally this is done by borrowing shares from a broker at an agreed upon fee or rate of interest . . . .  The short seller is obligated, however, to buy an equivalent number of shares in order to return the borrowed shares . . . ."  GFL Advantage Fund, Ltd. v. Colkitt, 272 F.3d 189, 196 (3d Cir. 2001) (citing Zlotnick v. TIE Communications, 836 F.2d 818, 820 (3d Cir.1988).

21.)  They also claim that Lead Plaintiffs inappropriately rely on short sales that occurred in 1998, which fall outside the Class Period, to support their contention that investors had the ability to short-sell DVI's stock.

The focus of our inquiry is whether there existed barriers such that investors were unable to short-sell DVI stock.  See In re Polymedica Corp. Sec. Litig., 453 F. Supp. 2d 260, 275 n.18 (D. Mass. 2006) ("What matters is that in this case, the barriers to short selling in the market for PolyMedica stock in particular were uncommonly high.")  Accordingly, while the average short interest of a security is a useful proxy for determining whether there existed barriers to short-selling a particular security, it is not dispositive because other factors (including the market's expectations about the future direction a of security's price) may have caused reduced short selling.  Here, though the average short interest in DVI was relatively low compared to other stocks, it is clear that investors *were* able to short-sell it during the Class Period.  The record shows that investors were able to substantially increase their short positions in DVI from approximately 100,000 shares in June 2003 to approximately 400,000 in August 2003.  This type of rapid increase in shorting DVI supports a conclusion that there did not exist significant barriers to short-selling DVI.  This conclusion is also supported by the high levels of short sales in the months proceeding the Class Period.  In light of the flexibility of the short selling market and the general level of short sales in DVI,[29] the Court finds this factor weighs in favor of efficiency.

(10) Autocorrelation

---

[29]  During the Class Period, the short interest in DVI ranged between 1,718 shares to 384,557 shares, with a significant spike towards the end of the Class Period.  (Hartzmark Report ¶ 47.)

Another factor we may consider is whether a security demonstrates autocorrelation.  See In re Polymedica Corp. Sec. Litig., 453 F.Supp.2d 260, 276-77 (D. Mass. 2006).  A security exhibits autocorrelation if the change in price of the security on a given day provides an indication of what the change in price for the security will be on the following day.  If new information about a company is incorporated slowly into the price of a security, then the security will exhibit autocorrelation, suggesting an inefficient market.

Defendants' expert Mr. Beckaert reported that, during the Class Period, the return on DVI's common stock showed significant patterns of autocorrelation.[30]  (Beckaert Report ¶ 13.) Lead Plaintiffs do not contest this finding.  As such, the Court finds that DVI's stock likely demonstrated some autocorrelation during the Class Period, and thus this factor weighs against a finding of efficiency.

Nevertheless, based on our assessment of the various factors analyzed above, for which most weigh in favor of market efficiency, we conclude that DVI's common stock traded in an efficient market during the Class Period.  We therefore move on to assess the market for DVI's Senior Notes.

DVI's Senior Notes

DVI's Senior Notes include two separate tranches of notes that entered the market at different times.  The 1997 Notes were offered in January 1997 and consisted of $100 million of 9 7/8% notes that traded on the NYSE.  The 1998 Notes were offered in December 1998 and consisted of an additional $55 million of 9 7/8% notes that traded in the over-the-counter market.

---

30  Defendants note that DVI's common stock during the Class Period had a autocorrelation coefficient of .23, which indicates statistically significant autocorrelation.  Specifically, this coefficient implies that if DVI's stock showed an above average return of 10% on a given day, then the return the next day would be expected to be 2.3% above average.  (Beckaert Report ¶ 15.)

Both tranches of notes had identical terms, covenants and provisions, and were thus considered virtual substitutes by the market.  Their interchangeability can be seen by the 99.2% + correlation between the two tranches' prices during the Class Period, and is also reflected in their highly correlated rates of return.  (Hartzmark Report ¶ 89.)  Thus, as the market effectively treated the two tranches as one security, the Court will do the same for purposes of evaluating whether they traded in an efficient market.  See In re Enron Corp. Sec., 2006 WL 4381143, at *74 (S.D. Tex. 2006) (accepting the grouping of securities that traded in different markets to analyze whether debt securities traded in an efficient market).

