IN THE UNITED STATE DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | : | CIVIL ACTION |
| DVI, INC. SECURITIES LITIGATION | : | |
| | : | No. 2:03-cv-05336 |

Legrome D. Davis, J.                                                        September 3, 2010

MEMORANDUM

## I.   FACTUAL BACKGROUND AND PROCEDURAL HISTORY

This securities fraud class action is brought by shareholders of Diagnostic Ventures, Inc.

("DVI") who allege that Defendants were involved in a scheme of misrepresentations and

omissions designed to artificially inflate the price of DVI's securities and conceal deceptive

accounting and lending practices.  Plaintiffs' Fifth Amended Consolidated Class Action

Complaint ("FAC") was filed on April 6, 2006 against directors and officers of DVI, "Special

Relationship" entities, independent auditor Deloitte & Touche, LLP, underwriter/lender Merrill

Lynch & Co., Inc., and other third-party entities, (FAC, Doc. No. 270-2).[1]  On May 31, 2005, this

Court granted in part and denied in part Defendants' motions to dismiss, (Mem. & Order Mots.

Dismiss, May 31, 2005, Doc. No. 181).  On April 29, 2008, this Court granted Lead Plaintiffs'

Motion for Class Certification, appointing Plaintiffs Cedar Street Fund, Cedar Street Offshore

Fund, and Kenneth Grossman as class representatives, (Mem. & Order Class Certification, Apr.

---

[1]      The following Defendants have been dismissed from this case: Presgar Imaging,
LLC, Dolphin Medical, Inc., and OnCure Medical Corp., (Nov. 17, 2006 Order, Doc. No. 403);
William S. Goldberg, John E. McHugh, and Nathan Shapiro, (Nov. 5, 2007 Order, Doc. No.
528); Radnet Management, Inc., (Oct. 14, 2008 Order, Doc. No. 651); and The Pritzker
Organization and Thomas Pritzker, (Apr. 15, 2009 Order, Doc. No. 679).

29, 2008, Doc. No. 609).[2]  Presently before this Court is Defendant Gerald Cohn's Motion for

Summary Judgment, (Def.'s Mot. Summ. J., Doc. No. 683).

This Court has previously set forth the relevant history of DVI, and the alleged fraudulent

schemes engaged in by DVI, its subsidiaries, its directors and officers, and outside entities.  (See

Mem. & Order Mots. Dismiss, May 31, 2005, Doc. No. 181; see also Mem. & Order on Class

Certification, Apr. 29, 2008, Doc. No. 609.)  Accordingly, we incorporate herein the factual

background provided in our previous Orders.  We now recount only the facts relevant to the

instant Motion.  Unless stated otherwise, the following facts are not in dispute.

Defendant Gerald "Jerry" Cohn (hereinafter, "Defendant" or "Cohn") was one of the

original investors in DVI's predecessor, Diagnostic Ventures, during its formation in the 1980s.[3]

(Def.'s Statement Undisputed Facts ("SOF") ¶ 2.)  He served on DVI's Board of Directors

(hereinafter, "Board of Directors" or "Board") from 1986 until DVI's demise.  (Id. at ¶ 18.)

Defendant has an "extensive background in business matters," and has relationships with "big-

---

[2]     The class is defined as:

> All Persons and entities who purchased or otherwise acquired the securities
> of DVI, Inc. (including its common stock and 9 7/8% Senior Notes) between
> August 10, 1999 and August 13, 2003, inclusive and who were thereby
> damaged.  Excluded from the class are Defendants; any entity in which a
> Defendant has a controlling interest or is a part or subsidiary of, or is
> controlled by a Defendant; the officers, directors, legal representatives, heirs,
> predecessors, successors and assigns of any of the Defendants; Lead Plaintiffs
> named in WM High Yield Fund, et al. v. O'Hanlon, et al., No. 04-CV-3423
> (E.D. Pa.).

(Class Certification Mem. & Order, Apr. 29, 2008.)

[3]     Diagnostic Ventures was renamed DVI, Inc. when it went public in or around
1986.  (Def.'s SOF ¶ 4.)

shot guys in the business." (Pls.' SOF ¶ 111 (quoting Gerald Cohn Dep. GLC-CA000077, 116, Anic v. DVI, Inc., No. 01-0383, Jan. 29, 2003, attached to Pls.' SOF as Ex. 1 (hereinafter, "Cohn Anic Dep.)).) Defendant previously served on the board of directors of a bank for over twenty-five years, and he made "hundreds of investments over the course of his career." (Id. at ¶¶ 112-13.) At the company's formation, Defendant invested $200,000 in preferred stock and $50,000 in equity. (Def.'s SOF ¶¶ 2, 3.) Over the course of his time at DVI, Defendant also exercised 20,000 stock options, (id. at ¶ 8), purchased approximately 320,000 shares of DVI common stock at an aggregate price of approximately $1 million, (id. at ¶ 9), invested $800,000 in debt obligations, and his family's charitable foundation invested $200,000 in debt obligations, (id. at ¶ 10). With the exception of 10,000 option shares, Defendant never sold any of his stock, and at the time of DVI's bankruptcy, Defendant lost "nearly the full amount" he had invested in DVI.[4] (Id. at ¶ 12.)

Since the time that DVI went public in approximately 1986, Defendant was considered a "driving force" of the company. (John Boyle Dep. 1394:3-9, Apr. 22, 2008, attached to Pls.' SOF as Ex. 20.) Throughout his tenure, Defendant was involved in selecting and removing DVI's executives and directors. (Def.'s SOF ¶ 6; Pls.' SOF ¶¶ 125-34 (collecting exhibits).) Furthermore, Defendant was "viewed as the chairman of the [B]oard of [D]irectors." (Pls.' SOF ¶¶ 147, 149 (quoting Boyle Dep. 84:7-9).) As a director, Defendant served on the Credit Committee, Compensation Committee, and International Committee. (Def.'s SOF ¶¶ 23, 33; Pls.' SOF ¶ 181.). Defendant also served on the Audit Committee from 1998 until December 31,

---

[4]     Defendant's daughter, Cindy Cohn, also invested in DVI by exercising stock options. She lost approximately $150,000 from DVI's bankruptcy. (Def.'s SOF ¶¶ 11, 13.) Cindy Cohn was an executive officer of DVI. (Pls.' SOF ¶ 145.)

1999, and returned in 2003.[5]  (Pls.' SOF ¶¶ 163, 165.)  Defendant became a salaried employee of

DVI in 1999 "when he began working 40 to 50 hours per week" through his involvement in these

committees.  (Def.'s SOF ¶ 34 (citing Gerald Cohn Dep. 112:11-14, Feb. 12, 2008, attached to

Def.'s SOF as Ex. A).)  Defendant's salary ranged from $50,000 to $110,000, and his bonus was

between $16,000 and $17,000.  (Cohn Dep. 112:16-13:7.)  In his capacity as a director,

Defendant signed all of DVI's Form 10-Ks, including those for fiscal years ending June 30, 1999,

2000, 2001, and 2002, which are the subject of the instant litigation.  (Pls.' SOF ¶ 156.)

