IN THE UNITED STATE DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | : | CIVIL ACTION |
| DVI, INC. SECURITIES LITIGATION | : | |
| | : | No. 2:03-cv-05336 |

Legrome D. Davis, J.                                                           September 3, 2010

<u>MEMORANDUM</u>

I.     FACTUAL BACKGROUND AND PROCEDURAL HISTORY

       This securities fraud class action is brought by shareholders of Diagnostic Ventures, Inc.

("DVI") who allege that Defendants were involved in a scheme of misrepresentations and

omissions designed to artificially inflate the price of DVI's securities and conceal deceptive

accounting and lending practices.  Plaintiffs' Fifth Amended Consolidated Class Action

Complaint ("FAC") was filed on April 6, 2006 against directors and officers of DVI, "Special

Relationship" entities, independent auditor Deloitte & Touche, LLP, underwriter/lender Merrill

Lynch & Co., Inc., and other third-party entities, (FAC, Doc. No. 270-2).[1]  On May 31, 2005, this

Court granted in part and denied in part Defendants' motions to dismiss, (Mem. & Order Mots.

Dismiss, May 31, 2005, Doc. No. 181).  On April 29, 2008, this Court granted Lead Plaintiffs'

Motion for Class Certification, appointing Plaintiffs Cedar Street Fund, Cedar Street Offshore

Fund, and Kenneth Grossman as class representatives, (Mem. & Order Class Certification, Apr.

---

[1]       The following Defendants have been dismissed from this case: Presgar Imaging,
LLC, Dolphin Medical, Inc., and OnCure Medical Corp., (Nov. 17, 2006 Order, Doc. No. 403);
William S. Goldberg, John E. McHugh, and Nathan Shapiro, (Nov. 5, 2007 Order, Doc. No.
528); Radnet Management, Inc., (Oct. 14, 2008 Order, Doc. No. 651); and The Pritzker
Organization and Thomas Pritzker, (Apr. 15, 2009 Order, Doc. No. 679).

29, 2008, Doc. No. 609).[2]  Following a period of prolonged and contentious discovery,

Defendant Deloitte & Touche (hereinafter, "Deloitte" or "Defendant") filed a Motion for

Summary Judgment on April 30, 2009, (Def.'s Mot. Summ. J., Doc. Nos. 685, 689, & 691), and

a Motion to Exclude Lead Plaintiffs' Alleged Loss Causation Expert on April 30, 2009, (Def.'s

Mot. Exclude, Doc. Nos. 686 & 690), which are presently before this Court.  Lead Plaintiffs

(hereinafter, "Plaintiffs") filed a Motion to Exclude Defendant Deloitte's Purported Loss

Causation Expert Kenneth Lehn on July 6, 2009, (Pls.' Mot. Exclude, Doc. No. 702), which is

also presently before this Court.

This Court has previously set forth the relevant history of DVI, and the alleged fraudulent

schemes engaged in by DVI, its subsidiaries, its directors and officers, and outside entities.  (See

Mem. & Order Mots. Dismiss, May 31, 2005, Doc. No. 181; see also Mem. & Order on Class

Certification, Apr. 29, 2008, Doc. No. 609.)  Accordingly, we incorporate herein the factual

background provided in our previous Orders.  We now recount only the facts relevant to the

instant Motions.  Unless stated otherwise, the following facts are not in dispute.

Defendant Deloitte was DVI's independent certified public accountant from May 1987

---

[2]        The class is defined as:

> All Persons and entities who purchased or otherwise acquired the securities
> of DVI, Inc. (including its common stock and 9 7/8% Senior Notes) between
> August 10, 1999 and August 13, 2003, inclusive and who were thereby
> damaged.  Excluded from the class are Defendants; any entity in which a
> Defendant has a controlling interest or is a part or subsidiary of, or is
> controlled by a Defendant; the officers, directors, legal representatives, heirs,
> predecessors, successors and assigns of any of the Defendants; Lead Plaintiffs
> named in WM High Yield Fund, et al. v. O'Hanlon, et al., No. 04-CV-3423
> (E.D. Pa.).

(Class Certification Mem. & Order, Apr. 29, 2008.)

until June 2003, when it resigned. (See FAC ¶ 59, attached to Def.'s Statement Undisputed Facts ("SOF") as Ex. A.) Deloitte issued unqualified audit opinions on DVI's financial statements in its Form 10-Ks for fiscal years 1999, 2000, 2001, and 2002. (Id. at ¶ 2.) The audit opinions contained the following language:

> We conducted our audits in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. . . . We believe that our audits provide a reasonable basis for our opinion.

> In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of DVI, Inc., and its subsidiaries as of June 30, [1999, 2000, 2001, 2002], and the consolidated results of their operations and their cash flows for each of the three years in the period ended June 30, [1999, 2000, 2001, 2002] in conformity with generally accepted accounting principles.

(Id. at ¶ 4.) Plaintiffs claim that the above-referenced financial statements in DVI's Form 10-Ks were false and misleading, and that Deloitte issued unqualified audit reports despite its knowledge that the financial statements were "materially false and misleading." (Id. at ¶¶ 1, 3; Pls.' Resp. Def.'s SOF ¶ 3.) Plaintiffs also claim that Deloitte issued false and misleading statements regarding their review of DVI's publicly filed quarterly financial statements in its Form 10-Qs for the quarters ending within fiscal years 1999, 2000, 2001, and 2002. (Pls.' Resp. Def.'s SOF ¶ 3 (collecting exhibits); Pls.' SOF ¶ 49; Defs.' Resp. Pls.' SOF ¶ 49.)

Specifically, Plaintiffs assert that Deloitte was aware that DVI materially understated its loan loss reserves,[3] yet it continued to issue unqualified audit opinions on DVI's financial

---

[3] "DVI reported loan loss reserves ranging from $12,279 to $25,628 million, on reported average managed net financed assets of $1,437 to $2,451 billion, resulting in a relatively low level of reported loss reserves of 0.85% to 1.04%." (Pls.' SOF ¶ 33 (citing Form 10-Ks for Fiscal Years 1999, 2000, 2001, 2002, attached to Pls.' SOF as Exs. 11-14.)

statements for the relevant fiscal years.[4] DVI's loan loss reserves were a significant audit area during Deloitte's work on DVI's Form 10-Ks and during its review of DVI's Form 10-Qs. (Pls.' SOF at ¶ 32; Def.'s Resp. Pls.' SOF ¶ 32 ("[D]uring the course of its audits . . . D&T performed audit testing on DVI's estimates of its loan loss reserves.").) Deloitte also assessed the adequacy of DVI's internal controls as they related to DVI's loan loss reserves, was aware of weaknesses in the internal controls, and criticized their effectiveness. (Pls.' SOF ¶ 35 (collecting exhibits); id. at ¶ 36 (collecting exhibits, e.g., FY 2001 Mgmt. Letter from Deloitte, Aug. 10, 2001, attached to Pls.' SOF as Ex. 33 (explaining that the policies surrounding allowance for loan losses are "outdated and have not been revised in more than three years"); FY 2002 Mgmt. Letter from Deloitte, Oct. 11, 2002, attached to Pls.' SOF as Ex. 34 ("The Company may not be evaluating its allowance for credit losses in accordance with generally accepted accounting principles.").) Deloitte disputes that it criticized the effectiveness of the internal controls and characterizes its review as providing only "recommendations . . . and observations." (Def.'s Resp. Pls.' SOF ¶ 36.) In addition, "Deloitte knew that DVI was engaged in 'aggressive' and 'creative' accounting practices" in an effort to understate its loan loss reserves, including "rewriting loans to avoid reporting them as delinquent," "overadvancing on loans in order for customers to repay other delinquent loans," "transferring delinquent loans to other obligors who had insufficient capital to service the debt," and "repurchasing delinquent loans from securitizations." (Pls.' SOF ¶ 37 (collecting exhibits).) Moreover, memoranda and email

---

[4]    Deloitte generally disputes the factual allegations supporting Plaintiffs' assertion and challenges Plaintiffs' allegations as irrelevant or unsupported by evidence, and refers to its unqualified audit opinions as evidence in support of its position. (See Def.'s Resp. Pls.' SOF ¶¶ 31-49.)

exchanges within Deloitte and between Deloitte and DVI reveal Deloitte's knowledge of DVI's misstatements of its loan loss reserves.  (Id. at ¶ 38 (collecting exhibits).)  For example, in an email exchange on March 6, 2002 among the Deloitte team, one individual writes:

> The true answer is that the retained interest should reflect the loss assumption and as losses are purchased back, the retained interest value should go up. . . . [T]he retained interest may not be where it should be[,] and we'll never know because they don't track leases the way they need to on the issue.  Now, we have our backs against the wall and are forced to argue a position with no back-up support.

(Michael Bogansky Email, Mar. 6, 2002, attached to Pls.' SOF as Ex. 58.)  Similarly, in a memorandum prepared by Deloitte in preparation for a meeting with DVI on August 22, 2002, Deloitte discussed substantial adjustments that DVI was required to make but never did, including an "understatement of the provision for losses on receivables of $1.2 million and an overstatement of the retained interest of $1.2 million."  (DVI Audit Status Update, Aug. 22, 2002, attached to Pls.' SOF as Ex. 63.)

Plaintiffs also assert that Deloitte knew about DVI's liquidity crisis and the deceptive practices used to conceal it,[5] yet it continued to issue unqualified audit opinions on DVI's financial statements for fiscal years 1999, 2000, 2001, and 2002.[6]  For example, DVI was at risk of defaulting on a loan covenant under its primary lending agreement with Fleet Bank, which required its debt to equity ratio to be below 10:1, and Deloitte was aware that its ratio was just over 9:1.  (Pls.' SOF ¶¶ 52, 53 (collecting exhibits); Defs.' Resp. Pls.' SOF ¶¶ 52, 53.)

---

[5]     "Growing delinquencies in DVI's customer loan balances prior to and throughout the Class Period adversely affected DVI's cash flow and liquidity."  (Pls.' SOF ¶ 50 (collecting exhibits).)

[6]     Deloitte generally disputes the allegations supporting Plaintiffs' assertion and challenges Plaintiffs' allegations as irrelevant or unsupported by admissible evidence.  (See Def.'s Resp. Pls.' SOF ¶¶ 50-54.)

Plaintiffs' accounting expert concluded that DVI was in "de facto" violation of the covenant because of its improper accounting practices, but Deloitte disputes this finding. (Pls.' SOF ¶ 55 (citing Epstein Report 54, attached to Pls.' SOF as Ex. 3); Def.'s Resp. Pls.' SOF ¶ 55 (citing Steven Garfinkel Dep. 1968:5-23, Mar. 31, 2006, attached to Def.'s Resp. Pls.' SOF as Ex. E).) Deloitte was aware that DVI attempted to raise additional capital but that these efforts failed, except for $25 million in convertible debt and $12 million of debt secured by ineligible collateral. (Pls.' SOF ¶¶ 56, 57 (collecting exhibits, e.g., Bd. of Dir. Minutes, Oct. 22, 2001, attached to Pls.' SOF as Ex. 130; Deloitte Fraud, Control Env't, Engagement Risk, June 30, 1999, attached to Pls.' SOF as Ex. 125 (finding that DVI had insufficient working capital or credit to enable the business to operate at a profitable capacity)); Def.'s Resp. Pls.' SOF ¶¶ 56, 57.) In addition, Deloitte knew that DVI was engaged in "aggressive and creating accounting practices," as described above, to conceal the amount of delinquencies it publicly reported and to improperly inflate its income. (Pls.' SOF ¶¶ 38, 51; see also Examiner's Report 159, Apr. 7, 2004, attached to Pls.' SOF as Ex. 131 (explaining Deloitte raised issues regarding suspect practices in Management Letters to DVI).) Deloitte also had access to, reviewed, and understood DVI's borrowing base reports, which showed that DVI pledged ineligible collateral and double-listed collateral to obtain advances from the Fleet credit facility because access to additional capital was restricted. (Pls.' SOF ¶¶ 58, 60 (collecting exhibits, e.g., John Ellingson Dep. 83:15-85:5, June 17, 2008, attached to Pls.' SOF as Ex. 133); Examiner's Report 157-58 (finding that double-pledging collateral on various warehousing credit lines began in January 2002 through May 2003, and use of ineligible collateral began in September 2001 through May 2003).) Based on this knowledge, Plaintiffs' accounting expert concluded that Deloitte should have issued an

adverse opinion rather than a "clean" audit report.  (Pls.' SOF ¶ 61 (citing Epstein Report 64, 89-90).)  Deloitte disputes that it had knowledge that DVI listed ineligible loans based on the borrowing base reports, and states that a review of borrowing base reports was outside the scope of its audit.  (Def.'s Resp. Pls.' SOF ¶¶ 58, 60 (citing Garfinkel Dep. 1767:18-23).)

