IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE                                           :            CIVIL ACTION
DVI, INC. SECURITIES LITIGATION   :            No. 03-5336

MEMORANDUM

Legrome D. Davis, J.                                                            January 4, 2013

    Plaintiff investors in Diagnostic Ventures, Inc. ("DVI") sue for violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b-5, 17 C.F.R. § 240.10b-5.[1]  Jurisdiction is the Exchange Act, 15 U.S.C. § 78aa, and federal question, 28 U.S.C. § 1331.

    Lead Plaintiffs – Cedar Street Fund, Cedar Street Offshore Fund, and Kenneth Grossman – move for partial reconsideration (Doc. No. 791) of the September 3, 2010 Order and Memorandum (Doc. Nos. 789, 790).[2]  As to disclosures made about DVI's business to the investing public on September 25, 2002 and May 13, 2003, the motion asks for a ruling that triable disputes exist – specifically whether Defendant Deloitte & Touche LLP's prior "clean" audit reports of DVI's financial statements caused the price of DVI's securities to decline.

---

[1] For the history and factual background of this action see: In re DVI, Inc. Sec. Litig., No. 03-5336, 2010 WL 3522090 (E.D. Pa. Sept. 3, 2010) (Order & Mem., Doc. Nos. 789, 790 re Plaintiffs' and Defendant Deloitte & Touche LLP's respective motions to exclude the other's loss causation expert, and Deloitte's motion for summary judgment); id., 249 F.R.D. 196 (E.D. Pa. 2008), aff'd, 639 F.3d 623 (3d Cir. 2011) (Apr. 29, 2008 Order & Mem., Doc. No. 609 re class certification); id., 2005 WL 1307959 (E.D. Pa. May 31. 2005) (Order & Mem., Doc. No. 181 re dismissal motions).

[2] The September 3, 2010 decision granted in part and denied in part Deloitte & Touche LLP's motion for summary judgment on loss causation (Doc. Nos. 685, 689, 691).  In re DVI, Inc. Sec. Litig., No. 03-5336, 2010 WL 3522090 (E.D. Pa. Sept. 3, 2010).  In part, it was ruled that disclosures made on September 25, 2002 and May 13, 2003, as identified by Plaintiffs' loss causation expert, Chad Coffman, "are not corrective disclosures as a matter of law, as no reasonable jury could find that these disclosures revealed to the market new information about the falsity of Defendant's alleged misstatements." Id. at *23; see also id. at *16, 18.  "Although DVI and Deloitte knew about the falsity of its financial statements, any explanations provided in these disclosures do not alert the market to the truth regarding [DVI's] loan loss reserves, or its liquidity crisis, but only to the deteriorating financial condition of DVI." Id.

1

The motion for reconsideration agrees that trial issues as to loss causation are presented by disclosures made on September 24, 26, and 27, 2002, as was so ruled.[3] That significant price declines occurred on each day of September 24-27 is not disputed. However, the motion ascribes "clear error of law and fact" amounting to "manifest injustice" because the September 25 disclosures were not analyzed as a "unified event window"[4] in conjunction with those that occurred the day before, and continued for two days afterward. Pls. Br., Doc. No. 791-1 at 5-6, 10, 11 & n.3, 14. Plaintiffs: the "September 25 drop was the continuation of the market's reaction to the new fraud-related information disclosed on September 24." Id. at 10. Also: "This series of disclosures had a snowball effect on investors, layering additional concerns on the market and causing investor skepticism of DVI's financial reporting related to the core frauds, loan losses and liquidity." Id. at 11 n.3. Ascribing further error, "express references to specific increases in loan losses that were at the center of the frauds" were ignored, and "new fraud-related revelations in DVI's May 13, 2003 conference call with investors and analysts" were not considered "because Plaintiffs' expert did not specifically quote that information in his report." Id. at 5-6, 15.

According to Deloitte, a number of procedural considerations preclude reconsideration – primarily because the multi-day event theory is improperly raised for the first time on

---

[3] The September 3, 2010 decision ruled that disclosures made on September 24, 26, and 27, 2002, as identified by Coffman, present genuine issues of material fact with regard to whether they "revealed the truth about Defendant's alleged misstatements as to DVI's financial statements." DVI, 2010 WL 3522090, at *23, 25 ("whether the 'very facts' misrepresented by Defendant in its audit of DVI's 10-Ks and its reviews of DVI's 10-Qs were a 'substantial factor in causing [Plaintiffs'] economic loss.'") (quoting McCabe v. Ernst & Young, LLP, 494 F.3d 418, 436 (3d Cir. 2007)).

