IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE | : | CIVIL ACTION |
| DVI, INC. SECURITIES LITIGATION | : | No. 03-5336 |

MEMORANDUM

Legrome D. Davis, J.                                                    January 22, 2013

Plaintiff investors in Diagnostic Ventures, Inc. (DVI) sue for violations of Section 10(b)

of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b-5, 17 C.F.R. § 240.10b-

5,[1] and imposition of liability under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

Jurisdiction is the Exchange Act, 15 U.S.C. § 78aa, and federal question, 28 U.S.C. § 1331.

Defendant Terry Cady – a former executive of DVI Business Credit, Inc. (DVI BC), a

subsidiary of DVI – moves for summary judgment (Doc. No. 684).  Fed. R. Civ. P. 56.  Among

other reasons reached here, the motion asserts that the record is devoid of evidence to support an

essential element of a private securities action – reliance by investors on Cady's allegedly

deceptive statements and acts.[2]  Lead Plaintiffs oppose summary judgment, asserting that

Stoneridge Inv. Partners, LLC v. Scientific–Atlanta, Inc., 552 U.S. 148, 157, 159 (2008) does not

preclude Rule 10b-5 "claims against insiders that had the level of involvement in the frauds that

---

[1]  For the history and factual background of this action see:  In re DVI, Inc. Sec. Litig., No. 03-5336, 2010 WL 3522090 (E.D. Pa. Sept. 3, 2010) (Order & Mem., Doc. Nos. 789, 790 re Plaintiffs' and Defendant Deloitte & Touche LLP's respective motions to exclude the other's loss causation expert, and Deloitte's motion for summary judgment); id., 249 F.R.D. 196 (E.D. Pa. 2008), aff'd, 639 F.3d 623 (3d Cir. 2011) (Apr. 29, 2008 Order & Mem., Doc. No. 609 re class certification); id., 2005 WL 1307959 (E.D. Pa. May 31, 2005) (Order & Mem., Doc. No. 181 re dismissal motions).

[2]  The essential elements of a § 10(b) and Rule 10b-5 private cause of action are:  "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."  Stoneridge Inv. Partners, LLC v. Scientific–Atlanta, Inc., 552 U.S. 148, 157, 159 (2008); accord Janus Capital Grp., Inv. v. First Derivative Traders, 131 S. Ct. 2296, 2301 n.3 (U.S. 2011).  The motion asserts that the record does not contain any evidence of manipulative or deceptive conduct; scienter; or reliance by investors on the allegedly deceptive statements and acts.  See, e.g., Def. Br., Ex. B, Doc. No. 684; Def. Reply Br., Doc. No. 719.

Cady had." Pls. Br., Doc. No. 699 at 1, 18-19, 20 n.9.  In their view, it should be presumed that

investors relied on Cady's allegedly deceptive statements and conduct because he was the

president, chief executive officer, and a director of DVI BC as well as a senior vice president of

DVI, Inc.  Id. at 19-21 & nn.9, 10.  Among other reasons, Cady's actions were "necessarily

communicated to the public by virtue of DVI's consolidated financial statements" because those

statements "included the results of DVI BC's operations and . . . necessarily reflected Cady's

actions" as an executive officer.  Id.  Also:  "Although Cady did not sign DVI's consolidated

financial statements, [he] adopted those statements (as shown in his November 2002

certification)."  Id. at 18-19 (footnote omitted).

The motion for summary judgment asserts that Cady cannot be held liable within the

meaning of § 20(a), primarily because the record does not contain proof of a threshold

requirement – that Cady actually controlled DVI, the alleged violator of the securities laws,

§ 10(b).  Def. Br., Ex. B, Doc. No. 684 at 15-20; Def. Reply Br., Doc. No. 719 at 16-20.  Lead

Plaintiffs contend that triable disputes exist as to this issue.  Pls. Br., Doc. No. 699 at 3-14.

The motion for summary judgment will be granted. The record does not show that

investors relied on any conduct or statements made by Cady.  Within the meaning of § 20(a), he

is not a person who had actual power or influence over the allegedly controlled person, DVI.

I.      PROCEDURAL AND FACTUAL BACKGROUND

The Complaint, as filed on September 23, 2003, and amended for the fifth time and

deemed filed on May 23, 2006 (Doc. Nos. 288, 298), alleges that Cady, individually and

collectively with other DVI officers and directors, participated in a deceptive scheme to defraud

purchasers of DVI's securities and made untrue statements of material fact or omitted material

facts necessary to clarify prior misleading statements – all in violation of § 10(b) and Rule 10b-5(a), (b), and (c).[3]  Compl. ¶ 493, Doc. No. 298.  Specifically, it is averred that Cady engaged in numerous schemes to artificially inflate the price of DVI's securities by concealing and delaying disclosure of accounting irregularities and deceptive lending practices or by failing to take corrective steps despite his knowledge of the improprieties.  Id. ¶¶ 6(1)(a)(iv), 6(3), 7, 9, 29, 37, 47, 289,  291-296, 300, 489-508 (Count I).  It is contended that these averments invoke "a presumption of reliance under the 'fraud-on-the-market' theory."[4]  Id. ¶¶ 486-487.  In addition, it is averred that Cady is liable under § 20(a) because he controlled DVI in its commission of primary violations of § 10(b).  Id. ¶¶ 44-45(a), 290, 501-502, 566-574 (Count VI).[5]

