# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____     :     **Case No. 2:03-CV-5336**
                                               :
**In Re DVI, Inc. Securities Litigation**      :
_____:     **Hon. Legrome D. Davis**


**LEAD PLAINTIFFS' OPPOSITION TO DELOITTE & TOUCHE LLP'S MOTION TO EXCLUDE FROM TRIAL ANY TESTIMONY FROM LEAD PLAINTIFF'S PURPORTED EXPERT CHAD COFFMAN**


Clinton A. Krislov, Esq.                Steven A. Schwartz, Esq.
Michael R. Karnuth, Esq.                Attorney I.D. No. 50579
KRISLOV & ASSOCIATES, LTD.              Kimberly M. Donaldson, Esq.
20 North Wacker Drive                   Attorney I.D. No. 84116
Chicago, Illinois   60606               CHIMICLES & TIKELLIS, LLP
Phone: 312-606-0500                     361 W. Lancaster Avenue
Fax: 312-606-0207                       One Haverford Centre
_Plaintiffs' Lead Counsel_              Haverford, PA   19041
                                        Phone:  610-642-8500
                                        Fax:  610-649-3633
                                        _Plaintiffs' Liaison Counsel_


Dated:  September 23, 2013

## TABLE OF CONTENTS

I.    **BACKGROUND** ........................................................................................4

    A.    **The Court's September 3, 2010 Order Denied, in part, Deloitte's Motion to Exclude Mr. Coffman's Testimony and Denied, in part, Deloitte's Motion for Summary Judgment on Loss Causation** ................................................................................4

    B.    **The Court's January 4, 2013 Order Denied Lead Plaintiffs' Motion for Partial Reconsideration of the September 3, 2010 Order** ....................................................................................................9

    C.    **The Court's January 4, 2013 Order Denied Deloitte's Motion for Interlocutory Appeal** .........................................................................10

    D.    **The Court's February 19, 2013 Order Allowing Deloitte to Substitute Its Retained Expert, Terry Musika** .....................................11

    E.    **The Court's June 27, 2013 Decision in the <u>WMHY</u> Case** ...................12

II.    **ARGUMENT** ............................................................................................13

    A.    **Deloitte is Precluded From Revisiting Issues Already Decided** ...............................................................................................14

    B.    **Mr. Coffman Evaluated and Opined on Whether Disaggregation of Non-Fraud Factors was Necessary for Each Loss Event Date** ..............................................................................15

    C.    **Apportioning Causation and Damages Among Defendants is Not Necessary at This Stage But Can Be Further Opined On by Plaintiffs' Experts, if Necessary** ...................................................24

        1.    **Expert Opinion on Apportioning Liability and Damages is Unnecessary** ...............................................................24

        2.    **Plaintiffs' Experts Established that a High Level Of Liability Should be Apportioned to Deloitte and Will Provide Further Testimony if Deemed Necessary And as Instructed by the Court** ...................................................30

III.    **CONCLUSION** ......................................................................................33

Deloitte & Touche LLP ("Deloitte") improperly submits a second motion to exclude testimony of Lead Plaintiffs' Loss Causation expert, Mr. Chad Coffman.  Deloitte's motion raises the same two arguments – that Mr. Coffman failed to disaggregate non-fraud factors on certain event dates and failed to apportion causation/damages among defendants – that it made (and/or could have made) in its April 30, 2009 Motion to Exclude Mr. Coffman (Dkt# 686 & 690) and in its April 30, 2009 Motion for Summary Judgment on Loss Causation (Dkt# 685 & 691); *see also* Memorandum of Law in Support of Deloitte & Touche LLP's Motion for Summary Judgment, at 6 & 14 (Dkt# 689) ("D&T SJ Mem. __").  The Court disregarded these arguments in its September 3, 2010 decision.  *See generally* In re DVI, Inc. Sec. Litig., 2010 WL 3522090 (E.D. Pa. Sept. 3, 2010) ("DVI I").

On January 4, 2013, this Court reaffirmed its September 3, 2010 ruling in denying Plaintiffs' Motion for Partial Reconsideration of the Court's September 3, 2010 decision,  *see* In re DVI, Inc. Sec. Litig., 2013 WL 56083 (E.D. Pa. Jan. 4, 2013) ("DVI II"), and also in denying Deloitte's Motion for Interlocutory Appeal, In re DVI, Inc. Sec. Litig., 2013 WL 56071, at *1 (E.D. Pa. Jan. 4, 2013) ("DVI III") ("Although Deloitte apparently disagrees with the outcome, the ruling that triable disputes exist applied governing Supreme Court and Third Circuit precedent.") (citations omitted).

Deloitte provides no valid reason for this Court to revisit or modify those decisions. Deloitte's reliance on this Court's decision in WM High Yield Fund et al. v. O'Hanlon et al., 2013 WL 3230667 (E.D.Pa June 27, 2013) ("WMHY"), is unavailing.  As grounds for denying the WMHY plaintiffs' collateral estoppel request to extend this Court's September 3, 2010 and January 4, 2013 rulings in this case to that case, Deloitte argued and this Court agreed that the claims and record presented in the WMHY case were materially different than those presented in

this case.  Indeed, in its <u>WMHY</u> ruling, this Court reaffirmed its rulings in this case and noted

material distinctions with the <u>WMHY</u> case.  <u>Id.</u> at *2 fn11 ("In *DVI*, 2010 WL 3522090, at *22-

23, the rulings that triable disputes exist as to certain disclosures were based on the ***more fully***

***developed record in that case – including expert reports submitted by both sides***.") (emphasis

added).  The <u>WMHY</u> plaintiffs' failure to submit expert reports on causation and damages, and

their otherwise woefully undeveloped and inadequate record makes the findings and conclusions

reached in that case completely inapposite.

     Moreover, on the merits Deloitte's motion is unfounded.  Deloitte's motion is an attempt

to distract from the compelling record which Lead Plaintiffs and their counsel developed in this

case, which establishes Deloitte's knowledge of and participation in the massive, understated

loan loss and liquidity frauds.  At summary judgment, this Court found, after reviewing

undisputed evidence, that "Deloitte knew that DVI was engaged in 'aggressive and creative

accounting practices' in an effort to understate its loan loss reserves [and] … to conceal the

amount of delinquencies it publicly reported and to improperly inflate its income." <u>DVI I</u>, 2010

WL 3522090, at *2-3. Coupled with its extensive evaluation of the loss causation standards and

evidence submitted, the "Court f[ound] that Plaintiffs … created a genuine issue" of disputed

fact on loss causation and damages regarding certain DVI securities price drops from September

2002 through August 13, 2003.  <u>DVI I</u>, 2010 WL 3522090, at *25.

     At summary judgment, Deloitte's experts did not offer valid, non-fraud explanations for

the losses Mr. Coffman estimated DVI investors incurred on the event dates which this Court

allowed to proceed to trial.  *See* Coffman Report (dated October 1, 2008) at ¶¶63-87 & Ex. 17

attached thereto (Ex. 1); Coffman Rebuttal Report (dated December 17, 2008) at ¶¶5-33 (Ex. 2).[1]

---

[1]     Separate from his evaluation of event date disclosures, Mr. Coffman explained his calculation of
"event-based inflation" (Coffman Rpt. ¶¶89-90 & Exs. 18 and 19, and Appdx. C attached thereto;

Deloitte, however, uses its new, substitute expert, Mr. Neil Demchick, to contend for the first time (in contravention of this Court's February 19, 2013 Order)[2] that Mr. Coffman fails to consider revelations of DVI's inability to refinance its senior notes and DVI's deteriorating international loan portfolio, as confounding factors.  These new arguments are both improper and unfounded (and Lead Plaintiffs will be filing, in accordance with this Court's September 9, 2013 Order, a Motion to Strike and Exclude Mr. Demchick's testimony).  Notably, these two purported confounding factors only affect a few days of the several event days that remain.

Notwithstanding the foregoing, Mr. Coffman's Rebuttal to Mr. Demchick confirms that he did evaluate each disclosure date and justifiably concluded, as have courts confronted with similar facts, that no material, non-fraud factors existed or need to be disaggregated.  *See, e.g.*, Liberty Media Corp. v. Vivendi, 923 F. Supp. 2d 511, 520 (S.D.N.Y. 2013) (denying defendant's motion for judgment as a matter of law after jury agreed with plaintiff's expert that "there were simply no confounding events").  *See* Rebuttal Report of Chad Coffman to the Report of Mr. Neil Demchick ("Coffman Substitute Rebuttal"), at ¶¶47-55 (Ex. 3).  This Court should therefore reject Deloitte's gamesmanship of using a tragic loss of its expert as a strategic opportunity to reintroduce failed arguments.

Furthermore, expert testimony is not required on apportioning damages among defendants.  This Court already found the evidence supports Deloitte's knowledge of the frauds, thus, apportioning liability is unnecessary because a jury will likely find Deloitte jointly and

---

Coffman Rebuttal ¶¶34-36 & Ex. R1 attached thereto) and event-based damages (Coffman Rpt. ¶¶ 91-98, 100-102 & Exs. 20-23 attached thereto).

