# EXHIBIT 1

EXHIBIT 1

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In Re DVI Inc. Securities Litigation | ) **2:03-CV-05336-LDD**<br>)<br>) **Hon. Legrome D. Davis, presiding**<br>) |

## EXPERT REPORT OF CHAD COFFMAN

## INTRODUCTION

1.      My name is Chad Coffman. I am the President of Winnemac Consulting, a Chicago-based firm that specializes in the application of economics, finance, statistics, and valuation principles to questions that arise in a variety of contexts, including, as here, in the context of litigation. My qualifications are set forth in the next section.

2.      I have been asked by counsel for Plaintiffs in this matter to quantify the damages suffered by the Class under the assumption that Defendants are found liable in this matter under the Securities Exchange Act of 1934.

3.      The materials I have relied upon in forming my opinions are summarized in **Appendix A**. Winnemac Consulting is being compensated at my standard hourly rate of $500 per hour for my work on this matter and my compensation is in no way contingent on the outcome of this case. The next section of the report discusses my qualifications and the remainder of the report describes the basis for my opinions.

## QUALIFICATIONS

4.      I hold a Bachelors Degree in Economics with Honors from Knox College and a Masters in Public Policy from the University of Chicago. I am also a CFA charter-holder. The CFA, or Chartered Financial Analyst, designation is awarded to those who have sufficient practical experience and complete a rigorous series of three exams over three years that cover a wide variety of financial topics with a particular focus on valuation.

5.      I, along with several others, founded Winnemac Consulting in March of this year. Prior to starting Winnemac Consulting, I was employed by Chicago Partners for over twelve years where I was responsible for conducting and managing analysis in a wide variety of areas including securities valuation and damages, labor discrimination and antitrust. I have been

2

responsible for conducting loss causation, damages, and valuation analysis in some of the most high profile securities cases on record including Parmalat, Enron, Tyco, and WorldCom among others. I have been engaged numerous times as a valuation expert both within and outside the litigation context. My experience in class action securities cases includes work for plaintiffs, defendants, D&O insurers and more recently I have been engaged by a prominent mediator (Retired Judge Daniel Weinstein) to provide neutral economic analysis and opinions in several securities class actions as well as other matters.

6.     My qualifications are further detailed in my curriculum vitae, which is attached as **Appendix B**.

## SUMMARY OF OPINIONS

7.     Below I summarize the opinions I have reached in this matter. My opinions regarding damages are based upon Defendants being found liable under the Securities Exchange Act of 1934. In particular, I assume Plaintiffs will be able to prove that Defendants were aware of, or should have been aware of, and had a duty to disclose that DVI's financial statements and public pronouncements regarding its financial condition were materially false and misleading.

8.     Based upon my own review of the facts and circumstances surrounding DVI and the forensic accounting work of Dr. Barry Epstein, in my opinion DVI's financial statements and public pronouncements regarding its financial condition were indeed materially false and misleading.

9.     Dr. Epstein has concluded, and I concur, that the magnitude of DVI's accounting misstatements were sufficiently material and had the true financial condition of the company been revealed, DVI would have been insolvent and forced into bankruptcy as early as the

3

beginning of the Class Period, which begins August 10, 1999 and extends through August 13, 2003.

10.     I base that opinion on multiple factors and evidence. The most important and reliable evidence is what actually occurred. When DVI's true financial condition became known it was forced into bankruptcy and liquidated. Second, a substantial portion of the accounting misstatements had occurred by the beginning of the Class Period. Third, evidence regarding the sensitivity of DVI's market prices to earnings surprises supports a conclusion that the misstatements were sufficiently large to wipe out the entire market capitalization of DVIs stock and Senior Notes. Fourth, by the beginning of the Class Period, DVI had already resorted to falsifying its borrowing base in order to raise needed capital and maintain the illusion it was not experiencing losses.

11.     One element of proof required for damages under the Securities Exchange Act of 1934 is loss causation. The courts have not uniformly adopted an unambiguous standard for meeting the loss causation requirement in these matters. As a result, I calculate damages under two different scenarios for DVI common stock:

12.     Insolvency Approach – This approach is premised on the notion that, but-for the fraud, DVI's equity would not have traded except as a penny stock and that any decline in value was causally linked to reliance on DVI's market price and the false and misleading information it reflected. Under this theory of loss causation, any downward movement in the stock price which brought the market price more in line with the "uninflated" price is recoverable. Under this scenario, Class members who purchased DVI equity suffered damages of at least $92.5 million.

13.     Event-Based Approach – This approach is premised on the notion that, regardless of whether DVI was insolvent, the loss causation burden is only met for stock price declines that

4

are causally related to the revelation of DVI's false and misleading statements. Under this scenario, Class members who purchased DVI equity suffered damages of at least \$55.3 million.

14. Application of the event-based approach is sufficient to explain all the downward movement in the market price of DVI's 9 7/8 Senior Notes. Therefore, an "insolvency" model is unnecessary and I rely on the event-based approach since it is the more stringent test. I find purchasers of DVI's Senior Notes suffered damages of at least \$33.5 million.

## OVERVIEW OF DVI'S BUSINESS MODEL

15. DVI's primary business activity involved borrowing money from various sources and extending loans to its clients. Like any regular financial institution, DVI intended to profit by charging higher interest rates to its loan customers than the interest rates that it paid to its lenders. As such, the interest rate spread between its borrowing and lending provided the basis for DVI's profitability.

16. However, unlike other financial institutions, DVI engaged in extending loans and lease financing largely to businesses that were engaged in providing healthcare services. In order to facilitate its lending, DVI operated through its subsidiaries, DVI Financial Services (DVIFS) and DVI Business Credit (DVIBC). While DVIFS financed healthcare providers to purchase or lease various sophisticated medical equipment, DVIBC primarily extended credit to healthcare providers to support their working capital.[1]

17. In order to fund its loans, DVI obtained its funds from various sources. Early in its history, DVI's equity contributions made up a significant portion of its capital holdings. Secondly, DVI borrowed funds by issuing Senior Notes. In 1997 and 1998, the company issued \$100 million of 9 7/8 Senior Notes that were registered to trade in the public market and another

---

[1] Garfinkel Affidavit, p. 3; Examiner's Report, p. 29

$55 million of Senior Notes that held the same characteristics of the $100 million offering except they were unregistered. In addition, DVI also sold convertible debt securities worth $40 million to CDC and the Pritzker family.[2] To obtain low cost financing, DVI also relied on securitizing pools of its loans to outside investors. Finally, DVI also relied on bank loans and lines of credit to fund DVIFS and DVIBC's transactions.

## OVERVIEW OF DVI'S PUBLICLY TRADED SECURITIES

18.    In this section I provide an overview of DVI's publicly-traded securities that are the subject of this case and describe the overall price performance of these securities. This analysis makes clear that DVI securities experienced substantial losses that are clearly firm-specific and unrelated to broad market forces. In addition, I quantify the total loss in value suffered by purchasers of DVI's publicly traded securities.

19.    This report addresses both DVI's publicly-traded common equity securities ("Equity" or "Stock") and DVI's publicly-traded Senior Notes. As of the beginning of the Class Period, there were roughly 14.1 million shares of Stock outstanding and this increased slightly to 15.1 million as of the end of the Class Period. DVI's Stock traded on the New York Stock Exchange ("NYSE") under the symbol "DVI" throughout the Class Period. **Exhibit 1** plots the NYSE reported closing price per share for DVI's equity for each day from August 1998 to November 2003. From the beginning of the Class Period to June 17, 2002, DVI's Stock traded between $11.94 and $20.99 and, on average, was rising.  From June 17, 2002 to September 12, 2002 DVI's stock price fell from $20.99 to $13.93. As I will show shortly, this decline in stock price is concurrent with a general decline in both the general market and financial stocks in particular.  After September 12, 2002, DVI's stock price declines from $13.93 to $0.30 per share

---

[2] Garfinkel Affidavit, p. 3

6

as of the day after the end of the Class Period on August 13, 2003. These later declines cannot be explained by general market forces.

20.     By multiplying DVI's shares outstanding with the closing price per share I obtain what is known as the "market capitalization" or the total market value of DVI's Equity. **Exhibit 2** plots the market capitalization over time and shows that from September 12, 2002 to the end of the Class Period, market capitalization declines from $206.5 million to $4.6 million, or a loss of $202.0 million in value for DVI stockholders.

21.     The overall decline in DVI's equity value from September 13, 2002 to the end of the Class Period cannot be explained by overall movements in DVI's underlying industry, broad market indices, or the performance of financial companies in general. DVI was in the business of financing medical equipment and medical services. **Exhibit 3** shows the value of a $100 invested in DVI versus $100 invested in the S&P 500 Health Care Index and the S&P 500 Health Care Equipment and Services Index. DVI's performance is consistent with these indices until late 2002, after which DVI's equity value drops substantially relative to the stocks of other medical companies. **Exhibit 4** shows total spending on healthcare in the U.S. from 1995 to 2003. Again, activity in the underlying market DVI lends to is thriving during the relevant period.

22.     The same pattern emerges if we compare an investment in DVI versus an investment in a broad stock market index or an index of financial stocks. **Exhibit 5** shows the value of $100 invested in DVI versus the S&P 500 and the Russell 2000 indices. Again, DVI's performance from September 2002 until the end of the Class Period is inconsistent with these other indices and exhibits substantial underperformance.

7

23.     As part of its October 28, 2002 proxy filing, DVI identified companies which it considered "peers" against which it measured its own performance. **Exhibit 6** provides a list of these companies and a general description of their business. In my opinion, these companies are not true "comparables" or "peers" for a variety of reasons – primarily because they are not involved in financing the same type of assets. For completeness, however, **Exhibit 7** shows the value of $100 investment in DVI versus a market-weighted index comprised of these companies. Consistent with my other analysis, DVI's decline in value starting in September 2002 cannot be explained by the performance of the companies DVI identifies as its comparables.[3]

24.     The primary conclusion to draw from this analysis is that market-wide or industry-wide forces are unable to account for DVI's decline in value from September 2002 forward. Therefore, firm-specific factors must account for the vast majority of DVI's declines in equity value.

25.     I now turn to a description and analysis of DVI's publicly-traded debt securities. During the Class Period, DVI had $155 million in Senior Notes that traded on the NYSE and dealer market. These securities paid a coupon of 9 7/8 percent and were due February 1, 2004.[4] Due to the inherent differences between debt and equity securities, debt securities exhibit fundamentally different pricing patterns. Equity securities have unlimited upside while debt-

---

[3] I also investigated whether any individual company on Exhibit 6 was sufficiently correlated with DVI to explain either its overall under-performance or under-performance on any particular day I have identified as containing a corrective disclosure. I find that controlling for any of these companies does not alter any of my conclusions regarding the materiality of any relevant movement in DVI stock prices.

[4] DVI issued $100 million of 9 7/8 senior notes on January 30, 1997 with a maturity date of February 1, 2004 (CUSIP: 233343AB8). On December 23, 1998 DVI issued $55 million of senior notes with the same maturity date of February 1, 2004 (CUSIP: 233343AD4). The only difference between these two Senior Note series is that the first Senior Note series was registered using an S-3 filing to trade on the NYSE. For purposes of my analysis, I treated these two Senior Note series as one combined security.

holders only receive contractual payments of interest and principal.[5] As a result, as long as the credit-worthiness of the borrower does not deteriorate, the price of debt securities will respond primarily to changes in the time value of money (interest rates) and will trade close to par value. However, once the ability of the issuer to pay becomes less certain, then Senior Notes can trade well below par value and their pricing behavior will be more equity-like.

26.    **Exhibit 8** shows the weighted-average trading price of Senior Notes on each day from January 1999 to the end of the Class Period.[6] Note that early in the Class Period the Senior Notes traded at roughly $100 per $100 of par value. At the end of the Class Period, as the truth about DVI's financial condition becomes known, the Senior Notes become extremely impaired and the price declines to roughly $20 per $100 of par value.

27.    Like with DVI's equity, the decline in price of DVI's Senior Notes cannot be explained by broader market movements. **Exhibit 9** shows the value of $100 invested in DVI's Senior Notes versus a high-yield corporate bond index. Corporate bonds were, in general, rising during the period that DVI's Senior Notes lost 80 percent of their value.

28.    **Exhibit 10** provides a summary of the total market value of both the Senior Notes and Stock during the Class Period and shows the market value of the Senior Notes. There is an important relationship between the Stock and Senior Note price movements. When there is substantial equity value, the Senior Note prices are relatively stable and trade close to par. This is because for equity-holders to receive any value, debt-holders must be fully paid. So if the

---

[5] The differences between debt and equity securities, and thus their pricing, can be blurred if the debt is convertible to equity either at the option of the holder or the issuer. In this particular case, however, DVI issued simple coupon debt that is not convertible to stock.

[6] I calculated the weighted average trading price using the 233343AB8 security's NYSE closing price and reported trading volume and the reported transactions of the 233343AB8 and 233343AD4 to the NASD's (now FINRA) electronic quotation and surveillance system for high-yield bonds. Until July of 2002, members of the NASD reported trading activity to the fixed income pricing system, FIPS. Beginning in July 2002, the NASD members reported activity to the Trade Reporting and Compliance Engine (TRACE).

market is placing substantial value on the equity – it must be because the market anticipates the Senior Note-holders to be paid. A company in financial distress, however, will exhibit lower and more volatile Senior Note prices and lower equity values since both the equity and debt prices will reflect the risk of non-payment. **Exhibit 10** also demonstrates that the total market value lost of the Stock and Senior Notes over the period from September 12, 2002 to the end of the Class Period is roughly $324 million.