In making this market-efficiency assessment, courts tend to apply the same factors as applied to common stock.  The factors and standards applicable to common stock, however, are admittedly not well-suited for the analysis of debt securities.  Id.  ("[C]ommentators and courts have recognized that the Cammer/Unger/Bell factors were developed to measure the efficiency of stock markets and do not fit the bond markets well").  This conflict arises in part from the particular characteristics of the debt market and the method by which debt securities are priced.[31] "[A] comparison between equity and bond markets is a comparison between the proverbial apple and orange."  Id. at *80.  This inapplicability is further complicated by the fact that few courts have addressed the issue.  See id. at 75.

Nevertheless, corporate bond investors cannot be categorically denied an opportunity to utilize the fraud on the market theory simply because of a structural difference in the way that debt securities are marketed and traded vis-a-vis equity securities.  See id.  Accordingly, the

---

31  As noted by Lead Plaintiffs' expert "[t]he corporate bond market is primarily an institutional market.  Most trading takes place over-the-counter where the potential bond trader cannot observe all quotes on a centralized exchange or on a computer screen."  (Hartzmark Report ¶ 51).  Additionally, the price of a corporate bonds is determined by the rate of return of risk-less debt, the provision and terms of the bond, the probability of default and the liquidity of the market for the offering. (Id. ¶ 53.)

Court will take the same general approach for determining the market-efficiency of DVI's Senior Notes as with DVI common stock, bearing in mind these structural differences.[32]

(1)  Trading Volume

Based on verifiable trade volume data, the Senior Notes had an average weekly trading volume during the Class Period of 1.25%.[33]  Under Cammer, this entitles Lead Plaintiffs to a substantial presumption that the market for the Senior Notes was efficient.  Indeed, this presumption is strengthened in light of the fact that the numerical thresholds set forth in Cammer were fashioned with respect to corporate equities and not corporate bonds, which generally experience lower trading volume.[34]  Furthermore, relative to other corporate bond issuances, the Senior Notes were very actively traded.  (Hartzmark Report ¶ 67.)

Defendants argue that there was no active market since the 1997 Notes were left un-traded for 48% of the trading days during the Class Period.  However, the trading level of the

---

32  Defendants argue that the market for 9 7/8% Senior Notes was not efficient during the Class Period because investor were unable to access price and volume data about prior trades.  Defendants contend that the available pricing information for the Senior Notes during the Class Period was a combination of matrix pricing and non-binding dealer quotes.  Defendants are correct that the price data for the 1998 Notes is incomplete prior to July 2002. (This is the date that the NASD's TRACE system began reporting trading information.)  There was, however, publicly available pricing information for the 1997 Notes.  Specifically, the price and volume information for the 1997 Notes was available through the NYSE's Automated Bond System.  According to the NYSE, "ABS reports real-time quotes and trades to market data vendors."  (Hartzmark Rebuttal Report ¶ 74.)  Because the 1997 Notes and 1998 Notes were identical, the pricing information for the 1997 Notes applies equally to the 1998 Notes.
        Furthermore, though the Court recognizes that the over-the-counter corporate bond market lacked some transparency, this particular short coming is insufficient for the Court to find that corporate bonds traded in this market are *pre se* inefficient.  In re Enron Corp. Sec., 2006 WL 4381143, at *90 (S.D. Tex. 2006) ("The Court notes that no-cost efficiency, or for that matter transparency, has not been established as the standard for an informationally efficient, over-the-counter bond market. Obviously 'transparency' is relative, involving consideration of numerous factors. No standard of requisite transparency has been established by the courts.").

33  Although there exist complete records for the 1997 Notes' trading volume, the records for the 1998 Notes are incomplete.  Lead Plaintiffs have attempted to recreate this missing data by extrapolating the missing volume numbers from the actual volume numbers.  While this method of extrapolation appears reasonable, the Court does not find it necessary to consider these numbers in analyzing this factor.

34  Defendants' expert notes that it is not unusual for corporate bond issues to go days without a single trade. (Helwege Report ¶ 21.)