Plaintiffs claim that these statements contained material misrepresentations "related to DVI's

loan loss reserves, reported revenues, asset quality, liquidity position, available capital, and

compliance with its loan covenants."  (Pls.' Am. Mem. 3 (citing Pls.' SOF ¶¶ 247, 253, 257,

291).)

        Defendant also had relationships with investors and customers of DVI.  Around the time

that DVI went public, Defendant introduced his friend Jay Pritzker to DVI.  Pritzker and the

Pritzker Organization made substantial investments in the company by purchasing the shares that

the underwriter was unable to sell in DVI's public offering and investing in DVI subordinated

bonds.  (Def.'s SOF ¶¶ 15-16.)  Defendant remained the Pritzkers' contact person at DVI.  (Mark

Hoplamazian Dep. 204:6-14, Apr. 17, 2008, attached to Pls.' SOF as Ex. 42.)  Additionally,

Defendant had relationships with some of the principals of DVI's customers, including Dolphin,

(Pls.' SOF ¶ 195), and Healthcare Integrated Services ("HIS"), (id. at ¶ 208).  Defendant also

---

        [5]        Defendant was required to resign from the Audit Committee in 1999 because new
SEC regulations mandated that directors be independent to serve on a company's audit
committee.  Cohn was not considered independent because he received a salary as a DVI
employee.  (Pls.' SOF ¶ 163; Def.'s Resp. SOF ¶ 163.)

invested in and served on the boards of some of DVI's borrowers, including Reliant Pharmaceuticals, (id. at ¶¶ 226-27), HIS, (id. at ¶ 208), and Physician's Endoscopy LLC ("PELL"), (id. at ¶ 219).

From the early days of the company, Defendant was prominently involved in reviewing and approving loans to DVI's borrowers. Before the Credit Committee was created, Defendant "was shown every credit before it was approved and [he] gave [his] opinion on each one." (Cohn Dep. 111:3-5.) Once the committee was formed, Defendant and Anthony Turek, DVI's Executive Vice President and Chief Credit Officer, were the "executive members" and either Cohn or Turek's vote was "required for an approval." (See Mark Gallagher Dep. 35:3-6, Dec. 7, 2006, attached to Pls.' SOF as Ex. 44.) As one former committee member stated, Cohn had a "dominant presence" on the committee; "[i]f Jerry didnt' like a deal, the deal didn't get done." (Joseph Malott Dep. 147:19-48:13, Sept. 18, 2007, attached to Pls.' SOF as Ex. 109.) The Credit Committee reviewed all domestic loans of $1 million or more. (Def.'s SOF ¶ 25.) Through his involvement in the Credit Committee, Defendant was "ver[y] close to all of the large obligors," (see Steven Garfinkel Dep. 67:7-8, Mar. 25, 2008, attached to Pls.' SOF as Ex. 14), and he gained insight into the borrowers' financial condition, operations, and their ability to repay DVI, (Def.'s SOF ¶¶ 27-28 (citing Cohn Dep. 143:8-47:9)). Defendant also received information regarding DVI's delinquent customers through Month End Delinquent Reports, Board Books, and Watch List reports. (See Pls.' SOF ¶¶ 189, 190, 192 (collecting exhibits).)

Furthermore, as an active member of DVI's Board and committees, Defendant knew about Deloitte & Touche's (hereinafter, "Deloitte") concerns regarding the company's policies for loss allowances and its "compliance with [its] credit facility," among other issues. (See, e.g.,

FY 1999 Mgmt. Letter from Deloitte, Aug. 6, 1999, attached to Pls.' SOF as Ex. 99; Def.'s Resp. SOF ¶ 169; Pls.' SOF ¶ 172.)  Additionally, Defendant knew of DVI's need to raise additional capital as early as October 2001, particularly because the company needed to remain in compliance with the "debt to equity limitation" in its loan agreements, which was viewed as a "serious covenant."  (See Pls.' SOF ¶ 263; Def.'s Resp. SOF ¶ 263; Oct. 2001 Capital & Liquidity Report SGM 004745, attached to Pls.' SOF as Ex. 81; see also Bd. of Dir. Minutes, Oct. 22, 2001, attached to Pls.' SOF as Ex. 75 ("Mr. Cohn discussed DVI's need to raise more capital.").)  In October 2002, Defendant was told that DVI needed $50 million, (Garfinkel Dep. 1664:14-66:1), and he was again reminded of this problem in April 2003 and July 2003.  (Pls.' SOF ¶ 280; Def.'s Resp. SOF ¶ 280; Michael O'Hanlon Dep. 1260:20-61:13, Jan. 28, 2008, attached to Pls.' SOF as Ex. 28.)  According to Defendant, however, DVI's executives never told him that DVI was out of cash, (Def.'s Resp. SOF ¶ 279 (citing Garfinkel Dep. 117:17-23, Apr. 1, 2008, attached to Def.'s SOF as Ex. J)), and he first learned of the $50 million "hole" in July 2003, (Def.'s SOF ¶ 89; Def.'s Mem. 16).

With respect to DVI's compliance with loan covenants, Defendant was first informed that DVI was out of compliance in 1999.  (Pls.' SOF ¶ 267; Def.'s Resp. SOF ¶ 267.)  In March or April 2001, Defendant again learned of a compliance problem when Lisa Cruikshank, DVI's treasury officer, expressed her intention to resign due to an "ethical issue . . . with the Fleet facility and the collateral [DVI was] pledging."  (Garfinkel Dep. 83:7-10; Pls.' SOF ¶ 269 (citing Cohn Dep. 288:15-89:22); Def.'s Resp. SOF ¶ 269; Pls.' SOF ¶ 270.)  Steven Garfinkel, DVI's Executive Vice President and Chief Financial Officer, told Cohn that DVI was "out of compliance," though he "didn't use the word[s] ineligible collateral" in his conversation with

Defendant. (Def.'s Resp. SOF ¶ 268 (quoting Garfinkel Dep. 83:3-10).) Defendant spoke with Michael O'Hanlon, DVI's President and Chief Executive Officer, about this matter, (Cohn Dep. 289:23-90:1), and he also raised the issue of DVI's compliance with Garfinkel and O'Hanlon at the April 10, 2001 Board meeting and the December 3, 2002 Board meeting, (Pls.' SOF ¶ 275; Def.'s Resp. SOF ¶ 275; Garfinkel Dep. 1505:15-06:6).

Defendant Cohn also knew that the SEC began investigating DVI's accounting practices as early as February 2002. (Pls.' SOF ¶ 287.) According to Defendant, he was involved with the investigation that resulted in DVI's bankruptcy; Plaintiffs generally dispute these facts. (Pls.' Resp. SOF ¶¶ 86-110.) In the spring of 2003, Defendant assisted DVI's independent counsel in reviewing a transaction that the SEC was investigating, (see Def.'s SOF ¶¶ 86-87), and in mid-July 2003, he spoke with DVI's directors about the company's $50 million "hole" in its collateral, (id. at ¶ 91). On August 1, 2003, Defendant was told that DVI received a "whistle-blower" letter from an employee in DVI's treasury department that explained DVI's practice of "double-pledging" collateral. (Id. at ¶¶ 93-96 (according to Defendant, "[t]his was the first time that [he] learned that DVI's compliance failures . . . were apparently due to intentional misconduct").) Upon further investigation into these charges, Defendant found out that two employees may have received severance payments which may have actually been "hush money." (Id. at ¶¶ 99-101 (collecting exhibits).) Based on what he had discovered, Defendant recommended to the Board that DVI undertake a bankruptcy proceeding. (Id. at ¶ 110 (citing Cohn Dep. 365:19-66:12).)