In addition, Deloitte was involved in responding to SEC inquiries into DVI's accounting from February 2002 through Deloitte's resignation in June 2003.[7]  (Pls.' SOF ¶ 40 (collecting exhibits, e.g., John Boyle Email to D&T, Feb. 27, 2002, attached to Pls.' SOF as Ex. 76 (discussing approaches to questions regarding loss reserves)); Feb. 12, 2002, May 8, 2002, September 23, 2002, February 25, 2003, July 11, 2003 SEC Letters, attached to Pls.' SOF as Exs. 80-84, respectively; Sandra Pfeffer Dep. 106:8-10, Apr. 16, 2008, attached to Def.'s Resp. Pls.' SOF as Ex. F (explaining that she provided comments to DVI about its responses to the SEC).) For example, in an email exchange between Robin Morris of Deloitte and Brian Schaller, formerly of Deloitte, regarding the February 2003 SEC letter, Ms. Morris stated that the comments in the SEC's letter regarding the recording of loans was "pretty interesting."  (Email Exch., Mar. 6-7, 2003, attached to Pls.' SOF as Ex. 66; see also Robin Morris Email, Feb. 10, 2003, attached to Pls.' SOF as Ex. 87 ("[O]ur good client has received 3 letters from the SEC in the past year, . . . word has come back to DVI from the SEC to their lawyer that the SEC is in 'disagreement with their accounting.'").)  The SEC's inquiries raised concerns about DVI's accounting of numerous transactions; however, Deloitte disputes that these inquiries indicated that the financial statements needed to be restated, as none were.  (Pls.' SOF ¶ 41; Def.'s Resp.

---

[7]       Deloitte generally disputes the allegations related to this assertion as irrelevant to the loss causation issue presented in its Motions.  (Def.'s Resp. Pls.' SOF ¶¶ 40-42.)

Pls.' SOF ¶ 41.)  The scope of the SEC's inquiry broadened following its February 2003 letter.

On May 20, 2003, DVI filed its Form 10-Q for the third quarter fiscal year 2003 late, noting that Deloitte and DVI disagreed about the accounting treatment of a transaction involving a radiology facility in Corpus Christi, Texas.  (See, e.g., May 13, 2003 Conference Call, 8-9, attached to Pls.' SOF as Ex. 157; Deloitte Letter to SEC, June 17, 2003, attached to Def.'s Resp. Pls.' SOF as Ex. T.)  On June 2, 2003, Deloitte resigned as DVI's independent auditor.  (Pls.' SOF ¶ 42; see Termination Letter, June 2, 2003, attached to Pls.' SOF as Ex. 91.)  On June 17, 2003, Deloitte submitted a letter to the SEC in response to DVI's Form 8-K filed on June 9, 2003 regarding Deloitte's resignation.  (See Deloitte Letter to SEC, June 17, 2003.)  In this letter, Deloitte explained that it advised DVI management on May 20, 2003 that its review of the interim financial statements to be included in the Form 10-Q for the period ending March 31, 2003 was not complete, and recommended that DVI delay filing.  Deloitte also raised concerns with management relating to the accounting on certain transactions, and explained that it was "unable to conclude on the appropriateness of [DVI's] accounting" for these transactions due to insufficient information.  (Id.)  Then, on June 27, 2003, DVI announced that the SEC rejected its Form 10-Q for the period ending March 31, 2003, because the interim financials contained therein were not reviewed by an independent auditor.  (See S&P cuts DVI counterparty credit ratings, Reuters, June 27, 2003, attached to Pls.' SOF as Ex. 162.)

Lastly, two other material facts are disputed between the parties, both of which are discussed in detail in Sections III.B and IV.B & C.  First, Plaintiffs and their loss causation expert, Mr. Chad Coffman, assert that DVI was insolvent at the start of the Class Period and that if DVI had truthfully reported its loan loss reserves or the magnitude of its loan covenant

violations, DVI's "demise would have been accelerated." (Pls.' SOF 59, 60.1 (collecting

exhibits).) Deloitte disputes these conclusions. (Def.'s Resp. Pls.' SOF ¶ 59.) Second, the

parties dispute which announcements during the Class Period represent partial disclosures that

reveal the alleged fraud. (Def.'s SOF ¶¶ 5-21; Pls.' SOF ¶¶ 62-134.) With this brief background

in place, we now turn to the Motions presently before us.

II.     LOSS CAUSATION STANDARD

        The parties dispute the proper standard for loss causation. Because this standard dictates

the resolution of the Summary Judgment and Exclusion Motions, we find it necessary to review

the legal principles of loss causation at the outset. "Section 10(b) of the Securities Exchange Act

forbids (1) the 'use or employ[ment of] . . . any manipulative or deceptive device or contrivance,'

(2) 'in connection with the purchase or sale of any security,' and (3) 'in contravention of [SEC]

rules and regulations.'" McCabe v. Ernst & Young, 494 F.3d 418, 424 (3d Cir. 2007) (quoting

15 U.S.C. § 78j(b)). "SEC regulations, in turn, make it unlawful '[t]o make any untrue statement

of a material fact or to omit to state a material fact necessary in order to make the statements

made, in the light of the circumstances under which they were made, not misleading,' in

connection with the purchase or sale of any security." Id. (quoting 17 C.F.R. § 240.10b-5(b)

("Rule 10-b5")). The Supreme Court has identified six required elements of a § 10(b) private

damages action: "(1) a material misrepresentation (or omission); (2) scienter, i.e., a wrongful

state of mind; (3) a connection with the purchase or sale of a security; (4) reliance, often referred

to . . . as 'transaction causation;' (5) economic loss; and (6) 'loss causation,' i.e., a causal

connection between the material misrepresentation and the loss.'" Id. (quoting Dura Pharms.,

Inc. v. Broudo, 544 U.S. 336, 341-42 (2005)). Defendant moves for summary judgment on the

basis of Plaintiffs' failure to prove loss causation; therefore, this Court's review is limited to this element only.

"Loss causation . . . is a causal connection between the material misrepresentation [or omission] and the loss [suffered]." Id. (quoting Dura, 544 U.S. at 342). The Third Circuit adopts a "practical approach [to loss causation], in effect applying general causation principles." McCabe, 494 F.3d at 426 (citing EP MedSystems, Inc. v. EchoCath, Inc., 235 F.3d 865, 884 (3d Cir. 2000)). Under Third Circuit law, "[i]n order to satisfy the loss causation requirement . . . , the plaintiff must show that the defendant misrepresented or omitted the very facts that were a substantial factor in causing the plaintiff's economic loss." McCabe, 494 F.3d at 426; see also Semerenko v. Cendant Corp., 223 F.3d 165, 184-85 (3d Cir. 2000) (loss causation element satisfied when plaintiff shows that the price of the security at the time of purchase was inflated "due to an alleged misrepresentation," and that the alleged misrepresentation "proximately caused the decline in the security's value"). The Supreme Court has held that loss causation is not established merely by showing that the price of the security was artificially inflated at the time of purchase because of the defendant's misrepresentations.[8] See McCabe, 494 F.3d at 433 (quoting Dura, 544 U.S. at 342). Rather, to satisfy loss causation, a plaintiff must show that "the share price fell significantly after the truth became known." See Dura, 544 U.S. at 347; see also

_____

[8]        The Supreme Court explained the "logical link between the inflated share price and any later economic loss is not invariably strong" because "[i]f the purchaser sells [] after the truth makes it way into the marketplace, an initially inflated purchase price *might* mean a later loss," but it is "far from inevitably so." Dura, 544 U.S. at 342-43. "[T]hat lower price may reflect, not the earlier misrepresentation, but the changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events . . . ." Id. at 343. Therefore, "a misrepresentation [might] . . . 'touch[] upon' a later economic loss. . . . [But] [t]o 'touch upon a loss a loss is not to *cause* a loss, and it is the latter that the law requires." Id. at 343

In re Ikon Office Solutions, Inc. Sec. Litig., 131 F. Supp. 2d 680, 687 (E.D. Pa. 2001) (stating that to prove loss causation in the Third Circuit, plaintiff must show that he/she purchased a security at price inflated due to the alleged misrepresentation, and that the stock price dropped in response to disclosure of the alleged misrepresentation (quoting Semerenko, 223 F.3d at 184)); Alaska Elec. Pension Fund v. Flowserve Corp., 572 F.3d 221, 229 (5th Cir. 2009) (stating that plaintiff must establish that there was disclosure of "negative truthful information that was related to the allegedly false, non-confirmatory, positive statement made earlier"); Lentell v. Merrill Lynch & Co., 396 F.3d 161, 173 (2d Cir. 2005) (explaining that plaintiff must show "that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security").  Dura did not address what types of events or disclosures may reveal the truth, nor did it address how specific such disclosures must be.  See In re Bradley Pharms., Inc. Sec. Litig., 421 F. Supp. 2d 822, 828 (D.N.J. 2006); In re Omnicom Group, Inc. Sec. Litig., 541 F. Supp. 2d 546, 551 (S.D.N.Y. 2008) ("Dura does not require that a corrective disclosure 'take a particular form . . . .  It is the exposure of the falsity of the fraudulent representation that is the critical component . . . ." (quoting In re Winstar Comm'ns, No. 01-3014, 2006 WL 473885, at *14 (S.D.N.Y. Feb. 27, 2006))), aff'd 597 F.3d 501 (2d Cir. 2010).  The Third Circuit has also not specifically ruled on this issue,[9] but other circuit courts and district courts in this circuit have examined the types of disclosures required to satisfy loss causation.

In general, a "corrective disclosure" must reveal at least part of the falsity of the alleged

---

[9]     In its Motion for Summary Judgment, Defendant asserts that the McCabe standard requires an "actual disclosure of the 'very facts' [D]efendant allegedly misrepresented," (see Def. Mot. Summ. J. 10, 11); however, this is a blatant mischaracterization of the McCabe standard, which does not make reference to the types of disclosures required.

misrepresentation, and it must reveal new information to the market.  See, e.g., In re Retek Inc. Sec. Litig., 621 F. Supp. 2d 690, 698 (D. Minn. 2009); In re Omnicom Group, Inc., 541 F. Supp. 2d at 551; see also In re Williams Sec. Litig.-WCG Subclass, 558 F.3d 1130, 1140 (10th Cir. 2009) ("[The disclosure] must at least relate back to the misrepresentation and not to some other negative information about the company.").  Despite Defendant's effort to convince the Court otherwise, "to be corrective, the disclosure need not precisely mirror the earlier misrepresentation."[10]  In re Williams, 558 F.3d at 1140; Alaska Elec. Pension Fund, 572 F.3d at 230; see also In re Bristol-Myers Squibb Sec. Litig., No. 00-1990, 2005 WL 2007004, at *20-21 (D.N.J. Aug. 17, 2005).  "If a fact-for-fact disclosure were required to establish loss causation, a defendant could defeat liability by refusing to admit the falsity of its prior misstatements." Alaska Elec. Pension Fund, 572 F.3d at 230 (citing In re Worlds of Wonder Sec. Litig., 35 F.3d 1407, 1422 (9th Cir. 1994)); see also In re Williams, 558 F.3d at 1140.  Nor does the disclosure have to be a "single, unitary disclosure."  See In re Bradley Pharms., Inc., 421 F. Supp. 2d at 828-29.  If a "'complete' disclosure were required, defendants could 'immunize themselves with a protracted series of partial disclosures.'"  Alaska Elec. Pension Fund, 572 F.3d at 230 (quoting Freeland v. Iridium World Commc'ns, Ltd., 233 F.R.D. 40, 47 (D.D.C. 2006)).  Instead, the truth