[4] Defined by Plaintiffs as "the length of time after a disclosure is made that a court analyzes for price changes in order to quantify the loss associated with that revelation . . . ." Pls. Br., Doc. No. 791-1 at 5, 7.

reconsideration without supporting expert opinion. See, e.g., Def. Br., Doc. No. 793 at 2, 3, 6-7, 10-11; Def. Sur-Reply Br., Doc. No. 798 at 2-3, 4-5, 8, 10. Moreover, in its view, summary judgment was properly granted on the merits because these "disclosures do not satisfy Third Circuit loss causation standards"– "[n]either disclosure revealed new information to the market that the market recognized as related to the alleged fraud." Def. Br., Doc. No. 793 at 1-2, 7-9.

None of the recognized reasons or categories of circumstances for reconsideration apply here. The motion for reconsideration will be denied.

I.     PROCEDURAL AND FACTUAL BACKGROUND

The Complaint, as filed on September 23, 2003, and amended for the fifth time and deemed filed on May 23, 2006 (Doc. Nos. 288, 298), alleges that Defendants were involved in a scheme of misrepresentations and omissions designed to artificially inflate the price of DVI's securities and conceal deceptive accounting and lending practices. It is averred that Deloitte participated with other defendants in a deceptive scheme to defraud purchasers of DVI's securities and made untrue statements of material fact or omitted material facts necessary to clarify prior misleading statements – all in violation of § 10(b) and Rule 10b-5(a), (b), and (c).[5] Compl., ¶¶ 19, 20, 424-485, 537-557 (Count IV), Doc. No. 298.

In Form 10-Ks for each fiscal year ending on June 30, 1999-2002, Deloitte issued unqualified audit opinions as to DVI's financial statements. Compl. ¶¶ 60, 447-448. It allegedly

---

[5] The Complaint avers that Deloitte violated Rule 10b-5(a), (b), and (c), 17 C.F.R. § 240.10b-5(a), (b), (c). Subsections (a) and (c), respectively, make it unlawful to "employ any device, scheme, or artifice to defraud," and to "engage in any act, practice, or course of business which operates . . . as a fraud," id. § 240.10b-5(a), (c). Subsection (b) prohibits "mak[ing] any untrue statement of material fact" or omitting a material fact necessary to clarify prior misleading statements. Id. § 240.10b-5(b). "We refer to claims under Rule 10b-5(a) and (c) as 'scheme liability claims' because they make deceptive conduct actionable, as opposed to Rule 10b-5(b), which relates to deceptive statements." In re DVI, Inc. Sec. Litig., 639 F.3d 623, 643 n.29 (3d Cir. 2011).

did so despite its knowledge that the financial statements were "materially false and misleading." Id.; see DVI, 2010 WL 3522090, at *2, 23. It is also averred that Deloitte issued false and misleading statements regarding its review of DVI's quarterly financial statements for Form 10-Qs filed within fiscal years 1999 through 2002. Id. at *2.

Specifically, Plaintiffs assert that Deloitte was aware that DVI materially understated its loan loss reserves, yet continued to issue unqualified audit opinions. See DVI, 2010 WL 3522090, at *2. In addition, Plaintiffs assert:

> "Deloitte knew that DVI was engaged in 'aggressive' and 'creative' accounting practices" in an effort to understate its loan loss reserves, including "rewriting loans to avoid reporting them as delinquent," "overadvancing on loans in order for customers to repay other delinquent loans," "transferring delinquent loans to other obligors who had insufficient capital to service the debt," and repurchasing delinquent loans from securitizations."

Id. (quoting Plaintiffs' Statement of Facts (SOF) ¶ 37, Doc. No. 707, Ex. A). Memoranda and email exchanges, within Deloitte and between Deloitte and DVI, reveal Deloitte's knowledge of DVI's misstatements of its loan loss reserves. DVI, 2010 WL 3522090, at *2-3 (citing Pls. SOF ¶ 38). It is also asserted that Deloitte knew about DVI's liquidity crises and the deceptive practices used to conceal them yet continued to issue unqualified audit opinions as to DVI's financial statements. Id. at *3. From February 2002 until resigning on June 2, 2003, Deloitte responded on behalf of DVI to inquiries by the Securities and Exchange Commission. Id. at *4.