---

[3]  Subsections (a) and (c) of Rule 10b-5, respectively, make it unlawful to "employ any device, scheme, or artifice to defraud," and to "engage in any act, practice, or course of business which operates . . . as a fraud."  Id., 17 C.F.R. § 240.10b-5(a), (c).  Subsection (b) of Rule 10b-5 prohibits "mak[ing] any untrue statement of material fact" or omitting a material fact necessary to clarify prior misleading statements.  Id. , 17 C.F.R. § 240.10b-5(b).  "We refer to claims under Rule 10b-5(a) and (c) as 'scheme liability claims' because they make deceptive conduct actionable, as opposed to Rule 10b-5(b), which relates to deceptive statements."  In re DVI, Inc. Sec. Litig., 639 F.3d 623, 643 n.29 (3d Cir. 2011).

[4]  A rebuttable presumption of reliance may be found in two circumstances: Under the "fraud-on-the-market" doctrine, reliance on the integrity of the market price for a security is presumed.  Basic, Inc. v. Levinson, 485 U.S. 224, 247 (1988).  Most publicly available information is reflected in the security's market price.  Id.  When statements or conduct become public, "[t]hen it can be assumed that an investor who buys or sells stock at the market price relies upon the statement [or conduct]."  Stoneridge, 552 U.S. at 159 (citing Basic, 485 U.S. at 247).  Under Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 153-54 (1972), where one with a duty to disclose omits to reveal material information, "the investor to whom the duty was owed need not provide specific proof of reliance."  Stoneridge, 552 U.S. at 159.

[5]  The Complaint alleges that Cady and other individual defendants controlled DVI within the meaning of § 20(a).  Compl. ¶ 569.  "By virtue of their high level positions," "awareness of [DVI's] finances and operations," and "intimate knowledge of the [its] false financial statements," defendants "had the power to . . . and did influence and control, directly or indirectly, DVI's "decision-making process . . . ."  Id. ¶ 570.  It is averred that the individual defendants "had the ability to prevent [the] issuance or public dissemination" of DVI's "reports, press releases, public filings, financial statements and other [false and misleading] statements . . . or "cause the statements to be corrected."  Id.

The Complaint avers that at the time Plaintiffs purchased DVI's securities, they "did not know DVI's true financial condition or the scheme to conceal it."  Compl. ¶ 564 (Count V against Defendant Clifford Chance).  Also, "they did not know of any of the false and/or misleading statements and omissions" in DVI's public filings.  Id. ¶¶ 506, 572 (Count I against Cady, an Individual Defendant).

Despite conclusory allegations of Rule 10b-5(b) liability, the Complaint does not aver that Cady made any public statements or signed any company documents that affected the market for DVI's securities, as was previously ruled under a previous version of the Complaint.  May 31, 2005 Order & Mem., Doc. No. 181; In re DVI, Inc. Sec. Litig., No. 03-5336, 2005 WL 130795, at *7, 9 (E.D. Pa. May 31, 2005) (ruling on the Third Amended Complaint, Doc. No. 88).

On November 1, 2004, Cady moved to dismiss the Third Amended Complaint (Def. Mot., Doc. No. 107).  Dismissal was granted in part as to the Rule 10b-5(b) claims because "Plaintiffs have not pled with the requisite particularity that . . . Cady . . . made any statements or signed any Company documents."  DVI, 2005 WL 130795, at *7, 9.  However, a question remained that our Court of Appeals had not addressed at that time:  "whether signatories to financial statements can be held to have adopted that document as a statement."  Id. at *8.  The Rule 10b-5(b) claims were permitted to "proceed on that basis, assuming that Plaintiffs have sufficiently pled the other elements of their securities fraud claim."  Id. at *8.  The motion to dismiss the § 10(b) and Rule 10b-5 claims and the § 20(a) claims was denied.  Id. at *12, 13-14.

On December 4, 2006, Lead Plaintiffs moved under Fed. R. Civ. P. 23(a) and 23(b)(3) (Doc. No. 406) to certify a class of all of the investors who purchased DVI securities during August 10, 1999 to August 13, 2003 – the period in which the company allegedly made

misrepresentations.  In addition to "fraud-on-the-market," the motion for class certification

invoked the presumption of reliance set forth in Affiliated Ute Citizens of Utah v. United States,

406 U.S. 128, 153-54 (1972) – a theory not stated in the Complaint.  Pls. Reply Br., Doc. No.

451 at 101-04.