[2]     The Court's February 19, 2013 Order "limited" Mr. Demchick's testimony "to the topics upon which Mr. Musika previously opined.  Dkt#862.  This Order also expressly provides Plaintiffs an opportunity to strike and exclude Mr. Demchick's testimony, as an opportunity to do so previously did not arise because Deloitte did not rely on Mr. Musika's testimony in its Motion for Summary Judgment on Loss Causation.  The Order does not, however, provide Deloitte leave to rehash arguments or otherwise again challenge Mr. Coffman's testimony.

severally liable.  DVI I, 2010 WL 3522090, at *2-4; 15 U.S.C. 78u-4(f)(2)(A).  But even if a jury

were to find Deloitte was only reckless and, thus, apportioning liability and damages is necessary

15 U.S.C. 78u-4(f)(2)(B)-(3), ample evidence exists to support placing a high percentage of

responsibility on Deloitte.  There is no reason that a jury cannot determine the proper percentage

of fault to assign Deloitte based on the evidence at trial.  Expert opinion is not needed on every

issue in a case and this particular issue does not involve matters only experts can opine, as

caselaw cited herein shows. Indeed, Deloitte points to no accepted standard that experts rely on

to apportion damages among defendants in a securities fraud case.

But, in the event such a standard exists and/or the Court believes that additional expert

testimony is needed on apportioning liability and/or damages among defendants, Lead Plaintiffs'

experts would submit supplemental declarations on these topics, as directed by the Court.  Any

such declaration would not be inconsistent with testimony already proffered by Plaintiffs'

experts and therefore Deloitte would not be prejudiced by such a submission.

## I.      BACKGROUND

Relevant portions of the Court's September 3, 2010 and its two January 4, 2013 decisions

on loss causation/damages in this case, its February 19, 2013 Order granting Deloitte's Motion to

Substitute Expert, and its June 27, 2013 decision in the WMHY case, are set forth below.

### A.  The Court's September 3, 2010 Order Denied, in part, Deloitte's Motion to Exclude Mr. Coffman's Testimony and Denied, in part, Deloitte's Motion for Summary Judgment on Loss Causation.

After considering extensive briefing and evidence submitted by Lead Plaintiffs on

Deloitte's Motion for Summary Judgment on Loss Causation and on the parties' cross-motions

to exclude loss causation and damages expert testimony, this Court denied in part Deloitte's

motions and allowed Lead Plaintiffs' loss causation and damages expert, Mr. Chad Coffman, to

testify at trial on a number of specific loss event dates.  In re DVI, Inc. Sec. Litig., 2010 WL

3522090, at *1 (E.D. Pa. Sept. 3, 2010) ("DVI I") (identifying the numerous briefs considered by

the Court, including Reply, Surreply and Supplemental Authority briefs).

      In rejecting Deloitte's argument that Mr. Coffman's entire event study should be

excluded, the Court concluded that "Defendant's argument is based on its untenable position that

the Third Circuit requires 'an actual disclosure of the very facts Defendant allegedly

misrepresented.'"  Id. at *12 (plaintiff must instead "show that the defendant misrepresented or

omitted the very facts that were a substantial factor in causing the plaintiff's economic loss").

The Court further stated:

> Despite Defendant's effort to convince the Court otherwise, to be
> corrective, the disclosure need not precisely mirror the earlier
> misrepresentation. … If a fact-for-fact disclosure were required to
> establish loss causation, a defendant could defeat liability by
> refusing to admit the falsity of its prior misstatements. … Nor does
> the disclosure have to be a single, unitary disclosure. … If a
> complete disclosure were required, defendants could immunize
> themselves with a protracted series of partial disclosures. …
> Instead, the truth may be revealed through a series of partial
> disclosures through which the truth gradually leaks out. …
>
> … the market does not have to learn of possible fraud from the
> company itself, but may be informed by 'whistleblowers, analysts
> questioning the financial results, resignation of CFOs or auditors,
> announcements by the company of changes in accounting
> treatment going forward, newspapers and journals, etc.

DVI I, at *5-6 (prefacing the foregoing with "[t]he Third Circuit adopts a practical approach to

loss causation, in effect applying general causation principles")[3] (internal citations omitted).

---

[3]    Further rejecting Deloitte's proposed loss causation standards, the Court stated:  "In its Motion for Summary Judgment, Defendant asserts that the McCabe standard requires an 'actual disclosure of the very facts' defendant allegedly misrepresented, (see Def. Mot. Summ. J. 10, 11); however this is a blatant mischaracterization of the McCabe standard, which does not make reference to the types of disclosures required."  Id. at *5 fn9; see also id. at *14 ("Defendant's arguments are based largely on its incorrect position that the Third Circuit requires an actual disclosure of the very facts Defendant allegedly misrepresented, or a sufficiently specific disclosure of previously omitted or misrepresented facts.").

The Court also recognized "a slightly different" causation standard that other courts, including the Second Circuit and other "district courts in this circuit," have applied, the "materialization of the concealed risk standard."  Id. at *7.  The Court stated:

> Under this standard, to establish loss causation, a plaintiff must prove that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security.  This requires a plaintiff to prove both that the loss was forseeable *and* that the loss was caused by the materialization of the concealed risk.

Id. (citations omitted).

The Court considered Deloitte's "Motions" … "[w]ith the [foregoing] loss causation principles in mind" and "f[ou]nd that a genuine issue of fact exists with regard to whether the very facts omitted by Defendant were a substantial factor in causing Plaintiffs' economic loss." Id. at *7 (internal citations omitted).  In rendering its decision, the Court found Mr. Coffman's "event study methods … isolate days where DVI's stock and bond values had statistically significant declines, [removed market and industry factors],[4] and then consider[ed] firm-specific events that may have caused these declines."  Id. at *13 (citing Coffman Report ¶¶55, 56, 61, 62).  In evaluating Mr. Coffman's identified disclosure events, the Court noted that he defined "partial corrective disclosure[s]" as "DVI specific news that brings the market closer to the realization that DVI had sustained massive hidden loan losses, was in financial distress, and has engaged in accounting improprieties."  Id. (also recognizing Mr. Coffman's description of partial disclosures as "reveal[ing] 'symptoms' of the fraud that was disguised in DVI's financial statements, including greater delinquencies, increased leverage, increased write-offs of bad

---

[4]    Mr. Coffman found that "[a]fter September 12, 2002, DVI's stock price declines from $13.93 to $0.30 per share as of the day after the end of the Class Period on August 13, 2003, [could] not be explained by general market forces."  Coffman Rpt. ¶¶19, 21-24, 56-57 & Exs. 3-7, 15 attached thereto (explaining his analyses which controlled for DVI's underlying industry, broad market indices and financial companies); id. at ¶27 & Ex. 9 attached thereto (making similar conclusion with respect to DVI's Senior Notes).

6

loans, DVI's underperformance in a thriving industry, lack of cash flow, and a weak operating performance which resulted in a downgraded credit rating.") (citing Coffman Report ¶62 & Coffman Rebuttal Report ¶¶11-16; Coffman Dep. 106:11-13:18).  The Court found that "Mr. Coffman['s] … event study methodologies are reliable and admissible" and allowed several event dates to be presented at trial.[5]  Id. at *14 & 23 ("In light of the loss causation standard articulated in Section II, and upon reviewing the evidence presented by the parties, this Court finds that genuine issues of material fact remain in dispute with regard to whether Plaintiffs have satisfied loss causation.").

The Court also ruled that Deloitte may be found "jointly and severally" liable for damages, and that a "jury" will determine the amount of damages.  Id. at *14 fn26 ("[T]he actual amount of damages have not yet been adjudicated in this case.  Moreover, pursuant to 15 U.S.C. §78u-4(f)(2)(A), if a jury finds Defendant in violation of §10(b), Defendant is liable for damages jointly and severally.").[6]

Significantly, the Court considered the same arguments Deloitte raised back then, as it does now, that Plaintiffs failed to disaggregate non-fraud factors from any of the event dates.

---

[5]       The dates the Court allowed are: September 24, 2002, September 26, 2002, September 27, 2002, June 4, 2003, June 27, 2003, July 1, 2003, August 1-4, 2003,  August 5, 2003 and August 6-14, 2003.  Id. at *15-23.  See also, id. at *25 ("With respect to [these] disclosures identified above, this Court finds that Plaintiffs have created a genuine issue as to whether the very facts misrepresented by Defendant in its audit of DVI's 10-Ks … were a substantial factor in causing Plaintiffs' economic loss."); and id. at 12 fn23 ("Contrary to Defendant's argument, Mr. Coffman's event study theory attributes the declines in securities prices to partial disclosures that reveal symptoms of the alleged fraud, and not just weak business performance.  As described below, to the extent that Mr. Coffman's event study attributes price declines to disclosures that reveal nothing more than the true financial condition of DVI, those portions of his report are excluded as irrelevant.").  The Court excluded as a matter of law four event dates: September 25, 2002, May 13, 2003, June 5-6, 2003 and July 16, 2003.
[6]       In support of its ruling, the Court found the "following facts [among others] are not in dispute: … Deloitte knew that DVI was engaged in 'aggressive' and 'creative' accounting practices in an effort to understate its loan loss reserves, including rewriting loans to avoid reporting them as delinquent, overadvancing on loans in order for customers to repay other delinquent loans, transferring delinquent loans to other obligors who had insufficient capital to service the debt, and repurchasing delinquent loans from securitizations."  Id. at *2-4 (citations to the record omitted).