### QUANTIFICATION OF ALLEGED FRAUD & IMPACT ON VALUATION

29.     Plaintiffs allege that DVI is liable for damages under the securities laws as a result of materially misstating its financial results during the Class Period. For purposes of my damages analysis, I assume these allegations are true. My role in this matter is to calculate damages resulting from these misstatements. In this section, I synthesize the evidence available regarding the magnitude of the alleged fraud and what it implies regarding the level of artificial inflation in the prices of DVI's publicly-traded securities.

30.     My understanding from discussions with Dr. Epstein is that he has undertaken an analysis of the documentary evidence in this case and has reached a number of conclusions upon which I rely.[7] First, Dr. Epstein has concluded that DVI, through a multitude of different improper accounting techniques, was able to disguise that it was consistently losing money. Using what he describes as conservative methods, he has calculated that, on average, for every dollar DVI lent to its customers, it could only be expected to receive $0.94 in return (before interest). In other words, DVI had a long-term loan loss rate of 6% on its managed portfolio. DVI's public statements, including to the SEC, was that their average loss rate on their core business was 0.40%, or that they could expect to receive $0.996 for every dollar they lent (before

---

[7] I understand Dr. Epstein has reached a number of conclusions regarding DVI's accounting. I only discuss those that I have relied on in preparing this report.

interest).[8]   I rely on Dr. Epstein's estimate of a 6% loan loss rate to evaluate the market impact

of a hypothetical corrective disclosure.

31.     My understanding is that Dr. Epstein has also concluded that DVI's net interest

margin was not high enough to sustain the losses they were incurring.  As a result, Dr. Epstein

concludes that if the true financial condition of DVI had become known at any point during the

Class Period, that it would have lost its access to financing and been unable to continue as a

going concern.

32.     Dr. Epstein's conclusions are consistent with other evidence in this matter.  For

example, on October 21, 2003, the Bankruptcy Court appointed R. Todd Neilson as Examiner.

The scope of Mr. Nielson's examination was described in the Bankruptcy Court's order and

stated,

> "IT IS FURTHER ORDERED that the Examiner is to (a) investigate financial
> transactions dealing with the assets, liabilities, operations and financial condition
> of the Debtors (including, without limitation, all transactions and relationships
> between the Debtors and nondebtor subsidiaries and affiliates), (b) investigate the
> accounting practices of the Debtors, (c) investigate any and all allegations of
> fraud, dishonesty, incompetence, misconduct, mismanagement, or financial and/or
> corporate irregularities relating to the Debtors and the circumstances surrounding
> same, including but not limited to, the improprieties alluded to in the Debtors'
> August 13, 2003 and September 26, 2003 press releases, (d) investigate potential
> claims of the Debtors against current and former directors and officers and others,
> including, without limitation, claims arising from conflicts of interest, and (e)
> otherwise perform the duties of an examiner set forth in section 1106(a)(3) and
> 1106(a)(4) of the Bankruptcy Court (collectively, the Investigation) ….".[9]

33.     Mr. Neilson issued his report ("The Examiner's Report") on April 7, 2004. The

Examiner's report documented numerous accounting improprieties and described DVI's loss

---

[8] DVI's financial statements showed their loan loss reserve was less than one percent of all managed assets.  This is
more inclusive than their core domestic financing business, but is still over 6 times less than Dr. Epstein's findings.

[9] Examiner's Report, p. 1

11

reserves as "deliberately misstated"[10] and that "common sense procedures of write-off and income recognition guidelines were cast aside an almost surreal environment."[11]  Based on his evaluation, Mr. Neilson opined that as of June 30, 2003, DVI required loan loss reserves of between $75 million and $120 million.[12]

34.     As of March 30, 2003, DVI reported $2.761 billion of managed receivables.[13] Applying Dr. Epstein's 6% loan loss reserve rate implies that DVI should have had reserves of approximately $166 million.  Therefore, both the Examiner and Dr. Epstein concur that DVI was under-reserving for credit losses by over 500%.  I am neither surprised nor concerned that the Examiner reports a lower figure than Dr. Epstein.  I understand that the Examiner limited the scope of the transactions he considered, did not have the benefit of General Electric Capital Corporation's ("GECC") due diligence of DVI, Deloitte's work papers, or the testimony of several key witnesses.

35.     DVI's loan loss reserves were also reviewed by GECC in 2002 as it was considering a purchase of some or all of DVI's Stock and/or assets.  GECC concluded that absorption of DVI would require additions to loan loss reserves of between $140 million and $200 million.[14]  This is further direct, third-party evidence of the gross misstatement of DVI's true financial condition.

36.     GECC was also acutely aware of DVI's difficult financial condition. Contemporaneous documents suggest that one of GECC's potential strategies was to "[p]urchase

---

[10] Examiner's Report, p. 57

[11] Examiner's Report, p. 55

[12] Examiner's Report, p. 57

[13] DVI, Inc. 10-Q filing for the quarter ended March 31st, 2003 (filing date: May 20th, 2003)

[14] Project Merlin Selected Discussion Materials dated October 31st, 2002 (Hanson Deposition Exhibit 21, LAZD0000685); Hanson Deposition pp. 211-2

assets out of bankruptcy".[15] This documentary evidence makes clear that GECC understood that there was a high probability that DVI's true financial condition would lead to a bankruptcy – even without discovering that DVI had been engaged in accounting improprieties for years and pledging ineligible collateral to its lenders. This provides further support of Dr. Epstein's opinion that had the truth become known the market would have lost confidence and pushed the company into bankruptcy (just as actually happened).

37.     During its due diligence review, GECC reviewed historical financial information provided by DVI. GECC also conducted an on-site due diligence review in which its team reviewed sample credit files and historical delinquency data. This on-site review only lasted a few days.[16]

38.     Despite the understatement of loss reserves, GECC expressed interest in buying certain DVI assets and submitted a non-binding offer of $10 per share.[17]  It is critical to understand why this does not represent an appropriate measure of the market value of DVI's stock but-for the fraud. First, the amount GECC would be willing to offer DVI to acquire the company would reflect the value of DVI's platform *as part of GECC*. In other words, it is not reflective of an independent DVI. An acquisition by GECC, for example, would immediately solve the liquidity crisis at DVI because of the size of their balance sheet and the strength of their credit rating. In addition, the consideration GECC was offering DVI includes the strategic value GECC placed on removing a competitor from the market as well as gaining the contacts and expertise of DVI. Contemporaneous documents suggest that part of GECC's calculus was the

---

[15] Project Phoenix Discussion Materials- Tactics dated April, 2003 (Lytton Deposition Exhibit 13, GECC0119940); Lytton Deposition pp. 273-4

[16] Deposition of Frederick Masnato, p. 64

[17] Letter from Frederick E. Wolfert, CEO of GE Capital to Mr. Ed Chin, UBS Warburg LLC, dated November 4th, 2002 (Hanson Deposition Exhibit 27, LAZD000072)

cost of building out its own business.[18]  Contrast these strategic considerations with the relevant

question at hand in this case: how much would a minority investor trading on the exchange with

no control or strategic considerations pay for a share of an independent DVI had the fraud been

revealed? The answer is a lot less.  It is also unclear whether GECC uncovered all of the

accounting irregularities at DVI and, in the end, no transaction ever actually took place.  For the

foregoing reasons, it would be inappropriate to use the GECC offer as an indication of the value

of DVI but-for the fraud.

39.     Steven Garfinkel, former CFO of DVI, Inc., submitted an affidavit ("Garfinkel

Affidavit") on March 26, 2007 describing the chronology of events at DVI and his recollection

of the demise of DVI's business. According to Garfinkel, DVI's liquidity problems extended

back to early September 1999 when DVI's loans to MedCap Oregon became delinquent and

needed to be repurchased from a securitization.[19] At this time, Garfinkel stated that DVI did not

have the cash necessary to repurchase these loans and, in order to get the necessary funding

under its existing financing line with Fleet, DVI had to pledge ineligible collateral to get the cash

it needed.  Garfinkel was describing how DVI had gone out of compliance with respect to its

borrowing base report and the only way it was able to get back into compliance was to pledge

collateral that was ineligible as eligible.[20]  Garfinkel also describes a Board of Directors meeting

on April 10th, 2001 in which he told the Board that DVI "drift[s] in and out of compliance, and

struggle[s] to stay in compliance."  Garfinkel also added that DVI listed the same collateral on

two different borrowing bases to Fleet and Merrill Lynch in October-November 2002, following

the bankruptcies of DVI customers U.S. Diagnostics, Inc. ("USD") and Healthcare Integrated

---

[18] GECC0000634

[19] Garfinkel Affidavit, p. 20

[20] Examiner's Report, Exhibit 71

14

Services, Inc. and that this process continued until July 2003.[21] As part of his analysis, the

Examiner documented that DVI was serially out of compliance by pledging ineligible collateral

and double-pledging collateral.[22]

40.    Before GECC's analysis of a potential merger with DVI, GMAC explored a

business combination with DVI in 2000. During their diligence process, GMAC retained

PriceWaterhouseCoopers ("PWC") to perform a due diligence review and submit a due diligence

report.[23] In its report titled, "Project Blue", PWC identified that DVI's allowance for loan losses

was understated by approximately $15 million or over 100% of the reported allowances as of

June 30, 2000.[24] This is further evidence that as far back as September 20, 2000 a third-party

reached the conclusion that DVI was materially under-reserved for loan losses. Again, the fact

that PWC did not discover the full extent of the reserving issue is not surprising. At the

beginning of its report, PWC clearly stated that their review of DVI was not an audit or

examination of internal controls of DVI.[25] PWC relied upon DVI's officers and employees to

provide them with the information they needed to complete their due diligence report. With

regard to their analysis of DVI's allowance for loan losses, PWC wrote, "the estimate of the

shortfall developed is highly judgmental since many of the large relationships are undergoing

---

[21] Garfinkel Affidavit, pp. 37-8; "Ocean Township, N.J. Based Health Care Firm Files for Bankruptcy Protection," Asbury Park Press, September 28, 2002.

[22] Garfinkel Affidavit, p. 23

[23] Project Blue, Due Diligence Report dated September 20th, 2000 (Went Deposition Exhibit 2, PWC 0000003-54)

[24] Project Blue, p. 8, PWC0000014

[25] Letter from PWC to Mr. Jack Katzmark, GMAC-RFC, including paragraph that reads "Our work did not constitute an audit conducted in accordance with generally accepted auditing standards, an examination of internal controls or other attestation or review services in accordance with standards established by the American Institute of Certified Public Accountants ("AICPA"). Accordingly, we do not express an opinion or any other form of assurance on the financial statements of the Company or any financial or other information, or operating and internal controls of the Company." PWC0000004

significant change and exhibiting deteriorating financial trends at the holding company level but are still servicing obligations."[26]

## REVALUATION OF DVI BUT FOR THE FRAUD

41.     In order to revalue DVI but-for the fraud I rely on Dr. Epstein's conclusion that DVI consistently sustained loan losses of, on average, 6% of its managed portfolio. Since DVI's practice was to repurchase delinquent and troubled assets from its securitizations, this indicates that the loan loss reserve on DVI's financial statements should have been 6% of the total managed portfolio. **Exhibit 11** shows the total value of the managed portfolio, the application of the 6% reserve rate, DVI's actual loan loss reserves, and the resulting additional reserve that DVI would have been required to take each quarter.

42.     How would the market have reacted to these loan loss reserve numbers? Dr. Epstein has concluded that the market, and DVI's lenders, would have quickly recognized DVI was losing money, its capital would have dried up and it would no longer be a going concern. Under that scenario, DVI would have zero or little equity value.

43.     Market evidence is consistent with this conclusion. One method for estimating how DVI's market prices would have responded to revelation of the truth is to estimate an "earnings response coefficient" or "ERC". This method is based on evaluating how DVI's market value was impacted by other earnings surprises and then apply it to a measure of the "surprise" that would occur if the truth would have been revealed. Use of earnings response coefficients to evaluate how the market reacts to information is a common and accepted method in the finance literature.[27]

---

[26] PWC0000014

[27] See for example, Collins and Kothari (1989); Chambers, Freeman & Koch (2005); Kormendi & Lipe (1987); Hotchkiss & Strickland (2003); Freeman & Tse (1992)

44.    **Exhibit 12** shows that during most quarters DVI did not have any earnings surprises since its actual earnings were equal to or very close to the consensus estimates. However, on three occasions during the Class Period, DVI surprised the market by announcing earnings that differed substantially from consensus estimates. These disclosures, therefore, provide a good natural experiment of how sensitive DVI's stock price is to material surprises in earnings. **Exhibit 13** shows the earnings surprise and market price reaction for each of these dates. For example, on September 27, 2002 DVI formally announced a loss of -$0.50 per share versus an expectation of $0.43 per share. This represents a negative earnings surprise of -$0.93 per share. This translates to quarterly earnings that were $13.8 million less than expected.

45.    For this particular announcement, the market reaction to the earnings surprise occurred over multiple days. While the final earnings announcement and management conference call to discuss those earnings occurred on September 27, 2002, DVI provided a range and previewed certain elements of the announcement two days earlier on September 25, 2002. In addition, there was a rating agency downgrade and an analyst report on September 24, 2002 that questioned DVI's earnings quality and expressed liquidity concerns about the company. Since the goal of my analysis is to estimate the impact of a substantial earnings surprise that would certainly have incorporated the impact of a ratings downgrade and negative analyst reports, I conclude it is appropriate and relevant to look at the total market price reaction from September 24 to September 27 to calculate the ERC. The market price reaction on September 24, 2002 through September 27, 2002, after controlling for market factors, was a decline of $91.14 million. Since the earnings surprise was $13.79 million, this implies an earnings response coefficient of 6.61 ($91.1M reaction divided by $13.8M surprise). In other words, for

each $1 million earnings shock, there was a $6.61 million decline in the market value of DVI's Equity and Senior Notes.