35

Senior Notes must be viewed in the context of corporate bond market.  The 1997 Notes were in the top 10% of all corporate bonds in terms of the fewest average days between trades, ranging between 1.92 to 4.63 days during the Class Period.  (Hartzmark Report Ex. XIII.)  Though such trading volume would not likely support a finding of an efficient market for equities, it is sufficient to support such a finding for corporate bonds.  See AAL High Yield Bond Fund v. Ruttenberg, 229 F.R.D. 676, 685 (N.D. Ala. 2005) (noting that a debt security that traded on at least 75 days of 140 days was not thinly traded).

(2)  Analyst Coverage

Though the Senior Notes were covered by all three credit rating agencies during the Class Period, they received coverage by a bond analyst only prior to May 2000.  This lack of analyst coverage weighs against market efficiency.  Our conclusion is mitigated, however, by the numerous reports produced by analysts covering DVI's common stock.  Though equity analyst coverage is not a perfect substitute for debt analyst coverage, the equity reports nevertheless provided substantial information to the Senior Notes investors.  Such information, particularly forecasts of DVI's financial prospects and condition, would likewise have allowed bond investors to better understand DVI's risk profile and its potential for default.

(3)  Number of Market Makers

The 1997 Notes were traded on the NYSE, which does not employ market makers.  The 1998 Notes, though traded on the over-the-counter market, were almost exclusively held by institutional investors and dealers.[35]  Lead Plaintiffs contend that these investors often played a similar role to market makers by serving as broker for buyer and sellers, thus creating a robust

---

35  According to Lead Plaintiffs' expert, "[d]uring the Class Period, at least 26 large institutions and investment banks held over 90 percent of DVI's two tranches of Notes."  (Id. ¶ 84.)

market.  Defendants do not refute this contention.  Consequently, the Court finds that this factor weighs in favor of market efficiency.

### (4)  Eligibility to File on SEC Form S-3

As previously discussed, DVI was eligible to file SEC Form S-3 and did in fact use it to issue securities.  Thus, this factor favors efficiency.

### (5)  Cause and Effect

To establish the requisite cause and effect relationship between price movements in the Senior Notes and the release of new public information about DVI, Lead Plaintiffs generated an event study in which it identified the days that the Senior Notes saw statistically significant price changes and then attempted to match these to identifiable news events.  In constructing the event study Lead Plaintiffs employed the Option Adjusted Spread ("OAS"), which subtracts the risk-free interest yield from the yield of the Senior Notes to adjust for market- and sector-wide factors that might affect the price of the notes.  The event study concluded that on 17 of the 26 days — or about 65% of the time — that the Senior Notes' yield experienced a significant percentage change, a news disclosure also occurred within 2 days.  (Lead Pls.' Reply Br. 96.)

Defendants criticize Lead Plaintiffs' use of OAS because it effectively reports a fluctuation in the Senior Notes' price even when that fluctuation is derived solely from a change in the risk-free interest yield, not a change in the price of the notes themselves.  Defendants' criticism is misplaced.  First, the use of OAS as a means to compensate for the effect of an underlying change to the risk-free interest rate is reasonable.  Second, in light of Defendants' event study finding a new public disclosure on 55% of the 31 days (i.e., 17 days) that the Senior Notes reported significant returns, the impact of OAS appears insubstantial.  The Court therefore

concludes that Lead Plaintiffs have established a sufficient cause and effect relationship to support a finding that the release of new public information affected the price of the Senior Notes.  This finding is strengthened by the fact that, though debt securities are typically less responsive to new public information, there exists a high level of correlation between the Senior Notes' price changes and identifiable news events.   See Jonathan R. Macey and Geoffrey P. Miller, Good Finance, Bad Economics: An Analysis of the Fraud-on-the-Market-Theory, 42 Stanford L.Rev. 1059, 1085 (April 1990) ("[[N]ot all corporate information will affect all securities of a given issuer in the same way.  Debt securities will be more insulated from the shocks associated with bad news than will equity securities.").

> (6)  Market Capitalization, Public Float, Short-selling Interest and Arbritrage Opportunities

These factors are not generally applicable to determining whether a debt security trades in an efficient market.