We now turn to Defendant's Motion for Summary Judgment. Defendant argues that Plaintiffs' § 10(b) claim against him must be dismissed because Plaintiffs are unable to show that

Defendant "made" a material misstatement or omission, or that Defendant acted with scienter, assuming he made such a statement. (Def.'s Mem. 1.) Defendant also seeks to dismiss Plaintiffs' § 20(a) control person liability claim. (Id. at 1.) For the following reasons, Defendant's Motion is denied.

II.     LEGAL STANDARD

In considering a motion for summary judgment, the court must determine whether "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party, and a factual dispute is material only if it might affect the outcome of the suit under governing law." Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). The moving party bears the initial responsibility of identifying the portions of the record "which it believes demonstrate the absence of a genuine issue of material fact." El v. SEPTA, 479 F.3d 232, 237 (3d Cir. 2007). However, even if the moving party fulfills this requirement, "the non-moving party can defeat summary judgment if it nonetheless produces or points to evidence in the record that creates a genuine issue of material fact." Id. at 238 (citing Josey v. John R. Hollingsworth Corp., 996 F.2d 632, 637 (3d Cir. 1993)); see also Fed. R. Civ. P. 56(e)(1). A non-moving party "cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument" to identify genuine issues of material fact. Berckeley Inv. Group, Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006). In evaluating a motion for summary judgment, the court is "not permitted to make factual findings, which remains the province of the jury," and

"all inferences [are drawn] in favor of the non-moving party." Id.

III.    SECTION 10(b) CLAIM

"Section 10(b) of the Securities Exchange Act forbids (1) the 'use or employ[ment of] . . . any manipulative or deceptive device or contrivance,' (2) 'in connection with the purchase or sale of any security,' and (3) 'in contravention of [SEC] rules and regulations.'" McCabe v. Ernst & Young, 494 F.3d 418, 424 (3d Cir. 2007) (quoting 15 U.S.C. § 78j(b)). "SEC regulations, in turn, make it unlawful '[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading,' in connection with the purchase or sale of any security." Id. (quoting 17 C.F.R. § 240.10b-5(b) ("Rule 10b-5")). The Supreme Court has identified six required elements of a § 10(b) private damages action: "(1) a material misrepresentation (or omission); (2) scienter, i.e., a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance, often referred to . . . as 'transaction causation;' (5) economic loss; and (6) 'loss causation,' i.e., a causal connection between the material misrepresentation and the loss.'" Id. (quoting Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 341-42 (2005)). Defendant moves for summary judgment on the basis of Plaintiffs' failure to prove the first and second elements of a § 10(b) claim—material misrepresentation and scienter—and this Court's review is limited to these elements only.

    A.    Material Misrepresentation or Omission

Defendant argues that summary judgment should be entered in his favor because Defendant is an outside director and he did not make a material misrepresentation or omission "merely by signing" DVI's annual reports for the years 1999 through 2002. (Def.'s Mem. 5.)

Plaintiffs respond that Defendant should be treated as a DVI insider, and regardless, "anyone who signed DVI's financial statements can be held liable." (Pls.' Am. Mem. 190-11.) This Court need not decide whether Defendant was in fact an outside director or an insider because assuming for purposes of this inquiry that Defendant was an outside director, Defendant can be held liable by signing DVI's financial statements that contained material misstatements.

Courts tend to consider the misrepresentation element along with the scienter requirement when deciding whether an outside director who signed an SEC filing can be held liable for the misleading information contained in that filing. See, e.g., In re Mut. Funds Inv. Litig., 437 F. Supp. 2d 444, 447-48, n.6 (D. Md. 2006) (collecting cases); In re Enron Corp. Secs., Derivatives & ERISA Litig., 258 F. Supp. 2d 576, 587 (S.D. Tex. 2003); In re Reliance Sec. Litig., 135 F. Supp. 2d 480, 504-05 (D. Del. 2001). Thus, an outside director, "acting with scienter, who on behalf of the corporation signs a document that is filed with the SEC that contains material misrepresentations, such as a fraudulent Form 10-K, regardless of whether he participated in the drafting of the document, 'makes' a statement and may be liable as a primary violator under § 10(b) for making a false statement."[6] In re Enron Corp., 258 F. Supp. 2d at 576 (collecting cases); see also In re Wojtunik v. Kealy, 394 F. Supp. 2d 1149, 1165 (D. Ariz. 2005); In re

---

[6]     This Court recognizes the significance of a director or officer's signature to an SEC filing. "SEC filings are the quintessential statement on which a reasonable investor may rely." In re Worldcom, Inc. Sec. Litig., 294 F. Supp. 2d 392, 417 (S.D.N.Y. 2003). Signatories should be held responsible for the statements in the document, as a signature is "not a mere formality, but rather signifies that the signer has read the document and attests to its accuracy." Howard v. Everex Sys., Inc., 228 F.3d 1057, 1061 (9th Cir. 2000) (quoting United States v. Gomez-Gutierrez, 140 F.3d 1287, 1288-89 (9th Cir. 1998)). As the Ninth Circuit explained, "[k]ey corporate officers should not be allowed to make important false financial statements knowingly or recklessly, yet still shield themselves from liability to investors simply by failing to be involved in the preparation of those statements." Howard, 228 F.3d at 1062.

Reliance, 135 F. Supp. 2d at 504 (finding outside directors "made statements" when they either had an opportunity to review the misleading documents, or had some responsibility for oversight of the auditing of financial statements). In his capacity as a director, Defendant signed DVI's Form 10-Ks for fiscal years ending June 30, 1999, 2000, 2001, and 2002, which allegedly contained material misrepresentations relating to "DVI's loan loss reserves, reported revenues, asset quality, liquidity position, available capital, and compliance with its loan covenants." (Pls.' SMF ¶¶ 247, 253, 257, 291.) Because we find that Plaintiffs have presented sufficient evidence to create a genuine dispute as to Defendant's scienter, see § III.B, we find that Defendant "made" a material misrepresentation by signing DVI's Form 10-Ks for fiscal years ending June 30, 1999, 2000, 2001, and 2002.

B. Scienter

Defendant argues that Plaintiffs cannot show that he acted with scienter when signing the relevant Form 10-Ks. (Def.'s Mem. 5.) "Scienter is a 'mental state embracing intent to deceive, manipulate, or defraud,' and requires a knowing or reckless state of mind." Institutional Investors Group v. Avaya, 564 F.3d 242, 252 (3d Cir. 2009) (quoting Ernst & Ernst v. Hochfelder, 423 U.S. 185, 193-94 (1976), and citing In re Advanta Corp. Sec. Litig., 180 F.3d 525, 534-35 (3d Cir. 1999)). "[A] determination of whether a party acted with scienter . . . often cannot be undertaken appropriately on summary judgment proceedings . . . ." In re Ikon Office Solutions, Inc., 277 F.3d 658, 668 (3d Cir. 2002). "In a [§] 10(b) action, a court may not grant such relief to the defendants on the ground of lack of scienter unless the plaintiff has failed to present facts that can support an inference of bad faith or an inference that defendants acted with an intent to deceive." Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Secs.