---

[10]     Defendant  relies on In re Intelligroup Sec. Litig. ("Intelligroup II"), 527 F. Supp. 2d 262 (D.N.J. 2007), to support its position that Plaintiffs must point to a "mirror-image" disclosure to satisfy loss causation.  In Intelligroup II, the district court granted the defendants' motions to dismiss for failure to plead loss causation, stating that "allegations of an actual disclosure of the very misrepresentation that cause[d] original inflation of [the] stock price are required to plead the loss causation element."  Id. at 332.  However, the court also suggested that disclosures that "implicitly touched" on errors may be sufficient, and cited a case from the Southern District of New York, which applies a more lenient standard for satisfying loss causation.  See id. at 326 (citing In re Winstar Comm'ns., 2006 WL 473885, at *13).  Thus, the district court's decision is not a compelling endorsement of the mirror image approach.

may be revealed through a series of partial disclosures through which the truth gradually "leaks out." See, e.g., Dura, 544 U.S. at 342 (acknowledging that relevant truth can "leak out"); Lormand v. US Unwired, Inc., 565 F.3d 228, 261 (5th Cir. 2009) ("[L]oss causation may be pleaded on the theory that the truth gradually emerged through a series of partial disclosures and that an entire series of partial disclosures caused the stock price deflation." (collecting cases)); In re Williams, 558 F.3d at 1140; In re Bradley Pharm., Inc., 421 F. Supp. 2d at 829 ("The revelation of the 'truth' . . . occurred through a series of disclosing events."); see also In re Motorola Sec. Litig., 505 F. Supp. 2d 501, 543 (N.D. Ill. 2007) (adopting In re Bradley Pharm., Inc. approach). Similarly, disclosure of the fraud may be "indirect" through "disclosure of another event," though in such a situation, the plaintiff must "provide proof that the market recognized a relationship between the event disclosed and the fraud." See McKowen Lowe & Co. v. Jasmine, Ltd., No. 94-5522, 2005 WL 1541062, at *8 (D.N.J. June 30, 2005) (citing In re Ikon, 131 F. Supp. 2d at 690), aff'd, 231 F. App'x 216 (3d Cir. 2007); see also In re Retek Inc., 621 F. Supp. 2d at 699 (adopting McKowen Lowe & Co. approach). A disclosure of disappointing earnings or other indications of the "true financial condition" of the company, without any evidence of a link between the disclosure and the fraud, is not a corrective disclosure.[11] See In re Ikon, 131 F. Supp. 2d at 689-90; Archdiocese of Milwaukee Supporting

---

[11]  Plaintiffs and Plaintiffs' expert rely in part on a "true financial condition" theory of loss causation. (Pls.' Resp. Mot. Summ. J. 12.) However, this approach has been rejected by many courts, including courts in this circuit, as it fails to connect the corrective disclosure to the alleged misrepresentation or omission. See Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton Co., 597 F.3d 330, 337-38 (5th Cir. 2010) ("[I]f [a] [p]laintiff cannot prove . . . that the market learned more than that [the] [d]efendant's earnings guidance was lower and so its business seemed less valuable, it cannot establish that its loss was caused by [the] [d]efendant's misstatements."); see also In re Ikon, 131 F. Supp. 2d at 687 (granting summary judgment for defendant for failure to establish loss causation because there was no evidence that the

Fund, Inc. v. Halliburton Co., 597 F.3d 330, 337-38 (5th Cir. 2010); In re Retek, 621 F. Supp. 2d

at 702-03. And, finally, the market does not have to learn of possible fraud from the company

itself, but may be informed by "whistleblowers, analysts questioning financial results, resignation

of CFOs or auditors, announcements by the company of changes in accounting treatment going

forward, newspapers and journals, etc." See, e.g., In re Intelligroup Sec. Litig., 527 F. Supp. 2d

262, 297 n.18 (D.N.J. 2007) (quoting Enron Corp. Sec. Derivative & "ERISA" Litig., No. MDL-

1446, 2005 WL 3504860, at *16 (S.D. Tex. Dec. 22, 2005)).

     The Second Circuit has taken a slightly different approach to loss causation, the

"materialization of the concealed risk" standard, which has been applied by district courts in this

circuit and cited favorably by other circuits.[12]  See, e.g., In re Cigna Corp. Sec. Litig., 459 F.

Supp. 2d 338, 349 n.22 (E.D. Pa. 2006) ("Courts have recently held that a plaintiff must

explicitly show that the market reacted negatively to either a corrective event or disclosure or a

materialization of the concealed risk." (citing Lentell, 396 F.3d at 173-75)); In re Williams, 558

F.3d at 1140; In re Tellium, Inc., Sec. Litig., No. 02-5878, 2005 WL 2090254, at *3 (D.N.J. Aug.

26, 2005) (adopting Lentell standard).  Under this standard, "to establish loss causation, a

---

misstatements caused the plaintiff's loss, rather than exposure of the "grim reality" of the
company's financial situation); Nat'l Jr. Baseball League v. Pharmanet Dev. Group, Inc., No. 08-
5723, 2010 WL 137935, at *35-36 (D.N.J. Mar. 30, 2010).  This Court agrees and will not apply
a standard that is "so lax that every announcement of negative news becomes a potential
corrective disclosure."  See In re Williams, 558 F.3d at 1140 (quoting In re Motorola, 505 F.
Supp. 2d at 546).

[12]    Although the Third Circuit has not adopted the Second Circuit's materialization of
the risk approach, it has in dicta discussed this standard and has not rejected it.  See McCabe, 494
F.3d at 429; Newton v. Merrill Lynch, Pierce, Fenner & Smith, 259 F.3d 154, 181 n.24 (3d Cir.
2001) (explaining that the Third Circuit and Second Circuit's tests for loss causation are "framed
somewhat differently" but not addressing "whether there are differences between these
standards").

plaintiff must [prove] . . . that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." Lentell, 396 F.3d at 173. This requires a plaintiff to prove "both that the loss [was] foreseeable *and* that the loss [was] caused by the materialization of the concealed risk." Id. (emphasis in original). To establish that the loss was foreseeable, a plaintiff must show that the "risk that caused the loss was within the zone of risk *concealed* by the misrepresentations and omissions alleged by the disappointed investor." In re Vivendi Universal, S.A. Sec. Litig., 634 F. Supp. 2d 352, 363 (S.D.N.Y. 2009) (quoting Lentell, 396 F.3d at 173 (emphasis in original)). To prove that the "loss [was] caused by the materialization of the concealed risk," a plaintiff may either (1) show that the market reacted negatively to a corrective disclosure, as described above, or (2) show that a "defendant's misstatements or omissions concealed a risk that later materialized to cause the plaintiff's loss."[13] See In re AOL Time Warner, Inc. Sec. Litig., 503 F. Supp. 2d 666, 677 (S.D.N.Y. 2007) (citing Lentell, 396 F.3d at 173, 175, 176). When relying on this standard, a plaintiff must allege with some degree of particularity what risk the defendant's misstatements allegedly concealed. See id. at 678.

With these loss causation principles in mind, we turn to the instant Motions and find that a genuine issue of fact exists with regard to whether the "very facts omitted by [Defendant] were a substantial factor in causing [P]laintiffs' economic loss." See McCabe, 494 F.3d at 436.

---

[13]     In In re Vivendi Universal, the Southern District of New York provides a helpful description of the causal connection between the allegedly false and misleading statements and the materialization of the risk: "[I]f a company misrepresents fact A (we have plenty of free cash flow), which conceals risk X (liquidity), the risk can still materialize by revelation of fact B (a ratings downgrade), an indication of risk X (liquidity). . . . When fact B is revealed, the market need not be aware of fact A or that fact A had been previously misrepresented." 634 F. Supp. 2d at 367.

Accordingly, we deny Defendant's Motion for Summary Judgment.

III.    MOTIONS TO EXCLUDE EXPERT WITNESSES

Defendant moves to exclude Plaintiffs' purported loss causation expert, Mr. Chad Coffman, and Plaintiffs move to exclude Defendant's purported loss causation expert, Dr. Kenneth Lehn. Both parties argue that the other's expert is unreliable. Mr. Coffman and Dr. Lehn opined on whether Defendant's conduct proximately caused Plaintiffs' losses. Mr. Coffman submitted his initial report on October 1, 2008, in which he posited two theories to assess loss causation and damages, an insolvency approach and event study approach. (Coffman Expert Report, attached to Pls.' Resp. Def.'s Mot. Exclude as Ex. 1 (hereinafter, "Coffman Report").) Dr. Lehn submitted his report on November 17, 2008, in which he reviewed and responded to Mr. Coffman's report, and opined on whether Plaintiffs suffered damages as a result of Defendant's actions. (Lehn Expert Report, attached to Pls.' Mot. Exclude as Ex. 1 (hereinafter, "Lehn Report").) Dr. Lehn also performed an event study approach in his report. (Id.) Mr. Coffman's rebuttal report was submitted on December 17, 2008. (Coffman Rebuttal Report, attached to Pls.' Resp. Def.'s Mot. Exclude as Ex. 2.) For the reasons that follow, this Court finds that Mr. Coffman's insolvency theory cannot support liability because it conflicts with the Supreme Court and Third Circuit precedent on loss causation, and it therefore is inadmissible as unreliable and unfit. With respect to the event study theories, this Court finds that both Mr. Coffman and Dr. Lehn's methodologies are reliable. However, as discussed in Sections IV.B & C, because some of the disclosure events relied upon are not corrective disclosures as a matter of law, these aspects of the experts' reports must be excluded.

A.    Legal Standard

Pursuant to the Federal Rules of Evidence, this Court must act as a "'gatekeeper' to ensure that 'any and all relevant expert testimony or evidence is not only relevant, but also reliable.'"  Pineda v. Ford Motor Co., 520 F.3d 237, 243 (3d Cir. 2008) (quoting Kannankeril v. Terminix Int'l, Inc., 128 F.3d 802, 806 (3d Cir. 1997)).  This Court, however, is reminded that the Rules of Evidence "embody a strong preference for admitting any evidence that may assist the trier of fact," and take a "liberal policy of admissibility" with respect to expert testimony.  Id. (citing Kannankeril, 128 F.3d at 806).  Rule 702,[14] which governs the admissibility of expert testimony, has three major requirements: "(1) the proffered witness must be an expert, i.e., must be qualified; (2) the expert must testify about matters requiring scientific, technical or specialized knowledge; and (3) the expert's testimony must assist the trier of fact."  Id. at 244 (internal citations omitted).  The Third Circuit has summarized these requirements as "a trilogy of restrictions on expert testimony: qualification, reliability[,] and fit."  Schneider v. Fried, 320 F.3d 396, 404 (3d Cir. 2003).

    1.    Qualification

"Qualification refers to the requirement that the witness possess specialized expertise."

_____

[14]    Federal Rule of Evidence 702 states:

If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods to the facts of the case.

Schneider, 320 F.3d at 404. The Third Circuit has interpreted the qualification requirement liberally, holding that a "broad range of knowledge, skills, and training qualify an expert." Id. (quoting In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 741-43 (3d Cir. 1994)). The circuit court has explained that this liberal approach "extends to the substantive as well as the formal qualifications." Pineda, 520 F.3d at 244. "It is an abuse of discretion to exclude testimony simply because the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that the court considers most appropriate." Id. (quoting Holbrook v. Lykes Bros. S.S. Co., 80 F.3d 777, 782 (3d Cir. 1996)).

2.    Reliability

Second, "an expert's testimony is admissible so long as the process or technique the expert used in formulating the opinion is reliable." Id. at 247 (citing Paoli, 35 F.3d at 742); see also Schneider, 320 F.3d at 404 ("[T]he expert must have good grounds for his [or] her belief."). "The admissibility inquiry thus focuses on principles and methodology, not on the conclusions" that they generate. In re TMI Litig., 193 F.3d 613, 665 (3d Cir. 1999) (citing Kannankeril, 128 F.3d at 806). The Third Circuit has explained that "[w]hile a litigant has to make more than a prima facie showing that his expert's methodology is reliable, . . . 'the evidentiary requirement of reliability is lower than the merits standard of correctness.'" Pineda, 520 F.3d at 247 (quoting In re Paoli, 35 F.3d at 744). In evaluating whether a methodology is reliable, a district court may consider the following factors:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness

testifying based on the methodology; and (8) the non-judicial uses to which the
method has been put.