<u>Disclosures Made on September 25, 2002</u>

On September 25, 2002, DVI announced that it expected to report a loss for the fourth-quarter of fiscal year 2002, ending June 30, 2002, and for the fiscal year 2002. The loss was attributed in part to "5.6 million in charges for de-emphasized business activities, the valuation

of other real estate owned and for the operations related to healthcare companies in which DVI has an ownership interest." DVI, 2010 WL 3522090, at *16 (quoting *DVI Will Report Fiscal Fourth Quarter and Year-End Results Friday, September 27, 2002*, Business Wire, Sept. 25, 2002, Def. Response to Pls. Mot. to Exclude, Ex. 6 at p. 5, Doc. No. 739).

DVI's announcement was also reported as "Significant Developments" by Reuters:

> DVI, Inc. announced that a net loss is anticipated for the fiscal year in the range of $3.4 million to $4.4 million with an after-tax loss for the fourth quarter in the range of $6.5 million to $7.5 million. Included in the loss for the quarter is approximately $5.6 million in charges for de-emphasized business activities, the valuation of other real estate owned and for the operations related to healthcare companies in which DVI has an ownership interest. The fourth quarter charges are primarily non-cash adjustments. Wall Street analysts on average were expecting the Company to earn $0.43 per share in the fourth quarter and $1.66 per share in the fiscal year . . . .

Plaintiffs' Amended Statement of Facts (ASOF), Ex. 149, Doc. No. 737. See also Pls. Br., Doc. No. 791-1 at 12 (quoting Sept. 25, 2002 Dow Jones News Service ("DVI's New York Stock Exchange-listed shares were halted for news pending at $4.60, a new 52-week low") (Pls. ASOF, Ex. 150, Doc. No. 737)).

Coffman explained that analysts had expected earnings of $0.43 per share, but earnings would be -$0.50 per share. Oct. 1, 2008 Coffman Report ¶ 66, ASOF, Ex. 1, Doc. No. 737 ("Coffman Report"). On this date, the price of DVI's stock and senior notes declined significantly. Id. Coffman opined that "this new information brought the market closer to the realization that DVI was in financial distress . . . ." Id. He separately analyzed the information disclosed, and separately calculated a drop in the price of DVI's securities, on each of the four days, September 24-27, 2002. Id. at ¶¶ 65-68. He treated each of the four days as separate events. Id. In his rebuttal report, he did not discuss the September 25, 26, or 27, 2002 events;

however, he treated the September 24, 2002 news reports as a separate event.  Dec. 17, 2008

Coffman Rebuttal Report ¶¶ 26-29, ASOF, Ex. 2, Doc. No. 737.

<u>Disclosures Made on May 13, 2003</u>

On May 13, 2003, the following news was reported to investors:

> DVI, Inc. . . . today announced results for the third quarter and first nine months of its fiscal year ending June 30, 2003. . . .
> The net income reported for the quarter ended March 31, 2003 reflected costs associated with several previously announced strategic initiatives intended to address the reorganization and relocation of DVI's Business Credit unit and the phase-out of its Third Coast Capital business unit. . . . In connection with the Third Coast Capital phase out, the Company incurred $0.3 million in employment-related expenses in the quarter just ended.  In addition, DVI recorded a $2.7 million provision in the quarter for loan losses in the Third Coast Capital portfolio.  DVI expects a significant reduction in future costs as these transition expenses are eliminated over the next several quarters.
> The total of the various charges associated with the Business Credit and Third Coast Capital units in this quarter was $3.8 million, or approximately $0.15 per share.
> \* \* \*
> [T]he Company will notify the SEC of its election to file its Quarterly Report on Form 10-Q for the period ended March 31, 2003, five days later than would be otherwise required.

Business Wire, May 13, 2003, Pls. ASOF, Ex. 155, Doc. No. 737.  On that same day, it was also

reported to the investing public:

> KEY POINTS: . . . Non-accrual assets remain high at about $205 MM, or 15.7% of balance sheet finance assets, but may be poised to decline materially over the next two quarters, which would increase net interest margins and raise our confidence in the profitability of the core business.

*DVI: EPS Below Forecast; Making Progress on Credit/Liquidity Issues*, US Bancorp Piper

Jaffray, May 13, 2003, Pls. ASOF, Ex. 156, Doc. No. 737.