On April 29, 2008, class certification was granted as to all Defendants but Clifford

Chance.  Apr. 29, 2008 Mem. & Order, Doc. No. 609; May 30, 2008 Am. Order, Doc. No. 611;

In re DVI Inc. Sec. Litig., 249 F.R.D. 196 (E.D. Pa. Apr. 29, 2008).  That decision relied in large

part on Stoneridge, 552 U.S. at 159-162 (Jan. 15, 2008) (declining to extend the reach of the

§ 10(b) private cause of action by presuming that investors in an efficient market rely on non-

public transactions reflected in public statements).  In pertinent part, this Court ruled that "Lead

Plaintiffs do not allege that Clifford Chance directly made any public misstatements that affected

the market for DVI securities."  DVI, 249 F.R.D. at 217.  Lead Plaintiffs were not entitled to the

fraud-on-the-market presumption to establish reliance as to Clifford Chance because "none of

[Clifford Chance's] alleged conduct was publically disclosed such that it affected the market for

DVI's securities."  Id. at 218, 216-18 & nn.38, 39.  Additionally, "the Affiliated Ute presumption

is equally inapplicable because Clifford Chance owed no duty of disclosure to DVI's investors."

Id. at 218.  Because neither presumption of reliance could be established through class-wide

proof, it was ruled that "individual issues of reliance will predominate over common issues of

law and fact with respect to Clifford Chance."  Id.  Lead Plaintiffs could not meet Rule 23(b)(3)'s

predominance requirement and class certification was denied as to Clifford Chance.[6]

---

[6]  Plaintiffs assert that this "Court has previously rejected Cady's arguments regarding reliance in
its decision to certify the § 10(b) and § 20(a) claims against Cady for class treatment . . . ."  Pls. Br., Doc.
No. 699 at 20.  No such ruling was made.  See DVI, 249 F.R.D. at 200 (proof at trial not at issue).  Moreover,
whereas Clifford Chance opposed certification, asserting among other reasons that neither a presumption of
reliance nor a finding of individualized reliance was warranted, Cady did not present argument on this point
before the district court or the court of appeals.  See Def. Reply Br., Doc. No. 719 at 6 n.2.

On September 12, 2008, Lead Plaintiffs petitioned under Fed. R. Civ. P. 23(f) for leave to appeal the interlocutory denial of class certification as to Clifford Chance.  In addition to arguments that had been presented to the district court, they asserted for the first time that Clifford Chance was primarily liable under Rule 10b-5(b) for mis-statements made in the 10-Q. In essence, their position was that Clifford Chance's deceptive conduct was communicated to the public through DVI's public filings.  They asserted that Stoneridge only requires publication of the fraudulent acts, but does not require public attribution of those acts to a particular defendant.

On March 29, 2011, our Court of Appeals affirmed the denial of class certification as to Clifford Chance because individual issues of reliance predominated.  In sum, it was held that Plaintiffs could not invoke the fraud-on the market presumption of reliance as to Clifford Chance because they did not contend its "alleged role in masterminding the fraudulent 10-Q was disclosed to the public" or attributed to that defendant.  DVI, 639 F.3d at 649 (discussed infra).

On April 30, 2009, before the ruling on class certification was issued, Clifford Chance moved for summary judgment, asserting as material, uncontested facts:

1.   Plaintiffs do not contend that they relied on any conduct by Clifford Chance in purchasing or selling securities.

2.   There is no evidence in the factual record that plaintiffs relied on any conduct by Clifford Chance in purchasing or selling DVI securities.

3.   At the time they purchased the securities at issue, plaintiffs did not know about the fraudulent scheme in which Clifford Chance allegedly participated. . . . Complaint ¶ 564.

Defs. Statement of Facts, Doc. No. 688 at 1.  On January 4, 2013, summary judgment was entered in favor of Clifford Chance and against Plaintiffs as to all claims contained in the Complaint.  (Jan. 4, 2013 Order & Mem., Doc. Nos. 847, 848).  In pertinent part, it was ruled

that <u>Janus Capital Grp., Inc. v. First Derivative Traders</u>, 131 S. Ct. 2296 (U.S. June 13, 2011) and

<u>Stoneridge</u> as well as the rulings by our Court of Appeals in <u>DVI</u> controlled the outcome –

"Plaintiff investors have not produced any evidence of individualized reliance" and therefore,

"Clifford Chance cannot be held liable for assisting in the alleged deceptive scheme or for

making any mis-statements in DVI's public filings."  Jan. 4. 2013 Order & Mem. at 13-14.

II.      <u>SUMMARY JUDGMENT FINDINGS OF UNDISPUTED MATERIAL FACT</u>

1.      DVI was a Delaware corporation with two operating subsidiaries, DVI Financial

Services, Inc. (DVI FS) and DVI BC.  Defendant Cady's Statement of Facts (SOF) ¶ 1, Doc. No.