D&T SJ Mem. (Dkt.#689) at 16 fn5 (arguing without support that DVI's disclosure of its

"intention to file for bankruptcy" was not fraud-related and must be disaggregated); Deloitte's

Reply to Lead Plaintiffs' Memorandum of Law in Opposition to Deloitte's Motion for Summary

Judgment, at 20 fn19 (Dkt#724) ("D&T SJ Reply Mem. __") (arguing generally and without

support that Plaintiffs failed to "disaggregat[e] … confounding factors"); and Deloitte's

Memorandum in Support of its Motion to Exclude Lead Plaintiffs' Loss Causation Expert Chad

Coffman (Dkt.#690), at 17 (arguing generally and without support that Mr. Coffman "fail[s] to

differentiate … between losses attributable to fraud and losses attributable to other forces").

This Court correctly disregarded Deloitte's unsupported argument.  *See generally* <u>DVI I</u>, at 2010

WL 3522090.[7]  Deloitte's current motion raises two new, purported non-fraud factors that it

could have, but failed to raise previously – i.e., DVI's inability to refinance its Senior Notes and

the deterioration in DVI's international loan portfolio.  *See* Deloitte's Second Motion to Exclude

From Trial Any Testimony From Chad Coffman (Dkt.#868, 870) ("D&T's Second Mtn to

Exclude"), at 12.  The senior notes disclosure was previously addressed in this Court's

September 3, 2010 ruling, which allowed DVI's inability to refinance its senior notes to be

included in the September 27, 2002 loss, but not the June 5-6, 2003 loss because by then it was

no longer new information.  <u>DVI I</u>, 2010 WL 3522090, at *24.[8]

---

[7]     With no outside market factors negatively affecting DVI's business, DVI's massive impaired loan
portfolio was ultimately a substantial factor in the cause of DVI's bankruptcy.  Indeed, DVI's impaired
loan portfolio adversely affected its cash flows (due to its inability to collect interest and principal) and
resulted in DVI and Deloitte misrepresenting the quality of DVI's loans in order for DVI to improperly
use such impaired loans as collateral to obtain financing.

[8]     DVI's inability to refinance its Senior Notes was a sign (and concern among investors) that its
loan portfolio (the cash flow of which was the source of repayment of its debts) was impaired.  Indeed,
during the Class Period DVI pursued but failed to obtain financing from several sources (including third-
parties who completed due diligence on DVI's portfolio), and only received a relatively small amount
from a lender, J.E. Matthews, who required collateral at several multiples of the face value of DVI's
customer loans because of the significantly impaired nature of the loans.  Amended SOF ¶57, Ex. 192
(Dkt#736).  Revelations of DVI's inability to refinance its senior notes, especially when (as one analyst
stated) the market for high yield debt was red hot, ASOF ¶90, Ex. 157, pp. 15-16  was certainly a partial

With respect to DVI's deteriorating international loan portfolio, the record shows that materially understated loan loss reserves existed in that portfolio as well as in DVI's domestic loan portfolio.  *See* Plaintiffs' Statement of Facts (Dkt#736) ("SOF ¶__") at ¶45 and Ex. 102 attached thereto (estimating a needed reserve on DVI's international loan portfolio as of June 30, 2002 of $56.4 million to $77.2 million.  Thus, revelations regarding the deterioration of DVI's international loan portfolio are fraud related and need not be disaggregated.

As to its second principle argument, Deloitte also previously argued that fault and damages needed to be apportioned among Defendants.  *See* D&T SJ Mem. (Dkt#689) at 14 ("even if these disclosures were sufficient to establish loss causation as to other Defendants, they are plainly insufficient to establish loss causation as to D&T" and "whether an auditor's alleged misstatement caused a loss must be separated from whether the issuer caused a loss") (emphasis in original); D&T SJ Reply Mem. (Dkt#724) at 18 ("Plaintiffs must make this showing of loss causation as to *each named defendant*, including D&T") (emphasis in original).  The Court disregarded these arguments also.  *See generally*, DVI I, 2010 WL 3522090.

### B. The Court's January 4, 2013 Order Denied Lead Plaintiffs' Motion for Partial Reconsideration of The September 3, 2010 Order

In denying Lead Plaintiffs' Motion for Partial Reconsideration of this Court's September 3, 2010 order excluding the September 25, 2002 loss event date, the Court stated that Plaintiffs' multi-day event "theory simply recasts evidence that was fully considered before with a new dimension of significance presented for the first time on reconsideration."  DVI II, 2013 WL 56083, at *5-6 ("the motion for reconsideration reargues previously presented matters, asserts

---

revelation of the frauds.  *See, e.g.*, Hunt v. Enzo Biochem, Inc., 530 F. Supp. 2d 580, 586-87 (S.D.N.Y. 2008) ("Constructive corrective notice occurred when events that were the subject of misrepresentation did not occur … and the stock price foreseeably dropped."); Massachusetts Ret. Sys. v. CVS Caremark Corp., 716 F.3d 229, 241-42 (1st Cir. 2013) (concluding that loss causation can be established where "[t]he price of the company's stock dropped sharply, although the market did not know the exact reason" and the company provides mixed signals that "raises concern").

arguments that could have been but were not raised before, and expresses disagreement with the September 3, 2010 decision").

In denying reconsideration of its exclusion of the May 13, 2003 loss event date, the Court likewise stated "that this is largely repetitious argument that has already been adjudicated on Deloitte's motion for summary judgment."  Id. at *7. The Court further concluded that Plaintiffs' expert "did not opine on any of the information contained in the May 13, 2003 transcript" and ruled that "Plaintiffs will not be permitted to supplement the shortcomings in their expert's reports by argument in their briefs after the close of discovery and an adverse ruling."  Id. at *8 ("If Plaintiffs were allowed to do so, the prejudice to Deloitte would be obvious.").

The Court, however, also reaffirmed its September 3, 2010 ruling allowing the other loss event dates to proceed to trial.  Id. at *1 fn3 ("The September 3, 2010 decision ruled that disclosures made on Sepember 24, 26 and 27, 2002, as identified by Coffman, present genuine issues of material fact with regard to whether they revealed the truth about Defendant's alleged misstatements as to DVI's financial statements.").

### C.   The Court's January 4, 2013 Order Denied Deloitte's Motion for Interlocutory Appeal.

In denying Deloitte's Motion for Interlocutory Appeal seeking review of the Court's application of loss causation standards to Mr. Coffman's Event Study, the Court stated:

> …Although Deloitte apparently disagrees with the outcome, the ruling that triable disputes exist applied governing Supreme Court and Third Circuit precedent.  *See DVI*, No. 03-5336, 2010 WL 3522090, at *5-6, 11 & n. 25, 14, 23-25 (citing inter alia *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342-43, 347 (2005); *McCabe v. Ernst & Young LLP*, 494 F.3d 418, 424, 426, 433, 436 (3d Cir. 2007); *Semerenko v. Cendant Corp.*, 223 F.3d 165, 184-85 (3d Cir. 2000)).

> … Inasmuch as the materialization of risk approach was taken into consideration when reviewing the disclosures at issue, *see DVI*,

> 2010 WL 3522090, at *7 n.12, 12 n.25, genuine issues of material
> fact remain under both standards of loss causation – requiring
> proof as to whether these partial disclosures revealed the truth as to
> Deloitte's alleged understatement of DVI's loan loss reserves in
> connection with DVI's liquidity crises and whether those events
> might be found to be 'materializations of the concealed risk.' *In re
> Vivendi Universal, S.A. Sec. Litig.*, 634 F. Supp. 2d 352, 365
> (S.D.N.Y. 2009) (quoting *Lentell v. Merrill Lynch & Co., Inc.*, 396
> F.3d 161, 173 (2d Cir. 2005)).

<u>DVI III</u>, 2013 WL 56071, at *1-2.

**D.  The Court's February 19 , 2013 Order Allowing Deloitte to Substitute Its
Retained Expert, Terry Musika.**

After considering the parties' briefs on Deloitte's request to designate a substitute expert

due to the death of Mr. Terry Musika, the Court granted Deloitte's motion, stating:

> The testimony of the expert so designated **shall be limited** to the
> topics upon which Mr. Musika previously opined.
> ***
> Issues of causation and damages will be the subject of expert
> testimony by both parties at trial.  The opportunity for cross-
> examination and observation of the demeanor of witnesses as to
> those issues are of paramount importance here.  The jury should be
> informed by the direct testimony of each side's experts as well.
> ***
> … Upon conclusion of the limited discovery permitted here, an
> appropriate motion to exclude the testimony of Defendant
> Deloitte's newly designated expert may be filed.

February 19, 2013 Order (Dkt#862) (emphasis added).

The Court's order gave Deloitte the opportunity to present a live witness at trial, to the

extent the testimony survives Plaintiffs' soon to be filed "motion to exclude."  The order did not,

however, give Deloitte leave to reopen issues already raised and decided, or otherwise give

Deloitte an opportunity to again challenge Mr. Coffman.