46.     The previously described calculation of the ERC, as well as the calculation of the ERC for the other two earnings surprises during the Class Period appear on **Exhibit 13**. In my view, the most appropriate multiple to use in this case is the 6.61 multiple associated with the September 2002 earnings surprise. This is because it most closely resembles the type of surprise we are attempting to evaluate. The surprise on February 14, 2003 is positive and small relative to the event I am trying to evaluate. It also comes at a time where there is increased skepticism regarding DVI and the reversal from negative earnings trends to a positive earnings announcement likely magnified the market's surprise. The negative surprise on May 13, 2003 comes at a time where DVI's liquidity problems are becoming clearer and prices are already reflecting pessimism regarding the company's ability to execute. In contrast, the earnings surprise in September 2002 is a reasonable proxy (although smaller in size) of the hypothetical disclosure I intend to evaluate. In particular, the market was subjected to a concurrent negative earnings shock, questions about its liquidity, and negative analyst commentary. This type of announcement is a better proxy than the other surprises. I view the ERC associated with this September 2002 announcement to be a reasonable proxy for the purposes of evaluating the valuation impact of a full corrective disclosure.

47.     If we apply this ERC of 6.61 to the earnings shock that would have occurred upon disclosure of DVI's true financial condition, it is sufficient to reduce the market capitalization to below where it stood as of the end of the Class Period. **Exhibit 14** shows the calculation of the market price impact and compares it to the observed combined market value of DVI's Equity and Senior Notes. The reduction in value ranges from $378.1 million during the first quarter of

18

the Class Period to $577.2 million by the May 13, 2003 earnings announcement, the last earnings announcement before the end of the Class Period.

48.    While application of earnings response coefficients is by no means an exact science, the take away from this analysis is that the materiality of the misstatements was sufficient to cause the types of stock and Senior Notes price declines we observe in DVI's securities during the Class Period. This result is not surprising and makes perfect sense. First, the loan loss reserves that would have to be taken at any point in the Class Period exceed the total income reported by DVI throughout the Class Period. In addition, this is what actually occurs when the truth about DVI comes to light. Equity holders got nothing and even though the Senior Notes traded at $0.20 on the dollar at the end of the Class Period, their recovery in the bankruptcy is still uncertain.[28]

## LOSS CAUSATION

49.    One element of proof required for damages under the Securities Exchange Act of 1934 is loss causation. I understand loss causation to be a combination of the "but-for" test and the "foresee-ability" test. In other words, would plaintiffs' have suffered the loss but-for defendants' actions and was the loss a foreseeable consequence of their actions? The roles for economists in this type of inquiry include evaluating the economic impact of the alleged fraud (in terms of how it would affect securities prices) and determining whether there is economic evidence to link later price declines (if any) to the revelation of the prior misstatements or omissions.

50.    The courts have not uniformly adopted an unambiguous standard for meeting the loss causation requirement in these matters. The Supreme Court decision *Dura*

---

[28] Disclosure Statement for the First Amended Joint Plan of Liquidation of DVI, Inc., et al., p. 5

*Pharmaceuticals, Inc., et al., v. Broudo et al.* ("*Dura*") recognizes that plaintiffs cannot prevail by simply proving the stock price was inflated.[29] Plaintiffs must also show that the investor held until at least a portion of the inflation was no longer in the stock. Clearly in DVI's case the inflation came out of the stock price since the price declined to essentially zero by the end of the Class Period. The relevant area of inquiry is how closely each decline must be tied to specific information about the alleged fraud.

51.     Nothing in the language of the *Dura* opinion suggests that in a case where a fraudulently inflated stock price is corrected slowly through the passage of time and partial corrective disclosures that only the final revelation of the fraud is recoverable. Nor would it be appropriate as a matter of economics to attribute only that particular loss to the fraud and the remainder to "other" factors. Indeed, the *Dura* decision specifically contemplates a case where, "the relevant truth begins to leak out". In my view, the 'relevant truth' is the true condition of the firm and there are many ways in which that truth can become reflected in the market price of the security. Recall that the primary conclusion of *Dura* is that it is insufficient to simply prove an inflated purchase price. I concur. What *Dura* is concerned about is price declines that are unrelated to the misrepresentations. In relevant part *Dura* states,

> "When the purchaser subsequently resells such shares, even at a lower price, that lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events which taken separately or together account for some or all of that lower price."

52.     How precisely does one ensure that the losses are not related to "other" factors? *Dura* is appropriately silent on this issue since the answer may be dominated by context-specific facts. One well-accepted approach to ruling out other factors is to perform an "event-study". An

---

[29] 544 U.S. (2005) Opinion of the Court, Supreme Court of the United States, No. 03-932, Dura Pharmaceuticals, Inc., et al., Petitioners, v. Michael Broudo, et al.

event study is a statistical technique designed to test whether a security exhibited a change in price over some period that is sufficiently material, after controlling for other factors. This technique has been utilized for over 30 years in the academic literature as an appropriate tool for measuring the value of information on securities prices.[30]

53.     The event-study approach will capture many of the discrete changes in price as the market learns of the true financial condition, but what of the general downward movement of prices with the passage of time if the market struggles to understand the true reasons for lack of performance and begins to systematically discount management's reassurances? While we cannot point to firm-specific revelations on each day, nor significant price movements, this does not indicate that the fraud did not cause these losses. The question is whether there is sufficient proof to meet the *Dura* standard. Is it sufficient to show that the market as a whole, and the underlying industry specifically, cannot explain the downward trend? If there are no competing theories, or alternative firm-specific facts or circumstances to explain the substantial losses, then why should we exclude these losses? In my view, the finder of fact needs to evaluate the reasonability of attributing these losses to the fraud.

54.     As a result, I calculate damages under two different scenarios for DVI's Stock. The first approach is what I call the "insolvency approach." This approach is premised on the notion that, but-for the fraud, DVI's Equity would not have traded except as a penny stock and that any decline in value was causally linked to reliance on DVI's market price and the false and misleading information it reflected. I have already shown that DVI's decline in value is generally unrelated to broader market or industry factors and that its underlying industry was robust. Under this theory of loss causation, any downward movement in the stock price which

---

[30] David I. Tabak and Frederick C. Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom," Ch. 19, Litigation Services Handbook, The Role of the Financial Expert, Third Edition, 2001.

21

brought the market price more in line with the "uninflated" price is recoverable. To calculate

damages associated with this model, I assume that the uninflated price is equal to $0.30 per

share. This is the market price that prevailed at the end of the Class Period. It should be noted

that DVI continued to trade after the Class Period and the average price over the 90 days

following the Class Period was $0.12 and equity-holders receive nothing under the bankruptcy

plan.[31]

  55. The second method is the "Event-Based Approach." This approach is premised

on the notion that, regardless of whether the fraud caused all the price declines in DVI's stock,

the loss causation burden is only met for particular events where there is a material change in

price in conjunction with the introduction of new firm-specific information causally related to

the alleged fraud. The next section describes this methodology and identifies the rationale

behind the events I select to include in the damages calculations.

## EVENT STUDY

  56. As briefly described above, an event study is a well-accepted statistical method

utilized to isolate the impact of information on market prices.[32] The event study accomplishes

this by specifying a model of what price movements are "expected" based on outside market

factors and then testing whether the deviation from expected price movements are sufficiently

large that simple random movement can be rejected as the cause. A well-accepted method for

performing an event study is to estimate a regression model over some period of time to observe

the typical relationship between the market price of the relevant security and broad market

factors. I have performed such an analysis where I evaluate the relationship between DVI's daily

return (percentage change in stock price) controlling for a broad market index (the S&P 500), a

---

[31] Disclosure Statement for the First Amended Joint Plan of Liquidation of DVI, Inc., et al., p. 5

[32] Tabak and Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom".

broad index of small-cap companies (Russell 2000 Small Cap Index) and an index of companies identified by DVI as relevant comparison companies. To estimate this regression I use data from August 10, 1999 (the beginning of the Class Period) through September 12, 2002 (the date before what I consider the first potential partial corrective disclosure).

57.     The results of this regression are shown on **Exhibit 15**. Unsurprisingly, the model suggests that there is positive correlation between each of the market factors identified. For example, the coefficient on the S&P 500 is 0.44 which suggests for every 1% increase (decrease) in the S&P 500, we expect DVI to rise (fall) 0.44%.

58.     Another important statistic from the regression is the Root Mean Squared Error, which in this case is 2.34%. The significance of this figure is that it measures the degree of imprecision in the predictions from the model (the "standard deviation" of the errors). For example, let's say the model predicts, based on movements in the three factors identified above that DVI's stock price would rise 1% (this is the "predicted return"). Because of the inherent randomness observed in stock price returns, we do not expect the model to predict returns exactly. For our example, let's assume we observe an actual return of 1.6%. Thus, the "abnormal return" is 0.6% (1.6% actual return minus 1% predicted return).

59.     Is this 0.6% abnormal return sufficiently large that we reject random movement as the explanation? This is where we rely on the standard deviation of the errors (Root Mean Squared Error) from the regression model. A "t-statistic" measures the number of standard deviations our actual observation is from the prediction. In the example, an abnormal return of 0.6% represents 0.26 standard deviations or a t-statistic of 0.26 (0.6% abnormal return divided by the root mean squared error of 2.34%). Probability theory tells us that, based on randomness alone, the abnormal return should only have a t-statistic of greater than 1.96 standard deviations

23

5% of the time.[33] Restating it another way, we have 95% confidence that the actual return will fall within 1.96 standard deviations of the predicted return unless there is some non-random explanation. Since our example only has a t-statistic of 0.26, we would say that abnormal return is statistically insignificant and we could not reject randomness as the cause. However, if on a particular day we observe an abnormal return that has a t-statistic of greater than 1.96 ("statistically significant") AND we observe firm-specific information, we reject randomness as the explanation and conclude that the information is what caused the stock price to move (and thus establishing loss causation if the news is a partial corrective disclosure of the alleged fraud).

60.    **Exhibit 16** shows the abnormal returns I calculate for DVI's equity prices on each day during the Class Period. The horizontal lines represent the threshold for statistical significance at 1.96 standard deviations. Therefore, for each vertical line that crosses the threshold, I am willing to conclude that price movement was not caused by random factors. For example, on June 4, 2003, Deloitte announced their resignation. On this day, DVI's stock price had an abnormal return (i.e. after controlling for market factors) of -10.94% (or -$0.87 per share) and the t-statistic associated with this event is -4.67. This event is therefore highly statistically significant and for reasons described below, I view this as a partial corrective disclosure. I therefore use the abnormal price movement on that day as evidence that there was $0.87 of inflation that existed in the stock prior to this disclosure and that loss causation has been proven for that decline in the stock price.

61.    I also performed an event study for DVI's Senior Notes. This event study controls for movements in risk-free interest rates. I considered a regression that also included

---

[33] Tabak and Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom".

returns on a high-yield bond index, but found it did not have explanatory power during the estimation period and had no impact on the loss causation analysis.

62. I collected and evaluated the news related to DVI during the Class Period to evaluate which events represent partial corrective disclosures of the hidden truth about DVI. In my view, any statistically significant price decline associated with DVI-specific news that brings the market closer to the realization that DVI had sustained massive hidden loan losses, was in financial distress, and has engaged in accounting improprieties, represents a partial corrective disclosure.

63. The remainder of this section discusses my evaluation of events that occurred during the period from September 13, 2002 until the end of the Class Period and which events I conclude reflect evidence of loss causation under the Event Based Approach, identified in paragraph 55. A tabular summary of this analysis is reflected in **Exhibit 17**.

64. September 13, 2002 – I considered this to be the first potential partial corrective disclosure. This is the day on which USD (a major customer of DVI) declared bankruptcy. I considered this a potentially important event because it was a chance for the market to call into question DVI's accounting since it could bring to light that one of its major customers could not repay its debts to DVI. Certain investors apparently took note. For example, on a conference call on September 27th, 2002 after the announcement of DVI's quarterly and annual earnings, CEO O'Hanlon, in response to a question about how the USD bankruptcy would impact DVI, O'Hanlon stated, ". . . . that [USD] situation has caused I don't know how many phone calls here and how many rumors about the potential loss of $30 to $40 million in that situation."[34] Despite

---

[34] DVI Inc. Q4 2002 Financial Release Conference Call (September 27, 2002)

the USD bankruptcy announcement, there was no statistically significant price reaction to this announcement on that day. As a result, I do not attribute any loss causation to this event.

65.     September 24, 2002 – Fitch downgraded DVI's Senior Unsecured Debt rating from "BB-" to "B+" and Piper Jaffray downgraded DVI to "Market Perform" from "Outperform". Fitch lowered its rating due to DVI's weak operating performance, DVI's asset growth exceeding its internal capital, increased encumbered assets and increased financial leverage.[35] Fitch states, "The Rating Outlook remains Negative as DVI faces significant challenges in reversing the trends in leverage and capitalization. As such, if current trends continue, the cushion available to unsecured debtholders may become further compromised. Fitch also notes that gain-on-sale revenue as a percentage of total revenue has risen sharply in fiscal year 2001 and the first nine months of fiscal year 2002." In my view, this lowering of expectations and concerns regarding liquidity represents a subset of the information that would have come out if DVI had been truthful. In other words, a full disclosure would have been far worse and more dramatic, but a lowering of the firm's credit rating and lowering of analyst expectations is something that certainly would have occurred had the truth been known. Stated another way, the "B+" and "Outperform" ratings maintained prior to this date would not have occurred but-for the fraud and these events bring the market closer to the realization that DVI is in financial distress. DVI's Senior Notes reacted very significantly by dropping over 10% with a t-stat of -5.16. DVI's stock price had an abnormal return of -4.2% and was just short of statistically significant (t-stat of -1.80). Taken together, there is strong evidence that this event caused DVI's stock and Senior Notes prices to move negatively and loss causation is established for both the stock and Senior Notes.