> (7)  Autocorrelation

Lead Plaintiffs' expert concluded, and Defendants do not contest, that after analyzing the 1997 Notes that they showed no autocorrelation.  (Hartzmark Report ¶ 87.)[36]  Neither party assessed the 1998 Notes's autocorrelation.  This factor therefore favors market efficiency.

Based on the Court's assessment, the weight of the various factors discussed above leads us to conclude that DVI's Senior Notes traded in an efficient market during the Class Period. Accordingly, we find that the Rule 26(b)(3) predominance requirement is met, as questions of

---

36  Lead Plaintiffs' expert employed the Durbin-Watson test for autocorrelation, which produced a Durbin-Watson statistic of approximately 2.28 for the 1997 Notes  Id.  A value greater than two indicates no autocorrelation.

law and fact common to the putative class members predominate over any questions affecting

individual members with respect to the claims set forth in the FAC.[37]

b. Inclusion of Clifford Chance in the Class

Defendant Clifford Chance argues that class certification is inappropriate, with respect to

itself, because neither the fraud on the market presumption or the Affiliated Ute presumption can

be utilized by Lead Plaintiffs to establish the necessary element of reliance under Section 10(b).

Specifically, Clifford Chance argues that the fraud on the market presumption is inapplicable

because Lead Plaintiffs do not allege that Clifford Chance directly made any public misstatement

that affected the market for DVI's common stock or Senior Notes.  Clifford Chance also argues

that the Affiliated Ute presumption is not applicable because it had no duty to disclose

information to DVI's  investors.  The Court agrees.

In reaching this conclusion, the Court relies in large part on the Supreme Court's recent

decision in Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc., 128 S. Ct. 761

(2008).  In Stoneridge, the Supreme Court considered "when, if ever, an injured investor may

rely upon §10(b) to recover from a party that neither makes a public misstatement nor violates a

duty to disclose but does participate in a scheme to violate §10(b)."  Id. at 767.  Specifically, the

Court considered whether two suppliers of a cable operator that entered into various sham

transactions with the cable operator to artificially increase the cable operator's publically

reported revenues could be held liable for violating section 10(b).  The suppliers were not

alleged to have directly made any misstatements to the public, but instead were alleged to have

---

37  Having determined that Lead Plaintiffs are entitled to a presumption of reliance based on the fraud on the market
theory, we need not reach the question of whether Lead Plaintiffs are also entitled to a presumption of reliance based
on the holding of Affiliated Ute Citizens of Utah v. United States, mentioned above.

knowingly participated in a scheme with the purpose of creating a false appearance about the cable operator's revenues.  The Court ultimately concluded that the suppliers could not be held liable because the suppliers' "deceptive acts, which were not disclosed to the investing public, [were] too remote to satisfy the requirement of reliance."  Id. at 770.  Reliance, the Court stated, was an "essential element of the §10(b) private cause of action." Id. at 769.

The Court also specifically addressed the applicability of the fraud on the market presumption and the Affiliated Ute presumption to these suppliers and found that neither presumption was applicable.  With respect to the fraud on the market presumption, the Court noted that the presumption is applicable "when the statements at issue become public" and "[t]he public information is reflect in the market price of the security."  Id. at 769.  Because the deceptive acts of the suppliers were not communicated to the public, "[n]o member of the investing public had knowledge, either actual or presumed, of the [supplier's] deceptive acts during the relevant times."  Id.  With respect to the Affiliated Ute presumption, the Court noted that this presumption applies when "there is an omission of a material fact by one with a duty to disclose" information to investors and concluded that there was no such duty to disclose.  Id.

In view of this decision, the Court must similarly conclude that neither the Affiliated Ute presumption or the fraud on the market presumption are applicable to the claims set forth by Lead Plaintiffs against Clifford Chance.