LLC, 592 F. Supp. 2d 608, 621-22 (S.D.N.Y. 2009) (quoting Wechsler v. Steinberg, 733 F.2d 1054, 1059 (2d Cir. 1984)).  To assess whether a plaintiff has presented sufficient evidence to support an inference of scienter, this Court turns to the standard set forth in Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308 (2007), for guidance.[7]  See Feinberg v. Benton, No. 05-4847, 2007 WL 4355408, at *6 & n.1 (E.D. Pa. Dec. 13, 2007) ("[T]his Court believes the Tellabs analysis is at least instructive in the summary judgment context."); Nolfi v. Ohio Ky. Oil Corp., 562 F. Supp. 2d 904, 910 (E.D. Ohio 2008) (finding that the "underlying rationale of [Tellabs] is applicable to the summary judgment setting").  Accordingly, upon examining the evidence presented, the inference of scienter must be "cogent and at least as compelling as any opposing inference of nonfraudulent intent" to survive summary judgment.  Tellabs, 551 U.S. at 314; see also Feinberg, 2007 WL 4355408, at *6.[8]

To establish the inference of scienter, a plaintiff must provide facts that constitute "strong circumstantial evidence of conscious behavior or recklessness."  In re Radian Sec. Litig., 612 F. Supp. 2d 594, 607 (E.D. Pa. 2009) (citing In re Suprema Specialties, Inc. Sec. Litig., 438 F.3d

---

[7]     Tellabs considered scienter in the context of a motion to dismiss and the heightened pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"), which requires that a plaintiff "state with particularity facts giving rise to a strong inference of scienter."  15 U.S.C. § 78u-4(b)(2).

[8]     Plaintiffs' argument against applying the Tellabs standard in the context of a summary judgment motion is unavailing.  Just as the application of the Tellabs test did not affect the motion to dismiss standard requiring that a court accept all factual allegations in a complaint as true and consider the complaint in its entirety, see Tellabs, 551 U.S. at 322, the application of the Tellabs test also does not disrupt the traditional summary judgment standard; a court is still required to view all facts in the light most favorable to the non-moving party and draw all inferences in favor of that party.  See Feinberg,  2007 WL 4355408, at *2.  However, when applying this standard, a court may consider whether the inference of scienter is at least as compelling as the inference of a non-fraudulent state of mind.  See Tellabs, 551 U.S. at 323.

256, 276 (3d Cir. 2006)). "Conscious misbehavior involves 'intentional fraud or other deliberate illegal behavior.'" Id. at 613 (quoting In re Advanta Corp., 180 F.3d at 540). Reckless conduct "requires a material misrepresentation or omission involving not merely simple, or even inexcusable, negligence, but an 'extreme departure' from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is 'so obvious' that the defendant 'must have been aware of it.'" Id. (quoting GSC Partners, CDO Fund v. Washington, 368 F.3d 228, 239 (3d Cir. 2004)). Furthermore, "[a]n egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference . . . of recklessness." In re Bristol-Myers Squibb Sec. Litig., No. 00-1990, 2005 WL 2007004, at *28 (D.N.J. Aug. 17, 2005) (quoting Novak v. Kasaks, 216 F.3d 300, 308 (2d Cir. 2000)).

Prior to the Third Circuit's decision in Avaya, a plaintiff could also establish scienter with evidence that a defendant had a motive and opportunity to commit fraud. See In re Radian, 612 F. Supp. 2d at 607. However, in Avaya, the Third Circuit ruled that evidence of a defendant's motive and opportunity is no longer an independent ground for establishing scienter. Avaya, 564 F.3d at 276.[9] Rather, when conducting its inquiry, a court must now examine all of the evidence, and then decide "whether collectively" it establishes an inference of scienter. Avaya, 564 F.3d at 268, 276 (citing Tellabs, 551 U.S. at 322-23). A court may consider motive and opportunity along with all of the other evidence to decide whether a plaintiff has established

---

[9]     The Avaya opinion was issued in the context of a motion to dismiss, and no court has considered its holding in the context of a motion for summary judgment. Because the substantive standards of proving scienter are applied equally to motions to dismiss and summary judgment motions, see, e.g., In re Radian, 612 F. Supp. 2d at 608 (motion to dismiss); Pennmont Sec. v. Wallace, No. 06-1646, 2008 WL 834379, at *6 (E.D. Pa. Mar. 26, 2008) (summary judgment), this Court concludes that the holding in Avaya applies to rulings on summary judgment motions as well.

such an inference.  Id. at 276.  However, the restrictions on proving motive remain.  That is, "a

plaintiff must assert a concrete and personal benefit to the individual defendants resulting from

the fraud."  In re Radian, 612 F. Supp. 2d at 608 (citing GSC Partners, 368 F.3d at 239); see also

Avaya, 564 F.3d at 278.  "Catch-all allegations that defendants stood to benefit from wrongdoing

and had the opportunity to implement a fraudulent scheme" are insufficient, as are "[m]otives

that are generally possessed by most corporate directors and officers."  In re Radian, 612 F. Supp.

2d at 608 (quoting GSC Partners, 368 F.3d at 237).

This Court finds that Plaintiffs have presented sufficient evidence to create a genuine

dispute as to whether Defendant was reckless in signing DVI's Form 10-Ks, such that his

conduct constitutes an "extreme departure from the standards of ordinary care."[10]  See id. at 613

(internal quotations omitted).  As an initial matter, Plaintiffs provide evidence regarding

Defendant's role in DVI.  Defendant was a founding member of DVI and one of its primary

investors.  Defendant was a director of DVI since 1986, and he was considered a "driving force"

of the company and the "chairman of the Board of Directors."  (Boyle Dep. 1394:3-9, 84:7-9.)

Defendant was a member of the Audit Committee from 1998 through 1999, and again in 2003,

---

[10]     In his Reply brief, Defendant attempts to rebut Plaintiffs' evidence by examining
each piece of evidence independently.  Defendant's approach, however, directly conflicts with
his argument that the Court should rely on the Tellabs test at the summary judgment phase.
Tellabs and Avaya clearly state that a court must consider a plaintiff's allegations or evidence
collectively.  See Tellabs, 551 U.S. at 322; Avaya, 564 F.3d at 269.  The Third Circuit stated that
"it is the composite picture, not the isolated components, that judges must evaluate[.]"  Avaya,
564 F.3d at 272.  Thus, Defendant cannot expect this Court to adopt the Tellabs standard and
also "de-contextualize every statement" presented by Plaintiffs, an approach rejected by the Third
Circuit.  See id. at 273 n.46 (quoting Metzler Inv. GMBH v. Corinthian Colls., Inc., 540 F.3d
1049, 1069 (9th Cir. 2008)); id. at 272 (rejecting defendants' effort to "focus on particular types
of allegations and argue for the insufficiency of each"). Because we have used the Tellabs
inference approach, we also use the totality of circumstances approach.