Id. at 247-48 (noting that factors were enunciated in Daubert v. Merrell Dow Pharms., Inc., 509

U.S. 579 (1993), and United States v. Downing, 753 F.2d 1224 (3d Cir. 1985)).  These factors

are "neither exhaustive nor applicable in every case," and we are reminded that the "inquiry

envisioned by Rule 702 is . . . a flexible one."  Id. (citing Kannankeril, 128 F.3d at 806-07, and

Daubert, 509 U.S. at 594).

        3.      Fit

The third requirement considers whether there is a "sufficient 'fit' between the expert's

testimony and the facts that the jury is being asked to consider."  United States v. Schiff, 602

F.3d 152, 172-73 (3d Cir. 2010) (citing Daubert, 509 U.S. at 591).  In order to satisfy the "fit"

requirement, the "expert testimony proffered [must be] sufficiently tied to the facts of the case

that it will aid the jury in resolving a factual dispute."  Id. at 173 (quoting United States v.

Downing, 753 F.2d 1224, 1242 (3d Cir. 1985)).  The Third Circuit has explained that the "fit"

requirement is one of relevance.  Id.; see also In re TMI, 193 F.3d at 670 ("[E]xpert evidence

which does not relate to an issue in the case is not helpful.").  The standard for this factor "is not

that high," but "higher than bare relevance."  Schiff, 602 F.3d at 173 (quoting In re Paoli, 35 F.3d

at 745).

        B.      Mr. Coffman's Insolvency Theory

Defendant moves to exclude Mr. Coffman's insolvency approach as unreliable for three

reasons: (1) the approach conflicts with the Supreme Court and Third Circuit law on loss

causation because it does not require that a stock price declined in response to a disclosure of the

alleged misrepresentations, and it does not differentiate between loss attributable to the fraud and loss attributable to other forces; (2) the approach has not been accepted by any courts or discussed in any literature; and (3) the methodology used to assess insolvency is flawed.[15] (Def.'s Mot. Exclude 4-6; Lehn Report ¶¶ 11-12.)  Plaintiffs respond that Mr. Coffman's insolvency theory comports with the loss causation standard and the remedies available under § 10(b) because of the unique position of DVI: "an insolvent company which undisputably engaged in massive frauds, whose securities' true value was zero [at the time of purchase], and whose securities significantly declined while its industry and competitors grew and increased in value." (Pls.' Resp. Def.'s Mot. Exclude 36-37; <u>see also</u> Coffman Rebuttal Report ¶ 61.)  Upon reviewing Mr. Coffman's approach, we find that his insolvency theory conflicts with the substantive legal principles of loss causation outlined in Section II, and must be excluded as unreliable and unfit.  <u>See</u> <u>In re Williams Sec. Litig.</u>, 496 F. Supp. 2d 1195, 1261-62 (N.D. Okla. 2007) (explaining that the admissibility of a proposed loss causation and damages expert "is governed as much by substantive legal principles as it is by principles of economics and finance[,]" and that a court's <u>Daubert</u> decisions "begin with an analysis of the relevant substantive legal principles"), <u>aff'd</u> 558 F.3d 1130 (10th Cir. 2009).

  Mr. Coffman summarizes his insolvency theory as follows:

> This approach is premised on the notion that, but-for the fraud, DVI's equity would not have traded except as a penny stock and that any decline in value was causally linked to reliance on DVI's market price and the false and misleading information it reflected.  Under this theory of loss causation, any downward movement in the stock price which brought the market price more in line with the "uninflated" price is recoverable.

---

[15]  Defendant does not challenge Mr. Coffman's qualifications as an expert. Accordingly, this Court only reviews the "reliability" and "fit" prongs of the Rule 702 standard.

(Coffman Report ¶ 12.)[16]  Mr. Coffman explains that the insolvency approach has three primary

elements.  First, Mr. Coffman "quantif[ies] . . . the degree of misstatements of earnings in DVI's

financial statement."  (Coffman Rebuttal Report ¶ 37.)  Mr. Coffman relies on Plaintiffs'

accounting expert Dr. Barry Epstein's conclusion that "DVI, through a multitude of different

improper accounting techniques, was able to disguise that it was consistently losing money."[17]

(Coffman Report ¶ 30.)  Dr. Epstein found that "DVI had a long-term loan loss rate of 6% on its

managed portfolio," though on its public statements, including those provided to the SEC, DVI

reported an "average loss rate on their core business [of] 0.40%."  (Id. at ¶¶ 29-30; Coffman

Rebuttal Report ¶ 39 (quoting Epstein Report 40, attached to Pls.' Resp. Def.'s Mot. Exclude as

Ex. 17).)  Dr. Epstein then "applie[d] this 6% loss rate to securitization[] [transactions] from

1999-2002 and [found] this reduce[d] gain on sale by 88% during that period."  (Coffman

Rebuttal Report ¶ 40 (citing Epstein Report 51).)  Second, Mr. Coffman estimates an Earnings

Response Coefficient (ERC) for DVI to "estimate how DVI's market prices would have

responded to revelation of the truth [about the loan loss reserve numbers]."[18]  (Coffman Report ¶

43.)  Mr. Coffman selects DVI's September 27, 2002 announcement of a material earnings

_____

[16]     Coffman's insolvency approach applies only to DVI's common stock declines, not
its debt securities.  (Coffman Report ¶ 14.)

[17]     Dr. Barry Jay Epstein, Ph.D., CPA, filed an expert report on October 3, 2008.
(See, e.g., Epstein Report, attached to Pls.' Resp. Def.'s Mot. Exclude as Ex. 17.)  Dr. Epstein's
report is not challenged by Defendant.

[18]     An ERC "measures the ratio of the price movement per share to the earnings
surprise per share."  (Coffman Rebuttal ¶ 47.)  Coffman evaluates how DVI's market value was
impacted by other earning surprises to calculate an ERC, and then applies the ERC to a "measure
of the 'surprise' that would occur if the truth would have been revealed" about its actual loan loss
rate of 6%.  (Coffman Report ¶ 43; Coffman Rebuttal Report ¶¶ 47, 48.)

surprise as the most comparable to his hypothetical based on "direction, magnitude, and content." (Coffman Rebuttal Report ¶ 48.)  The ERC for September 27, 2002 was calculated by dividing the market price reaction to the surprise by the amount of surprise, resulting in an ERC of 6.61. (Coffman Report ¶ 45.)  Applying this ERC to the earnings surprise that would have occurred if DVI disclosed its true loan loss reserve, he concludes that it is "sufficient to reduce the market capitalization to below where it stood [at the] end of the Class Period," thus showing that DVI would have been insolvent throughout the class period but-for the fraud.  (Id. at ¶ 47; Coffman Rebuttal Report ¶ 47.)  Third, Mr. Coffman calculates damages, by subtracting the "clean" price that would have prevailed had the market known that DVI was insolvent from the market price, resulting in at least $92.5 million in damages.  (Coffman Rebuttal Report ¶ 37; see also Coffman Dep. 72:10-16, Jan. 27, 2009, attached to Def.'s Mot. Exclude as Ex. A.)

Mr. Coffman admits that he does not require any form of corrective disclosure and does not exclude non-fraud factors, (see Coffman Rebuttal Report ¶¶ 58, 61; Coffman Dep. 73:10-14, 73:17-74:7); however, he asserts that these elements are not required when a company is insolvent as a result of fraud because in such situations, all loss is attributable to the fraud, (see Coffman Rebuttal Report ¶ 60).  According to Mr. Coffman, when a company is insolvent as a result of fraud and the "true price" of the company is zero, then any decline in the "observed price," even if associated with a non-fraud event, causes an economic loss because "while the observed price falls, the true price cannot fall farther."  (Id. at ¶ 60 & Table 2 (Insolvent Firm).)  He explains that "the loss would not have occurred but-for the fraud and the non-fraud event results in a decline in inflation and thus an economic loss to the investor."  (Id. at ¶ 61 ("'Economic loss caused by the fraud' is synonymous with a reduction in inflation."), Table 2.)

Regardless of whether this approach is based on "clear economic principles" as Mr. Coffman claims, it is in obvious conflict with the basic requirements of loss causation and must be excluded as unreliable and unfit.

Loss causation is defined as a "causal connection between the material misrepresentation [or omission] and the loss [suffered]."[19] McCabe, 494 F.3d at 424 (quoting Dura, 544 U.S. at 342). At a minimum, "[a]n inflated purchase price will not itself constitute or proximately cause the relevant economic loss," as the alleged loss could be the result of changed economic circumstances or other events and not the alleged fraud, see Dura, 544 U.S. at 342-43; rather, "a particular misrepresentation . . . 'will not have caused any loss' to an investor unless the 'relevant truth' about that misrepresentation is made known to the public," and the stock price declined as a result. Marsden v. Select Med. Corp., No. 04-4020, 2007 WL 1725204, at *2 (E.D. Pa. June 12, 2007) (citing Dura, 544 U.S. at 342, and Semerenko, 223 F.3d at 185); see also McKowan Lowe & Co., 231 F. App'x at 218 (affirming district court's holding that failure to prove that there were any disclosures to the market which revealed the truth was fatal to plaintiffs' claims); Alaska Elec. Pension Fund, 572 F.3d at 229; In re Omnicom, 541 F. Supp. 2d at 551 ("It is the exposure of the falsity of the fraudulent representation [to the market] that is the critical component of loss causation.") (internal quotations omitted). The "unique" position of DVI as an insolvent company due to fraud does not excuse Plaintiffs' obligation to show a causal nexus

---

[19]     It is worth noting that in his deposition, Coffman recognizes that "there is ambiguity in the loss causation standard such that a court could find that the insolvency approach does not meet the loss causation standard." (Coffman Dep. 72:18-21.) Although there is some ambiguity in loss causation jurisprudence, there is no doubt that at the most basic level, loss causation requires proof of a causal nexus between a misrepresentation and loss suffered, as shown through a revelation of the truth to the market, and Coffman's insolvency approach does not even satisfy that requirement.

between the economic loss and the alleged fraud through some disclosure events. If we were to admit Coffman's theory, we open the door for Plaintiffs to recover for all losses, regardless of cause, which "turns securities laws into just the sort of 'broad insurance against market losses' that Dura rejected." See In re Williams, 558 F.3d at 1139 (citing Dura, 544 F.3d at 345). In addition, the underlying assumption of his theory, that all inflation in the purchase price was due to fraud and thus any decline in inflation constitutes economic loss caused by fraud, directly contradicts the Supreme Court's holding in Dura that artificial inflation in the purchase price alone is insufficient to show loss causation. See also Semerenko, 223 F.3d at 185 ("In the absence of a correction in the market price, the cost of the alleged misrepresentation is still incorporated into the value of the security and may be recovered at any time simply by reselling the security at the inflated price.").

Furthermore, Mr. Coffman can point to no other federal court that has admitted this theory, and in fact, other courts have rejected a similar approach. For example, in In re Williams, the plaintiffs' loss causation expert relied on a leakage theory, he posited that the company's true value had the fraud not occurred was its value upon declaring bankruptcy, and attributed almost all of the company's value to the fraud. 496 F. Supp. 2d at 1253-54. The district court stated that this theory "collides directly with loss causation doctrine" and rejected it as unreliable. Id. at 1266. The district court emphasized that the expert "does not even purport . . . to have removed effects of 'nonfraud company-specific information,' . . . [n]or has he identified any corrective disclosures . . . other than to insist, meaninglessly, that corrective disclosures occurred 'every day.'" Id. In affirming the district court's ruling, the Tenth Circuit made clear that although Dura does not require a particular type of disclosure to satisfy loss causation, "any theory - even a

leakage theory . . . - will have to show some mechanism for how the truth was revealed." In re Williams, 538 F.3d at 1138. The expert's theory "bootstraps from the conclusion that [the company] was essentially valueless from the start to a scenario where any decline was a recognition of this truth and therefore a draining of the fraud premium. He fails, however, to identify *any causal link* between the revelation of the truth and the decline in price."[20] Id. at 1139 (emphasis added); see also In re Imperial Credit Indus., Inc., Sec. Litig., 252 F. Supp. 2d 1005, 1015 (C.D. Cal. 2003) (rejecting the argument that an event study was not necessary because even if the expert could assume that the stock had zero value during the class period, "the question would still arise as to the extent to which the difference between the true value and the market value of [the company's] stock during the Class Period was fraud-related or non-fraud related"), aff'd 145 F. App'x 218 (9th Cir. 2005). Like the expert in In re Williams, Coffman's failure to show how the truth was revealed to the market and his failure to link the revelation to a corresponding loss puts his theory in direct conflict with the fundamental elements of loss causation; thus, it is neither relevant nor reliable. See In re Williams, 558 F.3d at 1139.[21]

---

[20]     Plaintiffs seek to distinguish Mr. Coffman's insolvency approach from the approach rejected in In re Williams on two grounds: (1) that the Tenth Circuit was not addressing "an undisputed fraud or evidence showing the company was insolvent at the beginning of the class period;" and (2) that the expert's approach was based on "tiny corrective disclosures that occurred each and every day." (Pls.' Resp. Def.'s Mot. Exclude 41-42.) Plaintiffs' efforts fail. The fact that a company is insolvent at the start of the class period does not eliminate the requirement that Plaintiffs must prove loss causation. See In re Imperial Credit Indus., Inc., Sec. Litig., 252 F. Supp. 2d 1005, 1015 (C.D. Cal. 2003). Moreover, the expert's reference to "every day" disclosures was insufficient to show how the truth was revealed to the market, further supporting our position that Mr. Coffman's failure to point to any disclosure is fatal to his theory.