As to the reports on May 13, 2003, Coffman opined that "I incorporate this event as a

partial corrective disclosure since the negative earnings surprise and attendant increase in

earnings expectations result in getting the market closer to the realization of DVI's true financial condition."[6] Coffman Report ¶ 77. The announcements were also treated as a separate event on that day. He did not opine on information contained in the May 13, 2003 conference call transcript.[7]

As evidence of a causal nexus with the alleged fraud, Plaintiffs proffer a summary of questions posed by analysts to DVI's representatives during a May 13, 2003 conference call:[8]

- Concordia Advisors questioning DVI's delinquency levels . . . .[9]

---

[6] The September 3, 2010 decision ruled that a "disclosure of disappointing earnings or other indications of the 'true financial condition' of the company, without any evidence of a link between the disclosure and the fraud, is not a corrective disclosure" that comports with the Third Circuit's loss causation standard. DVI, 2010 WL 3522090, at *6. It was further noted that

> this approach has been rejected by many courts, including courts in this circuit, as it fails to connect the corrective disclosure to the alleged misrepresentation or omission. . . . This Court agrees and will not apply a standard that is so lax that every announcement of negative news becomes a potential corrective disclosure.

Id. at *6 n.11 (citations and internal quotation marked omitted); id. at *23 ("DVI's earnings announcements on September 25, 2002 and May 13, 2003 are nothing more than a disclosure of DVI's true financial condition and do not relate to the alleged misrepresentations").

[7] Plaintiffs acknowledge as much; however, they say Coffman "considered that information in his analysis and conclusions." Pls. Br., Doc. No. 791-1 at 15 n.10. In his report, unidentified FDFN "Conference Call transcripts" are listed among documents that were considered, but the May 13, 2003 transcript is not cited as the basis for any reported opinion. Oct. 1, 2008 Coffman Report, App. A at 3, Pls. ASOF, Ex. 1, Doc. No. 737 ("Coffman Report"). As noted by the September 3, 2010 decision, "Mr. Coffman did not examine the minutes of this conference call." DVI, 2010 WL 3522090, at *23 n.30.

[8] The summary is supported by citations to an SEC transcript of the conference call and an SEC website address where a "full transcript" is said to be found. Pls. Br., Doc. No. 791-1 at 15 n.10. A reasonable search of that address as well as the SEC's website directories has not produced the transcript. Plaintiffs filed a "preliminary draft version with several typographical errors," id.; FDFN Transcript, Pls. ASOF, Ex. 157, Doc. No. 737, which is cited here.

[9] The transcript records DVI's response: "The delinquencies are the domestic portfolio where without international is roughly 5.5 percent of managed assets or approximately . . . $2.3 billion. . . . we would expect that to get into the 4 percent range." * * * "The significant good news in that regard is that we've addressed or will have addressed by the end of this quarter a pretty significant portion of our over 90 [day] delinquencies . . . . So we are very happy with the trends in our delinquency with the tremendous improvement in our portfolio." FDFN Transcript, Pls. ASOF, Ex. 157 at 5-6, Doc. No. 737.

- Parsons Asset Management questioning whether DVI refinanced its 9 7/8% Senior Notes . . . .[10]

- US Bancorp Piper Jaffray questioning why the 10-Q was delayed, why DVI did not include a balance sheet with its press release, whether there was a "loss assumption" on DVI's securitization gain on sale calculation and also asking again about DVI's ability to refinance or repay its $155 million 9 7/8 Senior Notes . . . .[11]

- Brencourt Advisors questioning "the amount of loans on non-accrual status . . . ."[12]

- Concordia Advisors following-up with an additional question about DVI's failure to refinance its Senior Notes given its [Concordia's] belief that the "high yield market right now seems to be red hot" . . . .[13]

---

[10] The transcript does not reflect that the caller asked DVI about refinancing the Senior Notes: "At one point in your last conference call or the one before that even, you mentioned the fact that you were going to buy in some of the non-inseminate bonds since they were so cheap. Were you able to do that or have you been using your funds elsewhere?" FDFN Transcript, Pls. ASOF, Ex. 157 at 6, Doc. No. 737.