684, Ex. A; Lead Plaintiffs' Response to Defendant Cady's Statement of Material Facts (RSOF)

¶ 1, Doc. No. 703; Compl. ¶ 25.

2.      DVI was in the business of extending credit to healthcare providers.  Def. SOF

¶ 2; Pls. RSOF ¶ 2; Compl. ¶ 25.

3.      DVI FS extended financing to healthcare providers for the purchase or lease of

medical equipment – MRI machines, CT scanners, and other machinery – and improvements for

installation of the equipment.  DVI BC extended credit secured by accounts receivable from

health insurance programs – such as Medicare and Medicaid.   Def. SOF ¶ 3; Pls. RSOF, ¶ 3;

Compl. ¶¶ 25, 69.

4.      As between DVI's two subsidiaries during the Class Period, DVI BC held the

smaller loan portfolio.  Def. SOF ¶ 4 & Ex. 2 (DVI Form 10-Q for the period ending Dec. 31,

2002 at 15, comparing DVI FS' equipment financing income to DVI BC's medical-receivables

financing income); Pls. RSOF ¶ 4.

5.      DVI filed consolidated financial reports; it did not prepare separate financial statements for DVI FS and DVI BC.  Mar. 25, 2008 Garfinkel Dep., 231:3-22, Def. SOF, Ex. 6. DVI's public filings did not disclose the transfer or advancement of funds between DVI FS and DVI BC that were used to pay existing loans issued by one or the other subsidiary.  Id., 475:3-8. See also:  Def. SOF ¶¶ 16, 18, 22; Pls. RSOF ¶¶ 16, 18, 22; Lead Plaintiffs' Rule 56.1 Statement of Additional Facts (Add'l Facts) ¶¶ 41, 48, 51, 52, Doc. No. 703, and Defendant Cady's Response to Lead Plaintiffs' Statement of Additional Facts (R. Add'l Facts) ¶¶ 41, 48, 51, 52, Doc. No. 719-1.[7]

6.  As to the transfer or advancement of funds between DVI FS and DVI BC to pay existing loans, Cady testified:  "Those kinds of decisions happen.  And on occasion, you will consciously say yes, I'll do that to keep - - to keep you open."  Jan. 23, 2008 Cady Dep., 422:1-13, Def. SOF, Ex. 5.

7.      Cady was President, Chief Executive Officer, and Director of DVI BC from about February, 2000 to March, 2004.  Some public documents designate him as a senior vice president of DVI.  Report of Chapter 11 Examiner R. Todd Neilson, In re DVI, Inc., et al., No. 03-12656(MFW), Def. SOF ¶ 9 & Ex. 4 at 17; Pls. RSOF ¶ 9; Jan. 23, 3008 Cady Dep., 194:7-12, Def. SOF, Ex. 5; Cady Answer ¶ 37, Def. SOF, Ex. 11; Apr. 26, 2009 Cady Decl. ¶¶ 1-4, Def. SOF, Ex. 12; id., Def. Reply Br., Ex. A, Doc. No. 719.

---

[7]  In response to Cady's statement of facts, Plaintiffs "cit[ed] to particular parts of materials in the record."  Fed. R. Civ. P. 56.  Plaintiffs also filed a "Rule 56.1 Statement of Additional Facts" ¶¶ 24-103, Doc. No. 703.  Some of the additional facts were cited in the responses to Cady's SOF ¶¶ 1-23; however, others were not so cited.  This does not comply with Rule 56's requirements.  See Fed. R. Civ. P. 56(c)(1); Local R. Civ. P. 7.1(c) ("party opposing the motion shall serve a brief in opposition together with such answer or other response that may be appropriate").  See also Fed. R. Civ. P. 56(c)(3) ("court need consider only the cited materials, but it may consider other materials in the record").

8.      Cady learned that he had been given the title of "Senior Vice President" of DVI around June, 2003.  Apr. 26, 2009 Cady Decl. ¶ 3, Def. Reply Br., Ex. A, Doc. No. 719.

9.      Cady testified that he did not have any responsibilities over any DVI division other than DVI BC.  Jan. 23, 2008 Cady Dep., 182:4-6, Def. SOF, Ex. 5.  See also Pls. Add'l Facts ¶¶  26, 27; Def. R. Add'l Facts ¶¶ 26, 27.

10.     Cady did not have any responsibilities or duties in regard to the operations of DVI.  Jan 23, 2008 Cady Dep., 182:4-6, Def. SOF, Ex. 5; Cady Decl. ¶ 4, Def. Reply Br., Ex. A, Doc. No. 719.

11.     Cady did not serve as a director or voting member of DVI's Board of Directors, and he did not sign on behalf of DVI any financial reports or other filings submitted to the Securities Exchange Commission (SEC).  Def. SOF ¶ 13; Pls. RSOF ¶ 13.