11

**E.  The Court's June 27, 2013 Decision in the <u>WMHY</u> Case**

In the individual opt-out case filed by certain DVI Senior Noteholders, this Court ruled

that "**the record**" in that case did not contain sufficient evidence showing loss causation or

damages.  <u>WMHY</u>, 2013 WL 3230667, at *2 (emphasis added).  This Court importantly noted

that numerous, material distinctions exist between the <u>WMHY</u> record and the record developed

in this case, including, but not limited to: (1) the failure of the <u>WMHY</u> plaintiffs to retain a loss

causation and damages expert, <u>id.</u> at *1, 11 ("Plaintiffs did not designate experts on loss

causation and damages" and "disclaim any requirement for expert opinion on these issues"); (2)

the <u>WMHY</u> plaintiffs' causation/damages theory was not supported by an event study or

application of the partial corrective disclosure or materialization of the concealed risk standards

because the <u>WMHY</u> plaintiffs contended that no disclosures existed prior to DVI's bankruptcy,

and that "DVI's rapid collapse into bankruptcy liquidation removed any requirement to prove

loss causation," <u>id.</u> at *2, 5-6; and (3) the <u>WMHY</u> plaintiffs' damages theory sought their entire

"loss of principal and interest on their investments," but only provided vague support for how

much they actually lost, and made "no attempt … to isolate from the alleged investment losses

any portion of the Notes' price decline that might have been caused by external market forces

and DVI-specific or industry-specific facts, conditions, or other events unrelated to the alleged

fraud.").  <u>Id.</u> at 7, 10, 12 (citing deposition testimony of the <u>WMHY</u> plaintiffs' investment

advisor in noting that plaintiffs estimated damages at "somewhere approaching $20 million," but

asserted "attorney-client privilege" for not producing written damage calculations, and being

unable to reconcile two inconsistent documents it did produce reporting plaintiffs' DVI trades,

but which did not "reflect the number of Notes traded, or any gain or loss realized" or attribute

12

the $20 million loss estimate to any "specific transaction" or "apportion[] among the various transactions").

Importantly, this Court's <u>WMHY</u> opinion did not draw any parallels between the <u>WMHY</u> plaintiffs' loss theory and support (or lack thereof) and Plaintiffs' loss theory and ample support in this case, and actually rather reaffirmed its opinions in this case. *See* <u>id.</u> at *2 ("That [Class Action] decision denied Deloitte's motion for summary judgment, ruling that triable disputes existed as to whether certain partial disclosures identified by the plaintiffs' expert revealed the truth about Defendant [Deloitte's] alleged misstatements as to DVI's financial statements."). Indeed, this Court did not suggest that its <u>WMHY</u> ruling affected its decisions in this case.

Deloitte itself relied on the material distinctions between the records in the two cases to successfully bar collateral estoppel from applying the "rulings in [this case] to [the <u>WMHY</u> case], which this Court agreed in granting summary judgment in Deloitte's favor." <u>Id.</u> at *2 fn11 ("the rulings that triable disputes exist as to certain disclosures were based on the **more fully developed record in that case** – including expert reports submitted by both sides.  Those rulings finally decided only that a trial on genuinely disputed factual issues was necessary.  They cannot be excised from the record in *DVI* and imported wholesale into this case – the alleged misrepresentations, the disclosures at issue, and the methods of calculating damages are not the same as those presented here.") (citing Deloitte's brief "detailing the differences between *DVI* [Class Action] as compared to the present [<u>WMHY</u>] case").

## II.   ARGUMENT

Deloitte's exposition of the <u>Daubert</u> standards (D&T Second Mtn to Exclude, Dkt#870, at 6-7) omits several important factors, including the Third Circuit's strong preference for the admissibility of expert testimony under Federal Rule of Evidence 702.  *See, e.g.*, <u>Kannankeril v.</u>

Terminix Intern., Inc., 128 F.3d 802, 806 (3d Cir. 1997) (reversing exclusion of plaintiff's expert on causation).  Additionally, "[a]s long as an expert's scientific testimony rests upon good grounds, based on what is known, it should be tested by the adversary process--competing expert testimony and active cross-examination -- rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies."  U.S. v. Mitchell, 365 F.3d 215, 244 (3d Cir. 2004).  If an expert's testimony is within "the range where experts might reasonably differ," the jury, not the trial court, should be the one to decide among the conflicting views of different experts.  Kumho Tire Co. v. Carmichael, 526 U.S. 137, 153 (1999).

Applying the appropriate standards to Mr. Coffman's opinions in this case requires denial of Deloitte's motion.

### A.  Deloitte Is Precluded From Revisiting Issues Already Decided.

In denying Lead Plaintiffs' Motion for Partial Reconsideration of the Court's September 3, 2010 ruling, seeking reconsideration on two of the four excluded loss event dates, the Court ruled that "the motion for reconsideration reargues previously presented matters, asserts arguments that could have been but were not raised before, and expresses disagreement with the September 3, 2010 decision."  DVI II, 2013 WL 56083, at *5-6).  Deloitte should likewise be precluded from revisiting issues that it did or could have raised at summary judgment.  *See, e.g.*, Ross v. Baldwin Cnty. Bd. of Ed., 2008 WL 820573, at *6 (S.D. Ala. Mar. 24, 2008) ("declin[ing] to … revisit legal issues [submitted in trial briefs which were] previously argued before and decided by Judge Butler … in his summary judgment order"); Disability Advocates, Inc. v. Paterson, 2009 WL 1312112, at *2 (E.D.N.Y. May 8, 2009) ("This trial, occurring nearly six years after DAI filed this action, will resolve disputed issues of fact.  It will not be an opportunity for Defendants to present additional or different evidence than was before the Court

14

on the motion for summary judgment … on issues this court already decided."); Tufo's Wholesale Dairy, Inc. v. CNA Financial Corp., 2005 WL 3311997, at *4 (S.D.N.Y. Dec. 5, 2005) (denying motion for reconsideration and petition for interlocutory appeal, stating: "CNA seeks to relitigate issues already decided in this Court's March 2005 Decision and Order denying summary judgment" and rejecting contention that court "overlooked" arguments); Garraway v. Newcomb, 154 Fed. Appx. 258 (2d Cir. 2005) (affirming denial of motion for reconsideration where party merely sought "to do no more than relitigate issues already decided, while he sought to introduce some new evidence … available to him at the time of the original summary judgment").  Rather, the issues of disaggregation and apportionment among defendants, that Deloitte reargues here, should be decided by a jury.  See, e.g., Eischeid v. Dover Const. Inc., 265 F. Supp. 2d 1047, 1058 (N.D. Iowa June 2, 2003) ("The appropriate method of determining the percentage of fault was to assign that question to the jury."); In re Ntl. Smelting of New Jersey, Inc. Bondholders' Litig., 722 F. Supp. 152, 177 (D. N.J. 1989) ("we have held that the judgment the plaintiff receives at trial will be reduced only by that proportion which the *jury assigns* as [the settling defendant's] appropriate share of the total damages") (emphasis added).

### B.   Mr. Coffman Evaluated And Opined On Whether Disaggregation Of Non-Fraud Factors Was Necessary For Each Loss Event Date.

Deloitte's contention that Mr. Coffman failed to disaggregate from estimated losses the effect of news related to DVI's "international loan exposure" and its "need to refinance debt" (D&T Mem. 2-3, 12-13), is a new argument never previously raised by Deloitte.  On that basis alone, it should be disregarded.  See, e.g., DVI II, 2013 WL 56803, at *8 ("[Deloitte] will not be permitted to supplement the shortcomings in their expert's reports by argument in their briefs after the close of discovery and an adverse ruling.  If [Defendant] w[as] allowed to do so, the prejudice to [Plaintiff] would be obvious.").  But even on its merits the argument fails, as these

15

disclosures relate to the fraud (*see* §I.A., *infra*) and this Court already ruled on each of the event dates in Mr. Coffman's event study and found genuine issues of material fact exist to present to a jury.  DVI I, 2010 WL 3522090, at *7 and 23; *see also* DVI II, 2013 WL 56083, at *1 fn3; and DVI III, 2013 WL 56071, at *1-2.  Mr. Coffman's Rebuttal to Deloitte's substitute expert, Neil Demchick, confirms his prior opinion that disaggregation is not necessary on the dates this Court allowed to proceed to trial because the remaining losses were fraud related and no material, non-fraud confounding information exists.  Coffman Substitute Rebuttal at ¶¶47-55 (Ex. 3).[9]  It is not uncommon for losses on event days to not require disentanglement of non-fraud factors because after stripping away industry and market factors (as Mr. Coffman undisputedly did), material, company-specific non-fraud factors do not exist.  *See, e.g.*, U.S. v. Gushlak, -- F.3d --, 2013 WL 4558747, at *15 (2d Cir. Aug. 29, 2013) ("the district court had a factual basis for concluding that there were no company-specific disclosures concerning non-fraudulent information that would have affected GlobalNet's stock price. … [The government's expert] plausibly quashed the notion that [two possible non-fraud disclosures] would have affected the market price in any relevant way."); Rmed Intl., Inc. v. Sloan's Supermarkets, Inc., 2000 WL 310352, at *4 (S.D.N.Y. Mar. 24, 2000) (denying motion to exclude plaintiffs' damages expert where expert opined that after excluding market and industry affects class period losses were caused entirely by the fraud); Liberty Media Corp. v. Vivendi Univ., S.A., 923 F. Supp. 2d 511, 520 (S.D.N.Y. 2013) (denying judgment as a matter of law after jury agreed with plaintiff's expert that "there were simply no confounding events during the nine days on which [plaintiff's expert] identified materialization events.").