---

[35] "Fitch Lowers DVI's Sr Unsecured Debt To 'B+'; Outlook Remains Negative," Business Wire, September 24, 2002.

66.     September 25, 2002 – DVI announced that it expected to report a loss for the fourth quarter, in part due to $5.6 million in fourth-quarter charges related to de-emphasized business activities, valuation of other real estate owned, and for operations related to health care companies in which DVI holds an interest. Securities analysts had expected earnings of $0.43 per share while DVI was suggesting its earnings would be -$0.50 (or a miss of $0.93 per share).[36] The news coverage focused on DVI's charges as well as comments by US Bancorp Piper Jaffray that "We are disappointed by the trends at DVI, especially since the sector that DVI focuses on is one bright spot of the U.S. economy". Both DVI's Stock and Senior Notes prices fell significantly, they had abnormal returns of -29.6% and -5.0% respectively. In my view, this new information brought the market closer to the realization that DVI was in financial distress and satisfies the loss causation criteria.

67.     September 26, 2002 – CIBC issued an analyst report that provides additional detail of the charges DVI has pre-announced. The commentary within the analyst report was mixed, but CIBC lowers its future earnings forecasts and comments on the reasons for the previous price declines. CIBC stated, "Prior to the earnings pre-announcement, Fitch downgraded DVI's Senior Notes rating to B+ from BB, which sparked speculation of a liquidity squeeze and limited access to capital."[37] That 'speculation' turned out to be correct. DVI was in a liquidity squeeze since by this time there is substantial evidence that they relied heavily on pledging of ineligible collateral. This contemporaneous analyst commentary provides further support for my view that the price declines during this period are partial corrective disclosures and pass the more stringent loss causation standard. On September 26, 2002, DVI's stock had a

---

[36] "DVI, Inc.'s Q4 and Fiscal Year Guidance Will Miss Analysts' Estimates", Reuters Significant Developments, September 25, 2002.

[37] "DVI Sees Yr Loss $3.4M - $4.4M," Dow Jones News Service, September 25, 2002, 2:28pm.

statistically significant abnormal return of -4.75%. DVI's Senior Notes did not move in a significant way.

68.     September 27, 2002 – DVI released the details of their Q4 and FY 2002 earnings and hosts a conference call where analysts are able to ask questions of management. DVI's stock price fell dramatically with an abnormal return of over 20%, which is highly statistically significant. DVI's debt prices do not move significantly. Because there was substantially more detail incorporated in DVI's earnings announcement as well as in the conference call, in my view the market received new information regarding the quality of DVI's earnings outlook and the market adjusts the stock downward accordingly. This event brought the market's perception of DVI closer to the truth of DVI's financial distress that has been fraudulently concealed, and thus satisfies the more stringent loss causation criteria.

69.     September 20, 2002 – With the context of the events from September 13, 2002 to September 27, 2002 described above, I want to turn my attention back to September 20, 2002. On this day, the market price for DVI stock fell over 25% and far exceeded the threshold for statistical significance. There is not an obvious news announcement on that date that can explain the timing of this decline. Given the size of this price movement, however, I discuss my impression of the reasons for the decline. First, as noted above, O'Hanlon indicated there were "rumors" regarding the impact of the USD bankruptcy on DVI ahead of the conference call. Second, DVI's earnings announcement was coming much later than usual. Typically, DVI announced earnings on approximately August 16.[38] Therefore, DVI was 6 weeks late in providing information to the market which could be (rightly in this case) perceived as a potential negative signal about the upcoming earnings announcement. Third, the September 24th

---

[38] DVI released its FY 1999 earnings on August 10, 1999; FY 2000 earnings on August 23, 2000; and FY 2001 earnings on August 16, 2001.

announcement by the ratings agency indicates DVI was clearly under scrutiny at the time. Fourth, the Piper Jaffray analyst report on September 24th, which hints at the possibility of reserve charges, indicates there was the real potential that information regarding the upcoming earnings surprise leaked into the market prior to the earnings announcement and credit agency downgrade.[39] As a result, while the exact timing of the drop is perplexing, there are a number of plausible potential causes – none of which I can definitively rule in or out. As a result, even though I believe the true cause of this decline would qualify as a corrective disclosure, I do not feel I have sufficient evidence to meet the more stringent loss causation standard. At the end of the report, I will note the impact on damages in the event the finder of fact decides this fact pattern is sufficient to show loss causation.

70. September 30, 2002 – Moody's cut DVI's Senior Notes rating and CIBC issues another analyst report. There is a statistically significant positive move in the stock price (abnormal return of +6.63%). DVI's Senior Notes did not move significantly. This is the first trading day after a week-long series of negative news and negative price movements.[40] In my view, the market was potentially still in the process of digesting the news from the previous week and this represented a partial correction of the previous week's declines. I therefore include this date in my equity damages calculations, which has the effect of reducing damages since it partially offsets the previous declines.

---

[39] The notion of information leaking to the market early and causing price changes is a common concern in event studies. For example, a leading text on the use of event studies in litigation states that, "When it is unlikely that the news of an announcement was leaked beforehand, one typically would start the event window at the end of the trading day before the announcement was made. When there is a reasonable possibility that the information reached the market before a formal announcement, the event window may be extended back to include the potential leakage." Tabak and Dunbar, p. 4.

[40] This is the first trading day after September 27 – which was the date of the earnings announcement and management conference call.

71.     October 28, 2002 – DVI announced that it is prepping a new securitization of up to $3 billion before the end of the year. The stock price increased significantly with an abnormal return of +12.7%. In my view the market interpreted this information as a positive signal regarding DVI's liquidity position. I treat this day, therefore, as an event that "re-inflates" the stock and offsets some of the previous corrective disclosures. DVI's Senior Notes price does not move significantly.

72.     October 31, 2002 – DVI announced earnings for the quarter ending September 30, 2002 (Q1 for Fiscal 2003). Earnings met market expectations, yet the stock price increases significantly with an abnormal return of +14.42%. Again, in my view, the market interprets this as a positive signal regarding DVI's financial condition and ability to avoid a liquidity crisis. As a result, I treat this as another day that partially "re-inflates" the stock.

73.     November 14, 2002 – DVI announced that it had closed its largest securitization ever. DVI's Senior Notes have a significant positive abnormal return of +5.0%. The stock return was not statistically significant. In my view, this announcement gave the debt market false comfort regarding DVI's financial condition and had the truth been known, this event would not have occurred. As a result, I treat this as a day that partially "re-inflates" the Senior Notes.

74.     November 21, 2002 – Moody's assigned a "Aaa" rating to securities linked to DVI's recent securitization. DVI's stock had a statistically significant abnormal return of +7.82%. The prices of DVI's Senior Notes securities did not move significantly. I include this event as something that "re-inflates" DVI's stock since it is an event that would not have occurred but-for the fraud.

30

75.     February 14, 2003 – DVI reported earnings for the quarter ended December 31, 2002 (Fiscal 2003 Q2) that exceeded analyst expectations. DVI's stock and Senior Notes both experienced statistically significant positive abnormal returns (6.6% and 6.2% respectively). Given DVI's true financial condition at this time, this event would not have occurred but-for the fraud. I therefore treat this event as a "re-inflation" of both securities.

76.     February 27, 2003 – CIBC issued a more positive analyst report which states that, "Following a management conversation, we believe the tide has shifted for DVI." CIBC's optimism is still guarded, but they focus on positive aspects of the company's most recent earnings report. For example, they state "DVI's earnings were also positively affected by a reduction in the loan-loss provision . . . While we had initially been critical about the provisioning level, upon further reflection we believe the lower provision did accurately reflect the loss performance on the company's core business. Further, we believe additional losses that could be manifested in the upcoming quarters should be able to be reserved against through regular loan-loss provisioning practices." This analyst's ability to gain comfort with the loan loss reserves after a discussion with management would not have occurred had DVI not withheld its true financial condition. The stock price rose significantly on this day with an abnormal return of +5.8%. The Senior Notes did not react in a significant manner. Therefore, I include this as a re-inflation event for the stock.

77.     May 13, 2003 – DVI announced results for the third quarter and first nine months of its fiscal year 2003 ending June 30, 2003. Analysts had expected earnings of $0.30 per share, but DVI only reported earnings of $0.20 per share. The stock price dropped significantly with an abnormal return of -5.3%. The Senior Notes did not react significantly. US Bancorp Piper Jaffray reduces their earnings estimates going forward. I incorporate this event as a partial

31

corrective disclosure since the negative earnings surprise and attendant decrease in earnings expectations result in getting the market closer to the realization of DVI's true financial condition.

78.     June 4, 2003 – DVI announced the resignation of Deloitte as its auditor. In my view, this event is a signal to the market of potential problems with DVI's accounting. This is supported by contemporaneous news commentary. For example, Reuters stated, "DVI, in a statement, did not disclose the reasons for Deloitte's resignation, but the decline of the company's stock reflected investor concern about possible irregularities."[41] The Stock reacted significantly with an abnormal return of -10.9%. The Senior Notes had an abnormal return of -4.0% which was just shy of being statistically significant (t-stat of -1.92). In my view, given the level of attention on this particular event, the highly significant movement of the Stock, and the borderline significance on the Senior Notes, it is appropriate to attribute the movements in both the Stock and Senior Notes price movements to the auditor resignation. I conclude that this event represents a partial disclosure of the relevant truth that DVI had had engaged in accounting improprieties.

79.     June 6, 2003 – S&P announces that it may cut DVI's credit rating based on the resignation of Deloitte. "Standard & Poor's will assess the consequences of the change in accounting firms and any impact this change may have on the company's financial performance," S&P credit analyst Steven Picarillo said in a statement.[42] S&P also said it remained concerned about DVI's ability to refinance its maturing Senior Notes. Both the stock and Senior Notes declined significantly with abnormal returns of -11.43% and -12.22%, respectively. Consistent with my treatment of other downgrade actions, I view this as a partial corrective disclosure.

---

[41] "Healthcare lender DVI loses its auditor, stock hit." Reuters News, June 4, 2003, 4:41pm.

[42] "S&P may downgrade DVI after auditor resigned," Reuters News, June 5, 2003, 5:29pm.

80.    June 9, 2003 – DVI released an 8-K providing further information regarding the reasons for Deloitte's resignation. The stock price does not react, but the Senior Notes price rises significantly with an abnormal return of +5.47%.   For the Senior Notes, therefore, I effectively treat this as an offset to the June 4 and June 6 disclosures regarding Deloitte's resignation.

81.    June 27, 2003 – DVI announced that the SEC rejected its most recent quarterly filing because it was not reviewed by an independent auditor.[43]  Moody's downgraded DVI's senior unsecured debt rating to Caa3 from B3 due to the disclosure.  Moody's stated that as a result of the SEC's decision, DVI may be in default of certain covenants within its debt indentures or other financing agreements.  Moody's also stated that such a covenant default could lead to the cross-default and/or cross-acceleration of a number of DVI's debt obligations.[44]  S&P downgraded DVI's long-term counterparty credit rating two notches, to "CCC+" from "B".[45] Unsurprisingly, both DVI's stock and Senior Notes had significant negative abnormal returns, -26.19% and -20.87%, respectively.  In my view, this event represents a partial disclosure of DVI's true financial condition.

82.    June 30, 2003 - DVI announced the hiring of UBS Securities to help review the company's financial options, which included raising capital or a possible sale of all or most of the company's businesses.[46]  Fitch downgraded DVI's Senior Unsecured Debt rating from "B+" to "CCC" citing liquidity concerns after the SEC rejected its quarterly filing last week.[47]  A U.S.

---

[43] 6/27/03 Dow Jones Newswires article (time stamped 9:39:00 AM EDT) titled "SEC Staff Advises DVI Its March 31 10-Q Deficient"

[44] 6/27/03 Moody's Investor Service Press Release titled "MOODY'S DOWNGRADES DVI SENIOR DEBT TO Caa3 - OUTLOOK IS NEGATIVE"

[45] 6/27/03 Reuters article (time stamped 4:18:00 PM EDT) titled "S&P cuts DVI counterparty credit ratings"

[46] 6/30/03 Reuters article (time stamped 9:16:00 AM EDT) titled "DVI hires bank to explore strategic alternatives"

[47] 6/30/03 Reuters article (time stamped 3:21:00 PM EDT) titled "Fitch cuts DVI corporate debt rating"

Bancorp Piper Jaffray analyst report stated that DVI's debt holders could declare a default, as the 10Q for the March 31 quarter has not been filed in a "timely" fashion.[48] Both DVI's Equity and Senior Notes had positive significant returns (8.50% and 11.35%, respectively) as the market apparently took comfort in the hiring of UBS. In my view, this rebound in price would not have occurred if the full truth had been known and I include this day as "re-inflation" of the stock and the Senior Notes.

83.     July 1, 2003 – Moody's announced late on June 30, 2003 that it placed under review for possible downgrade nine asset-backed Senior Notes worth $1.8 billion issued by DVI. Moody's stated that the rating moves were prompted by two consecutive downgrades of DVI's senior unsecured debt by Moody's. Moody's said its review will focus on whether the transactions experience an increased delinquency and default rates.[49] Fitch announced that it placed all DVI asset-backed transactions on Rating Watch Negative due to increased operational and performance risks.[50] The stock had a significant abnormal return of -11.98% while the Senior Notes did not react significantly. For the same reasons described earlier, I conclude that ratings downgrades are partial corrective disclosures and that the decline in the stock meets the more stringent loss causation criteria.

84.     July 16, 2003 - DVI announced that on the previous day it received a Notice of Default from U.S. Bank National Association relating to DVI's 9 7/8 Senior Notes due 2004.[51] S&P downgraded DVI's senior unsecured rating to "CCC-minus" from "CCC-plus" due to concern that this default may cause DVI to be in default of certain covenants within certain

---

[48] 6/30/03 U.S. Bancorp Piper Jaffray report titled "DVI to Explore Strategic Alternatives"

[49] 7/1/03 Reuters article (time stamped 10:22:00 AM EDT) titled "Moody's says may cut $1.8 bln of DVI asset-backeds"

[50] 7/1/03 Business Wire article titled "Fitch Places DVI Equipment & Healthcare Securitizations on Rtg Watch Neg."