Lead Plaintiffs do not allege that Clifford Chance directly made any public misstatements that affected the market for DVI securities.[38]  Instead, Lead Plaintiffs argue that Clifford Chance

---

38  In their filings, Lead Plaintiffs point to an opinion letter issued by Clifford Chance with respect to a proposed exchange offer filed under Form S-3.  Though Lead Plaintiffs are correct that this statement qualifies as a public statement, there is no indication that the opinion tendered in that letter (that the conversion shares would be validly issued, fully paid and non-assessable) was a misstatement.  Accordingly, this statement cannot form the basis for invoking the fraud on the market presumption.

should be held liable under section 10(b) because it participated in a scheme to defraud investor

in DVI.  Though Lead Plaintiffs recognize that <u>Stonebridge</u> limits "scheme liability" under

section 10(b), they argue that Clifford Chance's unique role in initiating and masterminding

certain aspects of the overall scheme was sufficiently related to the injury suffered by DVI's

investors as to satisfy the reliance element.[39]  In making this argument, Lead Plaintiffs rely on

the Supreme Court's statement that "reliance is tied to causation, leading to the inquiry whether

respondents' acts were immediate or remote to the injury."  <u>Id.</u> at 770.  Though Lead Plaintiffs

are correct that the Court discusses the relationship between causality and reliance in

determining the applicability of scheme liability under section 10(b), it holding ultimately rejects

an expansion of liability under section 10(b) premised on a broad conception of scheme liability.

In rejecting scheme liability, the Court notes that plaintiffs under this theory could not overcome

the objection that investors in the cable operator "did not in fact rely upon [the supplier's] own

deceptive conduct."  <u>Id.</u>  Similarly this Court finds that Lead Plaintiffs have not overcome the

objection that investors in DVI did not rely upon the allegedly deceptive conduct of Clifford

Chance.  Though Lead Plaintiffs allege that Clifford Chance knew of the scheme, and at times

took a more active part in assisting DVI in the scheme, the fact remains that none of this alleged

conduct was publically disclosed such that it affected the market for DVI's securities.

Accordingly, this Court finds that Lead Plaintiffs are not entitled to the fraud on the market

presumption to establish reliance with respect to Clifford Chance.  Additionally, the Court finds

---

39  Specifically, Lead Plaintiffs argue that Clifford Chance initiated and masterminded a "workaround" that allowed
DVI to fraudulently misstate in its Report on Form 10-Q for the quarter ended September 2002 that its internal
controls were adequate.  This statement contradicted an earlier management letter from Deloitte to DVI indicating
that there were material weaknesses in its internal controls.  Though Lead Plaintiffs allege that Clifford Chance
directed and coordinated this disclosure, it remains uncontested that the misleading 10-Q was issued solely by DVI
and contains no indication that any statement therein is attributable to Clifford Chance.

that the <u>Affiliated Ute</u> presumption is equally inapplicable because Clifford Chance owed no

duty of disclosure to DVI's investors.  <u>Id.</u> at 769; <u>see also</u> <u>Regents of Univ. of Cal. v. Credit</u>

<u>Suisse First Boston (USA), Inc.</u>, 482 F.3d 372, 384 (5th Cir. 2007).  Therefore, because Lead

Plaintiffs are not entitled to either presumption in establishing reliance on a class wide basis, the

Court find that individual issues of reliance will predominate over common issues of law and

fact with respect to Clifford Chance.  Thus, the Court does not certify a class with respect to

Clifford Chance.

　　　2.  Superiority

　　　Additionally, to certify a class under Rule 23(b)(3) there must be a finding "that a class

action is superior to other available methods for fairly and efficiently adjudicating the

controversy." Fed. R. Civ. P. 23(b)(3).  "In assessing whether a class action is a superior method

of adjudication, [a court] must balance the fairness and efficiency of the class action against

other alternative forms of resolution, such as individual lawsuits or consolidation." <u>In re Rent-</u>

<u>Way Sec. Litig.</u>, 218 F.R.D. 101, 121 (W.D. Pa. 2003) (citing <u>In re Corel Corp. Sec. Litig.</u>, 206

F.R.D. 533, 544 (E.D. Pa. 2002)).  A class action is clearly the preferable means of adjudication

to promote the efficient use of limited judicial resources.  Absent a class action, courts could

theoretically be inundated with hundreds of lawsuits presenting near-identical factual and legal

issues, and many potential claimants might be precluded from pursing their claims due to the

prohibitively high costs associated with securities litigation.  A class action would allow both

Lead Plaintiffs and Defendants to avoid duplicative expenses and take advantage of economies

of scale which they would otherwise lack.  Moreover, there do not appear to be significant

administrative difficulties which would interfere with this Court's management of the case.  We

therefore find that a class action is the superior method to adjudicate the claims set forth in this action.