he was a member of the Compensation Committee, and he was considered an "executive" on the Credit Committee. (See Gallagher Dep. 35:3-6.) Defendant became a salaried employee in 1999, receiving a salary that ranged from $50,000 to $110,000, and a bonus between $16,000 and $17,000. Although Defendant's position in the company and his status as a founder and shareholder are not enough to impute knowledge of the fraud to Defendant, see, e.g., In re Radian, 612 F. Supp. 2d at 616 (quoting In re Alpharma Inc. Sec. Litig., 372 F.3d 137, 149-50 (3d Cir. 2004)), Defendant's position may be considered as circumstantial evidence "when the alleged fraud relates to the . . . core business" of the company, see Feinberg, 2007 WL 4355408, at *6 (quoting In re Aetna Inc. Sec. Litig., 34 F. Supp. 2d 935, 953 (E.D. Pa. 1999)). Both DVI's maintenance of its loan loss reserves as well as its liquidity related to the "core business" of DVI. (See Def.'s SOF ¶ 1 ("The Company provided diagnostic medical equipment financing and receivables financing to health care providers."); id. at ¶ 43 ("DVI, as a speciality lender[,] . . . needed sources of capital to finance its own loans to its customers.")); see also In re Reliance, 135 F. Supp. 2d at 507 ("[C]redit losses were the 'defining characteristic' of [defendant's] loan servicing business." (quoting Rehm v. Eagle Fin. Corp., 954 F. Supp. 1246, 1255 (N.D. Ill. 1997))). Therefore, this Court considers Defendant's position at DVI as circumstantial evidence of his scienter.

With regard to Defendant's knowledge or recklessness towards DVI's statements about its loan loss reserves, Defendant's status as a dominant member of the Credit Committee gave him access to information about DVI's loan portfolio and the financial background of DVI's potential customers and largest obligors. Defendant reviewed every domestic loan of $1 million or more, and either he or Turek had to approve each loan. Before approving any loan, Defendant

considered a customer's proposed loan and collateral, its financial statements, and whether the loan required a guarantor. (See Cohn Dep. 124:8-46:22.) Defendant had "access to any [information] he asked for," (see Garfinkel Dep. 894:13-15), and he was specifically concerned with and monitored "concentrations of substantial finance receivables" in DVI's portfolio. (Deloitte Fraud Risk Assessment Checklist, Apr. 25, 2000, DT0031619.000080; see also Cohn Dep. 203:4-14 (stating that his experience "showed [him] that you should not be overconcentrated in any one particular entity").) Defendant also received information regarding delinquent customers in DVI's Month End Delinquent Reports, (see. e,g,. Mar. 2000 Month End Delinquent Report, attached to Pls.' SOF as Ex. 111), Board books, (see Cohn Anic Dep. GLC-CA000146:21-47:24 (explaining that he was particularly interested in the domestic delinquencies in DVI's board books)), and Watch List reports, (see, e.g., Mar. 31, 2000 Watch List, attached to Pls.' SOF as Ex. 86).

Plaintiffs' evidence also shows that Defendant knew or should have known about DVI's practice of lending to impaired obligors.[11] Although the Credit Committee was not responsible

---

[11]     DVI's involvement with Dolphin is a useful example. Dolphin became a customer of DVI in 1999, and from the inception of their relationship, DVI financed all of Dolphin's operations. (Mark Cherney Dep. 115:14-19, July 31, 2007, attached to Pls.' SOF as Ex. 47.) Cohn approved loans to Dolphin while on the Credit Committee. (Pls.' SOF ¶ 198.) In the beginning of 2001, Dolphin took over four troubled centers, all of which were generating losses; Dolphin owed approximately $12 million to DVI on these centers, which DVI rewrote to Dolphin. (Id. at ¶ 200.) By the end of 2001, Dolphin was reporting a net loss of over $3.3 million and they were having difficultly paying back DVI's debt; however, DVI financed another purchase by Dolphin in late 2002 with the hope that this new acquisition supplied additional cash flow. (Id. at ¶ 202 (citing Dolphin Med. Periodic Review, attached to Pls.' SOF as Ex. 129).) Defendant gained insight into this tenuous relationship with Dolphin in a memo sent by O'Hanlon on March 10, 2003, which detailed the importance of the new facility and included Dolphin's financial records. (Mar. 10, 2003 Mem., attached to Pls.' SOF as Ex. 137.) The accounting of this transaction subsequently became the focus of the SEC's investigation and resulted in the resignation of Deloitte as DVI's independent auditor. (Pls.' SOF ¶ 204.)

for the workout of troubled loans, (see Cohn Dep. 380:19-81:10, Feb. 12, 2008, attached to

Def.'s SOF as Ex. D), if an additional credit was provided to a borrower, the Credit Committee

had to approve these extensions, even if they were part of an arrangement structured by the

workout department, (O'Hanlon Dep. 118:8-11). One employee recalled that Defendant was

"often brought in to discuss higher-level credits, credit that there was a fair amount of exposure

for the company, difficult workouts." (Sara Keller Dep. 159:21-60:3, May 1, 2008, attached to

Pls.' SOF as Ex. 22.) Furthermore, Defendant was a primary player in efforts to sell DVI and

knew that potential purchasers withdrew their interest because of DVI's impaired portfolio. For

example, GECC expressed interest in acquiring DVI and considered Cohn as the "lead contact"

on the deal. (Eric Hanson Dep. 224:23-25:11, July 17, 2009, attached to Pls.' SOF as Ex. 128.)

GECC ultimately withdrew its offer because, upon conducting its due diligence, it learned that

DVI "need[ed] to write off around $150 million across its business." (See Hanson Letter to Tom

Pritzker, Aug. 1, 2002, attached to Pls.' SOF as Ex. 127; Cohn Dep. 795:15-99:23 (explaining

that he had previously seen and understood the letter).) Defendant does not dispute his

knowledge of how DVI's loans were restructured, (Def.'s Reply Br. 12), but he states that

Plaintiffs admit that neither Garfinkel nor O'Hanlon told the Board "that ineligible collateral had

been included in the borrowing base reports, or that double-pledging of collateral had occurred,"

(Def.'s SOF ¶ 56 (citing Garfinkel Dep. 42:16-46:19)). Defendant's actual knowledge of these

practices is not required to raise an inference of scienter; Defendant's intimate knowledge about

DVI's loans and accounting practices and his relationship with the large obligors were sufficient

to make the risk of fraud "obvious." See Avaya, 564 F.3d at 270 (explaining that even if the

defendant was "not aware of the full extent" of the usual practices, "he might be culpable as long

as what he knew made obvious the risk" that his statements would mislead investors).

Additionally, Defendant was aware of weaknesses in DVI's policy for assessing its loan loss allowances and with its internal controls. (See, e.g., DVI Mem., Nov. 8, 2002, attached to Pls.' SOF as Ex. 96; Bd. of Dir. Minutes, Sept. 24, 2002 (explaining that SEC had a "particular focus on DVI's policies, practices, and procedures for estimating its loan loss allowances").) Defendant also knew that Deloitte and the SEC were concerned with DVI's policies for accruing income on delinquent contracts, its method for "valuing repossessed assets and investments," (see, e.g., Deloitte Indep. Auditor's Report, Aug. 10, 2001, attached to Pls.' SOF as Ex. 101), and DVI's "compliance with [its] credit facility[,]" (see Bd. of Dir. Minutes, Sept. 24, 2002).