[21]     Plaintiffs also assert that Mr. Coffman's insolvency theory complies with the out-of-pocket damages remedy that is available under § 10(b), particularly given the fact that DVI was an insolvent company that "undisputedly engaged in massive frauds, whose securities' true value was zero, and whose securities significantly declined while its industry and competitors

B.     Mr. Coffman and Dr. Lehn's Event Study Theories[22]

Both Defendant and Plaintiffs move to exclude the event study approaches of their

opponent experts on the grounds that they do not comply with the Third Circuit's standard for

loss causation.  Defendant argues that Mr. Coffman's position too closely resembles the "true

financial condition" theory which has been rejected by the courts, and his position that loss

causation does not require a "specific disclosure about a specific misrepresentation" but rather

permits for disclosure of "symptoms" of the alleged fraud, is contrary to Third Circuit

precedent.[23]  (Def.'s Mot. Exclude 7-9 (citing Coffman Dep. 104:11-05:15, 119:11-17).)

grew . . . ." (Pls.' Resp. Def.'s Mot. Exclude 37.)  Plaintiffs correctly argue that an out-of-pocket
measure is the most commonly used method to calculate damages, see In re Cigna Corp., 459 F.
Supp. 2d at 349-50, but Plaintiffs misstate the standard for this remedy in an attempt to fit
Coffman's insolvency approach into it.  Courts consider the "difference between the purchase
price and the 'true value' of a security at the time of the purchase" to be a proper measure of
economic loss.  See id.  However, "[d]etermining the difference between those prices typically
requires 'elimination of that portion of the price decline that is the result of forces unrelated to
the wrong.'"  Gordon Partners v. Blumenthal, No. 02-7377, 2007 WL 431864, at *13 (S.D.N.Y.
Feb. 9, 2007) (quoting In re Executive Telecard, Ltd. Sec. Litig., 979 F. Supp. 1021, 1025
(S.D.N.Y. 1997)); see also In re Cigna Corp., 459 F. Supp. 2d at 349-50.  Coffman's insolvency
approach fails to show that the price decline was actually attributable to the misrepresentation.

[22]     Plaintiffs challenge Dr. Lehn's qualifications in their Motion to Exclude, (see Pls.'
Mot. Exclude 7-8), but any argument as to Dr. Lehn's qualifications is rejected.  Dr. Lehn has a
B.A., an M.A., and a Ph.D in economics.  (Lehn Report ¶ 3.)  He was the chief economist of the
SEC from 1987 through 1991 where he often opined on "whether the release of particular
information had a significant effect on a company's securities prices," and he is currently the
Samuel A. McCullough Professor of Finance in the Joseph M. Katz School of Business at the
University of Pittsburgh.  (Id. at ¶¶ 1-2.)  It is clear that Dr. Lehn possesses "specialized
expertise" to qualify as an expert on loss causation.  Schneider, 320 F.3d at 404.

[23]     This Court rejects Defendant's argument that Mr. Coffman's event study approach
is similar to the one rejected in In re Ikon Office Solutions, Inc. Sec. Litig., 131 F. Supp. 2d 680
(E.D. Pa. 2001).  In In re Ikon, plaintiffs' loss causation expert attributed price declines to
announcements that focused on "factors such as the transformation initiative, tough competition,
and weak sales, and not on the alleged accounting misstatements or income inflation."  131 F.
Supp. 2d at 689.  The court found that the plaintiffs presented no evidence that the alleged

Defendant's argument is based on its untenable position that the Third Circuit requires "an actual disclosure of the 'very facts' [D]efendant allegedly misrepresented." (Id. at 15.) On the other hand, Plaintiffs argue that Dr. Lehn's method of interpreting corrective disclosures, which requires a "stringent fact-for-fact" disclosure and "robotically look[s] for certain 'buzzwords,'" is at odds with the Third Circuit's practical approach to loss causation.[24] (Pls.' Mot. Exclude 2-4.) Plaintiffs' argument is based on its view that the Third Circuit allows disclosures to be "direct or indirect" in revealing the truth of the alleged fraud, and permits loss causation to be satisfied through the "materialization of the concealed risk" approach, or even the "true financial condition" approach.[25] (Id. at 3.) As discussed in detail below, this Court finds that some of the

_____

misstatements, rather than the revelation of "operational and business problems" caused the loss. Id. at 690. Contrary to Defendant's argument, Mr. Coffman's event study theory attributes the declines in securities prices to partial disclosures that reveal symptoms of the alleged fraud, and not just weak business performance. As described below, to the extent that Mr. Coffman's event study attributes price declines to disclosures that reveal nothing more than the true financial condition of DVI, those portions of his report are excluded as irrelevant.

[24]     Additionally, Plaintiff argues that Dr. Lehn's event study methodology, which is substantially similar to the method used by their expert, is unreliable. (Pls.' Mot. Exclude 7.) Because both experts rely on an event study approach, which is widely accepted by courts, and because the primary challenges to the reports are about the types of disclosures permitted, we do not consider this argument.

[25]     Upon reviewing Mr. Coffman's report and rebuttal report, it does not appear that he was relying on the materialization of the risk approach to loss causation, but rather a combination of the partial disclosure and true financial condition approaches to loss causation. Plaintiffs argue to this Court that we should apply the materialization of the risk approach in our assessment of loss causation. To some degree, we agree with Defendant's argument that Plaintiffs are attempting  re-characterize Mr. Coffman's event study in terms of the materialization of risk approach. However, because this approach has been relied on by district courts in this circuit, cited favorably by other circuits, and has been referred to by the Third Circuit, we do not believe that this argument is sufficient grounds to reject the materialization of the risk standard entirely. Therefore, we take this approach into consideration when reviewing the disclosures at issue in this case.

"partial corrective disclosures" selected by Mr. Coffman do not qualify as corrective disclosures under any standard of loss causation because they disclose nothing more than the true financial condition of DVI and do not relate to Defendants' alleged misrepresentations; opinions as to these disclosures are excluded. With respect to the events not excluded, the conclusions of both Mr. Coffman and Dr. Lehn are admissible. See In re TMI, 193 F.3d at 665 ("The admissibility inquiry . . . focuses on principles and methodology, not on the conclusions . . . .").

"The event study method is an 'accepted method for the evaluation of materiality damages to a class of stockholders in a defendant corporation.'" In re Imperial Credit Indus., 252 F. Supp. 2d at 1014 (quoting In re Gaming Lottery Sec. Litig., No. 96-5567, 2000 WL 193125, at *1 (S.D.N.Y. Feb. 16, 2000)). "Because of the need to distinguish between fraud-related and non-fraud related influences of the stock's price behavior" in § 10(b) cases, many courts refuse to admit damages reports or testimony by damages experts that do not include event studies or something similar. Id. at 1015 (internal quotations omitted) (collecting cases). The "almost obligatory 'event study'" begins by "isolating stock declines associated with market-wide and industry-wide downturns from those specific to the company itself," and then "consider[ing] firm-specific events that might have caused those declines." In re Vivendi, 634 F. Supp. 2d at 364; see also In re Williams, 496 F. Supp. 2d at 1272-73; In re Imperial Credit Indus., 252 F. Supp. 2d at 1014 ("An event study is a statistical regression analysis that examines the effect of an event on a dependent variable, such as a corporation's stock price." (internal citation omitted)). Both Mr. Coffman and Dr. Lehn apply event study methods that isolate days where DVI's stock and bond values had "statistically significant" declines, and then consider firm-specific events that may have caused these declines. (See Coffman Report ¶¶ 55, 56, 61, 62;

Lehn Report ¶¶ 23-24, 70-77.)

The primary difference between Mr. Coffman's and Dr. Lehn's approaches is their views regarding which events qualify as corrective disclosures. Mr. Coffman evaluates news related to DVI during the class period to identify which events "represent partial disclosures of the hidden truth about DVI." (Coffman Report ¶ 62.) He defines a "partial corrective disclosure" as "DVI-specific news that brings the market closer to the realization that DVI had sustained massive hidden loan losses, was in financial distress, and has engaged in accounting improprieties." (Id.) Mr. Coffman also describes that these partial disclosures reveal "symptoms" of the fraud that was disguised in DVI's financial statements, including greater delinquencies, increased leverage, increased write-offs of bad loans, DVI's underperformance in a thriving industry, lack of cash flow, and a weak operating performance which resulted in a downgraded credit rating. (Coffman Rebuttal Report ¶¶ 11-16; Coffman Dep. 106:11-13:18.) On the days where he observes a statistically significant abnormal return and firm-specific information that partially reveals the fraud, he concludes that the information disclosed is what caused the price decline. (Coffman Report ¶ 59.) Mr. Coffman finds that class members who purchased DVI equity suffered damages of at least $55.3 million, and those who purchased 9 7/8% Senior Notes suffered damages of at least $33.5 million. (Id. at ¶¶ 99-100.)

On the other hand, Dr. Lehn looks for the "release of information that disclosed the truth about the alleged misrepresentations." (Lehn Report ¶ 23.) Dr. Lehn's report suggests that only those disclosures that "correct an earlier misrepresentation[]" and release "information about accounting improprieties" would constitute a corrective disclosure. (Id. at ¶ 17; see also, e.g., id. at ¶¶ 81, 83.) However, during his deposition, Dr. Lehn states that the "litmus test" for a

corrective disclosure is that the information released must be "corrective [of a misrepresentation] and it has to tie back to the alleged misrepresentation." (Kenneth Lehn Dep. 416:7-9, Feb. 26, 2009, attached to Pls.' Resp. Def.'s Mot. Exclude as Ex. 3.) He also clarifies that the disclosure need not "explicitly say there was a misrepresentation and we are correcting it," (id. at 414:19–21), nor does it need to include "buzz words," (id. at 399:2-5). Dr. Lehn conducts an independent review of the information Mr. Coffman considered to be corrective disclosures, and he concludes that "there is not a single day on which a statistically significant decline in the price of either DVI's stock or its Senior Notes can be traced to the release of information that corrects the alleged misrepresentations in this matter," and as such, damages are zero. (Lehn Report ¶ 17.) Upon Defendant's counsel's request, Dr. Lehn also calculated damages under the assumption that the "entire decline in the prices of DVI's stock and Senior Notes on August 14, 2003 resulted from a correction of the alleged misrepresentations." (Id. at ¶ 147.) He found that damages are $2.25 million for DVI's stock and $5.50 million for Senior Notes under the First-In-First-Out approach, and $1.83 million for stock and $4.34 million for Senior Notes under the Last-In-First-Out approach. (Id. at ¶ 150.)

    This Court finds that both Mr. Coffman and Dr. Lehn's event study methodologies are reliable and admissible. However, as discussed in detail below, to the extent that Mr. Coffman and Dr. Lehn opine on the revelations that occurred on September 25, 2002, May 13, 2003, June 5-6, 2003, and July 16, 2003, their opinions will not assist the jury in resolving any factual dispute, as the disclosures on those days are not corrective disclosures as a matter of law. Thus, those portions of their reports are excluded as irrelevant. See Schiff, 602 F.3d at 173.