[11] The transcript does not mention a "press release." FDFN Transcript, Pls. ASOF, Ex. 157 at 8-12, Doc. No. 737. It also does not record any questions about "loss assumption." See id. at 10 ("Caller: And then - - that's 4 to 5 percent [net interest spread] and you have some loss assumption, . . . is that spread similar? What has that been in the past, that's a wider spread tha[n] you have had historically, isn't it?") Furthermore, it does not record any questions about DVI's "ability to refinance or repay" the Senior Notes: "Caller: [O]n the international business, it sounds like from a liquidity standpoint, it is kind of slow moving, like its not going to line up with the $155 million of debt that you have due. Do you have other plans?" Id. at 11. DVI's response: "[W]e are talking about due diligence in the sale of our significant portion of our [international] portfolio, which would in fact bring back cash well before the bond to do in February. We certainly expect it to be done well before that." Id.

[12] The transcript: "Caller: Could you give the total dollar amount of loans on non-accrual status at the end of the quarter . . .?" FDFN Transcript, Pls. ASOF, Ex. 157 at 14, Doc. No. 737. DVI's response: "I think what was disclosed was disclosed in the past and its . . . 189 million as compared to 153 million in March 31, a year ago. . . . So we expect to be back to the impaired levels of a year ago shortly. . . . but we basically disclosed impaired contracts." Id. at 14-15.

[13] The transcript does not reflect any questions about DVI's "failure to refinance" the Senior Notes: "Caller: [Y]ou had mentioned earlier that you [had] begun discussions with an investment bank regarding the bonds that are due in February and that you expected a satisfactory resolution. Can you elaborate on exactly what in your mind constitute[s] a satisfactory resolution? I mean just looking at the high-yield market right now it seems to be red hot, and I am just wondering if there is a reason that you haven't made an attempt to tap the market at this point or if there is certain criteria that you want to further satisfy?" Pls. ASOF, Ex. 157 at 15.

- Ferris Capital raising . . . another follow-up question on whether DVI would access cash to repay the Senior Notes. . . .[14]

Pls. Br., Doc. No. 791-1 at 15 n.10, 16.

II.     ANALYSIS

Reconsideration requires either:  "(1) an intervening change in the law; (2) the availability of new evidence; or (3) the need to correct clear error of law or prevent manifest injustice." Cottrell v. Good Wheels, 458 Fed. App'x 98, 101 (3d Cir. 2012) (citing N. River Ins. Co. v. CIGNA Reins. Co., 52 F.3d 1194, 1218 (3d Cir. 1995)).  The scope of reconsideration is "extremely limited" and "[s]uch motions are not to be used as an opportunity to relitigate the case." Blystone v. Horn, 664 F.3d 397, 415 (3d Cir. 2011).  Nor are they a vehicle for registering disagreement with the court's initial decision, for rearguing matters already addressed by the court, or for raising arguments that could have been raised before but were not." Bostic v. AT&T of the V.I., 312 F. Supp. 2d 731, 733-34 (D.V.I. 2004).

Here, an intervening change in the law or the availability of new evidence is not cited. Instead, the motion for reconsideration reargues previously presented matters, asserts arguments that could have been but were not raised before, and expresses disagreement with the September 3, 2010 decision.  A "general dissatisfaction with the court's ruling is not a valid ground for granting . . . reconsideration." Ride the Ducks, L.L.C., v. Duck Boat Tours, Inc., No. 04-5595,

---

[14] The transcript: "Caller: [I]n the European portfolio, is that going to be an exact sale of that portfolio and will there be cash, will there be a significant amount of cash going down to pay down the bonds?" Pls. ASOF, Ex. 157 at 16, Doc. No. 737.  DVI recounted "our prior experience with the people we work off into Europe" and explained "whether or not we use any or all that money to buy back the bond is really depende[nt] on the market for the bonds . . . . So, that depends really on where the bonds are, what we can do with them, at what price we can either obtain them or at what price we can extend them, roll them over, whatever, compared to what we believe is the opportunity for that capital . . . ." Id. at 16-17.

2005 WL 984216, at *1 (E.D. Pa. Apr. 21, 2005).  The record does not show that the previous rulings on loss causation were unreasonable or create any injustice.

The motion for reconsideration asserts that DVI's September 25, 2002 announcement, and Reuters' report of that event, should not be considered standing alone.  Proposing that September 24 and 25 be viewed together as a single two-day event,[15] it is contended that

> DVI's September 25 statements included new partial, indirect disclosures of the core frauds in this case, i.e., understated loan loss reserves and liquidity issues, which continued the revelation of fraud-related information revealed on September 24, which this Court held sufficient for loss causation.