12.     Cady, as President of DVI BC, signed a "Certification," dated November 12, 2002, addressed to DVI's President and CEO, Michael O'Hanlon, and DVI's Executive Vice President and Chief Financial Officer, Steven R. Garfinkel, with copies to "Members of Audit Committee," which stated:

1.      I have reviewed the details of DVI's (the "Company's") Loss Allowances at August 31, 2002 contained in the Consolidated Delinquency Report (CDR);

2.      I read the Individual Criticized Asset Report (CAR) prepared for DVI Business Credit for August 31, 2002 and, where necessary, discussed the content of those reports with persons directly responsible for their preparation.

3.      Based on my review of the CDR and Individual CARs, my understanding of the Company's Policy and Procedures for The Allowance for Losses, and my own evaluation of the effectiveness of the design and operation of the Company's controls and procedures related to the assessment of the Allowance for Loss, I believe the controls and procedures were effective, in

all material respects, to ensure that the information contained in the CDR reflects an adequate estimate of losses for DVI's portfolio at August 31, 2002, and represents a proper basis for the information required to be disclosed in the reports the Company files and submits under the Securities and Exchange Act of 1934 related to Loss Allowance at September 30, 2002.

Certification, Pls. RSOF, Ex. 37; Jan. 23, 2008 Cady Dep., 437:3-14, Pls. RSOF, Ex. 2.

13.     The certification – one of a "series of six" to be signed by five other executives – "was something that Mike O'Hanlon was requiring as a result of . . . the audit letter."[8] Jan, 23, 2008 Cady Dep., 426-427, 430:12-16, Pls. RSOF, Ex. 2.

14.     Cady testified:  "It was not my understanding, but I'm not surprised" that the certification he signed was to be included in the draft Form 10-Q that would be provided for review by DVI's auditor, Deloitte & Touche, LLP.  Jan. 23, 2008 Cady Dep., 435, Pls. RSOF, Ex. 2; Def. Reply Br., Ex. B, Doc. No. 719; Def. R. Add'l Facts ¶ 36.

15.     Cady testified that he did not draft or make any changes to the certification, and he did not discuss it or its contents with Deloitte or with DVI's legal counsel, Clifford Chance.  Pls. Add'l Facts ¶ 36; Jan. 23, 2008 Cady Dep., 524-438, Pls. RSOF, Ex. 2.

----

[8]  "On October 11, 2002, Deloitte issued a Management Letter in connection with its annual audit of DVI.  The letter identified material weaknesses in DVI's internal controls for monitoring non-performing assets and assessing impaired loans.   Deloitte informed DVI that federal securities laws – the Sarbanes–Oxley Act of 2002 (SOX) . . . in particular – required disclosure of these weaknesses in DVI's next Form 10-Q. According to plaintiffs, disclosing this information would have forced DVI to write down millions of dollars of assets and reverse income accrued on impaired loans.  DVI initially prepared a portion of the 10-Q for the quarter ending September 30, 2002, revealing the material weaknesses and faxed it to John Healy, a partner at Clifford Chance.  Healy allegedly directed DVI not to release that version of the 10-Q.  Instead, according to plaintiffs, Healy devised a 'workaround' scheme to avoid having to disclose the weaknesses.  The parties dispute[d] Clifford Chance's role in drafting the misleading portions of the 10-Q, but they [did] not dispute that the final version did not state that there were material weaknesses in DVI's internal controls."  DVI, 639 F.3d at 642.  "[I]n essence Healy's alleged plan was to take advantage of a loophole in SOX by conducting a 'special audit' of DVI's internal controls during the two-week period following the issuance of the Management Letter, but before the deadline for filing the 10-Q.  The audit was meant to show there were no material weaknesses in DVI's internal controls, which allowed DVI to avoid disclosure to the SEC under the SOX guidelines."  Id. at 642 n.27.

16.     There is no evidence that the certification or its contents were ever referenced in DVI's public filings, otherwise communicated to the investing public, or publicly attributed to Cady during the Class Period.

17.     Plaintiffs acknowledge that none of the statements contained in DVI's public filings was publicly attributed to Cady.  Pls. Br., Doc. No. 699 at 18-19 & n.8 ("Cady did not sign DVI's consolidated financial statements" and he "cannot be held liable for the actual misstatements made in the fraudulent SEC filings").  It is not disputed that DVI BC itself made no public filings.

18.     The Complaint does not contain any averments that the Plaintiff investors relied on Cady's statements or conduct in purchasing or selling DVI's securities.

19.     The Complaint does not contain any averments that Cady publicly made any false, misleading, or fraudulent statements or omissions contained in DVI's public filings.

20.     At the time the Plaintiff investors purchased DVI's securities, they did not know about the fraudulent scheme in which Cady allegedly participated to conceal DVI's true financial condition.

21.     At the time the Plaintiff investors purchased DVI's securities, they also did not know of any false, misleading, or fraudulent statements or omissions contained in DVI's public filings.