---

[9]     Mr. Coffman also points out that "[t]his is a new argument introduced by Mr. Demchick as Mr. Musika discussed the general topic of alternative, superseding causes for illiquidity (his 'superseding events'), but did not discuss confounding information on the specific Corrective Disclosures."  Coffman Substitute Rebuttal, ¶47.  Mr. Demchick's opinion on this area is one of the subjects of Plaintiffs' separately filed Motion to Strike and Exclude Mr. Demchick's testimony.

Deloitte's argument is, at most, a rehashed dispute as to the proper interpretation of the event disclosures in this case, which is ultimately a fact question for the jury to decide. *See, e.g.*, Gould v. Winstar, 692 F.3d 148, 161-62 (2d Cir. 2012) (reversing summary judgment for auditor on loss causation because "the downgrade in Winstar's credit rating [which] resulted in a substantial decline in the stock price" did not "foreclose the reasonable inference that some part of the decline was substantially caused by the disclosures about the fraud itself"); Liberty Media Corp., 923 F. Supp. 2d at 519 ("[plaintiff's expert's] testimony was not inadmissible simply because it took an aggressively skeptical view of the significance of non-fraud-related news of the nine materialization days, any more than [defendant's expert's] testimony was inadmissible because of his equally aggressive but opposite interpretation of potential confounding events. The weighing of the experts' conflicting testimony was a matter for the jury"); Huberman v. Tag-It Pacific, Inc., 314 Fed. Appx. 59 (9th Cir. 2009) (reversing summary judgment dismissal and allowing jury to decide whether defendant's press releases disclosing its "deteriorating financial condition" was related to the "alleged fraudulent conduct" and "was a substantial cause of [plaintiff's] loss"); In re Cooper Sec. Litig., 691 F. Supp. 2d 1105, 1116 (C.D. Cal. 2010) (denying defendants' motion for summary judgment where parties' experts "disputed … whether the statements caused artificial inflation to continue to be incorporated into the stock price, as opposed to revealing the truth, which allegedly would have caused the stock price to fall."). And, even if a non-fraud factor possibly caused part of plaintiffs' losses (which Deloitte has not shown to be the case) that does not bar plaintiffs' recovery. *See* Semerenko v. Cendant Corp., 223 F.3d 165, 186-87 (3d Cir. 2000) ("So long as the alleged misrepresentations were a substantial cause of the inflation in the price of a security and in its subsequent decline in value, other contributing forces will not bar recovery.").

Deloitte's heavy reliance on the Court's <u>WMHY</u> decision is misplaced as explained *infra* §I.E.  Deloitte's other cited cases, many of which were addressed or available during summary judgment, are factually distinguishable, do not undercut Plaintiffs or their experts, nor support Deloitte's arguments.  *See* D&T's Second Mtn to Exclude at 10, 14-17 (citing <u>Bricklayers and Trowel Trades Int'l Pension Fund v. Credit Suisse First Boston</u>, 853 F. Supp. 2d 181 (D. Mass 2012); <u>In re Scientific Atlanta, Inc. Sec. Litig.</u>, 754 F. Supp. 2d 1339 (N.D. Ga. 2010); <u>In re Nuveen Funds/City of Alameda Sec. Litig.</u>, 2011 WL 1842819 (N.D. Cal. May 16, 2011); <u>In re BankAtlantic Bancorp, Inc. Sec. Litig.</u>, 2011 WL 1585605 (S.D. Fla. Apr. 25, 2011), *aff'd on other grounds*, <u>Hubbard v. BankAtlantic Bancorp, Inc.</u>, 688 F.3d 713 (11th Cir. 2012); <u>In re Williams Sec. Litig. – WCG Subclass</u>, 558 F.3d 1130 (10th Cir. 2009); and <u>Miller v. Asensio & Co., Inc.</u>, 364 F.3d 223 (4th Cir. 2004)).

In <u>Bricklayers</u>, the court excluded an expert's event study testimony about AOL-Time Warner ("AOL") stock because it relied on "cherry-picked" event days, used "dummy variables[10] for a greater number of days and a higher percentage of the study period" than acceptable, relied on news events that were "released nine days earlier without any corresponding impact" and "made unreasonable judgments about which [confounding] factors likely caused stock price movement on event days." 853 F. Supp. 2d at 188-191.  In excluding the expert's testimony, the court noted that "[h]ad [the expert's] event study suffered from only one of the four methodological defects identified by this Court, or suffered from those flaws jointly but to a lesser degree, today's ruling might have been different."  <u>Id.</u> at 191.  Thus, even if Deloitte's confounding factors challenge had some merit (which it does not), <u>Bricklayer</u>'s

---

[10]     A "dummy variable is a variable that takes the value of one or zero to indicate the presence or absence of some effect in an event study" and "[d]ummy variables allow financial economists to control for the effect of event days and material news days on the price of a stock." <u>Bricklayers</u>, 853 F. Supp. 2d at 188. The court noted that although "[t]hey are a common and accepted component of securities fraud event studies, … courts have cautioned against their overuse." <u>Id.</u>

holding would not exclude Mr. Coffman's testimony.  Moreover, unlike the "herculean task" the court found plaintiffs' expert had in sifting through the "extraordinary volume of AOL-related news in the marketplace during the Class Period" to disaggregate confounding factors and the numerous factual distinctions described above, no such hurdles existed with respect to DVI and, as this Court found, Mr. Coffman cogently explained the causal connection of each disclosure. DVI I, 2010 WL 3522090, at *14 ("Mr. Coffman['s] … event study methodologies are reliable and admissible").[11] See also Coffman Substitute Rebuttal at ¶¶47-55 (analyzing and confirming his loss estimates on the dates the Court allowed to proceed).

In Scientific-Atlanta, plaintiffs brought securities fraud claims based on alleged "channel-stuffing" and improper revenue recognition.  754 F. Supp. 2d at 1345.  Contrary to Deloitte's contention, the court adopted the rule that "a corrective disclosure need not specifically address the falsity of prior statements[, s]o long as a later disclosure reveals new information which an earlier omission fraudulently concealed."  Id. at 1369-70 (citing, e.g., Alaska Elec. Pension Fund v. Flowserve Corp., 572 F.3d 221, 230 (5th Cir. 2009) (rejecting defendants' "proposed rule that would allow wrongdoers to avoid liability by merely refusing to admit the falsity of prior misstatements"); In re Vivendi Univ. S.A. Sec. Litig., 605 F. Supp. 2d 586, 598 (S.D.N.Y. 2009) ("External events, such as a ratings downgrade that reveals the risk of deteriorating liquidity, may also suffice.")).  Additionally, the court recognized a circuit "split" on the issue of who has

---

[11]    The dates the Court allowed are: September 24, 2002, September 26, 2002, September 27, 2002, June 4, 2003, June 27, 2003, July 1, 2003,  August 5, 2003 and August 6-14, 2003.  Id. at *15-23.  See also, id. at *25 ("With respect to [these] disclosures identified above, this Court finds that Plaintiffs have created a genuine issue as to whether the very facts misrepresented by Defendant in its audit of DVI's 10-Ks … were a substantial factor in causing Plaintiffs' economic loss."); and id. at 12 fn23 ("Contrary to Defendant's argument, Mr. Coffman's event study theory attributes the declines in securities prices to partial disclosures that reveal symptoms of the alleged fraud, and not just weak business performance.  As described below, to the extent that Mr. Coffman's event study attributes price declines to disclosures that reveal nothing more than the true financial condition of DVI, those portions of his report are excluded as irrelevant.").  The Court excluded as a matter of law four event dates: September 25, 2002, May 13, 2003, June 5-6, 2003 and July 16, 2003.

the burden to establish the existence or non-existence of non-fraud related factors.  Id. at 1373

(citing Caremark, Inc. v. Coram Healthcare Corp., 113 F.3d 645, 649-50 (7th Cir. 1997)

(recognizing that it's defendant's burden to establish that "the decline in the value of the security

is attributable in total to some other factor")) *with* In re Vivendi, 605 F. Supp. 2d at 604-05

(finding plaintiffs met burden of disaggregating non-fraud factors, which "need only

disaggregate some rough percentage of the declines resulting from non-fraud related events

rather than the precise amount of loss attributable to the defendant's fraudulent conduct" and that

"defendants failed to point to an obvious competing cause for the plaintiffs' loss on the days

identified.")).  Adopting Vivendi's burden shifting approach, the district court found that

plaintiffs failed to consider several non-fraud, confounding factors, such as "global economic

weakness and seasonal factors," and the "company-specific effect of [negative] market-wide

trends" as causes for Scientific Atlanta's revenue declines.  Id. at 1379-80 (holding that

plaintiffs' evidence merely provided a basis that channel stuffing may be a factor in the loss, but

was insufficient to show it was a substantial factor in light of the negative industry news).  The

Eleventh Circuit affirmed, reiterating that the disclosures revealed "multiple pieces of non-fraud-

related information (for example, the uncertain economic climate, reduced marketing by S-A's

customers, unexpectedly slow deployment of interactive digital cable services) … [a]nd … [the]

new impact of industry trends and the weakened economy *on* S-A."  Phillips v. Scientific-

Atlanta, Inc., 489 Fed. Appx. 339, 342-43 (11th Cir. 2012) (emphasis in original).  Unlike in

Scientific-Atlanta, no market or industry-wide phenomena caused DVI's demise.  Indeed, the

record shows that DVI's industry was thriving while DVI was collapsing into bankruptcy.  *See*

Ex. 1 (Coffman Rept. ¶¶21-24, 27, 56-57 & Exs. 3-7, 9 and 15 attached thereto); *see also* Lead

Plaintiffs' Amended Statement of Facts ¶65 (Dkt.#736) and Ex. 142 thereto (September 24, 2002

Company Note from U.S. Bancorp Piper Jaffray on DVI, <u>Downgrading and Reducing Estimates</u>, raising questions about DVI negative trends "since the health care sector that DVI focuses on is one bright spot of the U.S. economy"). Thus, even if Plaintiffs have the initial burden on disaggregation, they clearly met it; Deloitte, however, has not met its burden because it "fail[s] to point to an obvious competing cause." <u>Vivendi</u>, 605 F. Supp. 2d at 604-05.