[51] 7/16/03 Business Wire article titled "DVI Receives Notice of Default on Senior Notes"

34

indentures and other agreements that govern various debt obligations.[52] There were statistically significant abnormal declines in both DVI's Stock and Senior Notes prices associated with this announcement (-9.77% and -7.84%, respectively). In my view these losses meet the more stringent loss causation standard.

85.     August 1, 2003 and August 4, 2003 - DVI announced on Friday August 1, 2003 that it would not make the scheduled interest payment due that day for its 9 7/8 Senior Notes due 2004 because of severe liquidity constraints. DVI also said it had defaulted under its main bank facility because of a shortfall in the amount of collateral supporting the amounts it borrowed.[53] The exact timing of when this information reaches the market is unclear. By 4:54pm Reuters News was reporting that S&P had downgraded DVI's Senior Notes rating to "D". The stock price begins declining substantially minutes before the close at 4pm. The first Senior Notes transaction reflecting a decline is not until the following Monday on August 4, 2003. Contemporaneous analyst reports and news articles attribute the last minute stock price decline on August 1, 2003 and the decline of both the stock and Senior Notes price on August 4, 2003 to the missed interest payment. The stock price had an abnormal return of -39.77% on August 1 and   -43.91% on August 4. The Senior Notes had an abnormal return of -41.39% on August 4. These events bring the market closer to understanding DVI's true financial condition and the declines meet the loss causation standard.

86.     August 5, 2003 – After market close on August 4, 2003, DVI announced that neither it nor any of its wholly-owned subsidiaries had any remaining availability under its various credit facilities and that it is considering Chapter 11 bankruptcy protection.[54] Both the

---

[52] 7/16/03 Reuters article (time stamped 1:54:00 PM EDT) titled "S&P lowers DVI debt rating after default notice"

[53] 8/1/03 Business Wire article titled "DVI Announces Failure to Make Interest Payment"

[54] 8/4/03 Business Wire article titled "DVI Seeking to Address Liquidity Constraints"

Stock and Senior Notes had significant abnormal returns of -32.99% and +8.11%, respectively. While it may seem strange that the stock and Senior Notes move in opposite directions on this day, keep in mind that from August 1 through August 5, the stock and Senior Notes fell 62.8% and 36.6%, respectively. There is no doubt that the disclosures over this period, on net, are negative developments for both securities. In my view, the partial rebound in the Senior Notes is reflective of the market's uncertainty regarding the company's value in bankruptcy. The event on August 5 brings the market closer to understanding DVI's true financial condition and the price changes meet the loss causation standard.

87.     August 6, 2003 – August 14, 2003 – On August 14, 2003, DVI formally announces it will seek bankruptcy protection and discloses the existence of "accounting improprieties". There are significant Senior Notes price declines leading up to the August 14, 2003 bankruptcy announcement and both the stock and the Senior Notes decline significantly on August 14, 2003. For example, on August 7 and August 8, the Senior Notes have significant declines in price. In my view, these declines are causally related to the market grappling with how to value DVI in the wake of its announcement that it is considering bankruptcy protection. While it is difficult to tie specific news stories to specific declines in this short window of time with remarkable firm-specific developments, there is no doubt in my mind that the declines in price reflect the market coming to the realization of the true value of DVI which had previously been hidden from the market. At the end of the Class Period, DVI's Stock price was $0.30 and its Senior Notes price was $20.74.

88.     Post Class Period – The market price of DVI's securities did not recover after the Class Period. For example, the average closing price of the common stock was $0.12 per share

36

over the 90 days following the end of the Class Period and the average Senior Notes price was $20.94 during this time.

## CALCULATION OF INFLATION FOR EVENT-BASED MODEL

89.     To understand how the dollar amount of event-based inflation is determined on each day during the Class Period, it is helpful to follow DVI stock price movements and work backwards in time starting from the day after the Class Period ends (August 14, 2003). By the close of trading August 14th DVI had already announced its plan to seek bankruptcy protection and all other corrective information had previously been released to the market. As a result there is no longer any inflation in the stock. As of the close of trading on the previous day (before DVI had made its final disclosure), the stock price was still inflated as a result of not knowing about what the announcement of the bankruptcy and discovery of "accounting improprieties". The inflation at this time is measured by the abnormal dollar movement the disclosure caused. I used the event study techniques described earlier in this report to determine the abnormal stock price change on August 14th was -$0.50 (or $0.50 of inflation). The $0.50 inflation is carried back in time until either the original event that initial caused inflation occurs (at which point the $0.50 would be removed from the stock price) or another corrective disclosure occurs (at which point the $0.50 would be added to the change in inflation caused by the earlier disclosure). In this case, the $0.50 is carried back to the August 8th disclosure date when the abnormal stock price movement was $0.21. The $0.50 inflation is added to the $0.21 inflation to get $0.71 of inflation being carried back to dates prior to August 8th.

90.     This process of accumulating the changes in inflation is continued until the beginning of the Class Period. In a previous section I described how based on Dr. Epstein's analysis as well as my own, a revelation of the full truth at any point in the Class Period would

37

have been sufficient to force the company into bankruptcy. This provides the rationale and justification for me to carry the inflation measured on the corrective disclosure dates back to the beginning of the Class Period. The resulting inflation per share for each day during the Class Period is plotted for the common stock in **Exhibit 18.** I determine the inflation for the Senior Notes using the same methodology and plot the results in **Exhibit 19. Appendix C** contains detailed results of the event study and calculation of the inflation on each day during the Class Period.

## EQUITY & SENIOR NOTES DAMAGES

91. Damages in security class action cases are calculated using two sets of information: 1.) the inflation per share of the subject company's security during the Class Period and 2.) the trading activity of the investors who purchased the inflated security during the Class Period. The calculation of damages suffered by a single share is the difference in the inflation per share on the date of the purchase less the inflation per share on the date the security is sold[55], or in other words damages per share is equal to the change in the stock price caused by the fraud from the time of purchase to the time of the sale. For example, if an investor purchased a share of a company's common stock when some unrevealed fraud had falsely inflated the share price by five dollars, and subsequently sold the shares after the truth was revealed to the market and the stock price dropped five dollars (inflation dropped to zero), then the investor suffered five dollars in damages due to the decrease in the stock price caused by the fraud. Alternatively, if during the period between the purchase and sale the inflation per share increased, then the investor benefited or gained from the fraudulent activities of the subject company.

---

[55] If the security is not sold, the inflation per share is calculated using the average closing price in the 90 days following the end of the Class Period. This is referred to as the "90 Day Lookback Price".

92.     Typically, experts calculating damages do not have access to the trading records of investors purchasing and selling the subject company's security, so in order to calculate damages, experts will estimate trading activity using publicly available data. A common method among experts is to separate the investors into two groups, institutions and non-institutional investors (individuals). Institutional investors are made up of investment managers who exercise discretion over $100 million or more in publicly traded equity securities. These institutions are required to report their equity holding to the U.S. Securities and Exchange Commission ("SEC") on a quarterly basis in a Schedule 13F report. The net change in an institution's quarterly holdings of a given security can then be converted into daily trading activity by prorating the change proportionally by the reported daily trading volume of that security. After the trading activity of the institutions is accounted for, the remaining reported trading activity of the security is assigned to the non-institutional investors. The trading activity of individuals making up this group is then typically estimated by making assumptions about their propensity to trade given the remaining unaccounted reported volume.[56]

93.     For this particular litigation it is possible to avoid most of the typical trading activity modeling to determine investors' trading activity in DVI securities by using the claims data filed by Class Members in connection with three prior settlements in this case. In order to allocate the settlement monies received from three of DVI's "Special Relationship" entities (OnCure Technologies Corp., Dolphin Medical, Inc., and PresGar Imaging, LLC), who were

---

[56] Fischel, Daniel R., Keable, Michael A., and Ross, David J., "The Use of Trading Models To Estimate Aggregate Damages in Securities Fraud Litigation: An Update," The National Legal Center for Public Interest, Vol. 10, Number 3, March 2006. Mayer, Marcia Kramer, "Best-Fit Estimation of Damaged Volume in Shareholder Class Actions: The Multi-Sector, Multi-Trader Model of Investor Behavior," National Economic Research Associates, Third Edition, October 2000.

originally named as defendants in the matter, investors who purchased DVI's common stock and Senior Notes during the Class Period have already been asked to submit their Class Period trading activity to a claims administrator through a proof of claims and release document. The proof of claims document requested the trading activity of investors in DVI common stock and DVI 9 7/8 Senior Notes between August 10, 1999 and August 13, 2003 along with the balance of shares held on the day prior to the start of the Class Period and the day following the end of the Class Period. The claims administrator validated the claimants' transactions, eliminated duplicate claims, matched purchase transactions with sale transactions using a first-in first-out (FIFO) inventory method, and created an electronic database of these "Observed Claims." The database was made available for my use in the calculation of damages.

94.    **Exhibit 20** shows the percentage of DVI common stock trading volume represented in the Observed Claims for each calendar quarter of the Class Period. By comparing the Observed Claims to the reported volume of DVI common stock on the NYSE, it is evident that the Observed Claims represents some but not all of the purchases made during the Class Period. There were over 28 million shares purchased during the Class Period that are not accounted for in the Observed Claims. The missing purchases were purchased at inflated prices and damaged if the shares were sold at a lower inflation amount.

95.    Clear evidence of missing damaged transactions from Observed Claims is provided by the SEC Schedule 13D beneficial ownership report filed on September 4, 2003 by Flero Services Ltd. (According to the SEC, when an investor acquires beneficial ownership of more than 5% of a voting class of a company's registered equity securities, the investor is required to file a Schedule 13D with the SEC). The Schedule 13D details Flero Services' purchase of 717,000 DVI common stock shares from July 29, 2003 through August 8, 2003.

These transactions do not appear in the Observed Claims and were purchased at inflated prices. Flero Services held the shares through the final fraud related disclosures and stock price drops over the final weeks of the Class Period.

96.      Additionally, in order to capture the trading activity of investors not included in the Observed Claims, I compared the quarterly holdings of institutional investors filing SEC Schedule 13F to claimants trading records. I performed a name search and a comparison of trading activity to match claimants to all institutions reporting holdings of DVI common stock during the Class Period. Many of the institutions appear to have filed claims, however, 30 institutions do not appear as claimants.[57] I therefore rely on these institutions' 13F data for the purposes of calculating their damages.

97.      Taking into account the total trading activity of the observed claimants, Flero Services, and the institutions not represented in the claims data, I was able to calculate the number of the total number of shares represented by these three groups. **Exhibit 21** plots the shares throughout the Class Period. From August 9, 1999 until April 30, 2003 this combined group makes up a growing percentage of shares available for trading or float.[58] From April 30, 2003 through the end of the Class Period, the observed group's share of the float is decreasing, or in other words, the observed group is a net seller of DVI common stock to the unobserved group. As a result, the unobserved group is a net purchaser during this period. Members of the

---

[57] Voyageur Asset Management, Inc., CAM North America LLC, VCH Equity Group AG, OFI Institutional Asset Management, Inc., Verizon Communications Investment Management, Fifth Third Asset Management, ProFund Advisors LLC, Evergreen Investment Management Co., Inc., Quantitative Management Associates LLC, Whitebox Advisors LLC, Citadel Investment Group LLC, Somerville Trading Enterprises LLC, Bedford Oak Advisors LLC, Victory Capital Management, Inc. , Bailard, Inc. , Wyper Capital Management, Schroder Investment Management (UK) Ltd., Caxton Associates LLC, Rochdale Investment Management LLC, MFC Global Investment Management (USA) Ltd., Phoenix/Zweig Advisers LLC, NWQ Investment Management Co. LLC, Dreman Value Management LLC, Gilder, Gagnon, Howe & Co. LLC, Muhlenkamp & Co., Inc. , Frontier Capital Management Co., Inc., Comerica Bank, General Motors Asset Management, Lehman Brothers, Inc., Babson Capital Management LLC.

[58] Float is defined as the number of shares available to the public. Float is calculated by subtracting the shares held by insiders, and those deemed stagnant shareholders, from the total shares outstanding. (Source: Bloomberg)

unobserved group, therefore, experienced damages on these shares (since they did not sell them). Therefore, I incorporate this net purchasing activity in my damages calculation.

98.     The damages for the DVI 9 7/8 Senior Notes are calculated using the same methodology as the DVI common stock. However, only the observed claims data was used. **Exhibit 22** shows the number of the outstanding Senior Notes captured by the validated observed claims is 7.3% at the start of the class period and grows to 33.5% by the time the class period ends. Because the observed data represents a growing portion of the outstanding debt and therefore there is no continuous period of time where the unobserved investor would be net purchasers of DVI Senior Notes from the observed group, I have calculated damages only for the investors represented in the observed claims.

99.     Under the Insolvency Approach, Class Members who purchased DVI equity suffered damages of at least $92.5 million. Under the Event Based Approach, class members who purchased DVI equity suffered damages of at least $55.3 million. A summary of damages for both approaches is listed in **Exhibit 23**.

100.    Under the Event Based Approach, class members who purchased DVI 9 7/8 Senior Notes suffered damages of at least $33.5 million. The categorization of the Senior Notes damage amounts are also displayed in **Exhibit 23**.