III.  APPROPRIATE DEFINITION OF THE CLASS

Lead Plaintiffs seek certification of a class consisting of:

> all Persons and entities who purchased or otherwise acquired the securities of DVI, Inc. (including its common stock and 9 7/8% Senior Notes) between August 10, 1999 and August 13, 2003, both dates inclusive. Excluded from the class are Defendants; any entity in which a Defendant has a controlling interest or is a part or subsidiary of, or is controlled by a Defendant; the officers, directors, legal representatives, heirs, predecessors, successors and assigns of any of the Defendants; Lead Plaintiffs named in WM High Yield Fund, et al. v. O'Hanlon, et al., No. 04-CV-3423 (E.D. Pa.).

Defendants argue that this definition is inappropriate and should be modified because (1) it includes persons that sold their DVI securities prior to May 20, 2003, the date Lead Plaintiffs allege the fraud was initially disclosed to the public, and (2) it should exclude, as a matter of law, recovery of any diminution of value of DVI's securities that occurred prior to May 20, 2003. Additionally, Clifford Chance argues that with respect to its liability, the definition of the class should be altered to exclude investors who purchased securities prior to January 14, 2002.

    1.  Persons Who Sold DVI Securities Prior to May 20, 2003

Defendants' first contention is that investors who sold their DVI securities prior to May 20, 2003, the date of DVI's initial public disclosure regarding its accounting issues, should be excluded from the class.  Specifically, Defendants cite Dura Pharmaceuticals, Inc. v. Brudo to argue that, where an investor purchases securities at a fraud-inflated price but then turns around and sells them before any corrective disclosures are made, they cannot show economic loss.  544 U.S. 336 (2005).  In Dura, the Supreme Court held that the mere allegation that a security was *purchased* at an inflated price due to fraudulent misstatements is insufficient to establish loss

causation for purposes of Section 10(b) of the Exchange Act. "[I]f [ ] the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss." Id. at 342.  Courts have thus found that investors who sell securities prior to an initial corrective disclosure are barred from recovery.  See e.g., In re Cornerstone Propane Partners, L.P. Securities Litigation, 2006 WL 1180267, at *8 (N.D. Cal. May 3, 2006) ("Here, since corrective disclosure is alleged to have occurred only from July 2001 onwards, under Dura there can be no loss causation for plaintiffs who purchased and sold stock at the inflated share price prior to that disclosure, and thus these plaintiffs may not recover at all."); In re Compuware Sec. Litig., 386 F. Supp. 2d 913, 920 (E.D. Mich. 2005) (holding that a plaintiff who sold all securities prior to disclosure of fraud could not establish damages under Dura).

　　　　We agree that all class members, including those who sold their DVI securities prior to the first corrective disclosure, must "prove that the defendant's misrepresentation (or other fraudulent conduct) proximately caused the plaintiff's economic loss."  Dura, 544 U.S. at 346. Ultimately, however, the existence of loss causation is a factual question.  In re Tyco Int'l, Ltd, 236 F.R.D. 62, 71 (D.N.H. 2006) (citing Wortley v. Camplin, 333 F.3d 284, 295 (1st Cir. 2003)). Accordingly, while Lead Plaintiffs will face a difficult task establishing loss causation for those class members who sold their DVI securities before May 20, 2003, we cannot properly make this factual determination at the class certification stage.  See In re Tyco Int'l, Ltd, 236 F.R.D. 62, 71 (D.N.H. 2006) (noting that it was premature to exclude class members who sold securities prior to corrective disclosure because the possibility existed for the identification of earlier corrective disclosures); Roth v. Aon Corp., 238 F.R.D. 603, 609 (N.D. Ill. 2006) (same); In re BearingPoint, Inc. Sec. Litig., 232 F.R.D. 534, 544 (E.D. Va. 2006) (same, since the inflationary

effect of a misrepresentation may diminish over time even without a corrective disclosure).  The
Court will therefore certify a class that includes those persons that sold DVI securities prior to
May 20, 2003, but participants in the class will be limited to only those who can show damages.