With regard to DVI's liquidity crisis, Defendant knew as early as 2001 that DVI needed to raise additional capital to remain in compliance with the "debt to equity limitation" in its loan agreements, which was considered a "serious covenant." (See, e.g., Oct. 2001 Capital & Liquidity Report SGM 004745.) In October 2002, Garfinkel provided Defendant with a cash flow projection at Defendant's request, and Garfinkel specifically noted that the cash flow statement did not show DVI's "need to fund delinquent or ineligible loan collateral with our own cash," but that "[o]ver 60% of DVI's capital is tied up this way[,]" which "has by far had the largest impact on our liquidity." (Garfinkel Mem. to Cohn, 2002, attached to Pls.' SOF as Ex. 113.) Around the same time, Defendant was advised that DVI had not been paying its vendors and needed $50 million dollars. Defendant responded, "I'm sick and tired of working for a bankrupt and insolvent company," and told Garfinkel that he was "going to solve this company's

18

liquidity need problems once and for all."[12]  (Garfinkel Dep. 1666:2-4.)  Defendant was again

informed of this "hole" in DVI's collateral in April 2003 and August 2003.  In response to this

evidence, Defendant argues that the Board was never told the company was in "negative capital,"

(see Garfinkel Dep. 117:17-23); however, Defendant had enough warning signs to "place him on

notice of a risk" of a liquidity crisis, and he "cannot ignore [these] facts and plead ignorance of

the risk," see Avaya, 564 F.3d at 270 (quoting Makor Issues & Rights, Ltd. v. Tellabs Inc.

(Tellabs II), 513 F.3d 702, 704 (7th Cir. 2008)).

Moreover, Defendant knew that DVI was out of compliance with its loan covenants in

1999.  Defendant grew increasingly concerned with DVI's non-compliance in March or April

2001, when Lisa Cruikshank, DVI's treasury officer, expressed her intention to resign due to an

"ethical issue . . . with the Fleet facility and the collateral [DVI was] pledging."  (Garfinkel Dep.

83:7-10; see also id. at 83:10-11 (noting that he expressed similar concerns as Cruikshank).)

Garfinkel told Cohn that Cruikshank "[felt] uncomfortable signing the collateral sheet," (see

Cohn Dep. 289:11-13), and that DVI was "out of compliance," though he "didn't use the word[s]

ineligible collateral" in his conversation with Cohn, (Garfinkel Dep. 83:3-10).  Defendant stated,

"We can't be doing that. . . . We can't be out of compliance[,]" (id. at 814:2-4), and asked to

speak to Cruikshank, (Cohn Dep. 290:1-3).  Defendant then called O'Hanlon to discuss the issue.

When O'Hanlon told Cohn that going out of compliance was "like overdrawing your checking

account," Cohn responded, "You might think it's like overdrawing a bank account, but I don't

take that position, and . . . I'm going to call you every quarter and that you . . . make sure that we

---

[12]      Defendant denies having said, "I'm sick and tired of working for a bankrupt and
insolvent company."  (See Defs.' Resp. SOF ¶ 279 (citing Cohn Dep. 894:17-22, attached to
Def.'s SOF as Ex. C).)

are in compliance." (Id. at 290:14-91:3). Subsequently, at the April 10, 2001 Board meeting, Cohn asked all non-directors to leave and spoke with Garfinkel and O'Hanlon about the compliance issues. Garfinkel stated that DVI "drifts in and out of compliance and struggles to stay in compliance." (Garfinkel Dep. 1913:16-14:2.) Then, at the December 4, 2002 Board meeting, Cohn and another director approached Garfinkel to discuss compliance with the Fleet facility, and Garfinkel told them, "[W]e are definitely not in compliance in all of the interim periods and I'm not sure about this year-end." (Id. at 1505:15-06:6.) Garfinkel seemed surprised that this answer satisfied Cohn. (See id. at 1504:10-11.) Garfinkel further explained that the Board members were "sophisticated people, . . . all come out of the . . .bank," and stated that "[w]ithout knowing any of the covenants, any of the detail, [the Board] should have been able to grasp that there is a significance behind the word out of compliance." (Id. at 1502:1-16.) However, as Garfinkel stated, "No one ever said well, maybe we should have someone else take a look at this." (Id. at 1505:1-3; see also id. at 1505:11-14 ("[T]hey can't say oh, we're shocked if all along you have had this concern[.]").)

Defendant suggests that his knowledge that DVI had gone out of compliance "cannot equate to knowledge that DVI had been pledging ineligible collateral, or otherwise engaged in fraudulent activity," because he believed that the violations related only to cash flow, which did not create a default. (Def.'s Mem. 7.) He also asserts that he was never told that the compliance issues related to collateral, and that he was never given the opportunity to speak with Cruikshank. (Id.; see also Lisa Cruikshank Dep. 239:20-40:2, Aug. 21, 2007, attached to Def.'s SOF as Ex. Q (explaining that Garfinkel told her not to speak with Cohn).) The evidence described above clearly refutes this argument. Garfinkel specifically told Cohn that Cruikshank's "ethical issue"

involved the Fleet facility and the collateral that DVI was pledging. Furthermore, Cohn's

reaction to the compliance issues demonstrates his belief that this matter was of serious concern.

See Palladin Partners v. Gaon, No. 05-3305, 2006 WL 2460650, at *13 (D.N.J. Aug. 22, 2006)

(finding a strong inference of knowledge on the part of a director of misstatements in SEC filings

based in part on the fact that the director contacted the CEO "all the time" for information about

the company and expressed concern about the company's earnings). Defendant's argument in

fact reveals that he was deliberately ignorant towards the fraud.

Defendant's efforts to provide "exculpatory evidence" to rebut the strong inference of

scienter raised by Plaintiffs' evidence are not compelling. First, Defendant points to the fact that

he and his family substantially invested in DVI and never sold their stock, except for one option

transaction. Specifically, Defendant explains that he "rolled over" his $1 million in subordinated

notes that were due in June 2002, and that it "defies common sense to believe that [Defendant]

would have engaged in such conduct if he had reason to doubt the veracity of DVI's financial

reporting." (Def.'s Mem. 11.) Although continued ownership of stock may suggest that

Defendant did not have a motive to commit fraud, continued ownership does not negate the

inference that Defendant's failure to know about the fraud was extremely reckless. See In re

Entropin, Inc. Sec. Litig., 487 F. Supp. 2d 1141, 1154 (C.D. Cal. 2007) ("Scienter can be

established even if the officers who made the misleading statements did not sell stock during the

class period. In other words, the lack of stock sales by a defendant is not dispositive of scienter."

(quoting No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.,

320 F.3d 920, 944 (9th Cir. 2003))). Furthermore, Plaintiffs' evidence suggests that DVI insiders

did not sell their shares to avoid "send[ing] a false signal that [its] recently completed quarter

might have some problems[.]"  (See O'Hanlon Mem. to Turek, Jan. 22, 2003, attached to Pls.'

SOF as Ex. 11.)  Second, Defendant claims that he acted "diligen[tly] when he learned of the

fraud in the summer of 2003" by questioning Deloitte, monitoring independent counsel's

investigation into the OnCure transaction, and investigating management's payment of "hush

money" to employees. (Def.'s Mem. 15-16; Def.'s Reply 14-15.)  While an investigation into

allegations of fraud may weigh against the inference of scienter, that is not the case here.