IV.    MOTION FOR SUMMARY JUDGMENT

Defendant moves for summary judgment on the ground that Lead Plaintiffs cannot prove

that Defendant's audit opinions on DVI's financial statements caused Plaintiffs' economic loss.[26]

(Def.'s Mot. Summ. J. 1.)  Defendant argues that Plaintiffs cannot show loss causation for the

following reasons: (1) the August 13, 2003 announcement of bankruptcy and an audit committee

investigation did not correct prior alleged misrepresentations in Defendant's audit opinions, (see

id. at 6); (2) the other disclosures referred to by Plaintiffs' expert, including announcements of

missed earnings, ratings downgrades, and analysts' reports, do not satisfy the Third Circuit's

standard for loss causation, (see Def.'s Reply Supp. Summ. J. 11-13, 15-19); and (3) even under

the Second Circuit's materialization of the risk approach, Plaintiffs have failed to show that the

risks of understated loan loss reserves and liquidity crises materialized, (see id. at 25).[27]  Again,

---

[26]    Defendant also argues that summary judgment must be granted in its favor
because, "assuming *arguendo* that DVI's August 13, 2003 announcement were a corrective
disclosure, the total damages to the class range . . . between $6.17 million and $7.75 million,"
and the class has already received $17.635 million through settlements and thus has recovered for
its loss. (Def.'s Mot. Summ. J. 17.)  Defendant's argument fails.  This damages calculation is
merely an estimate by Defendant's own loss causation expert; the actual amount of damages have
not yet been adjudicated in this case.  Moreover, pursuant to 15 U.S.C. § 78u-4(f)(2)(A), if a jury
finds Defendant in violation of § 10(b), Defendant is liable for damages jointly and severally.
Whether the total amount of damages is ultimately reduced by Plaintiffs' prior settlements, or
whether Defendant is entitled to a reduction in a final judgment, see 15 U.S.C. § 78u-4(f), is not
ripe at this time.

[27]    Defendant also argues that Plaintiffs cannot establish loss causation because,
according to Defendant, Plaintiffs have previously admitted and this Court has previously found
that DVI did not publicly identify any misrepresentations or accounting improprieties prior to
August 13, 2003.  (Def.'s Mot. Summ. J. 6.)  Both Plaintiffs' and the Court's prior statements
about partial disclosures prior to August 13, 2003 were in regard to whether Lead Plaintiffs'
satisfied the commonality requirement for Class Certification, an issue entirely distinct from the
present issues.  (See Mem. & Order on Class Certification n.13, Apr. 29, 2008, Doc. No. 609;
Chart of DVI's Partial Disclosures and Countervailing Announcements from May 20, 2003 to
August 13, 2003, attached to Def.'s Mot. Summ. J. as Ex. C.) This Court now reexamines the

Defendant's arguments are based largely on its incorrect position that the Third Circuit requires "an actual disclosure of the 'very facts' [D]efendant allegedly misrepresented," or a "sufficiently specific disclosure of previously omitted or misrepresented facts." (Def.'s Mot. Summ. J. 10; Def.'s Reply Supp. Summ. J. 19.) Plaintiffs respond that summary judgment must be denied because Plaintiffs have presented sufficient evidence to create genuine issues of material fact as to whether disclosures during the Class Period revealed the truth of Defendant's alleged misrepresentations to the market. (Pls.' Resp. Summ. J. 13.) Plaintiffs rely on Mr. Coffman's report which identifies numerous disclosures that partially reveal DVI's true financial condition to the market and thus Defendant's prior misstatements and omissions in its audit opinions. (Id. at 12.) Plaintiffs' argument is based on its lenient articulation of the Third Circuit's practical approach to loss causation, which requires either direct or indirect disclosures that reveal the truth that was allegedly concealed by misstatements or omissions. (Id. at 8-9.) Plaintiffs also rely on the Second Circuit's materialization of the risk approach, though their interpretation of the standard is too broadly construed and incorporates the "true financial condition" approach, which has been rejected by the courts. (Id. at 9.) In light of the loss causation standard articulated in Section II, and upon reviewing the evidence presented by the parties, this Court finds that genuine issues of material fact remain in dispute with regard to whether Plaintiffs have satisfied loss causation.

A.     Legal Standard

In considering a motion for summary judgment, the court must determine whether "the

---

disclosures in light of a developed factual record, expert reports, and Defendant's instant Motion for Summary Judgment. See In re Tyson Foods, Inc., No. 01-425, 2004 WL 1396269, at *9 (D. Del. June 17, 2004).

pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party, and a factual dispute is material only if it might affect the outcome of the suit under governing law." Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). The moving party bears the initial responsibility of identifying the portions of the record "which it believes demonstrate the absence of a genuine issue of material fact." El v. SEPTA, 479 F.3d 232, 237 (3d Cir. 2007). However, even if the moving party fulfills this requirement, "the non-moving party can defeat summary judgment if it nonetheless produces or points to evidence in the record that creates a genuine issue of material fact." Id. at 238 (citing Josey v. John R. Hollingsworth Corp., 996 F.2d 632, 637 (3d Cir. 1993)); see also Fed. R. Civ. P. 56(e)(1). A non-moving party "cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument" to identify genuine issues of material fact. Berckeley Inv. Group, Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006). In evaluating a motion for summary judgment, the court is "not permitted to make factual findings, which remains the province of the jury," and "all inferences [are drawn] in favor of the non-moving party." Id.

      B.    The Disclosures Identified by Mr. Coffman

Like their challenges to the expert reports, the parties' dispute at summary judgment turns primarily on their views regarding what qualifies as a corrective disclosure. In conducting his event study analysis, Mr. Coffman identified particular announcements or events as "partial

corrective disclosures" and Dr. Lehn offered his opinion of the events identified.[28]  We discuss

each announcement in turn below.

                1.     September 24, 2002 Revelations

On September 24, 2002, Fitch Ratings downgraded DVI's Senior Unsecured Debt rating

to "B+" from "BB-" because of "DVI's weak operating performance, asset growth exceeding

internal capital formation, rise in encumbered assets as a percentage of total assets, and increased

financial leverage."  (Fitch Lowers DVI's Sr Unsecured Debt to 'B+'; Outlook Remains

Negative, Business Wire, Sept. 24, 2002, attached to Def.'s Resp. Pls.' Mot. Exclude as Ex. 6 at

2.)  Fitch stated that "DVI faces significant challenges in reversing trends in leverage and

capitalization. . . .  [I]f current trends continue, the cushion available to unsecured debtholders

may become further compromised."  (Id.)  U.S. Bancorp Piper Jaffray ("Piper Jaffray") also

"downgrad[ed] DVI to Market Perform from Outperform due to [its] concerns about earnings

quality and quantity trends and potential for some liquidity issues."  (DVI, Inc.: Downgrading

And Reducing Estimates, Piper Jaffray, Sept. 24, 2002, attached to Def.'s Resp. Pls.' Mot.

Exclude as Ex. 6 at 3-4.)  Piper Jaffray expressed disappointment in the trends of DVI,

"especially since the sector that DVI focuses on is one bright spot of the U.S. economy."  (Id.)

Mr. Coffman concluded that these downgrades and concerns regarding liquidity "are the

_____

      [28]     In addition to the events discussed below, Coffman identifies disclosure events
that had a statistically significant positive impact on stock price and/or bond value.  He concludes
that these events "re-inflate[]" the stock and "offset[] some of the previous corrective
disclosures."  (See Coffman Report ¶¶ 70-76, 80, 82 (events on Sept. 30, 2002; Oct. 28, 2002;
Oct. 31, 2002; Nov. 14, 2002; Nov. 21, 2002; Feb. 14, 2003; Feb. 27, 2004; June 9, 2003; June
30, 2003).)  Plaintiffs do not include these disclosures in support of their opposition to
Defendant's Motion for Summary Judgment, (see Pls.' Resp. Summ. J. 22 n.17), and we
therefore do not consider them either.

logical and foreseeable consequence of DVI hiding credit losses and engaging in the deceptive practices of 'rewriting,' 'swapping,' and 'buying out' impaired loans and leases in order to keep them from being reported as delinquent." (Coffman Rebuttal Report ¶ 27; see also Coffman Report ¶ 65 (explaining that these events "represent[] a subset of the information that would have come out if DVI had been truthful," and "bring the market closer to the realization that DVI is in financial distress" ).) He also noted that the rating agency cites the reliance on "gain[-]on[-]sale" accounting as a risk factor, which was one of Plaintiffs' primary allegations." (Coffman Rebuttal Report ¶ 27.) Because DVI's Senior Notes had a statistically significant reaction, and DVI's stock price had an abnormal return that was "just short" of statistically significant, Coffman concluded that these events caused the price movement, and thus established loss causation. Dr. Lehn also reviewed the information released by Fitch Ratings and Piper Jaffray and the returns on DVI's stocks and Senior Notes, finding only DVI's Senior Notes had a statistically significant return. (Lehn Report ¶¶ 79-80.) He concluded that the information released about a decline in DVI's credit rating "does not involve the correction of an earlier misrepresentation[,]" and "[s]pecifically[,] no information about accounting improprieties was released on [September 24, 2002]." (Id. at ¶ 81.)

2. September 25, 2002 Revelation

On September 25, 2002, DVI announced that it expected to report a loss for fiscal year 2002 fourth quarter, ending June 30, 2002, and for fiscal year 2002, partly due to the "$5.6 million in charges for de-emphasized business activities, the valuation of other real estate owned and for the operations related to healthcare companies in which DVI has an ownership interest." (DVI Will Report Fiscal Fourth Quarter and Year-End Results Friday, September 27, 2002,

Business Wire, Sept. 25, 2002, attached to Def.'s Resp. Pls.' Mot. Exclude as Ex. 6 at 5.) Mr. Coffman explains that analysts had expected earnings of $0.43 per share, but the earnings would be -$0.50 per share. (Coffman Report ¶ 66.)

On this date, both DVI's stock and senior notes had statistically significant declines, and Mr. Coffman concluded that loss causation was satisfied, as this information "brought the market closer to the realization that DVI was in financial distress." (Id.) Dr. Lehn also reviewed the information released by DVI on September 25, 2002, and found that DVI's stock return had a statistically significant decline. (Lehn Report ¶ 83.) However, he concluded that the information released by DVI did not correct an earlier misrepresentation and did not reveal information about accounting improprieties, and therefore failed to meet the loss causation standard. (Id.)

3. September 26, 2002 Revelation

On September 26, 2002, CIBC issued an analyst report in which it lowered its future earnings forecasts and commented on the reasons for price declines. CIBC explained that "prior to the earnings pre-announcement, Fitch downgraded DVI's debt rating to B+ from BB[-], which sparked speculation of a liquidity squeeze and limited access to capital." (DVI, Inc: It's Going To Be a Messy Quarter, But Core Business Remains Strong, CIBC, Sept. 26, 2002, attached to Def.'s Resp. Pls.' Mot. Exclude as Ex. 6 at 6 (hereinafter, "CIBC Sept. 26, 2002").) CIBC also reported that the delay in releasing the fiscal fourth quarter earnings "related to an in-depth auditor review which has subsequently resulted in the revaluation of a variety of investment assets . . . ." (CIBC Sept. 26, 2002.)

Mr. Coffman commented that the CIBC's "speculation" about DVI's "liquidity squeeze" was correct, as there was already evidence that DVI relied heavily on pledging ineligible

collateral, a signal of a liquidity squeeze.  (Coffman Report ¶ 67.)  Because DVI's stocks had a

statistically significant negative return, Mr. Coffman concluded that loss causation was satisfied.

(Id.)  Dr. Lehn reviewed the information released by CIBC and disagreed with Mr. Coffman's

opinion that this report revealed the existence of a liquidity squeeze.  (Lehn Report ¶ 116.)  He

stated that this report did not correct an earlier misrepresentation and did not refer to accounting

improprieties.  (Id.)  He also noted that neither the stocks nor the Senior Notes experienced a

statistically significant return.  (Id. at ¶ 114.)

        4.     September 27, 2002 Revelations

On September 27, 2002, DVI released details of its earnings for the fourth quarter and

fiscal year ending June 30, 2002.  (DVI Reports Fourth Quarter and Year-End Results, Sept. 27,

2002, Business Wire, attached to Def.'s Resp. Pls.' Mot. Exclude as Ex. 6 at 8.)  DVI also hosted

a conference call on the same day, during which analysts were able to ask questions of

management.  (Minutes from Conference Call, Sept. 27, 2002, attached to Pls.' Resp. Mot.