Id. at 11, 13 ("the extreme reaction by investors and intervention by regulatory authorities on September 25 [NYSE stopped trading on DVI securities] was caused, at least in part, by the interrelationship and aggregate effect of the fraud-related disclosures and significant price decline the day before").  Viewed alternatively as a four-day event of "partial disclosures that caused significant price declines," it is contended that

> declines on September 24 and 25, 2002 were followed by additional disclosures and price drops on September 26 and 27 that this Court correctly found revealed information relevant to the frauds for loss causation purposes.

Id. at 11 n.3

Although this multi-day event theory could have presented before, it was not articulated during the summary judgment proceedings or by expert opinion.  Its factual underpinnings were

---

[15]  Plaintiffs say "[t]he Court previously endorsed analyzing loss causation pursuant to a two-day event window in connection with class certification . . . ." Pls. Br., Doc. No. 791-1 at 5, 8 ("already held that price adjustments within two days are acceptable").  No such ruling was made.  See In re DVI, Inc. Sec. Litig., 249 F.R.D. 196, 219 (E.D. Pa. 2008) ("the existence of loss causation is a factual question . . . we cannot properly make this factual determination at the class certification stage").  As noted on summary adjudication, "the Court's prior statements about partial disclosures prior to August 13, 2003 were in regard to whether Lead Plaintiffs satisfied the commonality requirement for Class Certification, an issue entirely distinct from the present issue." DVI, 2010 WL 3522090, at *14 n.27.  The disclosures were previously examined, just as they are here, in light of a more full developed record and the expert reports.  Id.

10

not subject to discovery. Instead, the theory is grounded on disclosures, which the parties explored in discovery and do not dispute as to their text. Those statements are not new evidence that was previously unavailable. The theory simply recasts evidence that was fully considered before with a new dimension of significance presented for the first time on reconsideration.

Plaintiffs say that Coffman "raised the multi-day event window concept," quoting a portion of his report that discussed the unsuccessful "insolvency theory"[16] of loss causation:

> For this particular announcement [September 27, 2002], the market reaction to the earnings surprise occurred over multiple days. . . . it is appropriate and relevant to look at the total market price reaction from September 24 to September 27 to calculate ERC [earnings response coefficient]. The market price reaction on September 24 . . . through September 27 . . . was a decline of $91.13 million.

Pls. Reply Br., Doc. No. 795 at 2-3 (quoting Coffman Report ¶ 45). This reading is buttressed by other excerpts from Coffman's report – disparate phrases, narrative references to other events, and a footnote to the events of September 25-27, 2002 – all of which are said to touch on the concept.[17] Id.

---

[16] The insolvency theory was "excluded as unreliable and unfit" and "in obvious conflict with the basic requirements of loss causation." DVI, 2010 WL 3522090, at *7, 11, 9-12. The September 3, 2010 memorandum decision explained in part:

> If we were to admit Coffman's theory, we open the door for Plaintiffs to recover for all losses, regardless of cause . . . . [T]he underlying assumption of [t]his theory, that all inflation in the purchase price was due to fraud and thus any decline in inflation constitutes economic loss caused by fraud, directly contradicts the Supreme Court's holding in Dura that artificial inflation in the purchase price alone is insufficient to show loss causation.

Id. at *11 (quoting In re Williams Sec. Litig. – WCG Subclass, 558 F.3d 1130, 1139 (10th Cir. 2009) (quoting Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 345 (2005)).

[17] See, e.g., "September 26 . . . an analyst report that provides additional detail of the charges DVI has pre-announced," Coffman Report ¶ 67; "September 27 . . . there was substantially more detail incorporated in DVI's earnings announcement as well as in the conference . . . ," id. ¶ 68; "[w]hen there is a possibility that the information reached the market before a formal announcement, the event window may be extended back to include the potential leakage," ¶ 69 n.39 (emphasis in original omitted).

While a creative reading, it is not an accurate or a fair one.  In his reports, Coffman did not treat the September 25, 2002 disclosures as part of a multi-day event window.  Any reason for defendants to predict that he might do so is not apparent.  Instead, he opined that "this new information brought the market closer to the realization that DVI was in financial distress" – an opinion based on the unsuccessful "true financial condition" theory.  Coffman Report ¶ 66.  His reports proffered no loss causation opinions based on the novel theory.