22.     The record contains no evidence that the Plaintiff investors relied on any conduct or statements made by Cady in purchasing or selling DVI's securities.

23.     The record contains no evidence that Cady publicly made or adopted any false, misleading, or fraudulent statements or omissions contained in DVI's public filings.

III.    ANALYSIS

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The "party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).   This requires "affirmative evidence . . . from which a jury might return a verdict in his favor."  Id. at 257; Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986) (must set forth specific facts showing the existence of a genuine issue for trial); Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) ("[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial") (citation and internal quotation marks omitted).  Cady has met his movant's burden.

A.    Section 10(b) and Rule 10b-5 Claims

Considering the record as a whole along with the additional facts submitted by Plaintiffs, there is no triable dispute as to reliance – an  element of all private actions under § 10b and Rule 10b-5.  Stoneridge, 552 U.S. at 159 ("an essential element"); Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 180 (1994) ("critical for recovery under 10b-5"); Basic. Inc. v. Levinson, 485 U.S. 224, 243 (1988) ("[r]eliance provides the requisite causal connection between a defendant's misrepresentation and a plaintiff's injury").  The record does not establish that the Plaintiff investors knew about or otherwise relied on any conduct or statements made by Cady at the time that they purchased or sold DVI's securities.  The record shows just the opposite – none of the alleged misrepresentations were publicly disclosed or attributed to Cady.

Nonetheless, Plaintiffs assert entitlement to the fraud-on-the-market presumption of reliance.  Pls. Br., Doc. No. 699 at 20-21.  In their view, this case must be distinguished from Stoneridge because "Cady's actions are necessarily communicated to the public by virtue of his status as President, CEO, and Director of DVI BC and as Senior Vice President of DVI, Inc."  Id. at 20  n.9; see also id. at 18 (whereas Stoneridge involved allegations against a "*third party*". . . , "the allegations against Cady involve . . . an *insider* of the company") (emphasis in original)). And "DVI's reported financial information included the results of DVI BC's operations, and it necessarily reflected Cady's actions."  Id. at 20, 21 & n.10 ("Cady's *acts* were reflected in DVI's public disclosures" and it is "only require[d] that the resulting deception or misinformation be disclosed") (emphasis in original)).

Reliance may not be presumed here.  Our Court of Appeals ruled in regard to Clifford Chance's opposition to class certification that Plaintiffs

> cannot invoke the fraud-on-the-market presumption of reliance in a private action
> under Rule 10b-5(a) and (c) unless the deceptive conduct has been publicly disclosed
> and attributed to the actor. . . . [B]ecause plaintiffs do not contend Clifford Chance's
> alleged role in masterminding the fraudulent 10-Q was disclosed to the public, they
> cannot invoke the presumption.

DVI, 639 F.3d at 649.  For largely the same reasons, the record here compels a similar conclusion as to Cady.  Plaintiffs have not shown that the allegedly deceptive conduct was publicly disclosed and attributed to Cady:  "It is insufficient to show only that the deceptive conduct was publicly disclosed through other statements or conduct; the public must be made aware of the defendant's acts."  DVI, 639 F.3d at 648 (citations and internal quotation marks omitted); see also Stoneridge, 552 U.S. at 160 (rejecting the argument that "investors rely not only upon the public statements relating to a security but also upon the transactions those statements reflect").

The proposed distinction of high level executives as compared to other third parties such as vendors, customers, or suppliers of the investors' company, is immaterial:

> Stoneridge . . . did not create a remoteness test for private causes of action.  The fact that the vendors' conduct was 'not disclosed to the investing public,' id., is what made it too remote to invoke the presumption of reliance.

DVI, 639 F.R.D. at 647 (quoting Stoneridge, 552 U.S. at 161); see also id. (invocation of the fraud-on-the-market presumption of reliance as to Clifford Chance precluded because "we cannot materially distinguish the facts in this case from those in Stoneridge").  See also Pugh v. Tribune Co., 521 F.3d 686, 696-87 (7th Cir. 2008) (private cause of action not stated where executive had no role in preparing or disseminating company's financial statements or press releases, and it was not alleged that the company's investors were informed of his false certification).

 Plaintiffs suggest that the Affiliated Ute presumption of reliance is applicable here: "Investors can be said to have relied on an insiders' deceptive acts where that insider had a duty to disclose all material information."  Pls. Br., Doc. No. 699 at 19-20.  This presumption of reliance "is generally applicable only when material information is withheld from investors by a defendant having an affirmative duty of disclosure."  DVI, 639 F.3d at 631 n.10 (citing Affiliated Ute, 406 U.S. at 153-54); Stoneridge, 552 U.S. at 159); see also id. at 643 n.30 (discussing the unsuccessful assertion of such a duty to disclose against Clifford Chance).