In <u>Bank Atlantic</u>, a "[j]ury returned a verdict mainly in Defendants' favor" on claims involving alleged false statements made during conference calls involving alleged deteriorating loans involving the Florida real estate market. 2011 WL 1585605, at *6. The district court granted defendants' motion for a directed verdict on loss causation and damages on the remaining claims because plaintiffs' expert "freely admitted at trial that she did not attempt to disaggregate [a] bundle of negative land loan information because she assumed that it was all fraud related," despite acknowledging that the negative news was broken down into fraud and non-fraud components, and despite Plaintiff's expert "testif[ying] at trial that she was capable of a disaggregation analysis where the competing factors were not quantified." <u>Id.</u> at *19. The court further found that plaintiff's expert's "testimony on damages fail[ed] for the same reasons as it d[id] with respect to loss causation." <u>Id.</u> at *22. On appeal, the Eleventh Circuit found error in the district court's decision, but affirmed on the ground that plaintiff did not submit sufficient evidence on loss causation. 688 F.3d at 716. The Eleventh Circuit clarified the reason plaintiffs lost in stating plaintiffs "failed to adequately separate losses caused by fraud from those caused by the 2007 collapse of the Florida real estate market." <u>Id.</u> at 725. The court noted that "in 2007, Florida, having benefitted more than most states from the real estate boom of the previous years, was hit harder than most by the ensuing bust."). <u>Id.</u> at 729. Specifically, the court found that plaintiffs' expert "failed … to account for the effects of the collapse of the Florida real estate

market," which BankAtlantic's "assets were concentrated in," when she used the "broader"

NASDAQ Bank Index, which "capture[d] the effects of national trends in the banking industry"

but which plaintiffs' expert "admitted on cross-examination" did not represent "Florida financial

institutions," because those "made up only a small percentage of the NASDAQ Bank Index."  Id.

at 729 (finding the "NASDAQ Bank Index … inappropriate for the task of filtering out the

effects of industry-wide factors that might affect the stock price of a bank … whose assets were

concentrated in loans tied to Florida real estate in 2007").

      Similarly, in Williams, the Tenth Circuit affirmed dismissal of claims against a

telecommunications company on loss causation grounds because plaintiff's expert failed to

account for losses caused by "the meltdown in the telecommunications sector and other negative

developments unrelated to the alleged fraud."  558 F.3d at 1135 ("the decline in WCG share

price closely correlated with the overall decline in the telecommunications industry.")   In

rejecting the plaintiff's expert's first causation theory, the court noted that he "could not explain

how the market learned of the fraud over that year-and-a-half [July 24, 2000 to January 28,

2002], … despite the fact that the same period witnessed the bankruptcies of WCG competitors,

a decline in the telecommunications industry as a whole, and the overall market declines that

followed the 9/11 terrorist attacks."  Id. at 1139.  In rejecting the expert's second, alternative

theory, the court noted that it "suffer[ed] from the same defect as [the first]," that plaintiff's

expert conceded "that the market already knew of the alleged misrepresentations on the very day

of the first corrective disclosure," and that there were "too many intervening factors at play –

including the total meltdown of the telecommunications industry." Id. at 1140-43 ("Like his

leakage theory, Dr. Nye's corrective disclosure theory fails to identify the mechanism by which

fraud was revealed to the market.  Though he points to four disclosures, he simultaneously

concedes that the market knew of the misrepresentations even before these disclosures, and also makes no account for the fact that these disclosures contained non-fraud related information that would have also affected WCG's value.").[12]

Unlike the failure of the plaintiffs' experts to consider market or industry affects in Scientific-Atlanta and Williams, and the non-representative market index used by the expert in BankAtlantic, none of Deloitte's experts challenge Mr. Coffman's selection of the market and industry indexes he used, or the analyzes he conducted, to strip out the non DVI-related price affects. Moreover, unlike the industry meltdowns that occurred in Scientific-Atlanta, BankAtlantic and Williams, there is no dispute here that DVI's industry was thriving at the time DVI's financial results were substantially declining (proving that outside market factors were not

[12]     In Miller, the Fourth Circuit reviewed whether a jury's verdict of liability under Rule 10b-5 must also award damages, and answered "it does not." 364 F.3d at 224. The case involved alleged derogatory statements that employees of Asensio & Co. ("Asensio"), an investment bank, made about Chromatics Color Sciences International, Inc. ("CCSI"), after it allegedly shorted CCSI stock and issued reports recommending that investors sell CCSI or take a short position because one of CCSI's products had little potential to become widely used. Id. at 225. The court noted the unique facts of the case in stating that "cases [finding liability but no damages] will be rare." Id. at 231 (clarifying that "a jury's award of damages will be upheld even if there is some uncertainty as to their amount…" and plaintiff may prove damages "as a matter of just and reasonable inference, although the result be only approximate"). Significantly, and contrary to Deloitte's arguments, Miller relied on the Third Circuit's decision in Rochez Bros. Inc. v. Rhoades, 527 F.2d 891, 894-95 (3d Cir. 1975), which held that "the law does not command mathematical preciseness from the evidence in finding damages" just "sufficient facts … so that a court can arrive at an intelligent estimate without speculation." Miller, 364 F.3d at 231& fn5 (Supreme Court precedent "allows presentation of somewhat 'uncertain' damage calculations to the jury and insulates from vacatur the jury's 'estimate' based on such calculations"). In concluding that the facts of the case supported no damages, the court noted that plaintiff's expert provided no written analysis of his conclusions, "failed to make any adjustment for market factors" other than an inadequate last minute adjustment before his in-court trial testimony, and plaintiffs failed to rebut the evidence offered by defendants that showed other non-fraud factors caused plaintiffs' losses. Id. at 234-35.
        Deloitte's reliance on Nuveen is also misplaced because that case involved, unlike here, a private placement offering to sophisticated and accredited investors. 2011 WL 1842819, at *2. In excluding plaintiff's expert, the court noted that the expert "did not perform any computations or statistical analysis to determine whether there was a causal relationship between the corrective disclosure and the supposed decline in the value of the Notes" and "performed no meaningful analysis to determine what proportion of plaintiffs' losses is attributable to defendants' alleged fraud." Id. at 7. Significantly, the court noted that plaintiffs conceded that "because the market for the Notes was inefficient, [their expert] could not perform an event study." Id. The substantially deficient facts in Nuveen and the unique facts in Miller are completely inapposite to the well-founded facts and testimony of Mr. Coffman in this case.

causally related to DVI's investor losses).  The jury is certainly capable of sorting through the

DVI-specific revelations and assigning appropriate blame and loss to Deloitte.  *See, e.g.*, In re

Apollo Group, Inc. Sec. Litig., 2010 WL 5927988, at *1 (9th Cir. June 23, 2010) (reversing

district court's judgment as a matter of law on loss causation after jury found in favor of

plaintiffs), *cert. denied*, 131 S.Ct. 1602 (Mar. 7, 2011); *see also* LePage's Inc. v. 3M, 324 F.3d

141, 164-66 (3d Cir. 2003) (*en banc*) (rejecting exclusion of plaintiff's damages expert, Terry

Musika, and motion for judgment as a matter of law for "fail[ing] to disaggregate damages" and

also rejecting defendant's argument that plaintiffs did not provide "the jury with [a] mechanism

to discern damages").

### C.  Apportioning Causation and Damages Among Defendants Is Not Necessary At This Stage But Can Be Further Opined On By Plaintiffs' Experts, If Necessary.

Deloitte's apportionment among defendants argument, as its disaggregation argument,

was previously raised and disregarded by this Court.  *See* Ex. 3 (Coffman Substitute Rebuttal

¶58) ("Mr. Demchick repeats the criticism of Mr. Musika that I do not consider other potentially

responsible parties… I responded to this in the Coffman Rebuttal Report and re-incorporate my

response herein."); *see also* D&T SJ Mem. (Dkt#689) at 14 (arguing Plaintiffs failed to apportion

among defendants); D&T SJ Reply Mem. (Dkt.#724) at 18 (same).  Deloitte provides no valid

reason why expert testimony is required on this narrow issue.  But if this Court were to now rule

that such testimony is required, Plaintiffs' experts should be given leave to supplement.

### 1.  Expert Opinion On Apportioning Liability And Damages Is Unnecessary.

The PSLRA contains a joint and several, and a proportionate liability

provision.  The joint and several provision states:

> (2) Liability for damages
>     (A) Joint and several liability

24

> Any covered person against whom a final judgment is
> entered in a private action shall be liable for damages jointly and
> severally only if the trier of fact specifically determines that such
> covered person knowingly committed a violation of the securities
> laws.