101.    The combined Equity and Senior Notes damages suffered by Class Members are at least $126.0 million using the insolvency approach for the Equity and the Event-Based approach for the Senior Notes. The combined damages of both securities under the Event-Based approach are at least $88.8 million. If in the event the finder of fact decides the fact pattern on September 20, 2002 is sufficient to show loss causation, then my calculation of Event-Based Equity damages and combined Equity and Senior Notes damages would be at least $14.1 million

42

higher. It should be noted that there is significant volume in DVI's stock and Senior Notes that is not accounted for in my damage calculations. There are almost certainly additional parties that are damaged, however I have no reliable way to quantify these amounts.

102.    Finally, none of my damages calculations include pre-judgment interest.

Respectfully Submitted on October 1, 2008

Chad Coffman

43



Exhibit 1
DVI Inc. Common Stock Price and Daily Volume
8/10/98 to 11/11/03

Class Period (8/10/1999 to 8/13/2003)

8/10/99
Beginning of Class Period
Price: $16.06

9/12/02
Beginning of Corrective
Disclosure Period
Price: $13.93

8/14/03
End of Class Period
Price: $0.30

90 day Lookback Period
Average Price: $0.12

Volume ——— Closing Price

Sources: Center for Research in Security Prices, Bloomberg

Exhibit 2
DVI Inc. Common Stock Market Capitalization
8/10/98 to 11/11/03

Class Period (8/10/1999 to 8/13/2003)

9/12/02
Beginning of Corrective
Disclosure Period
$206.5M Market Capitalization

8/14/03
End of Class Period
$4.6M Market
Capitalization

Total Market Cap loss over
corrective disclosure
period: $202.0M

8/10/99
Beginning of Class Period
$227.0M Market Capitalization

$350 M
$300 M
$250 M
$200 M
$150 M
$100 M
$50 M
$0 M

8/10/98
10/10/98
12/10/98
2/10/99
4/10/99
6/10/99
8/10/99
10/10/99
12/10/99
2/10/00
4/10/00
6/10/00
8/10/00
10/10/00
12/10/00
2/10/01
4/10/01
6/10/01
8/10/01
10/10/01
12/10/01
2/10/02
4/10/02
6/10/02
8/10/02
10/10/02
12/10/02
2/10/03
4/10/03
6/10/03
8/10/03
10/10/03

—— Market Capitalization

Sources: Center for Research in Security Prices, Bloomberg



Exhibit 3

$100 Invested in DVI Inc. Common Stock vs. S&P 500 Health Care Index & S&P 500 Health Care Equipment and Services Index

Sources: Center for Research on Security Prices, Bloomberg

Exhibit 4
National Health Expenditures
1995 to 2003

Sources: Centers for Medicare & Medicaid Services, Office of the Actuary: Data from the National Health Statistics Group



Exhibit 5
$100 Invested at the Beginning of the Class Period
in DVI Inc. Common Stock, S&P 500, and Russell 2000

Sources: Center for Research in Security Prices, Bloomberg

## Exhibit 6

## List of Peer Companies Identified in DVI Inc.'s 2002 SEC 8-K Proxy Statement

1. **FINOVA Group Incorporated**
   FINOVA is a financial services holding company. Through its principal operating subsidiary, FINOVA Capital, the Company has provided a broad range of financing and capital markets products, primarily to mid-size businesses. FINOVA Capital has been in operation since 1954.

2. **Financial Federal Corporation**
   Financial Federal, incorporated under the laws of Nevada in 1989, is a nationwide independent financial services company with $1.5 billion of assets at July 31, 2002. Financial Federal finances industrial and commercial equipment through installment sales and leasing programs for manufacturers, dealers and end users of such equipment. Financial Federal also makes capital loans to equipment users, secured by the same types of equipment and other collateral. Financial Federal provides its services to middle-market businesses located throughout the nation, generally with annual revenues of up to $25 million, in the general construction, road and infrastructure construction and repair, road transportation, manufacturing and waste disposal industries.

3. **Medallion Financial Corporation**
   Medallion Financial Corp. is a specialty finance company that has a leading position in originating and servicing loans that finance taxicab medallions and various types of commercial businesses. Total assets under our management, which includes assets serviced for third party investors, were approximately $647,557,000 as of December 31, 2002, and have grown from $215,000,000 at the end of 1996, a compound annual growth rate of 20%.

4. **MicroFinancial Incorporated**
   MicroFinancial Incorporated was formed as a Massachusetts corporation on January 27, 1987. The company, which operates primarily through its wholly-owned subsidiary Leasecomm Corporation, is a specialized commercial finance company that leases and rents "microticket" equipment and provides other financing services in amounts generally ranging from $400 to $15,000, with an average amount financed of approximately $1,500 and an average lease term of 44 months. Leasecomm Corporation started originating leases in January 1986. MicroFinancial has used proprietary software in developing a sophisticated, risk-adjusted pricing model and in automating its credit approval and collection systems, including a fully-automated, Internet-based application, credit scoring and approval process.

5. **Resource America Incorporated**
   Resource America, Inc. and its subsidiaries are Delaware corporations. Resource America, Inc. is a specialized asset management company that uses industry specific expertise to generate and administer investment opportunities for its own account and for outside investors in the commercial finance, real estate and financial fund management sectors.

Sources: DVI Inc.'s October 28, 2002 SEC 8-K Proxy Statement, Peer Company 10-K Filings.



**Exhibit 7**

**$100 Invested at the Beginning of the Class Period in DVI Inc. Common Stock and an Index of Peers Indentified by DVI Inc.**

Note: The Peer Index is a market weighted index consisting of the companies DVI Inc. identified as peers in its October 28, 2002 SEC 8-K Proxy Statement (Financial Federal Corp., Medallion Financial Corp., Microfinancial Inc. Resource America Inc., and Finova Group).

Sources: Center for Research in Security Prices, Bloomberg, DVI Inc.'s 2002 SEC 8-K Proxy Statement



**Exhibit 8**
**DVI Inc. 9 7/8 Senior Notes Price and Daily Volume**
**1/4/99 to 11/11/03**

Note: The Senior Note price series is calculated as the volume weighted average price of FIPS/TRACE transactions and NYSE closing price.
Sources: FIPS, TRACE, NYSE



**Exhibit 9**

**$100 Invested in DVI Inc. 9 7/8 Senior Notes vs.
Lehman US Corporate High Yield Index
8/10/99 to 11/11/03**

Note: The U.S. Corporate High Yield Index covers the USD-denominated, non-investment-grade, fixed-rate, taxable corporate bond market.
Sources: FIPS, TRACE, NYSE, Lehman Brothers



Exhibit 10
DVI Inc. 9 7/8 Senior Notes Value and Common Stock
Combined Market Capitalization
8/10/99 to 8/14/03

Sources: FIPS, TRACE, NYSE, Center for Research in Security Prices

Exhibit 11

## DVI Inc. Reported and Adjusted Loan Loss Reserves

| Balance Sheet as of: / Earnings Announcement Date | 6/30/99 9/11/99 | 9/30/99 11/9/99 | 12/31/99 2/1/00 | 3/31/00 5/5/00 | 6/30/00 8/24/00 | 9/30/00 11/7/00 | 12/31/00 2/9/01 | 3/31/01 5/9/01 | 6/30/01 8/17/01 | 9/30/01 11/8/01 | 12/31/01 2/14/02 | 3/31/02 5/14/02 | 6/30/02 9/27/02 | 9/30/02 11/1/02 | 12/31/02 2/14/03 | 3/31/03 5/13/03 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [1] Managed Net Financed Assets (M) | $1,661.8 | $1,814.2 | $1,891.2 | $1,937.6 | $1,992.0 | $2,000.0 | $2,100.0 | $2,200.0 | $2,273.2 | $2,400.0 | $2,500.0 | $2,600.0 | $2,664.8 | $2,657.0 | $2,733.0 | $2,761.0 |
| [2] Adjusted Loan Loss Reserve Rate | 6.0% | 6.0% | 6.0% | 6.0% | 6.0% | 6.0% | 6.0% | 6.0% | 6.0% | 6.0% | 6.0% | 6.0% | 6.0% | 6.0% | 6.0% | 6.0% |
| [3] Adjusted Loan Loss Reserve (M) | $99.7 | $108.9 | $113.5 | $116.3 | $119.5 | $120.0 | $126.0 | $132.0 | $136.4 | $144.0 | $150.0 | $156.0 | $159.9 | $159.4 | $164.0 | $165.7 |
| [4] Reported Loan Loss Reserve (M) | $12.3 | $13.5 | $14.7 | $14.2 | $14.3 | $17.4 | $16.4 | $15.4 | $15.9 | $16.7 | $17.0 | $17.0 | $25.6 | $26.7 | $22.5 | $20.1 |
| [5] Reported Loan Loss Reserve Rate | 0.7% | 0.7% | 0.8% | 0.7% | 0.7% | 0.9% | 0.8% | 0.7% | 0.7% | 0.7% | 0.7% | 0.7% | 1.0% | 1.0% | 0.8% | 0.7% |
| [6] Difference between Reported and Adjusted Loan Loss Reserve (M) | $87.4 | $95.3 | $98.8 | $102.1 | $105.2 | $102.6 | $109.6 | $116.6 | $120.5 | $127.3 | $133.0 | $139.0 | $134.3 | $132.7 | $141.4 | $145.5 |

Sources: DVI Inc's 10-Q & 10-K SEC Filings, Dr. Epstein

# Exhibit 12
## Estimated and Actual EPS

| Period | Quarter End Date | Announcement Date | Estimated EPS (1) | Actual EPS | Surprise |
|---|---|---|---|---|---|
| 1999 - Q1 | 9/30/1998 | 10/29/1998 | 0.30 | 0.30 | 0.00 |
| Q2 | 12/31/1998 | 2/3/1999 | 0.33 | 0.32 | -0.01 |
| Q3 | 3/31/1999 | 5/5/1999 | 0.33 | 0.33 | 0.00 |
| Q4 | 6/30/1999 | 8/11/1999 | 0.35 | 0.35 | 0.00 |
| 2000 - Q1 | 9/30/1999 | 11/9/1999 | 0.36 | 0.37 | 0.01 |
| Q2 | 12/31/1999 | 2/11/2000 | 0.38 | 0.38 | 0.00 |
| Q3 | 3/31/2000 | 5/5/2000 | 0.39 | 0.39 | 0.00 |
| Q4 | 6/30/2000 | 8/24/2000 | 0.41 | 0.40 | -0.01 |
| 2001 - Q1 | 9/30/2000 | 11/7/2000 | 0.41 | 0.42 | 0.01 |
| Q2 | 12/31/2000 | 2/9/2001 | N/A (2) | 0.31 | N/A |
| Q3 | 3/31/2001 | 5/9/2001 | 0.33 | 0.33 | 0.00 |
| Q4 | 6/30/2001 | 8/17/2001 | 0.35 | 0.38 | 0.03 |
| 2002 - Q1 | 9/30/2001 | 11/8/2001 | 0.38 | 0.40 | 0.03 |
| Q2 | 12/31/2001 | 2/14/2002 | 0.40 | 0.41 | 0.01 |
| Q3 | 3/31/2002 | 5/14/2002 | 0.42 | 0.42 | 0.01 |
| Q4 | 6/30/2002 | 9/27/2002 | 0.42 | -0.50 | -0.92 |
| 2003 - Q1 | 9/30/2002 | 11/1/2002 | 0.35 | 0.33 | -0.02 |
| Q2 | 12/31/2002 | 2/14/2003 | 0.31 | 0.35 | 0.05 |
| Q3 | 3/31/2003 | 5/13/2003 | 0.31 | 0.20 | -0.11 |

Notes:

(1) Derived by taking the average of the most up-to-date EPS estimates from analysts who issued reports within 3 months of earnings announcement date.

(2) The analyst covering DVI at that time withdrew their estimate.

Source: Analyst Reports and Capital IQ Financial Statement.

Preliminary Draft

Exhibit 13

Earnings Response Coefficient

| Date of Surprise | 9/24/2002 - 9/27/2002 | 2/14/2003 | 5/13/2003 |
|---|---|---|---|
| **Market Reaction (millions)** | | | |
| [1] Equity | ($64.22) | $6.59 | ($6.91) |
| [2] Debt | ($26.92) | $8.32 | ($0.31) |
| [3] = [2]+[1] | ($91.14) | $14.92 | ($7.22) |
| | | | |
| **Earnings Per Share** | | | |
| [4] Forecast Prior to Announcement | $0.43 | $0.31 | $0.30 |
| [5] Announced Earnings | ($0.50) | $0.35 | $0.20 |
| [6] = [4] - [5] Earnings Surprise (per share) | ($0.93) | $0.04 | ($0.10) |
| | | | |
| [7] Shares Outstanding (millions) | 14.83 | 15.15 | 15.16 |
| [8] = [6]*[7] Earnings Surprise (millions) | ($13.79) | $0.61 | ($1.52) |
| | | | |
| [9] = [3]/[8] Implied Earnings Response Coefficient | 6.61 | 24.61 | 4.76 |

Sources: Center for Research in Security Prices, Factiva, NYSE, FIPS, TRACE, Analyst Reports