    2.  Limitation on Calculation of Damages

Defendants also contend that this Court should find as a matter of law that no class
member is entitled to recover for any decrease in the value of DVI's securities prior to May 20,
2003, the date of DVI's first corrective disclosure.  The Defendants again point to Dura, in
which the Supreme Court stated:

> If the purchaser sells later after the truth makes its way into the marketplace, an
> initially inflated purchase price might mean a later loss. But that is far from
> inevitably so. When the purchaser subsequently resells such shares, even at a
> lower price, that lower price may reflect, not the earlier misrepresentation, but
> changed economic circumstances, changed investor expectations, new
> industry-specific or firm-specific facts, conditions, or other events, which taken
> separately or together account for some or all of that lower price.

Dura, 544 U.S. at 342-343.

As discussed above, though we may review the merits of a case in evaluating a class
certification motion, this is not the proper juncture for us to determine the appropriate measure
of damages.  Defendants' request is therefore denied.

IV.  APPOINTMENT OF CLASS REPRESENTATIVE

As discussed above, the Court that finds that Lead Plaintiffs will fairly and adequately
represent the interests of the class members.  Accordingly, the Lead Plaintiffs are appointed as
class representatives.

V.  APPOINTMENT OF LEAD COUNSEL

Under Federal Rule of Civil Procedure 23(g)(1)(A), a court that certifies a class must appoint class counsel. Here, the law firms of Krislov & Associates and Chimicles & Tikellis, LLP seek appointment as class counsel and liaison counsel, respectively.[40]  In appointing class counsel, a court must consider the work counsel has done in identifying or investigating potential claims in the action, counsel's experience in handling class actions, other complex litigation, and claims of the type asserted in the action, counsel's knowledge of the applicable law, and the resources counsel will commit to representing the class.  Fed.R.Civ.P. 23(g)(1)(C).

The Court has reviewed the evidence submitted by Lead Plaintiffs in support of their motion to appoint these firms and is satisfied that both firms meet the requisite criteria.  Both firms have extensive experience litigating claims such as those in this case and have competently managed the matter up until this point.  Accordingly, Krislov & Associates and Chimicles & Tikellis, LLP are appointed as class counsel and liaison counsel, respectively.

V. CONCLUSION

For the reasons set forth above, Lead Plaintiffs' Motion for Class Certification (Doc. No 406), with the amended class definition, is GRANTED.  An appropriate order follows.

---

[40]  In an Order dated November 25, 2003, this Court initially approved the selection of Krislov & Associates, as lead counsel, and Chimicles & Tikellis, LLP, as liason counsel, as provided for under the PSLRA.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE DVI INC. SECURITIES :        CIVIL ACTION
LITIGATION :
:        NO. 2:03-cv-05336-LDD

ORDER

AND NOW, this   29th  day of April 2008, it is hereby ORDERED as follows:

1.  Lead Plaintiffs' Motion for Class Certification (Doc. No 406) is GRANTED.

2.  This action is certified as a class action pursuant to Federal Rule of Civil Procedure
23(a) and 23(b)(3) on behalf of the following class:

All Persons and entities who purchased or otherwise acquired the securities of DVI, Inc.
(including its common stock and 9 7/8% Senior Notes) between August 10, 1999 and August 13,
2003, inclusive and who were thereby damaged. Excluded from the class are Defendants; any
entity in which a Defendant has a controlling interest or is a part or subsidiary of, or is controlled
by a Defendant; the officers, directors, legal representatives, heirs, predecessors, successors and
assigns of any of the Defendants; Lead Plaintiffs named in WM High Yield Fund, et al. v.
O'Hanlon, et al., No. 04-CV-3423 (E.D. Pa.).

3.  Plaintiffs Cedar Street Fund, Cedar Street Offshore Fund and Kenneth Grossman are
appointed as class representatives.

4.  Krislov & Associates and Chimicles & Tikellis, LLP are appointed as class counsel
and liaison counsel, respectively.

BY THE COURT:

Legrome D. Davis, J.