Plaintiffs' evidence shows that Defendant disregarded numerous red flags prior to the summer of

2003 that alerted him to the fraud such that his failure to investigate before then demonstrates

"[a]n egregious refusal to see the obvious, or to investigate the doubtful."  See Shogen v. Global

Aggressive Growth Fund, Ltd., No. 04-5695, 2007 WL 1237829, at *12 (D.N.J. Apr. 26, 2007)

(quoting Novak v. Kasaks, 216 F.3d 300, 308 (2d Cir. 2000)).  Third, Defendant points to

Garfinkel's Memorandum to O'Hanlon in April 2003 as "conclusive evidence that DVI

management deceived Mr. Cohn."  (Def.'s Reply 16.)  Defendant asserts that Garfinkel

"express[es] his concern over the Board's lack of knowledge concerning DVI's true financial

condition."[13]  (Def.'s Mem. 5.)  In the same memo, however, Garfinkel also refers to Cohn's

---

[13]     Defendant focuses on the following statements in Garfinkel's memo:

It had been frustrating sitting in on Board decisions and conversations about
raising capital or selling business assets that I know would have had a
different answer with a fuller discourse of the company's liquidity situation.
. . . You and I both have to cringe when Jerry [Cohn] talks about using the
cash from overseas operations to retire the senior notes and dismisses having
to raise capital. . . .

I cannot even think through the prospects of letting the Board members
proceed with the exchange and capital raising issues with no awareness
whatsoever of the risks they are exposed to.

"awareness of our problems" and the use of the words "'insolvent and bankrupt' by [Cohn],"

when discussing the problems DVI was suffering since 2002.[14]  (Garfinkel Mem. to O'Hanlon 2.)

Defendant tries to discount this statement by explaining that it only refers to his knowledge of

"cash flow problems;" yet, he also states that this memo "makes clear" the "Board members' lack

of knowledge of DVI's 'cash problem.'"  (Def.'s Reply 15-16.)  As shown by Defendant's own

analysis, this memorandum is certainly not "conclusive evidence" that Defendant was deceived.

    Finally, Defendant presents two more general arguments in an attempt to negate the

inference of scienter, both of which we reject.  Defendant asserts that DVI's liquidity and

impaired portfolio problems could arise for many reasons in the regular course of business and

are not necessarily due to fraud.  But as the Third Circuit has explained, "[t]he plausibility of an

explanation depends on the plausibility of the alternative explanations.  As more and more

alternatives to a given explanation are ruled out, the probability of that explanation's being the

correct one rises."  Avaya, 564 F.3d at 271-72 (quoting Tellabs II, 513 F.3d at 711).  Here, the

importance of DVI's loan loss reserves and liquidity, the magnitude of the problem, Defendant's

active involvement on DVI's Board and Credit Committee, and his access to information related

to DVI's portfolio, taken together, make the inference that Defendant "knew at the time that

---

(Garfinkel Mem. to O'Hanlon, Apr. 2003, 1, 5, attached to Def.'s SOF as Ex. V.)

    [14]    Garfinkel also made this statement in his memo:

        "Given Jerry's awareness of our problems the use of the words 'insolvent and
        bankrupt' by him, as well as his apparent support from the Pritzkers, we all
        assumed that a cash infusion of some type would have been facilitated to
        relieve the pressure and problem."

(Garfinkel Mem. to O'Hanlon 2.)

[DVI's statements] were false or was reckless in disregarding the obvious risk in misleading the public" at least as compelling, if not more compelling, than the opposite inference.  See id. at 272.

Second, Defendant claims that he justifiably relied on DVI management and outside auditors and he was deceived by them.  (See, e.g., Def.'s Reply Br. 10-12.)  Even assuming that Defendant, a "sophisticated businessman,"[15] had a good faith belief in the truth of his statements, his subjective belief will not suffice if "Defendant[] [was] reckless in not knowing information that would prove those statements to have been false or misleading."  Shogen, 2007 WL 1237829, at *11 (citing S.E.C. v. Infinity Group Co., 212 F.3d 180, 193 n.16 (3d Cir. 2000)).[16] As Plaintiffs have shown, Defendant knew of or recklessly disregarded many warning signs since 1999 that DVI's loan loss reserves and liquidity were materially misstated in its financial statements, and therefore his own belief that the statements were accurate does not rebut this

---

[15]     Defendant classifies himself as a "sophisticated" businessman and investor who would not engage in activity that would make him a target for fraud allegations, (see Def.'s Reply 14, 18), yet he also claims that he was the victim of the fraudulent activity of DVI's management. Defendant cannot use his status as an experienced and sophisticated businessman to support both a position that he was smart enough not to expose himself to liability and also that he was deceived by DVI's management.

[16]     Defendant argues that this case is similar to In re Livent, Inc. Sec. Litig., 148 F. Supp. 2d 331 (S.D.N.Y. 2001), in which the court found that the outside directors were "at worst negligent, not reckless in failing to investigate" the alleged fraudulent agreements, and that the outside directors justifiably relied on representations made by the company's management and independent auditor.  148 F. Supp. 2d at 371.  This case is distinguished from the facts here, because unlike the outside auditors in In re Livent, Inc., Cohn "ignored obvious signs of fraud" with respect to misstatements in DVI's Form 10-Ks and therefore cannot merely assert that he relied on management and Deloitte's representations.  See id. at 371.

strong inference of scienter.[17]

IV.    SECTION 20(A) CLAIM

"Section 20(a) of the Securities and Exchange Act imposes joint and several liability on any person who controls any person liable under any provision of the Exchange Act." In re Radian, 612 F. Supp. 2d at 622 (citing In re Alpharma Inc., 372 F.3d at 153). "To recover under [§] 20(a), a plaintiff must show: (1) one person controlled another person or entity; (2) that the controlled person or entity committed a primary violation of the securities laws; and (3) that the defendant was a culpable participant in the fraud." Belmont v. MB Inv. Partners, Inc., No. 09-4951, 2010 WL 2348073, at *9 (E.D. Pa. June 10, 2010) (citing Fox Int'l Relations v. Fiserv Sec. Inc., 490 F. Supp. 2d 590, 601 (E.D. Pa. 2007)). "If no controlled person is liable, no controlling person liability exists." Id. (citing In re Alpharma, 372 F.3d at 153). "A corporate officer or director can be liable under Section 20(a) for exercising control over a corporation that has committed securities fraud." Palladin Partners, 2006 WL 2460650, at *15 (citing In re Mobile Media Sec. Litig., 28 F. Supp. 2d 901, 940 (D.N.J. 1998)). The parties do not dispute that DVI, the controlled entity, committed a violation of securities law; thus, our inquiry focuses on the first and third elements of a § 20(a) claim—control person and culpable participation.