Exclude as Ex. 13.)  Piper Jaffray issued a report following the conference call and stated that

they "believe DVI has substantial growth opportunities in the health care financing market," but

they were "concerned about liquidity on a longer-term basis and are focused on the need to

refinance $155 million of unsecured debt in 2004."  (DVI, Inc: June Quarter EPS Of ($0.50) On

Various Charges, Outlook Remains Cloudy For Now, Piper Jaffray, Sept. 27, 2002, attached to

Def.'s Resp. Pls.' Mot. Exclude as Ex. 6 at 9.)

According to Mr. Coffman, substantially more detail was incorporated into these

announcements, such that the market received "new information," and the stock declined

significantly.  (Coffman Report ¶ 68.)  He concluded that "[t]his event brought the market's

perception of DVI closer to the truth of DVI's financial distress that had been fraudulently concealed . . . ." (Id.) Dr. Lehn disagreed with Mr. Coffman's finding and concluded that this information did not satisfy the loss causation criteria. He noted that DVI's residual stock return had a statistically significant decline, but he opined that the information released did not correct an earlier misrepresentation and did not discuss accounting improprieties. (Lehn Report ¶ 120.)

     5.     May 13, 2003 Revelations

On May 12, 2003, DVI reported results for the third quarter and first nine months of its fiscal year ending June 30, 2003. (See DVI Third Quarter Net Income at $3.0 Million - $0.20 EPS - Results Include Impact of Strategic Initiatives, Business Wire, May 12, 2003, attached to Def.'s Resp. Pls.' Mot. Exclude as Ex. 6 at 45-46.) On May 13, 2003, Piper Jaffray reported that it had expected earnings of $0.30 per share, but DVI reported earnings of only $0.20 per share and reduced earnings estimates going forward. (DVI: EPS Below Forecast; Making Progress on Credit/Liquidity Issues, Piper Jaffray, May 13, 2003, attached to Def.'s Resp. Pls.' Mot. Exclude as Ex. 6 at 47.) Piper Jaffray did note that its "liquidity concerns have diminished somewhat." (Id.)

Mr. Coffman treated this event as a "partial corrective disclosure" because the stock price dropped significantly and "the negative earnings surprise and attendant decrease in earnings expectations result in getting the market closer to the realization of DVI's true financial condition." (Coffman Report ¶ 77.) Dr. Lehn, on the other hand, concluded that the stock return on May 13, 2003 was not statistically significant and therefore found no evidence to show that Plaintiffs suffered an economic loss because of the alleged misrepresentations. (Lehn Report ¶ 123.) Dr. Lehn did not comment on the content of the information disclosed.

6.    <u>June 4, 2003 Revelations</u>

On June 4, 2003, DVI announced the resignation of Deloitte as its auditor, and shares declined immediately.  (<u>DVI In Process of Selecting New Auditor</u>, Business Wire, June 4, 2003, attached to Def.'s Resp. Pls.' Mot. Exclude as Ex. 6 at 48.)  Contemporaneously, Reuters released an article indicating that DVI "did not disclose the reasons for Deloitte & Touche's resignation, but the decline of the company's stock reflected investor concern about possible irregularities." (<u>Healthcare lender DVI loses its auditor, stock hit</u>, Reuters News, June 4, 2003, attached to Def.'s Resp. Pls.' Mot. Exclude as Ex. 6 at 48 (hereinafter, "Reuters June 4, 2003 article").)  One commentator stated that Deloitte's resignation was "probably [due to] a dispute over something, it could be fees, accounting methods, any number things.  It's too soon to speculate, and it may mean nothing at all."  (<u>Id.</u>)

Mr. Coffman found that "given the level of attention on this particular event, . . . it is appropriate to attribute" the highly significant movement of the stock and the borderline significant movement of the Senior Notes to "auditor resignation."  (Coffman Report ¶ 78.)  He concluded that this event was a "partial disclosure of the relevant truth that DVI had . . . engaged in accounting improprieties."  (<u>Id.</u>)  Dr. Lehn reviewed DVI's announcement that Deloitte had resigned and the Reuters article regarding the resignation, and he concluded that the information released failed to meet the loss causation criteria because it "did not represent the correction of an earlier misrepresentation," and "no information about accounting improprieties was released on [that] day."  (Lehn Report ¶ 87.)  He also found that the residual stock return on June 4, 2003 was statistically significant, but the Senior Notes return was not.

7.    June 5-6, 2003 Revelation

On June 5, 2003, after the close of trading, S&P announced that it may downgrade the junk credit rating of DVI based on the resignation of Deloitte. (S&P may downgrade DVI after auditor resigned, Reuters News, June 5, 2003, attached to Def.'s Resp. Pls.' Mot. Exclude as Ex. 6 at 49.) "Standard & Poor's will assess the consequences of the change in accounting firms and any impact this change may have on the company's financial performance." (Id.) S&P was also concerned about DVI's ability to refinance its maturing debt. (Id.)

Both the stock and Senior Notes declined significantly, and Mr. Coffman treated this event as a partial disclosure. (Coffman Report ¶ 79.) Dr. Lehn agreed that the residual stock return and the Senior Notes return were statistically significant. However, he found that the information released by S&P did not correct an alleged misrepresentation, and therefore failed to meet the loss causation standard. (Lehn Report ¶ 90.)

8.    June 27, 2003 Revelations

On June 27, 2003, DVI announced that the SEC rejected its quarterly report on Form 10-Q for the period ended March 31, 2003 because the interim financial statements contained in the report were not reviewed by an independent public accountant, as required under the SEC's regulations. (10-Q Filing for 3/31/03, Thomas Financial, June 27, 2003, attached to Def.'s Resp. Pls.' Mot. Exclude as Ex. 6 at 53-54.) DVI stated that it was "deemed not to be current in its filings required under the Securities Exchange Act of 1934," and although filing an amended report will make it current, "it will not be deemed timely for purposes of the rules governing eligibility to use registration statements on Forms S-2 and S-3." (Id.) DVI explained that some of its indentures and other agreements contain covenants that require DVI to make timely filings,

and it did not know if any holders of these obligations would assert that DVI was in default, though it believed it would have a meritorious defense if that occurred.  (Id.)  DVI also stated that it is "continuing to consider the need to change the accounting treatment for the transactions referred to in Note 11 to the interim financial statements contained in this report."  (Id.)  As a result of "the serious implications related to [this] disclosure," Moody's downgraded DVI's senior unsecured debt rating fro mB3 to Caa3.  (Moody's Downgrades DVI Senior Debt to Caa3 - Outlook in Negative, Moody's Investor Service Press Release, June 27, 2003, attached to Def.'s Resp. Pls.' Mot. Exclude as Ex. 6 at 54.)  Moody's expressed concern that DVI may be in default of certain covenants within some financing agreements, and that such default could lead to the "cross-default and/or cross-acceleration of a number of DVI's debt obligations," which would be difficult for DVI to manage.  (Id.)  Moody's also opined that if a default occurred, "the rated senior notes would likely face a loss of principal."  (Id.)  S&P also downgraded DVI's ratings from "B" to "CCC+."  (S&P cuts DVI counterparty credit ratings, Reuters News, June 27, 2003, attached to Def.'s Resp. Pls.' Mot. Exclude as Ex. 6 at 55.)

Because both stock and Senior notes had significant abnormal returns, Mr. Coffman concluded that these events represent "a partial disclosure of DVI's true financial condition." (Coffman Report ¶ 81.)  Dr. Lehn found that the information disclosed by DVI and Moody's did not represent the correction of alleged misrepresentations, or reveal accounting improprieties, and therefore did not satisfy loss causation.  (Lehn Report ¶ 93.)  However, he noted that both DVI's stocks and Senior Notes experienced statistically significant returns.  (Id. at ¶ 92.)

9.      July 1, 2003 Revelations

On July 1, 2003, Moody's announced that "it placed under review for possible downgrade

41

the ratings of nine asset-backed Senior Notes worth $1.8 billion issued by DVI." (Moody's says may cut $1.8 bln of DVI asset-backeds, Reuters News, July 1, 2003, attached to Def.'s Resp. Pls.' Mot. Exclude as Ex. 6 at 58.) Moody's stated that its review will "focus on whether the transactions experience an increased delinquency and default rates, . . . as well as decreased recoveries on defaulted leases and loans, leading to more severe losses in these transactions." (Id.) Fitch Ratings also announced that it placed all DVI asset-backed transactions on "Ratings Watch Negative" because of "increased operational and performance risk." (Fitch Places DVI Equipment and Healthcare Securitizations on Rtg Watch Neg., Business Wire, July 1, 2003, attached to Def.'s Resp. Pls.' Mot. Exclude as Ex. 6 at 59.) DVI's stocks had a significant abnormal return, and Mr. Coffman concluded that the downgrades were "partial corrective disclosures" and satisfied the loss causation criteria. (Coffman Report ¶ 83.)

10.     July 16, 2003 Revelations

On July 16, 2003, DVI announced that on July 15, 2003, it received a Notice of Default from U.S. Bank National Association relating to DVI's 9 7/8% Senior Notes due in 2004, due to DVI's failure to satisfy its obligation to file its quarterly report for the period ending March 31, 2003. (DVI Receives Notice of Default on Senior Notes, Business Wire, July 16, 2003, attached to Def.'s Resp. Pls.' Mot. Exclude as Ex. 6 at 60.) As a result, S&P downgraded DVI's debt rating from "CCC+" to "CCC-" because it was concerned that this default may cause defaults on other agreements. (S&P lowers DVI debt rating after default notice, Reuters News, July 16, 2003, attached to Def.'s Resp. Pls.' Mot. Exclude as Ex. 6 at 60.)

Because there were statistically significant declines in both DVI's stock and Senior Notes prices following this event, Mr. Coffman concluded that loss causation was satisfied. (Coffman

Report ¶ 84.)  Dr. Lehn also found that the stock and Senior Notes experienced statistically significant returns.  (Lehn Report ¶ 96.)  However, upon reviewing the information released by DVI and the S&P's downgrading, Dr. Lehn concluded that this information did not represent the correction of alleged misrepresentations, and specifically, nothing was said about accounting improprieties.  (Id. at ¶ 97.)

               11.    <u>August 1, 2003 to August 4, 2003 Revelations</u>

On Friday, August 1, 2003, DVI announced that it would not make the scheduled interest payment due that day on its 9 7/8% Senior Notes due 2004 because of "severe liquidity constraints."  (<u>DVI Announces Failure to Make Interest Payment</u>, Business Wire, Aug. 1, 2003, attached to Def.'s Resp. Pls.' Mot. Exclude as Ex. 6 at 61.)  DVI's liquidity problems were attributed, in part, to a "shortfall in the amount of qualifying collateral supporting its borrowings under its principal bank lending facility."  (Id.)  That afternoon, S&P downgraded DVI's Senior Notes rating to "D."  (<u>S&P Cuts DVI Inc. Ratings to 'D' Off Watch</u>, Dow Jones Capital Markets Report, Aug. 1, 2003, attached to Def.'s Resp. Pls.' Mot. Exclude as Ex. 6 at 61.)

According to Mr. Coffman, stock prices "beg[an] declining substantially minutes before the close [of the market] at 4pm," and Senior Notes began declining on Monday, August 4, 2003. (Coffman Report ¶ 85.)  Mr. Coffman stated that "analyst reports and news articles attribute the last minute stock price decline on August 1, 2003 and the decline of both the stock and Senior Notes price on August 4, 2003 to the missed interest payment."  (Id.)  These events met the loss causation standard because they resulted in significant abnormal returns and "[brought] the market closer to understanding DVI's true financial condition."  (Id.)  Mr. Coffman further explained, "a foreseeable consequence of hiding credit losses is that cash collections will lag

behind accrued income and, if material enough, lead to an unexpected announcement that the firm is out of cash," which is what DVI revealed through these disclosures. (Coffman Rebuttal Report ¶ 30.)