Plaintiffs say that the theory was presented in opposition to Deloitte's motion for summary judgment.[18]  Pls. Reply Br., Doc. No. 795 at 1, 3-4 (citing Pls. Response to Deloitte's Mot. for S. J., Doc. No. 707 at 25-26; Pls. Sur-Reply Br., Doc. No. 757 at 7-8).  In those briefs, it was said that the September 25 events were "further explained in the September 26 . . . and 27, 2002 disclosures" and "built upon the prior September 24, 2002 disclosure which revealed investor concerns regarding loan loss and liquidity problems."  Id. at 3-4.  This is not enough.  Plaintiffs' briefs presented no substantive arguments based on the multi-day event theory.

Plaintiffs say that the September 25, 2002 reports included "new partial, indirect disclosures of the core frauds" – "understated loan loss reserves and liquidity issues."  Pls. Br., Doc. No. 791-1 at 11.  Nonetheless, the record does not show that anything new became known to the market on that day.  The only thing disclosed on that day was DVI's deteriorating financial condition, which is insufficient to constitute a corrective disclosure, as was so ruled, DVI, 2010 WL 3522090, at *23.

---

[18] Plaintiffs also say deposition testimony of Deloitte's loss causation expert, Dr. Kenneth Lehn, demonstrates that the multi-day event argument was presented during summary judgment proceedings. Pls. Reply Br., Doc. No. 795 at 1, 4-5; but see Def. Sur-Reply Br., Doc. No. 798 at 3-4 (Lehn "did not use an event window here and did not concede . . . Coffman had appropriately used an event window in his event study"). Plaintiffs' characterization of the testimony – an obvious distortion of the record – is without merit.

Plaintiffs find "new" content in the announcements by mistakenly reading in information that was disclosed earlier and later.  See, e.g., Pls. Br., Doc. No. 791-1 at 12-13; see also Pls. Reply Br., Doc. No. 795 at 8 (information about "significant, unexpected loan losses" in conjunction with a "halt to trading in DVI securities" are to said establish a causal connection), 9-10.  However, just because one event follows another in time, or two events are contemporaneous, does not show that they are causally related.  Importantly, as to all of the disclosures at issue here, the record does not contain any evidence that investors understood the September 25, 2002 reports to have the meanings ascribed by Plaintiffs or that their imputed understanding caused the price of DVI's securities to decline.  The assertion that "[t]he September 25 drop was the continuation of the market's reaction to the new fraud-related information disclosed on September 24," id. at 11, is also unsupported.  The disclosures at issue were made before the close of trading, and there is no evidence that the market did not or could not incorporate that information in the securities' price on the release dates.  See Def. Br., Doc. No. 793 at 6.

The proffered evidence does not permit an inference that the September 25, 2002 disclosures relate to the alleged frauds in this case.  "The market cannot react to information of which it is unaware."  Marsden v. Select Med. Corp., No. 04-4020, 2007 WL 518556, at *5 (E.D. Pa. Feb. 12, 2007).  Loss causation cannot be established through hindsight.  See, e.g., In re Take-Two Interactive Sec. Litig., 551 F. Supp. 2d 247, 285 (S.D.N.Y. 2008) (afterthoughts could not establish that particular disclosures revealed to the market some part of the truth of the alleged fraud).

Moreover, the "multi-day event window concept" is improper reargument of previously presented matters. It reiterates earlier attempts to recover for all losses regardless of cause – albeit for a shorter period of time. As formulated here, the theory does not establish loss causation for the same reason the "true financial condition" and "insolvency" theories failed – a corrective disclosure that is connected to an alleged misrepresentation by Deloitte has not been identified. See Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 345 (2005) (private securities fraud actions are "available, not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause"). "In the absence of a correction in the market price, the cost of the alleged misrepresentation is still incorporated into the value of the security and may be recovered at any time by simply reselling the security at the inflated price." Semerenko v. Cendant Corp., 223 F.3d 165, 185 (3d Cir. 2000). See also DVI, 2010 WL 3522090, at *6 & n.11 ("true financial condition" theory, without any evidence of a link between the disclosure and the fraud, is not a corrective disclosure"); id. at *7, 11 ("insolvency theory," premised on the mistaken concept that all inflation in the purchase price was due to fraud and thus, any decline in inflation constituted economic loss caused by fraud, is inadmissible).

As to the news reports and conference call with investors and analysts on May 13, 2003, Plaintiffs say that "new information . . . directly related to DVI's frauds" was disclosed to the market. Pls. Br., Doc. No. 791-1 at 15. Plaintiffs again proceed by hindsight and afterthought, reading into the record information that was not publicly available, was unknown to the market at the time, or is simply not to be found in the evidence proffered. See, e.g., id. at 17-18; Pls. Reply Br., Doc. No. 795 at 11, 12-14.