The proposed duty to disclose is also without merit.  "Silence, absent a duty to disclose, is not misleading under Rule 10b-5."  Basic, Inc., 485 U.S. at 239 n.17.  Generally, "an affirmative duty arises only when there is insider trading, a statute requiring disclosure, or an inaccurate, incomplete, or misleading prior disclosure."  Winer Family Trust v. Queen, 503 F.3d 319, 329 (3d Cir. 2007) (citing Oran v. Stafford, 226 F.3d 275, 285-86 (3d Cir. 2000)).  See also DVI, 249

F.R.D. at 218 ("<u>Affiliated Ute</u> presumption is equally inapplicable because Clifford Chance owed

no duty of disclosure to DVI's investors") (citing <u>Stoneridge</u>, 552 U.S. at 159)), <u>aff'd</u>, 639 F.3d

at 629, 643 n.30.))  No affirmative duty to disclose was ever pled.  No applicable statute or case

law is cited to support such a finding that Cady owed a duty to disclose information to investors.

      Moreover, the Plaintiff investors have not submitted evidence of individualized reliance

on Cady's statements or conduct.  Each Plaintiff investor must prove "reliance on a fraudulent

material misrepresentation or omission," <u>Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.</u>,

259 F.3d 154, 174 (3d Cir. 2001).  This  includes proof that each was "aware of, and directly

misled by, an alleged misrepresentation," <u>Semerenko v. Cendant Corp.</u>, 223 F.3d 165, 178 (3d

Cir. 2000), and that such statement or conduct caused each "to engage in the transaction in

question," <u>Newton</u>, 259 F.3d at 174 (citations and internal quotation marks omitted).

      Perhaps in recognition of shortcomings in the proofs, Plaintiffs submit that Cady

"adopted" DVI's financial statements and therefore made false representations to the public.  Pls.

RSOF ¶ 11; <u>see</u> Pls. Add'l Facts, ¶¶36-38; Pls. Br., Doc. No. 699 at 18-19.  The primary support

for this assertion is Cady's signature on the November 12, 2002 certification.  Once again, this is

a position without merit.  The record shows that the certification was addressed to DVI's

executives – O'Hanlon and Garfinkel – and members of its audit committee, and it might have

been sent to Deloitte for evaluation.  But there is no evidence that it or its contents were ever

referenced in DVI's public filings, otherwise communicated to the investing public, or publicly

attributed to Cady.  There is no evidence that Cady endorsed or "adopted" any statements

contained in the DVI's public filings as his own.

Plaintiffs say the certification falsely stated that DVI BC's reported loan loss reserves were adequate; DVI, Deloitte, or Clifford Chance used the certification in the "workaround"[9] scheme; and DVI used it to prepare its public Form 10-Q filing.  See, e.g., Pls. Add'l Facts, ¶¶ 37, 38.  Even assuming as much, which is not decided, those facts would not support a finding that Cady was the maker of statements contained in DVI's public filings:

> For purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it.  Without control, a person or entity can merely suggest what to say, not "make" a statement in its own right.  One who prepares or publishes a statement on behalf of another is not its maker.  And in the ordinary case, attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by – and only by – the party to whom it is attributed.

Janus Capital, 131 S. Ct. at 2302 & n.6 ("We draw a clean line . . . – the maker is the person or entity with ultimate authority over a statement and others are not.").  DVI was the maker of its own financial statements.  Nothing Cady did or is alleged to have done "'made it necessary or inevitable for [DVI] to record the transactions as it did.'"  Id. at 2303 (quoting Stoneridge, 552 U.S. at 161).  Moreover, even if Cady were found to be the maker of the statements contained in the certification, which is not decided, there is no evidence that it was made public or that it was ever publicly attributed to Cady.  Here, a reasonable juror could not conclude that the investing public relied on undisclosed conduct or statements made by Cady.

B.      Section 20(a) Claims

"Section 20(a) of the Exchange Act imposes joint and several liability upon one who controls a violator of Section 10(b)."  Suprema Specialties, Inc. Sec. Litig., 438 F.3d 256, 284 (3d Cir. 2006) ("plaintiff must prove that one person controlled another person or entity and that

---

[9] See footnote 8, supra.

the controlled person or entity committed a primary violation of the securities laws").  Here, it is alleged that Cady controlled DVI, and DVI committed a primary violation of the securities laws. It is not alleged that DVI BC committed a primary violation of § 10(b) or Rule 10b-5.

As previously ruled, Plaintiffs have the burden of demonstrating that Cady was a control person within the meaning of § 20(a), including proof of an essential element – that he "had actual power or influence over the allegedly controlled person," DVI.  DVI, 2005 WL 1307959, at *12 (citing In re Mobile Media Sec. Litig., 28 F. Supp. 2d 901, 940 (D.N.J. 1998)).  See 17 C.F.R. § 240.12b-2 ("The term 'control' . . . means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through ownership of voting securities, by contract or otherwise.").  As to other elements – whether Cady was a culpable participant in DVI's fraud, or whether his actions and decisions on behalf of DVI BC were legitimate business transactions made in good faith – there is no need to reach those questions.  The record does not contain threshold proof of Cady's control of DVI.