15 U.S.C. 78u-4(f)(2)(A).

Expert testimony on apportioning liability and damages is certainly not required if Deloitte is found joint and severally liable. *See, e.g.*, U.S. v. Scop, 940 F. 2d 1004, 1010 (7th Cir. 1991) ("By definition, being jointly and severally liable means that each individual remains responsible for payment of the entire liability, so long as any part is unpaid.") (citing Restatement (Second) of Torts, §875); S.E.C. v. Stringer, 2003 WL 23538011, at *9 (D. Or. Sept. 3, 2003) ("joint and several liability means that 'each liable party is individually responsible for the entire obligation.'") (citing Blacks Law Dictionary, "liability," 7th ed. 1999). A jury verdict finding that Deloitte knowingly committed a securities fraud violation, thereby triggering joint and several liability, would be reasonable given this Court's September 3, 2010 decision and the well developed record in this case. DVI I, 2010 WL 3522090, at *2-4, 14 fn26 ("Moreover, pursuant to 15 U.S.C. 78u-4(f)(2)(A), if a jury finds Defendant in violation of §10(b), Defendant is liable for damages jointly and severally"). Thus, Mr. Coffman's total damages opinion is sufficient for computing joint and several liability damages against Deloitte. Coffman Substitute Rebuttal ¶57 (estimating $72.8 million in damages under event study).

On the other hand, the PSLRA's proportionate liability provision is silent on whose burden it is to prove proportionate fault. *See* 15 U.S.C. 78u-4(f)(2)-(3); *see also* Judge Amy J. St. Eve and Bryce C. Pilz, The Fault Allocation Provisions of the Private Securities Litigation Reform Act of 1995 – A Roadmap for Litigants and Courts, NYU Journal of Law & Business (Fall 2006), at *203 (hereinafter, "Judge St. Eve & Pilz, Fault Allocation of the PSLRA").

25

("because the PSLRA does not state which party bears the burden of proving proportionate fault, courts will likely look to analogous areas of law … [which] typically place the burden on the party asserting that another is proportionately at fault.").  The PSLRA's proportionate liability provision states:

> (B) Proportionate liability
> (i) In general
> Except as provided in subparagraph (A), a covered person against whom a final judgment is entered in a private action shall be liable solely for the portion of the judgment that corresponds to the percentage of responsibility of that covered person, as determined under paragraph (3).
> ***
> (3) Determination of responsibility
> (A) In general
> In any private action, the court shall instruct the jury to answer special interrogatories … with respect to each covered person and each of the other persons claimed by any of the parties to have caused or contributed to the loss incurred by the plaintiff … concerning (i) whether such person violated the securities laws; (ii) the percentage of responsibility of such person, measured as a percentage of the total fault of all persons who caused or contributed to the loss incurred by the plaintiff; and (iii) whether such person knowingly committed a violation of the securities laws.
> (B) Contents of special interrogatories or findings
> The responses to interrogatories … under subparagraph (A) shall specify the total amount of damages that the plaintiff is entitled to recover and the percentage of responsibility of each covered person found to have caused or contributed to the loss incurred by the plaintiff or plaintiffs.
> (C) Factors for consideration
> In determining the percentage of responsibility under this paragraph, the trier of fact shall consider – (i) the nature of the conduct of each covered person found to have caused or contributed to the loss incurred by the plaintiff or plaintiffs; and (ii) the nature and extent of the causal relationship between the conduct of each such person and the damages incurred by the plaintiff or plaintiffs.

15 U.S.C. 78u-4(f)(2)(B)-(3).

Contrary to Deloitte's contention, "a plaintiff does not have to disprove that any particular non-party caused or contributed to its loss in order to prove that a defendant did in fact legally cause its loss."  Judge St. Eve & Pilz, Fault Allocation of the PSLRA, at *209. "Accordingly, in analyzing the PSLRA, courts will likely determine that, while the plaintiff bears the burden of proving loss causation (i.e., that the plaintiffs loss is attributable to the defendant's fraud), the plaintiff does not bear the burden of proving that a particular percentage of that loss was attributable to a particular defendant, as compared to another defendant or person."  Id. (citing, e.g., Miller v. Asensio & Co., 364 F.3d 223, 231-32 (4th Cir. 2004) and Semerenko v. Cendant Corp., 223 F.3d 165, 186-87).  In raising its apportionment argument as an affirmative defense, Deloitte recognizes that it bears the burden on that issue at trial.  *See* Excerpt of Deloitte's Answer & Affirmative Defenses to Lead Plaintiffs' Fifth Amended Complaint (Dkt#297), at Twenty First Affirmative Defense (attached hereto as Ex. 4); *see also* Gruber v. PriceWaterhouse, 911 F.2d 960, 963 (3d Cir. 1990) ("the burden of establishing [the] applicability [of an affirmative defense] to a particular claim rests with the defendant").

Moreover, even if plaintiff bears the burden, the PSLRA does not instruct that expert testimony is required on apportioning liability.  Courts frequently leave this issue for the jury to decide from the evidence presented without requiring expert testimony.  *See, e.g.*, Robinson v. Freightliner LLC, 2010 WL 887372, at *3 (M.D. Pa. Mar. 10, 2010) (agreeing that Plaintiff's "expert need not apportion damages among each defendant because the assessment of damages is a classic jury function to be made after hearing the totality of the evidence"); Sauer v. Burlington Northern R. Co., 106 F.3d 1490, 1494 (10th Cir. 1997) ("We reject Sauer's argument that there must be expert testimony precisely apportioning the injury on a percentage basis … Although apportionment may be difficult, like comparative negligence it is a question for which

27

juries are well suited.") (citations omitted); *see also* <u>In re Neopharm, Inc. Sec. Litig.</u>, 705 F.

Supp. 2d 946, 970 (N.D. Ill. 2010) (denying defendants' motion for summary judgment on loss

causation, stating: "The court declines to strike [plaintiff's expert's] testimony on these bases

because the court has already determined, without relying on his testimony, that there is an issue

of fact as to whether defendants failed to disclose material information to investors"); <u>Rochez</u>

<u>Bros. Inc. v. Rhoades</u>, 527 F.2d 891, 894-95 (3d Cir. 1975) ("the law does not command

mathematical preciseness from the evidence in finding damages").[13]

   Furthermore, apportioning liability to Deloitte is made easier by the fact that few

individual defendants remain and those that are left have no ability to pay a substantial judgment.

In such a situation, the PSLRA allows Deloitte's share of responsibility to be increased by up to

50% if others responsible for the fraud have no ability to pay a judgment.  *See* 15 U.S.C. 78u-

4(f)(4).[14]  Thus, even if only proportional liability were to apply and a jury found the other few

remaining individual defendants in this case liable along with Deloitte, Deloitte's share could be

increased by up to 50% of its assigned liability.  <u>Id.</u>; *see also* <u>In re WorldCom, Inc. Sec. Litig.</u>,

No. 02 Civ. 3288, 2005 WL 335201, at *7 (S.D.N.Y. Feb. 14, 2005) ("The [PSLRA] mitigates

the consequences the plaintiff will suffer from uncollectible judgments against proportionately

liable defendants through the Uncollectible Share provision of Paragraph (4). … In that event,

---

[13] Mr. Coffman's testimony explains why specific apportionment at this stage is not necessary. *See, e.g.*, Coffman Substitute Rebuttal ¶59 ("as described above, there is no reason to suggest that D&T's alleged misstatements only relate to a subset of the artificial inflation. … If D&T had withheld its audit opinion and DVI had been forced to disclose the truth earlier, then later investors would not have purchased at an inflated price and suffered damages as the truth was revealed. … Moreover, it is my understanding that Dr. Epstein supports the position that D&T was aware of and facilitated the concealment of the material misstatements in DVI's financial statements during the Class Period; the result of which could lead to D&T being joint and severally liable, or at least held to a high percentage under a proportionate liability theory.").

[14] PSLRA §78u04(f)(4) states: "Uncollectible share (A) In general … (ii) Other plaintiffs … each covered person shall be liable for the uncollectible share in proportion to the percentages of responsibility of that covered person, except that the total liability of a covered person under this clause may not exceed 50% of the proportionate share of that covered person, as determined under paragraph (3)(B)."

every other Covered Person becomes jointly and severally liable for the uncollectible share … up to 150 percent of his percentage of responsibility").

Deloitte provides no valid reason for this Court to revisit the apportionment issue. Deloitte's reference to this Court's citation to a pre-PSLRA decision stating a "general rule" requiring "expert testimony to establish both the fact of damage and the appropriate method of calculation," is inapposite.  D&T Second Mtn to Exclude at 15 (citing WMHY, at LEXIS *61, relying on Sowell v. Butcher & Singer, Inc., 926 F.2d 289, 301 (3d Cir. 1991)).  In Sowell, plaintiff's claims regarding unregistered securities were actually submitted to trial but did not withstand a directed verdict on damages.  926 F.2d at 297-98 ("Sowell's evidence with respect to damages was remarkably sparse. … Sowell introduced no direct evidence of the plaintiff's individual transactions. … Sowell sought, instead, to prove class-wide damages by using an average-price concept based upon his own [layman's] explanations.").  Sowell did not hold that experts were required to apportion damages, nor was apportioning damages among defendants a specific issue in the case.  Rather, in finding plaintiff's evidentiary support on total damages insufficient, the court noted plaintiff's failure "to designate experts" on any issue, his disregard of evidence identifying class member transactions, and his misplaced reliance on evidence submitted in another case as support for valuing the securities as "worthless" when record evidence was to the contrary.  Id. at 299-301 (further noting plaintiff did not rely on corporate records or tax documents, and no executive officers were called as witnesses).