Exhibit 14

DVI Inc. Reported and Adjusted Loan Loss Reserves and
Estimated Market Impact of Full Disclosure

| Balance Sheet as of: / Earnings Announcement Date | 6/30/99 8/10/99 | 9/30/99 12/9/99 | 12/31/99 2/11/00 | 3/31/00 5/5/00 | 6/30/00 8/24/00 | 9/30/00 11/7/00 | 12/31/00 2/9/01 | 3/31/01 5/9/01 | 6/30/01 8/17/01 | 9/30/01 11/6/01 | 12/31/01 2/14/02 | 3/31/02 5/14/02 | 6/30/02 9/27/02 | 9/30/02 11/7/02 | 12/31/02 2/14/03 | 3/31/03 5/13/03 | Class Period End |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [1] Managed Net Financed Assets (M) | $1,661.8 | $1,814.2 | $1,891.2 | $1,937.6 | $1,992.0 | $2,000.0 | $2,100.0 | $2,200.0 | $2,273.2 | $2,400.0 | $2,500.0 | $2,600.0 | $2,664.8 | $2,657.0 | $2,733.0 | $2,761.0 | |
| [2] Adjusted Loan Loss Reserve Rate | 6.0% | 6.0% | 6.0% | 6.0% | 6.0% | 6.0% | 6.0% | 6.0% | 6.0% | 6.0% | 6.0% | 6.0% | 6.0% | 6.0% | 6.0% | 6.0% | |
| [3] Adjusted Loan Loss Reserve (M) | $99.7 | $108.9 | $113.5 | $116.3 | $119.5 | $120.0 | $126.0 | $132.0 | $136.4 | $144.0 | $150.0 | $156.0 | $159.9 | $159.4 | $164.0 | $165.7 | |
| [4] Reported Loan Loss Reserve (M) | $12.3 | $13.5 | $14.7 | $14.2 | $14.3 | $17.4 | $16.4 | $15.4 | $15.9 | $16.7 | $17.0 | $17.0 | $25.6 | $26.7 | $22.5 | $20.1 | |
| [5] Reported Loan Loss Reserve Rate | 0.7% | 0.7% | 0.8% | 0.7% | 0.7% | 0.9% | 0.8% | 0.7% | 0.7% | 0.7% | 0.7% | 0.7% | 1.0% | 1.0% | 0.8% | 0.7% | |
| [6] Difference between Reported and Adjusted Loan Loss Reserve (M) | $87.4 | $95.3 | $98.8 | $102.1 | $105.2 | $102.6 | $109.6 | $116.6 | $120.5 | $127.3 | $133.0 | $139.0 | $134.3 | $132.7 | $141.4 | $145.5 | |
| [7] Post-Tax Impact on Earnings - Assuming 40% Tax Rate (M) | $52.5 | $57.2 | $59.3 | $61.2 | $63.1 | $61.6 | $65.8 | $70.0 | $72.3 | $76.4 | $79.8 | $83.4 | $80.6 | $79.6 | $84.9 | $87.3 | |
| [8] Earnings Response Coefficient | 6.61 | 6.61 | 6.61 | 6.61 | 6.61 | 6.61 | 6.61 | 6.61 | 6.61 | 6.61 | 6.61 | 6.61 | 6.61 | 6.61 | 6.61 | 6.61 | |
| [9] Aggregate Valuation Impact (M) [8][7] | $346.7 | $378.1 | $391.8 | $404.8 | $417.3 | $406.9 | $434.8 | $462.6 | $477.7 | $504.9 | $527.6 | $551.2 | $532.4 | $526.4 | $560.9 | $572.2 | |
| [10] Observed Market Cap of Senior Notes and Common Stock (M) | $381.3 | $347.9 | $371.8 | $345.7 | $394.5 | $385.1 | $393.8 | $344.8 | $390.8 | $380.6 | $401.8 | $429.2 | $175.2 | $240.0 | $247.9 | $275.6 | $36.7 |
| [11] Revised Market Cap after Valuation Impact (M) [10][9] | $34.6 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | |

Sources:  Analyst Reports Covering DVI Inc., DVI Inc.'s 10-Q & 10-K SEC Filings, Dr. Epstein

## Exhibit 15
## DVI Inc. Common Stock Market Model

**Time Period:** 8/10/99 to 9/12/02
**Number of Observations:** 777

| | Coefficient | t Value |
|---|---|---|
| Intercept | 0.0002 | 0.26 |
| S&P 500 Total Return | 0.4403 | 7.00 |
| Russell 2000 Nominal Return | 0.2918 | 3.20 |
| Peer Group Nominal Return | 0.0880 | 2.27 |
| | | |
| Root Mean Squared Error | 2.34% | |

Sources: Center for Research in Security Prices, Bloomberg



Exhibit 16
Abnormal Returns for DVI Inc. Common Stock
8/10/99 to 8/13/03

Threshold for statistical
significance: 4.59%
Abnormal Return

Return after removin
effect of market movements

6/4/03
DVI announces that Deloitte
has resigned as its auditor
Abnormal Return: -10.94%
t Value: -4.67

Sources: Center for Research in Security Prices, Bloomberg

Exhibit 17

Events Included in Event-Based Model[1]

| Date | DVI Stock Price | Stock Abnormal Return[1] | Abnormal Dollar Change | t-Stat[1] | Stock Significant Day | Senior Notes Price | Senior Notes Abnormal Return[1] | Abnormal Dollar Change | t-Stat[1] | Senior Notes Significant Day | Event (Summary) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 9/24/2002 | $8.40 | -4.20% | -$0.37 | -1.80 | -- | $77.94 | -10.75% | -$9.39 | -5.16 | -- | US Bancorp Piper Jaffray downgrades DVI to Market Perform from Outperform |
| 9/25/2002 | $6.00 | -29.59% | -$2.49 | -12.64 | -- | $74.03 | -5.02% | -$3.84 | -2.41 | -- | DVI announces expected loss for 4Q |
| 9/26/2002 | $5.75 | -4.75% | -$0.29 | -2.03 | -- | $72.38 | -2.24% | -$1.68 | -1.07 | | CIBC Analyst Report  It's going to be a messy quarter, but core business remains strong. |
| 9/27/2002 | $4.50 | -20.72% | -$1.19 | -8.85 | -- | $70.00 | -3.28% | -$2.46 | -1.58 | | DVI reports fourth quarter and year-end losses |
| 9/30/2002 | $4.80 | 6.63% | $0.30 | 2.83 | ++ | $69.57 | -0.61% | -$0.53 | -0.29 | | CIBC Analyst Report  Fiscal 4Q02 EPS at High-End of Pre Announced Loss; Outlook Remains Cloudy. |
| 10/28/2002 | $7.99 | 12.73% | $0.90 | 5.44 | ++ | $70.61 | 0.61% | $0.38 | 0.29 | | DVI said to be prepping a deal as much as $3B in issuance before the year end |
| 10/31/2002 | $8.75 | 14.42% | $1.10 | 6.16 | ++ | $69.17 | -3.10% | -$2.27 | -1.49 | | DVI reports 3Q earnings of $5.1M compared to $5.2M in the prior year first quarter |
| 11/14/2002 | $7.18 | -0.38% | -$0.03 | -0.16 | | $79.96 | 5.00% | $3.92 | 2.40 | ++ | DVI closes on $462M securitization, the single largest transaction in DVI history |
| 11/21/2002 | $8.07 | 7.82% | $0.58 | 3.34 | ++ | $83.00 | 0.00% | $0.08 | 0.00 | | Moody's assigns new ratings of Aaa to DVI Senior Notes |
| 2/14/2003 | $7.05 | 6.61% | $0.44 | 2.83 | ++ | $91.00 | 6.21% | $5.37 | 2.98 | ++ | DVI reports 2Q earnings of $5.2M compared to $6.3M in the prior year second quarter |

Exhibit 17
Events Included in Event-Based Model[1]

| Date | DVI Stock Price | Stock Abnormal Return[2] | Abnormal Dollar Change | t-Stat[3] | Stock Significant Day | Senior Notes Price | Senior Notes Abnormal Return[4] | Abnormal Dollar Change | t-Stat[3] | Senior Notes Significant Day | Event (Summary) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2/27/2003 | $7.28 | 5.82% | $0.40 | 2.49 | ++ | $90.69 | -0.43% | -$0.37 | -0.21 | | CIBC Analyst Report. Following a management conversation, we believe the tide has shifted for DVI |
| 5/13/2003 | $8.20 | -5.27% | -$0.46 | -2.25 | - | $97.58 | -0.23% | -$0.20 | -0.11 | | DVI announces 3Q net income of $3M |
| 6/4/2003 | $7.10 | -10.94% | -$0.87 | -4.67 | - | $93.74 | -3.99% | -$3.90 | -1.92 | | DVI announces that Deloitte & Touche have resigned as its accountant |
| 6/6/2003 | $6.07 | -11.43% | -$0.79 | -4.88 | - | $82.52 | -12.22% | -$11.49 | -5.57 | - | S&P states that it may downgrade DVI's credit rating |
| 6/9/2003 | $6.07 | 0.74% | $0.05 | 0.32 | | $87.04 | 5.47% | $4.51 | 2.63 | ++ | DVI files 8-K relating to Deloitte & Touche resignation |
| 6/27/2003 | $4.30 | -26.19% | -$1.53 | -11.19 | - | $67.39 | -20.87% | -$17.77 | -10.02 | - | DVI announces that the SEC rejected its March 3Q quarterly report, Moody's downgrades DVI's senior unsecured debt rating to Caa3 from B3. S&P downgrades DVI's long-term counterparty credit rating from B to CCC+ |
| 6/30/2003 | $4.67 | 8.50% | $0.37 | 3.63 | ++ | $75.04 | 11.35% | $7.65 | 5.45 | ++ | DVI announces hiring of UBS Securities to review financial options, including raising capital or possible sale. Fitch downgrades DVI's Senior Unsecured Debt rating from B+ to CCC. A U.S. Bancorp Piper Jaffray analyst report states that DVI's debt holders could declare a default |
| 7/1/2003 | $4.12 | -11.88% | -$0.56 | -5.12 | - | $73.71 | -1.77% | -$1.31 | -0.95 | | Moody's announces late 6/30/03 that it placed nine DVI asset-backed Senior Notes worth $3.8B under review for possible downgrade. Fitch announces that it placed all DVI asset-backed transactions on Rating Watch Negative |
| 7/16/2003 | $4.23 | -9.77% | -$0.46 | -4.18 | - | $81.86 | -7.94% | -$6.97 | -3.77 | - | On 7/15/03, DVI announces that it received a Notice of Default from U.S. Bank National Association relating to DVI's 9 7/8% Senior Notes due 2004. S&P downgrades DVI's senior unsecured rating to CCC-minus from CCC-plus |
| 8/1/2003 | $2.50 | -39.77% | -$1.67 | -16.99 | - | $79.56 | 1.18% | $0.95 | 0.57 | | DVI announces that it will not make the scheduled interest payment due on 8/1/03 for its 9 7/8% Senior Notes due 2004 and that it has defaulted under its main bank facility. Fitch downgrades DVI's senior unsecured debt rating to C from CCC. S&P downgrades DVI corporate bond ratings to D from CCC- |

Exhibit 17

Events Included in Event-Based Model[1]

| Date | DVI Stock Price | Stock Abnormal Return[2] | Abnormal Dollar Change | t-Stat[3] | Stock Significant Day | Senior Notes Price | Senior Notes Abnormal Return[4] | Abnormal Dollar Change | t-Stat[3] | Senior Notes Significant Day | Event (Summary) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 8/4/2003 | $1.40 | -43.91% | -$1.10 | -18.76 | -- | $46.63 | -41.39% | -$32.93 | -19.87 | -- | A.P. attributes 8/4/03 stock drop to missed interest payment on 8/1/03 US Bancorp Piper Jaffray downgrades DVI to underperform. Fitch downgrades class C note to C from CCC |
| 8/5/2003 | $0.93 | -32.99% | -$0.46 | -14.09 | -- | $50.41 | 8.11% | $3.80 | 3.89 | ++ | DVI announces after hours on 8/4/03 that is considering Chapter 11 bankruptcy protection |
| 8/6/2003 | $0.99 | 6.67% | $0.06 | 2.85 | ++ | $50.60 | 0.37% | $0.19 | 0.18 | ++ | S&P places its ratings on DVI's asset-backed notes series 2003-1 on CreditWatch with negative Implications |
| 8/7/2003 | $1.00 | 0.96% | $0.01 | 0.41 | | $44.19 | -12.67% | -$6.41 | -6.09 | -- | |
| 8/8/2003 | $0.79 | -21.08% | -$0.21 | -9.00 | -- | $42.05 | -4.83% | -$2.12 | -2.32 | -- | After trading hours on 8/7/03, S&P affirms its ratings on MSF Funding LLC's asset-backed notes, which are backed by medical equipment leases originated by DVI |
| 8/12/2003 | $0.80 | -3.03% | -$0.02 | -1.30 | | $31.86 | -22.58% | -$9.29 | -10.84 | -- | |
| 8/14/2003 | $0.30 | -62.99% | -$0.50 | -26.91 | -- | $20.74 | -33.83% | -$10.60 | -16.25 | -- | DVI announces after hours on 8/13/03 that it plans to file for Chapter 11 bankruptcy protection. In addition, DVI announced it discovered improprieties in its dealings with lenders and misrepresentations involving the amount and nature of its pledged collateral |

Notes

[1] Bold event data indicates the abnormal security movement was used as an inflation changing event date under the event based approach

[2] The regression model is calibrated between August 10, 1999 and September 12, 2002 and runs the returns of DVI against those of the S&P against the S&P 500, the Russell 2000 and a market weighted peer index consisting of Financial Federal Corp., Medallion Financial Corp., MicroFinancial Inc., Resource America Inc., and Emera Group

[3] A trading day with a t-stat greater than 1.96 or less than -1.96 is considered significant at the 5% level

[4] Abnormal return movements are calculated as the percentage change in weighted average Senior Notes price less the change in the risk free rate

Source: Center for Research in Security Prices, Bloomberg, BPS, TRACE, NYSE, Factiva



Exhibit 18
DVI Common Stock Price and Inflation Per Share
8/10/99 to 8/13/03

Sources: Center for Research in Security Prices, Bloomberg



Exhibit 19
DVI Inc. 9 7/8 Senior Notes Price and Inflation Per Share
8/10/99 to 8/13/03