Defendant first argues that he did not exercise control over DVI's fraudulent operations

---

[17]    Plaintiffs also argue that Defendant possessed motive and opportunity to commit fraud. Plaintiffs assert that Defendant was motivated by a desire to sell the company at a profit and "bury[] a fraudulent enterprise," (Pls.' Am. Mem. 28), and that Defendant personally benefitted from DVI's customers in which he was invested or served on their boards, (id. at 29). This Court has not factored these allegations into its scienter analysis. A motive to profit from a transaction is one that is "generally possessed by most corporate directors and officers" and therefore is insufficient to support an inference of scienter. See In re Radian, 612 F. Supp. 2d at 608 (quoting GSC Partners, 368 F.3d at 237).

because he "lacked the power to direct DVI's management." (Def.'s Mem. 17.) To show that a

defendant is a control person, "a plaintiff must demonstrate that 'the defendant had actual power

or influence over the allegedly controlled person [or entity].'" Id. at *16 (quoting In re Mobile

Media, 28 F. Supp. 2d at 940); see also Freeland v. Iridium World Communs., Ltd., 545 F. Supp.

2d 59, 84 (D.D.C. 2008) (explaining that "enforceable power" of a control person includes the

"power to direct the controlled person" and the "power to cause the direction"). Although a

defendant's status as a director is insufficient on its own to establish control, a plaintiff may

establish control by showing that a director signed the SEC filings at issue. See id. (citing In re

Philip Servs. Corp. Sec. Litig., 383 F. Supp. 2d 463, 485 (S.D.N.Y. 2005)); see also In re Alstom

SA, 406 F. Supp. 2d 433, 438 (S.D.N.Y. 2005) ("[A]n outside director and audit committee

member who signs an SEC filing can be presumed to have the power to control those who write

the report, within the meaning of Section 20(a)."); In re Livent, Inc., 148 F. Supp. 2d at 373

(same).[18] Furthermore, the fact that Defendant was an original investor of DVI, remained

substantially invested in DVI,[19] was involved in selecting DVI's executive officers, and served as

---

[18]     Defendant cites In re Livent, Inc. for the proposition that his role as an outside
director and member of the Audit Committee is insufficient for § 20(a) liability. See 148 F.
Supp. 2d at 372. However, the court also stated that, "[a]n outside director and audit committee
member who is in a position to approve a corporation's financial statements can be presumed to
have 'the power to direct or cause the direction of management and policies of' the corporation,
at least insofar as the 'management and policies' referred to relate to ensuring a measure of
accuracy in the contents of company reports and SEC registrations that they actually sign." Id. at
373 (quoting 17 C.F.R. § 240.12b-2).

[19]     In fact, in DVI's loan agreements, "Change of Control" was defined as follows:

'Change of Control' shall mean if at any time . . . (b) the Pritzker family,
Gerald Cohn and members of his immediate family, on a combined basis,
shall at any time own, beneficially and of record, less than the greater of 10%
of all of the issued and outstanding shares of capital stock of the Guarantor

26

the chairman on the Audit and Credit Committees, both of which were integral to DVI's lending and accounting practices, are sufficient to raise a genuine issue of material fact regarding Defendant's control status. See In re Reliance, 135 F. Supp. 2d at 518 (finding outside directors' role on subcommittees that were involved in the oversight of the company's accounting and reporting practices as sufficient to defeat summary judgment); see also Freeland, 545 F. Supp. 2d at 86 (explaining that a court must consider "the total effect of the various indicia of control in combination").

Next, Defendant argues that Plaintiff cannot show that he "culpably participated" in the fraudulent activities at DVI. (Def.'s Mem. 18.) Plaintiffs respond that their evidence supports a finding that Defendant culpably participated in the fraud through examples of both "action and inaction." (Pls.' Am. Mem. 39.) This Court agrees. "'Culpable participation' can be satisfied on summary judgment where facts show the control person 'knew or should have known that the primary violator . . . was engaged in fraudulent conduct.'" In re Bristol-Myers Squibb, 2005 WL 2007004, at *63 (quoting Dietrich v. Bauer, 126 F. Supp. 2d 759, 765-66 (S.D.N.Y. 2001)). "The plaintiff must show that the defendant participated in the fraud or furthered the fraud through inaction." In re Reliance, 135 F. Supp. 2d at 518 (citing Rochez Bros. v. Rhoades, 527 F.2d 880, 891 (3d Cir. 1975)). "Inaction alone cannot be the basis of liability; defendants' inaction must be deliberate and done intentionally to further the fraud." Id. (citing Rochez Bros., 527 F.2d at 891).

As discussed above, Plaintiffs have presented sufficient evidence to raise a genuine issue

---

having ordinary voting rights for the election of directors.

(See, e.g., Fleet Agreement, Aug. 6, 1999, DT 0006798, attached to Pls.' SOF as Ex. 7.)

as to whether Defendant was reckless in failing to know that DVI's Form 10-Ks contained material misrepresentations related to its loan loss reserves and liquidity. See In re Bristol-Myers Squibb, 2005 WL 2007004, at *64 (denying summary judgment on § 20(a) claim because plaintiff provided sufficient evidence to find that defendant "knew or should have known" that the primary violator was engaged in fraud based on defendant's involvement in "daily affairs of corporation"). Although Plaintiffs have not identified facts showing that Defendant's inaction was done deliberately, Plaintiffs' evidence does demonstrate that Defendant was not merely negligent in signing DVI's financial statement. Cf. In re Tyson Foods, Inc., No. 2004 WL 1396269, at *13 (D. Del. June 17, 2004) (granting summary judgment on § 20(a) claim because "at most, the evidence of [defendants'] conduct would amount to negligence in failing to oversee the actions of corporate officers," which is insufficient on its own to support liability). Plaintiffs' evidence is sufficient to survive summary judgment on their § 20(a) claim.[20] See In re Reliance, 135 F. Supp. 2d at 519 (relying on plaintiffs' evidence in support of their claim that defendants acted with scienter to find that a "reasonable juror could conclude that defendants culpably participated in the fraud by approving the allegedly misleading SEC documents"); see also Longview Equity Fund, L.P. v. Iworld Projects & Sys., Inc., No. 05-6745, 2008 WL 833230, at *10 (S.D.N.Y. Mar. 26, 2008) (finding that plaintiffs' evidence that supported a "strong inference" of scienter against defendant was also sufficient to defeat summary judgment on plaintiffs' § 20(a) claim).

---

[20]     Plaintiffs also point to the following actions as demonstrative of Defendant's culpable participation: Defendant continued to extend loans to delinquent customers to avoid recognizing loan losses, and continued to try to sell DVI to "mask correction of misstatements in DVI's fraudulent financial statements." (Pls.' Am. Mem. 40.)

Finally, Defendant argues that even if he was a "controlling person," he cannot be liable under § 20(a) because he executed his duties in good faith. (Def.'s Mem. 19.) Section 20(a) provides for an affirmative defense of good faith. See 15 U.S.C. § 78t(a). A defendant "is not liable if the evidence proves that he took precautionary measures by diligently maintaining an adequate system of internal control." SEC v. Pasternak, 561 F. Supp. 2d 459, 516 (D.N.J. 2008). Because this Court has found that Plaintiffs have presented sufficient evidence to show that Defendant was reckless in his role as a director of DVI and in signing the Form 10-Ks that contained material misrepresentations, this Court cannot find as a matter of law that Defendant performed his duties in good faith. See In re Reliance, 135 F.3d at 519.

V.     CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment (Doc. No. 683) is DENIED. An order consistent with this Memorandum follows.