Dr. Lehn examined the information released after the close of business on August 1, 2003, including S&P's announcement, Fitch's announcement, and Piper Jaffray's announcement that it reduced its ratings on DVI to "Underperform," that it believed DVI was under "severe liquidity constraints," and that the "risk of a bankruptcy filing is relatively high." (See DVI, Inc.: Liquidity Crisis Accelerates, Reducing Rating to Underperform, Piper Jaffray, Aug. 1, 2003, attached to Def.'s Resp. Pls.' Mot. Exclude as Ex. 6 at 61-62; Lehn Report ¶ 98.) Dr. Lehn found that the residual stock return and Senior Notes return on August 4, 2003 were statistically significant, but he concluded that the information released on August 1, 2003 did not represent the correction of alleged misrepresentations or reveal accounting improprieties. Thus, he found "no scientific evidence that [P]laintiffs suffered an economic loss on this day because of the alleged misrepresentations." (Lehn Report ¶¶ 99-100.)

12.    August 5, 2003 Revelation

After the market closed on August 4, 2003, DVI announced that "neither it nor any of its wholly-owned subsidiaries has any remaining availability under its or their various credit facilities," and that DVI was "actively pursuing various alternatives . . . includ[ing] Chapter 11 bankruptcy filing." (DVI Seeking to Address Liquidity Constraints, Business Wire, Aug. 4, 2003, attached to Def.'s Resp. Pls.' Mot. Exclude as Ex. 6 at 63.) DVI's stock prices declined significantly on August 5, 2003.

Mr. Coffman acknowledged that the value of the Senior Notes "partially rebound[ed]" but

believed it was "reflective of the market's uncertainty regarding the company's value in bankruptcy." (Coffman Report ¶ 86.) He concluded that this event satisfied the loss causation standard. (Id.) Dr. Lehn reviewed DVI's announcement as well as Fitch's announcement on the same day that it was downgrading the class C note of DVI's Business Credit Receivables from "C" to "CCC," and he concluded that this information did not represent the correction of an alleged misrepresentation, nor the revelation of accounting improprieties. (Lehn Report ¶ 104.) Although DVI's residual stock return and Senior Notes return were statistically significant, Dr. Lehn found that there was no evidence that Plaintiffs suffered an economic loss because of the alleged misrepresentations. (Id. at ¶¶ 103-04.)

### 13. August 6, 2003 to August 14, 2003 Revelations

After the close of trading on August 13, 2003, DVI formally announced that it would seek Chapter 11 bankruptcy protection, that its Chief Financial Officer, Steven Garfinkel, had been placed on administrative leave and Chief Accounting Officer John Boyle and Chief Credit Officer Anthony Turek were taking over his functions, that it had discovered "apparent improprieties in its prior dealings with lenders involving misrepresentations as to the amount and nature of collateral pledged to lenders," and that an investigation into those improprieties by DVI's audit committee had begun. (DVI to Seek Bankruptcy Protection, Business Wire, Aug. 13, 2003, attached to Def.'s Resp. Pls.' Mot. Exclude as Ex. 6 at 69.) The prices of DVI's stocks and Senior Notes declined significantly on August 14, 2003, and Mr. Coffman attributed this loss to the August 13, 2003 statement.[29] (Coffman Report ¶ 87.) Mr. Coffman also stated that the

---

[29] Defendant cites to statements made by Mr. Coffman during his deposition to undercut his conclusion that revelations prior to the August 13, 2003 announcement disclosed the existence of accounting improprieties. (Def.'s Mot. Exclude 15-16.) Specifically, Defendant

Senior Notes experienced significant declines on August 7, 2003 and August 8, 2003, but he acknowledged that it is "difficult to tie specific news stories to specific declines." (Id. at ¶ 87.)

Like Mr. Coffman, Dr. Lehn found no information released on August 7, 2003 that related to DVI. (Lehn Report ¶ 131.) He then examined the information released by S&P after the close of the market on August 8, 2003, that S&P "affirmed its ratings on MSF Funding LLC . . . asset-backed notes" which are backed by leases originated by DVI. (See S&P Affirms MSF Funding LLC Notes Series 2000-1 Rtg., Business Wire, Aug. 7, 2003, attached to Def.'s Resp. Pls.' Mot. Exclude as Ex. 6 at 66.) Dr. Lehn concluded that DVI's residual stock return was statistically significant, however, the information released failed to satisfy the loss causation criteria. (Lehn Report ¶¶ 105-07.)

Dr. Lehn also reviewed DVI's August 13, 2003 press release. He found that both the stock and Senior Notes experienced statistically significant returns, but he opined that "the information released . . . [did] not represent the correction of an alleged misrepresentation and therefore fail[ed] to meet the criteria for loss causation[,]" and "[s]pecifically, no information about accounting improprieties was released." (Id. at ¶¶ 108-10.) Therefore, he found no evidence to satisfy the loss causation standard.

C.     Analysis

Upon reviewing the evidence submitted by the parties, as well as the expert reports and accompanying exhibits, and drawing all inferences in favor of Plaintiffs, this Court finds that

---

refers to Mr. Coffman's statement that "August 13, [2003] is certainly the first time" that DVI announced its intent to seek bankruptcy and the existence and investigation of improprieties. (See id. (quoting Coffman Dep. 68:23-69:5, 114:5-13).) However, Mr. Coffman's event study approach does not require actual disclosures of the alleged fraud, and therefore, these statements do not contradict his conclusions.

Defendant's Motion for Summary Judgment must be granted in part and denied in part. In light of the loss causation principles articulated in Section II, this Court finds that the disclosures identified by Mr. Coffman on September 25, 2002, May 13, 2003, June 5-6, 2003, and July 16, 2003 are not corrective disclosures as a matter of law, as no reasonable jury could find that these disclosures revealed to the market new information about the falsity of Defendant's alleged misstatements. With respect to all of the other disclosures listed above, this Court finds that Plaintiffs have presented a genuine issue of material fact with regard to whether these partial disclosures revealed the truth about Defendant's alleged misstatements as to DVI's financial statements. See In re Vivendi, 634 F. Supp. 2d at 372; In re Cigna, 459 F. Supp. 2d at 356-57 (noting that there are disputes of material fact surrounding the effect of "corrective events" the resolution of which is left for the factfinder); see also In re Loewen Group, Inc. Sec. Litig., 395 F. Supp. 2d 211, 217-18 (E.D. Pa. 2005).

1.      September 25, 2002 &  May 13, 2003 Revelations

On September 25, 2002, DVI announced that it expected to report a loss for the fourth quarter of fiscal year 2002 and for the fiscal year 2002, partly due to the "$5.6 million in charges for de-emphasized business activities, the valuation of other real estate owned and for the operations related to healthcare companies in which DVI has an ownership interest." (DVI Will Report Fiscal Fourth Quarter and Year-End Results Friday, September 27, 2002, Business Wire.) On May 13, 2003, DVI reported results for the third quarter and first nine months of its fiscal year ending June 30, 2003, and Piper Jaffray issued an accompanying report.[30] This Court finds

---

[30]      In addition, Plaintiffs refer to a conference call held on May 13, 2003 during which analysts inquired into why DVI delayed filing its quarterly Form 10-Q for the period ending March 31, 2003, and why DVI had not refinanced its Senior Notes due February 2004.

that DVI's earnings announcements on September 25, 2002 and May 13, 2003 are nothing more than a disclosure of DVI's true financial condition and do not relate to the alleged misrepresentations. An "earnings warning [or announcement] *standing alone*, is not a 'corrective disclosure' because the resulting share price decline does not necessarily dissipate the particular price inflation caused by the alleged fraud." In re Motorola, 505 F. Supp. 2d at 546-47 (emphasis in original) (collecting cases) (finding that earnings warning was not a corrective disclosure because, although evidence showed that defendants were aware of the truth concealed by the fraud, there is no evidence that these concerns "actually motivated" the warning); see also In re Retek Inc., 621 F. Supp. 2d at 702 ("It is clear that the mere disclosure of disappointing earnings or reduced future guidance is not sufficient to reveal that prior financial statements contained misrepresentations."); In re AOL TW, 503 F. Supp. 2d at 678. Although DVI and Deloitte knew about the falsity of its financial statements, any explanations provided in these disclosures do not alert the market to the truth regarding its loan loss reserves, or its liquidity crisis, but only to the deteriorating financial condition of DVI. Therefore, to the extent that Mr. Coffman and Dr. Lehn opine on these disclosures, their reports are excluded as irrelevant and summary judgment is granted as to these disclosures.

       2.      June 5-6, 2003 Revelation

After the close of trading on June 5, 2003, S&P announced that it may downgrade the junk credit rating of DVI based on Deloitte's resignation, and raised concerns about DVI's ability to refinance its maturing debt. (S&P may downgrade DVI after auditor resigned, Reuters News.)

<hr />

(Pls.' Resp. Summ. J. 31 (citing Conference Call Summ., attached to Pls.' SOF as Ex. 157.) Mr. Coffman did not examine the minutes of this conference call.

This Court finds that the S&P announcement is not a corrective disclosure as a matter of law. First, the S&P announcement did not reveal any new information to the market, as the market learned of Deloitte's resignation on June 4, 2003, and of concerns about its maturing debt on September 27, 2002. See, e.g., In re Omnicom Group, Inc., 541 F. Supp. 2d at 551 ("[T]he disclosed fact must be new to the market. . . . A recharacterization of previously disclosed facts cannot qualify as a corrective disclosure."). Second, to the extent that the information about the maturing debt was new information and may have indirectly disclosed the truth regarding its delinquent loans and liquidity concerns, there is no evidence indicating that the market in fact recognized such a relationship or that the S&P announcement was actually due to those concerns. See McKowen Lowe & Co., 2005 WL 1541062, at *8 (if fraud is disclosed indirectly through the disclosure of a different event, the plaintiff must "provide proof that the market recognized a relationship between the event disclosed and the fraud"); see also In re Williams, 558 F.3d at 1140 ("[The disclosure] must at least relate back to the misrepresentation and not to some other negative information about the company."); In re Retek Inc., 621 F. Supp. 2d at 702-03 (finding that plaintiffs failed to produce evidence that showed that a statement regarding deferred write-offs actually revealed the truth about improper accounting methods). Thus, because this announcement does not reveal any new information related to Defendants' alleged misrepresentations, it cannot qualify as a corrective disclosure, and to the extent that Mr. Coffman and Dr. Lehn opine on this announcement, their reports are excluded as irrelevant and summary judgment is granted as to this disclosure.

   3.  July 16, 2003 Revelations

On July 16, 2003, DVI announced that it received a Notice of Default from U.S. Bank

National Association on July 15, 2003, and as a result, S&P downgraded DVI's debt rating

because it was concerned that this default may lead to others. Upon reviewing these

announcements, this Court finds that they do not qualify as corrective disclosures. First, the

market was made aware of the fact that DVI may default on some of its indentures, and that this

default may lead to defaults on other debt obligations on June 27, 2003. See In re Omnicom

Group, Inc., 541 F. Supp. 2d at 551. Alternatively, to the extent that this information was new,

the fact that DVI received a notice of default for its failure to timely file its quarterly 10-Q with

the SEC may indicate future financial troubles, but it does not reveal the truth underlying

Defendants' misrepresentations in DVI's financial statements. See In re Williams, 558 F.3d at

1140. Nor do these statements reveal to the market the risks of DVI's understated loan loss

reserves or liquidity crisis, which Plaintiffs allege were previously concealed by Defendants'

misrepresentations. Accordingly, because no reasonable factfinder could conclude that these

announcements are corrective disclosures, Mr. Coffman and Dr. Lehn's opinions as to these

revelations are irrelevant and excluded. Summary judgment is also granted as to these

disclosures.

 With respect to the other disclosures identified above, this Court finds that Plaintiffs have

created a genuine issue as to whether the "very facts" misrepresented by Defendant in its audit of

DVI's 10-Ks and its reviews of DVI's 10-Qs were a "substantial factor in causing [Plaintiffs']

economic loss." See McCabe, 494 F.3d at 436. Accordingly, summary judgment is granted in

part and denied in part.

IV.    CONCLUSION

For foregoing reasons, Defendant's Motion to Exclude Lead Plaintiffs' Alleged Loss Causation Expert Chad Coffman (Doc. Nos. 686 & 690) is GRANTED in part and DENIED in part; Lead Plaintiffs' Motion to Exclude Deloitte & Touche's Purported Loss Causation Expert Kenneth Lehn (Doc. No. 702) is GRANTED in part and DENIED in part; and Defendant's Motion for Summary Judgment (Doc. Nos. 685, 689 & 691) is GRANTED in part and DENIED in part.  An order consistent with this Memorandum follows.