Plaintiffs cite the May 13, 2003 news reports about loan losses in DVI's Third Coast Capital portfolio; however, those reports do not reveal anything about DVI's understated loan loss reserves. Such an inference, tenuous as it is, might be drawn from the vantage point of a fully-informed investor, but there is no evidence that the market recognized the relationship at that time. See Pls. Br., Doc. No. 791-1 (relying on non-public documents and information). In any case, this is largely repetitious argument that has already been adjudicated on Deloitte's motion for summary judgment. See Pls. Response to Deloitte's Mot. for S. J., Doc. No. 707 at 31-32; Pls. Sur-Reply Br., Doc. No. 757 at 9-10.

The transcript of the May 13, 2003 conference call does not support a finding that new fraud-related information was communicated. It is merely said to record content that is not to be found upon a careful reading. For example, "the revelation that DVI would not file its financial statements on time . . . was due to Deloitte's disagreement over DVI's accounting for several transactions including large unreported losses in DVI loans to OnCure, Dolphin, and PELL." Pls. Br., Doc. No. 791-1 at 17. The transcript is silent as to any disagreement with Deloitte. Another example – among many too numerous to discuss here – callers asked questions during the conference call that raised the topic of DVI's plans to repay or refinance its Senior Notes, however, Plaintiffs acknowledge that concerns about DVI's ability to do so had been previously revealed. Id. at 17.

Plaintiffs cite various other concerns that were raised during the call: "delinquency levels, loss assumption on gain on sale calculations, and the amount of loans on non-accrual status." See Pls. Br., Doc. No. 791-1 at 17. Even assuming the transcript provides some evidence probative of those concerns, which in all instances is not born out upon a careful

reading, it does not reflect or even suggest that the market recognized that the information disclosed was related to fraudulently understated loan loss reserves or concealed liquidity crises. See supra analysis of Plaintiffs' summary of questions posed by analysts to DVI's representatives during a May 13, 2003 conference call.

As to the revelations on May 13, 2003, Coffman opined that "the negative earnings surprise and attendant decrease in earnings expectations result in getting the market closer to the realization of DVI's true financial condition." Coffman Report ¶ 77. This opinion concerning DVI's "true financial condition" has already been considered and ruled inadequate to satisfy the Third Circuit's standard for loss causation. DVI, 2010 WL 3522090, at *6 & n.11 (refusing to "apply a standard that is so lax that every announcement of negative news becomes a potential corrective disclosure"). Coffman did not opine on any of the information contained in the May 13, 2003 transcript. In this regard, the substance of his opinions remains unknown.

As to all of the disclosures at issue here, Plaintiffs at best proffer speculation. A "loss caused solely by a general impression in the market that 'something is wrong' is insufficient to establish causation." Alaska Elec. Pension Fund v. Flowserve Corp., 572 F.3d 221, 232 (5th Cir. 2009). Moreover, Plaintiffs will not be permitted to supplement the shortcomings in their expert's reports by argument in their briefs after the close of discovery and an adverse ruling. If Plaintiffs were allowed to do so, the prejudice to Deloitte would be obvious. "'Because of the need to distinguish between fraud-related and non-fraud related influences of the stock's price behavior' in § 10(b) cases, many courts refuse to admit damages reports or testimony by damages experts that do not include event studies or something similar." DVI, 2010 WL 3522090, at *13 (quoting In re Imperial Credit Indus., Inc. Sec. Litig., 252 F. Supp. 2d 1005, 1014-15 (C.D. Cal.

2003) (internal quotation marks and citation omitted)).  Klatch-Maynard v. Sugarloaf Twp., No. 06-0845, 2011 WL 2006424, at *4 (M.D. Pa. May 23, 2011) (citing Sowell v. Butcher & Singer, Inc., 926 F.2d 289, 301-02 (3d Cir. 1991) (upholding exclusion of expert testimony with regard to damages in securities action because counsel refused to supply information concerning the substance of the experts' opinions in discovery)).

This Court found that DVI's earnings announcements on September 25, 2002 and May 13, 2003 "are nothing more than a disclosure of DVI's true financial condition and do not relate to the alleged misrepresentations."  DVI, 2010 WL 3522090, at * 23.  The multi-day event theory, and the evidence proffered to support its application here, do not add anything that warrants reconsideration.

An order accompanies this memorandum.


BY THE COURT:


Legrome D. Davis, J.