Plaintiffs say Cady should be considered a person that controlled DVI because he "was represented to DVI shareholders as an Executive Officer and Senior Vice President of DVI."  Pls. Br., Doc. No. 699 at 8 ("[b]y virtue of his high-level position with DVI").  On the ther hand, "the public's perception of the influence that job title carries has no bearing on the question whether Cady had actual power or influence over the parent company.  He did not."  Def. Br., Doc. No. 719 at 17.  The latter assertion is correct.

That Cady was held out at times as a senior vice president is not probative of his actual power to direct or cause the direction of the management and policies of DVI.  The record shows that he did not have any responsibilities in regard to the operations of DVI – nothing in the record

controverts that crucial fact.  Moreover, the assertions that Cady was "President, CEO, and Director" of DVI BC and "was a direct report to DVI's CEO, Michael O'Hanlon," with whom Cady had a "close working relationship,"[10] Pls. Br., Doc. No. 699 at at 3, 10, are also immaterial. Cady's various titles, line of reporting, and collegial relationships alone do not evidence what he actually could or did perform on behalf of DVI.

Plaintiffs say that "[b]oth Cady and DVI BC played an *integral* role in the fraudulent schemes of understating DVI's loan loss reserves and hiding liquidity problems."  Pls. Br., Doc. No. 699 at 7 (emphasis in original).  In support of these assertions, materials were submitted that largely bear on the transfer or advancement of funds between DVI FS and DVI BC – which Plaintiffs call fraudulent "round trip financing."  Id. at 7-8.  The materials might have some significance as to the role the inter-subsidiary transfers played in the fraudulent scheme allegedly committed by DVI – an issue not decided here.  Some might be germane to Cady's control of DVI BC, which is also not decided.  However, none of the submissions are probative of whether Cady had the actual power to direct or cause the direction of the management and policies of DVI, or that he actually did so at any time.

More specifically, Plaintiffs say that Cady "participated in setting loan loss reserves," and "was a member of the committee that met to establish loan loss reserves."  Pls. Br., Doc. No. 699

---

[10]  The record suggests that Michael O'Hanlon made the final decisions at DVI:

Another example of the dominant nature of O'Hanlon's personality was his stated insistence that he have "the final say" on whether a loss should be recognized on problem or delinquent accounts.  Virtually every person connected with this process describes O'Hanlon as having the ultimate decision making power in this regard.

Report of Chapter 11 Examiner R. Todd Neilson, In re DVI, Inc., et al., No. 03-12656(MFW), Def. Reply Br., Ex. D, Doc. No. 719-6 at 3-4.

at 3, 9 (citing Pls. Add'l Facts ¶¶ 28, 31-35).  And he "was a member of the workout committee for troubled loans."  Id. at 3.  They also say that Cady "was in charge of implementing the scheme to under-report loan loss reserves and hide liquidity problems."  Id. at 9 (citing Pls. Add'l Facts ¶¶ 31-40).  To the extent these assertions find support in the record, they describe Cady's actions on behalf of DVI BC, not DVI.  As but one example, Cady made initial recommendations on loss reserves for DVI BC loans, which were then reviewed by Deloitte and others.  See Def. R. Add'l Facts ¶ 31.  Otherwise, the assertions are wholly unsupported.  In particular, there is no evidence that Cady determined the amount of DVI's loan loss reserves or that he implemented any plan to under-report DVI's loan loss reserves and hide its liquidity problems.

Plaintiffs say that Cady's signature on the November 12, 2002 certification demonstrates his "status as a control person" of DVI.  Pls. Br., Doc. No. 699 at 8 (citing Add'l Facts ¶¶ 36-38).  "Without Cady's signature on this certification, DVI would have [been] required to disclose Deloitte's material weakness letter and, more importantly, Deloitte, DVI and Clifford Chance would not have been able to carry out their workaround scheme."  Id. at 8-9; see also id. at 3, 10 ("he had to power to prevent the workaround scheme by refusing to sign his certification"), 12 ("without Cady's signature, DVI would have been required to disclose Deloitte's material weakness letter and the workaround could not have successfully transpired").

This argument is speculation imbued with wishful thinking – and it distorts the record.  Saying so is not enough.  No reasonable juror could conclude that because Cady signed the certification he had the actual power to direct or cause the direction of the management and policies of DVI, or that he actually did so at any time in regard to the alleged workaround.

IV.    <u>CONCLUSION</u>

Cady cannot be held liable under § 10(b) or Rule 10b-5 for allegedly participating in DVI's scheme or making any mis-statements in DVI's public filings.  He also cannot be held liable under § 20(a) as a person who controlled the alleged violator of the securities laws, DVI.

An Order accompanies this Memorandum.


BY THE COURT:

/s/ Legrome D. Davis

Legrome D. Davis, J.