Deloitte's reliance on EP MedSystems, Inc. v. EchoCath, Inc., 235 F.3d 865, 884 (3d Cir. 2000); and Winer Family Trust v. Queen, 503 F.3d 319 (3d Cir. 2007), are equally misplaced. See D&T Second Mtn to Exclude at 18-19.[15]  Neither decision ruled that expert testimony was

---

[15]     Deloitte makes no attempt to explain its reliance on Consulnet Computing, Inc. v. Moore, 2008 WL 375102 (E.D. Pa. Feb. 11, 2008), involving a website copyright dispute where the court excluded

required to apportion damages among defendants.  In <u>EP Med Systems</u>, no expert issue was

before the Third Circuit and the court actually reversed the district court's "too restrictive[]" loss

causation ruling. 235 F. 3d at 884-85 (Recognizing the Third Circuit's "practical approach" to

evaluating loss causation and stating: "[t]he causation issue becomes most critical at the proof

stage.  Whether the plaintiff has proven causation is usually reserved for the trier of fact.")

(citing <u>Huddleston v. Herman & MacLean</u>, 640 F.2d 534, 549 (5th Cir. 1981) (reversing for

failure to submit causation to the jury)).  In <u>Winer</u>, not only were expert issues not discussed, the

term loss causation was not even mentioned.  The Third Circuit's discussion of "group pleading"

was confined to whether alleged misstatements must be pled as to each defendant or if it could

be satisfied under the "group pleading doctrine".  503 F.3d at 335-36 (ruling that plaintiffs

cannot merely plead that corporate insiders are liable for misstatements in group published

documents just because of their "day-to-day control or involvement in regular company

operations").  The group pleading doctrine is not at issue here and Deloitte's reliance on it

underscores the irrelevance of its argument.

### 2. Plaintiffs' Experts Established That A High Level of Liability Should Be Apportioned To Deloitte And Will Provide Further Testimony If Deemed Necessary And As Instructed By The Court.

The record in this case shows that if Deloitte is not found joint and severally liable,

Deloitte deserves a high percentage of fault for the losses DVI investors suffered.  DVI's

---

parts of expert testimony proffered by both parties, but allowed the case to proceed to trial.  *See* D&T Second Mtn to Exclude at 7 and 20.  This holding actually supports allowing Mr. Coffman's testimony. <u>Id.</u> at *3 (deferring ruling on the admissibility of an expert report until presentation of causation evidence at trial).  The <u>Consulnet</u> court's subsequent December 5, 2008 decision, which Deloitte ignores, further shows why Deloitte's reliance on this case is misplaced.  <u>Consulnet Computing, Inc. v. Moore</u>, 631 F.Supp.2d 614, 617-18, 622 (E.D. Pa. 2008) (allowing <u>additional</u> expert testimony at the trial's damages phase after the jury ruled on liability and causation; and allowing party to present damages evidence despite excluding that party's damages expert, stating: "defendants should be permitted, through testimony at the damages trial, to offer evidence of their non-infringing web products" but "Gering's analysis of this issue should not be admitted as expert testimony").

understated loan loss reserves was a fraud involving DVI's core business (i.e., its loan portfolio) that Deloitte heavily audited and also involved areas of accounting that DVI abdicated to Deloitte.  As Plaintiffs showed at summary judgment, Deloitte recognized that DVI's allowance for loan losses was a material part of DVI's financial statements involving its core business, that because of DVI's lack of controls surrounding this area Deloitte did not rely on DVI's representations, and that DVI engaged in "aggressive" and "creative" accounting in this area. *See* DVI I, 2010 WL 3522090, *2-4; Lead Plaintiffs' Amended Statement of Facts ("ASOF ¶__") at ¶¶31-32, 35-37 (Dkt#736).  As such, it was incumbent on Deloitte to assess the magnitude of DVI's impaired loans and the reasonableness of its loan loss reserves.  In assessing DVI's portfolio of impaired loans, Deloitte identified ample evidence of DVI's inability to collect from customers and determined that DVI's loan loss reserves were materially understated (as every other third-party, including GMAC and GECC, who reviewed DVI's records during the Class Period, concluded, ASOF ¶¶38, 41-45), but Deloitte failed to force DVI to adjust its books and instead continued collecting millions in fees from its DVI business.  This case, therefore, is certainly one of those cases where the auditor's actions justify requiring them to cover a large percentage of the damages.  *See, e.g.*, In re Suprema Specialties, Inc. Sec. Litig., 2008 WL 906254, at *2 (D. N.J. Mar. 31, 2008) (approving settlement involving auditor defendant's payment of 50% of settlement amount; culminating after the Third Circuit reversed dismissal against auditors and district court certified class).

 The appropriate, specific percentage to assign Deloitte should await presentation of all the evidence and submission of a to-be-determined jury verdict form.  Requiring Plaintiffs to prematurely lock in their position as to how much liability and damages Deloitte should be assigned versus the other few remaining signing defendants in the case, is unnecessary and

unfair.  *See, e.g.*, <u>Gushlak</u>, 2013 WL 4558747, at *9 (recognizing that computing "actual loss" does not mean "mathematically precise" and that it is a "settled understanding among courts of appeals that a 'reasonable approximation' will suffice") (citing, e.g., <u>United States v. Hand</u>, 863 F.2d 1100, 1104 (3d Cir. 1988) ("Difficulties of measurement do not preclude the court from ordering a defendant to compensate the victim through some restitution.").  Deloitte has not even pointed to a standard by which experts rely when apportioning liability and damages in securities cases, let alone showed why expert testimony on this issue is needed or why the jury could not decide the issue based on the record presented.

In the event, however, this Court requires expert testimony on Deloitte's percentage of fault, Mr. Coffman would do so at the Court's direction (but would prefer to wait until trial) and has expressly reserved the right to provide further testimony on any issue if necessary.  *See* Coffman Rebuttal Rpt at 2 fn.1 (Ex. 2); and Coffman Substitute Rebuttal at 2 fn. 1 (Ex. 3).[16]  *See also* <u>Gushlak</u>, 2013 WL 4558747, at *3, 6 (upholding district court's orders allowing plaintiff several attempts at establishing loss and computing damages against defendants, stating: "The court expressed the view that it would be unfortunate if the government failed to obtain restitution for victims. … It was also of the view, however, based on [the district court's] decade-long supervision of the matter, that the need to compensate victims outweighed challenges of measurement.").  Allowing additional testimony on this narrow issue would not prejudice Deloitte because it is a relatively narrow issue and would not conflict with anything Plaintiffs' experts have submitted thus far.

Moreover, Deloitte's own cases allow experts to provide new or additional testimony before or at trial.  *See, e.g.*, <u>ConsulNet</u>, 631 F. Supp. 2d at 622-23, 625 (allowing expert to base

---

[16]    Lead Plaintiffs' accounting and auditing expert, Dr. Barry Epstein, also stated that he reserved the right to address other issues.  *See* October 6, 2008 Report of Barry J. Epstein at 372.

opinion on new conversations with another witness and rejecting party's contention that it would be prejudicial to be "forced to question" the witness on the new issue "for the first time during cross examination;" further allowing an additional expert designation and report submission "six weeks after the deadline" because it would not unduly prejudice the other side and was not being presented in bad faith) (citing Soufflas v. Zimmer, 474 F. Supp. 2d 737, 745 (E.D. Pa. 2007) (admitting an expert report submitted late because it was "in the nature of a rebuttal report" and because the case had "not yet been listed for trial")).

## III.     CONCLUSION

Lead Plaintiffs would be unfairly prejudiced if the Court reconsiders its September 3, 2010 ruling to now require Plaintiffs' experts to further opine on disaggregation and damage apportionment, but deny Lead Plaintiffs the right to submit supplemental opinions on those issues.  As stated above, no such opinions are necessary, but to the extent they are, Lead Plaintiffs' experts will submit a supplemental report as specifically directed by the Court.

For all the foregoing reasons, Lead Plaintiffs respectfully request that this Court deny Deloitte & Touche LLP's Motion to Exclude From Trial Any Testimony From Lead Plaintiffs' Expert Chad Coffman.

Date:    September 23, 2013

                                        Respectfully submitted,

                        By:     /s/ Michael R. Karnuth

                                Clinton A. Krislov, Esq.
                                Michael R. Karnuth, Esq.
                                KRISLOV & ASSOCIATES, LTD.
                                20 North Wacker Drive, Suite 1300
                                Chicago, Illinois   60606
                                Phone: 312-606-0500
                                Fax: 312-606-0207
                                *Plaintiffs' Lead Counsel*

CHIMICLES & TIKELLIS, LLP
Steven A. Schwartz, Esq.
Attorney I.D. No. 50579
Kimberly M. Donaldson, Esq.
Attorney I.D. No. 84116
361 W. Lancaster Avenue
One Haverford Centre
Haverford, PA   19041
Phone:  610-642-8500
Fax:  610-649-3633
*Plaintiffs' Liaison Counsel*

34