Sources: FIIPS, TRACE, NYSE

Exhibit 20

## DVI Inc. Common Stock Claimant Transactions as a Percentage of NYSE Volume by Quarter

| Year | Qtr | Adjusted NYSE Volume | Claimant Purchases | Claimant Purchases as a Percentage of NYSE Volume | Claimant Sales | Claimant Sales as a Percentage of NYSE Volume |
|------|-----|----------------------|--------------------|---------------------------------------------------|----------------|-----------------------------------------------|
| 1999 | 3 | 532,960 | 148,781 | 27.9% | 14,671 | 2.8% |
| 1999 | 4 | 1,427,040 | 526,225 | 36.9% | 148,862 | 10.4% |
| 2000 | 1 | 2,298,640 | 397,864 | 17.3% | 251,986 | 11.0% |
| 2000 | 2 | 1,697,280 | 366,521 | 21.6% | 412,633 | 24.3% |
| 2000 | 3 | 2,042,400 | 298,789 | 14.6% | 195,991 | 9.6% |
| 2000 | 4 | 1,465,280 | 834,015 | 56.9% | 139,964 | 9.6% |
| 2001 | 1 | 1,202,720 | 1,144,555 | 95.2% | 488,846 | 40.6% |
| 2001 | 2 | 996,880 | 663,921 | 66.6% | 397,609 | 39.9% |
| 2001 | 3 | 923,280 | 789,154 | 85.5% | 514,623 | 55.7% |
| 2001 | 4 | 890,560 | 426,390 | 47.9% | 318,150 | 35.7% |
| 2002 | 1 | 830,480 | 477,688 | 57.5% | 238,908 | 28.8% |
| 2002 | 2 | 1,446,640 | 781,940 | 54.1% | 531,788 | 36.8% |
| 2002 | 3 | 2,648,080 | 909,638 | 34.4% | 956,164 | 36.1% |
| 2002 | 4 | 3,920,960 | 1,940,300 | 49.5% | 1,310,352 | 33.4% |
| 2003 | 1 | 1,941,840 | 910,423 | 46.9% | 903,145 | 46.5% |
| 2003 | 2 | 5,299,040 | 1,398,123 | 26.4% | 1,848,239 | 34.9% |
| 2003 | 3 | 12,703,440 | 2,177,319 | 17.1% | 3,617,017 | 28.5% |
| Total | | 42,267,520 | 14,191,646 | 33.6% | 12,288,948 | 29.1% |

Notes: NYSE volume is adjust downward by 20% for market marker activity (Gould and Kleidon, 1994). Analysis for the third quarter of 1999 begins on the first day of the class period, August 10, 1999 and the third quarter of 2003 ends on the last day of the class period, August 13, 2003.
Sources: Center for Research in Security Prices, Strategic Claims Services



Exhibit 21
DVI Inc. Common Stock Float and Holdings of Claimants, Flero Services, and
Unobserved Institutions - 8/10/99 to 8/13/03

Sources: Center for Research in Security Prices, DVI Inc.'s SEC 8-k filings, FactSet, and Strategic Claims Services



Exhibit 22
Percentage of DVI Inc. 9 7/8 Senior Notes Held by Claimants
8/10/99 to 8/13/03

Source: Strategic Claims Sevices

# Exhibit 23
## DVI Inc. Common Stock and
## 9 7/8 Senior Notes Damages (in millions)

| Grouping | Damages |
|---|---|
| **Common Stock - Insolvency Inflation** | |
| Claimants | $81.1 |
| Institutions Without Claims | $7.6 |
| Flero Services | $1.3 |
| Damages based on the net selling activity of the observed groups after April 30, 2003 | $2.5 |
| Damages from other unobserved purchasers | N/A |
| **Total** | **$92.5** |
| **Common Stock - Event Based Inflation** | |
| Claimants | $46.4 |
| Institutions Without Claims | $4.9 |
| Flero Services | $1.2 |
| Damages based on the net selling activity of the observed groups after April 30, 2003 | $2.7 |
| Damages from other unobserved purchasers | N/A |
| **Total** | **$55.3** |
| **Senior Notes - Event Based Inflation** | |
| Claimants | $33.5 |
| Damages from other unobserved purchasers | N/A |
| **Total** | **$33.5** |
| **Total Common Stock and Senior Notes Damages** | |
| Insolvency Inflation | $126.0 |
| Event Based Inflation | $88.8 |
| Additional Damages if September 20, 2002 is included as a corrective disclosure (Event Based Inflation) | $14.1 |

Sources: Center for Research in Security Prices, FactSet, Strategic Claims Services, Flero Services' September 4, 2003 SEC Filing 13-D

Appendix A

List of Documents/Data Considered

Court Documents

- Fifth Amended Consolidated Class Action Complaint, In Re DVI, Inc. Securities Litigation, U.S District Court, Eastern District of Pennsylvania, 2:03-CV-05336-LDD
- Report of Chapter 11 Examiner, R. Todd Neilson, In Re DVI, Inc. et al., Debtors, Chapter 11 Case No. 03-12656(MFW), U.S. Bankruptcy Court for the District of Delaware
- Affidavit of Stephen R. Garfinkel, March 26th, 2007
- Disclosure Statement for the First Amended Joint Plan of Liquidation of DVI, Inc., et al.
- Excerpt from Order Granting Class Certification
- Excerpt from Defendant's Opposition to Class Certification
- Excerpt from Lead Plaintiff's Reply in Support of Class Certification
- Stephen R. Garfinkel Guilty Plea Agreement
- Charges Against Stephen R. Garfinkel, United States of America v. Stephen R. Garfinkel
- Expert Report of Michael Hartzmark on the Market Efficiency of DVI, Inc. Common Stock and Senior Notes dated July 5th, 2006
- Expert Rebuttal Report of Michael Hartzmark on the Market Efficiency of DVI, Inc. Common Stock and Senior Notes dated August 4th, 2006
- Expert Report of Barry Epstein dated XX

Depositions and Exhibits

- Michael Bogansky
- John Boyle
- Terry Cady
- Mark Cherney
- Cindy Cohn
- Gerald Cohn
- Matthew Colasanti
- Lisa Cruikshank
- John Ellingsen
- Harold Neas
- Sandy Pfeffer
- Ray Fear
- Timothy Forrester
- Mark Gallagher

- Maria Gansz
- Stephen Gardner
- Stephen Garfinkel
- Maggie Lytton
- Frederick Masnato
- Susan Gibson
- Robert Conway
- William Goldberg
- Matthew Goldenberg
- Thomas Hammer
- Eric Hanson
- Phillip Jackson
- Sheila Kalkunte
- Sara Lee Keller
- Martin Lewin
- Joseph Malott
- Elizabeth Maust
- Richard Miller
- Robin Morris
- R. Todd Neilson
- Michael O'Hanlon
- William Platt
- Audrey Went
- Traci Richardson Crabtree
- Harry Roberts
- Jennifer Santangelo
- Nathan Shapiro
- Christine Snyder
- Andrew Stearns
- Anthony Turek
- Pamela Turner
- William Walsh

## DVI Documents Received from Counsel

- Consolidated Delinquency Reports (Buckley00041374-90; DT0010157-8; DT0015513-20; DT0015521-31; DT0035448-51; DT0035433-47; DT0035452-68; DT0035469-71; DT0051105-19; DT0051376-8; DT0051120-33; DT0051134-50; DT0051151-70; DT0065561-79; DT0065930-48; DT0075346-65

- Daily Unused Line Reports (DT0009315-7; DT010989-91; DT0110465-7; DT0051631-3; Buckley00151059-62; Buckley00013921-3; Buckley00014036-8; TC01419-21; TC01504-6)
- Month-End Delinquency Reports (Buckley00046104-49; Buckley00012986-94; Buckley00013006-14; Buckley00012912-20; DT0019870-9; Buckley00012948-56; Buckley00012965-73; Buckley00013249-57; Buckley00013236-44; Buckley00013156-63; Buckley00013147-55; DT0038928; Buckley00013136-43; Buckley00013036-46; Buckley00011797-807; Buckley00011850-60; Buckley00011865-75; Buckley00011889-92; Buckley00012055-8; Buckley00012064-74; Buckley00029889-901; Buckley00012347-58; Buckley00012390-400; Buckley00012402; Buckley00064186-95; Buckley00039147-57; Buckley00146030-37; Buckley00029442-54; Buckley00029429-41; Buckley00149314-25; Buckley00040920-31; Buckley00040890-901; Buckley00053571-82; Buckley00053526-38; Buckley00040986-06; MLDVI00062378-88)
- Forbearance (Buckley00029913-5; Buckley00039132-44; Buckley00039159-61)
- Other Delinquency Info (Buckley00013058-63; Buckley00039145-6; Buckley00039162; Buckley00039177-84; Buckley00039189-96; Buckley00039197-204; Buckley00039213; Buckley00064165; Buckley00122916; Buckley00146016-29; DT0040452-66)
- Promissory Notes (Buckley00070977; DT0049231; D0049232)
- Rewrites (DT0014967-8; DVIEMAIL3000046592-655; DT0031822-4; DVIEMAIL3000046376-410; DT0046595-608; DVIEMAIL3000046411-65; DT0063000-41; DVIEMAIL3000046466-517; Buckley00000620-7; DVIEMAIL3000046518-91)
- SEC Letters and Responses (DT0048026-36; DT0048037-53; CC007317-25; DT0048063-85; DT0048087-98; DT0141240-65; DT0116966-88; DT0116471-7; DT0112874-904; DT0112905-12; DT0112913-37; DT0112938-46; CC003292-351; CC003604-18)
- Cash Funded Loan Report (Buckley00013888)
- Excerpts from DVI 10-Ks (DT0100995; DT0101002; DT0103941; DT0103948; DT0147196; DT0147203; DT0066600; DT0066606-8)
- Excerpts from DVI Draft 10-Ks (DT0039553; DT0039560; DT0145786; DT0145792-4)

## DVI Analyst Reports & Conference Call Transcripts

- Analyst reports for DVI, Inc. written by U.S. Bancorp Piper Jaffray, CIBC, Kinnard, Fitch, Miller Johnson, Prudential and Duff & Phelps
- Fair Disclosure Financial Network Earnings Conference Call transcripts for DVI, Inc.

## DVI Financial Statements

- DVI, Inc. quarterly and annual income statements, balance sheets and statements of cash flow from Capital IQ

## SEC Filings

- DVI Inc. 10-K, 10-Q, Proxies and Prospecti for DVI, Inc. from 1995 to 2003
- Flero Services September 4, 2003 13-D Filing
- Financial Federal Corp., Medallion Financial Corp., Microfinancial Inc. Resource America Inc., and Finova Group 10-Ks from 2002

## Stock Data

- The Center for Research in Security Prices (CRSP) historical data for DVI Inc., Financial Federal Corp., Medallion Financial Corp., Microfinancial Inc. Resource America Inc., and Finova Group common stock
- Bloomberg historical data for DVI Inc. common stock
- Bloomberg historical price data for the S&P 500, S&P 500 Financial Services Index, S&P 600 Financial Services Index, Russell 2000, S&P 500 Health Care Index, and S&P 500 Health Care Equipment and Services Index
- FactSet 13F data for institutional holdings for DVI, Inc.
- Vickers insider holdings data for DVI, Inc.

## Bond Data

- NYSE data for DVI Senior Notes
- TRACE data for DVI Senior Notes
- FIPS data for DVI Senior Notes
- FactSet DVI Senior Notes price data
- FactSet price data for US 5-year Treasury Note
- Lehman US Corporate High Yield Bond Index

## DVI Claims Data

- Proof of Claims Data and Release Forms received from Counsel
- Claims database work product provided by Strategic Claims Services

## DVI News

- News articles downloaded from Factiva for DVI, Inc. and other related companies

- News search results from Factiva for DVI, Inc. from 1/1/1999 to 12/31/2003 (804 articles)
- Additional news search results from Factiva for DVI, Inc. and other related companies for stock and/or bond significant days

## Academic Articles

- Bessembinder, Hendrik, Kathleen M. Kahle, William F. Maxwell and Danielle Xu, "Measuring Abnormal Bond Performance," April 2008.
- Collins, Daniel W. and S.P. Kothari, "An Analysis of Intertemporal and Cross-Sectional Determinants of Earnings Response Coefficients," Journal of Accounting and Economics, 11 (1989), 143-181
- Easton, Peter D. and Mark E. Zmijewski, "Cross-Sectional Variation in the Stock Market Response to Accounting Earnings Announcements," Journal of Accounting and Economics, 11 (1989), 117-141
- Fischel, Daniel R., Keable, Michael A., and Ross, David J., "The Use of Trading Models To Estimate Aggregate Damages in Securities Fraud Litigation: An Update," The National Legal Center for Public Interest, Vol. 10, Number 3, March 2006.
- Freeman, Robert N. and Senyo Tse, "A Nonlinear Model of Security Price Responses to Unexpected Earnings," Journal of Accounting Research, Vol. 30, No. 2 (Autumn 1992), pp. 185-209
- Gould, John F. and Allan W. Kleidon, "Market Maker Activity on Nasdaq: Implications for Trading Volume," Stanford Journal of Law, Business & Finance, Vol. 1:11, pp. 11-27
- Hagerman, Robert L., Mark E. Zmijewski and Pravin Shah, "The Association Between the Magnitude of Quarterly Earnings Forecast Errors and Risk-Adjusted Stock Returns," Journal of Accounting Research, Vol. 22, No. 2, Autumn 1984, pp. 526-540
- MacKinlay, A. Craig, "Event Studies in Economics and Finance," The Journal of Economic Literature, Vol. 35, No.1 (Mar. 1997), pp. 13-39
- Mayer, Marcia Kramer, "Best-Fit Estimation of Damaged Volume in Shareholder Class Actions: The Multi-Sector, Multi-Trader Model of Investor Behavior," National Economic Research Associates, Third Edition, October 2000.
- Tabak, David I. and Frederick Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom," Chapter 19 to Litigation Services Handbook, The Role of the Financial Expert, Third Edition, Roman L. Weil, Michael J. Wagner and Peter B. Frank, 2001.