# EXHIBIT 2

EXHIBIT 2

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| ) | 2:03-CV-05336-LDD |
| In Re DVI Inc. Securities Litigation ) | |
| ) | Hon. Legrome D. Davis, presiding |
| ) | |

**REBUTTAL REPORT OF CHAD COFFMAN**

## INTRODUCTION

1.      My name is Chad Coffman.  I am the President of Winnemac Consulting, a Chicago-based firm that specializes in the application of economics, finance, statistics, and valuation principles to questions that arise in a variety of contexts, including, as here, in the context of litigation.

2.      I have previously filed a report in this matter dated October 1, 2008 ("Expert Report").  Subsequently, I was provided reports filed by Dr. Daniel R. Fischel ("Fischel Report"), Dr. Kenneth Lehn ("Lehn Report"), and Mr. Terry Musika ("Musika Report") on behalf of certain Defendants (collectively "Defense Reports").  Each of the Defense Reports criticizes either the manner by which I arrived at certain conclusions contained in my expert report, the conclusions themselves, or both.  I have been asked by counsel for Plaintiffs in this matter to review and discuss the criticisms contained in the Defense Reports.[1]

3.      The additional materials I have relied upon subsequent to my Expert Report are summarized in **Appendix A**.  Winnemac Consulting is being compensated at my standard hourly rate of $500 per hour for my work on this matter and my compensation is in no way contingent on the outcome of this case.  My qualifications are detailed in my Expert Report.

## SUMMARY OF OPINIONS

4.      The opinions I set forth in my Expert Report remain the same and are unaltered by my review of the Fischel, Lehn, and Musika Reports.  Furthermore, I have reached the following additional opinions:

> i.  The standard of proof for loss causation employed by Dr. Lehn and Dr. Fischel in their criticism of my Event Based Approach is far too narrow as a matter of

---

[1] My purpose in submitting this report is not to rebut every argument raised in the Defense Reports and my silence on certain minor issues contained therein should not be construed as implicit agreement with their criticisms.  I reserve the right to respond to any criticisms not covered in this report at trial.

economics.  The flaw in Dr. Lehn and Dr. Fischel's reasoning is their failure to acknowledge that the truth concealed by a misrepresentation can be disclosed to market participants in many ways and need not be an admission of fraud or a mirror image of the misrepresentation itself.

ii.  Dr Lehn's criticism that I did not account for "structural breaks" in the volatility of DVI's stock returns is inconsequential.  While I disagree with his conclusion that my method methodology is unscientific and unreliable, **Exhibit R1** demonstrates that if Dr. Lehn had applied his event study regression model to my corrective disclosure dates the resulting inflation per share is not materially different than the inflation per share reflected in my Expert Report.

iii.  Mr. Musika's assertion that my application of a 6% loan loss reserve rate is somehow inconsistent with Dr. Epstein's analysis or opinions is incorrect.

iv.  The Defense Reports critique the *method* by which I arrive at my Earnings Response Coefficient ("ERC") but do not offer an opinion that I overstate the *magnitude* of the ERC.  The criticisms that my ERC methodology is inconsistent with the academic literature are misplaced.  The magnitude of the ERC I employ is inherently reasonable and my methodology is sound. While the Defense Reports criticize the *method* by which I arrive at my conclusion DVI was insolvent, none of the Defense Reports offer an affirmative opinion that DVI was solvent during the Class Period, which begins August 10, 1999 and extends through August 13, 2003.

v.  Dr. Lehn and Dr. Fischel's criticisms of the Insolvency Approach focus on the fact that the calculation incorporates price declines that are not associated with corrective disclosures and can be explained, at least partially, by news that is unrelated to

the fraud. These criticisms are irrelevant if one accepts the underlying economic premise of the Insolvency Approach.

      vi.   Dr Lehn criticizes my use of the first-in, first-out ("FIFO") inventory method for matching trades in the claims data. His criticism is that use of FIFO is arbitrary and that a last-in, first-out ("LIFO") often results in lower damages. There is no theoretical basis for rejecting FIFO, and I understand that Courts have accepted FIFO as an inventory method in matters involving securities litigation. I also note that selection of LIFO would be equally "arbitrary" and the fact it often results in lower damages does not make it more reliable.

      vii.   The Fischel Report notes that damages would be lower if investors' "gains" on shares bought prior to the Class Period and sold during the Class Period were netted against their subsequent Class Period Losses. I understand Plaintiffs' legal position to be that these gains are irrelevant as a matter of law under the theory that shares purchased prior to the Class Period are not part of the Class and not relevant to the case or the calculation of damages. If Plaintiffs' theory prevails, then the damage calculations in my Expert Report apply. In the event the Court finds that these gains should be accounted for, I report damages figures with and without Pre-Class Gains in **Exhibit R2**.

      viii.   Dr. Lehn's opinion that my calculation of damaged shares is unscientific and unfounded is based on the premise that I "estimated" the number of damaged shares. This premise is simply incorrect. For 100% of the Senior Note damages and 87% of stock damages I do not "estimate" damaged shares, but rather rely on actual claims data. Dr. Lehn does not articulate any rationale for rejecting the methodology I employ for the remaining 13% of stock damages.

ix.   Mr. Musika's argument that I am overstating damages because there is the

potential for "multiple recoveries" is incorrect.

## LOSS CAUSATION USING THE EVENT-STUDY APPROACH

5.    **Loss Causation** - The Lehn Report, Fischel Report and my Expert Report each

adopt event-study approaches to measure the value of the alleged misrepresentations.[2]  Both Dr.

Lehn and Dr. Fischel opine that there is insufficient evidence to establish loss causation for the

event dates included in the Event Based Approach described in my Expert Report.[3]  As I will

demonstrate, this disagreement about which events qualify as "corrective disclosures" account

for the vast majority of difference in estimated damages across the expert reports under the Event

Based Approach.  All of the remaining methodological criticisms of the Event Based Approach

are, in a relative sense, minor.  For that reason, I focus on this issue as the most relevant

difference between the experts.

6.     The difference in opinion between the experts as to which events constitute

"corrective disclosures" results from diverging views about what constitutes revelation of the

"truth".   Quoting Dr. Lehn,

> "It is my understanding that, in order to recover damages in a 10b-5 securities
> case, plaintiffs must establish that they suffered an economic loss because of the
> alleged misrepresentations. From an economic perspective, the appropriate way to
> determine whether plaintiffs suffered an economic loss because of the alleged
> misrepresentations is to examine how the securities prices of the relevant issuer
> reacted to the release of information that disclosed the *truth* about the alleged
> misrepresentations."[4]

---

[2] I also adopted a separate "Insolvency Approach" which I address in a later section.

[3] Dr. Fischel acknowledges that June 4, 2003 and August 14, 2003 are corrective disclosures.  Fischel Report, pg. 14.

[4] Lehn Report, pg. 6-7.

7.      Dr. Lehn and I agree that this is the appropriate way to conduct an Event Based Approach.  Our difference of opinion is limited to what constitutes a disclosure of "truth".

8.      The Lehn Report states: "I find there is not a single day on which a statistically significant decline in the price of either DVI's stock or its Senior Notes can be traced to the release of information that corrects the alleged misrepresentations in this matter."[5]  Likewise, Dr. Fischel states, "...DVI did not disclose the existence of any of the purported accounting irregularities which constitute the alleged fraud until August 14, 2003."[6]  Wish respect to all dates I identify as corrective disclosures, Dr. Lehn dismisses them using the following rationale,

> "...the information released on this date does not represent the correction
> of an alleged misrepresentation and therefore fails to meet the criteria for
> loss causation.  Specifically, no information about accounting
> improprieties was released on this day."[7]

9.      Dr. Fischel adopts an equivalent standard.  Both experts for the Defense adopt a criterion for loss causation that requires an admission of a misrepresentation or accounting impropriety to qualify as a corrective disclosure.

10.     The critical error in Dr. Lehn and Dr. Fischel's reasoning is the failure to contemplate the different ways the truth related to the alleged misrepresentations can be disclosed to market participants.  Dr. Lehn and Dr. Fischel's standards for proof of loss causation are far too narrow as a matter of economics.  As outlined clearly in the Complaint and elsewhere, DVI is accused of defrauding investors by misrepresenting its true financial condition to the market.  In particular, DVI is accused of, among other things, hiding losses on its loan portfolio by refusing to take write-downs, repurchasing delinquent contracts from securitized pools, restructuring loan contracts to make them look current, and failing to record liabilities and

---

[5] Lehn Report, pg. 4.

[6] Fischel Report, pg. 11.

[7] Lehn Report, pg. 22.

improperly recognizing income through "gain-on-sale" treatment – all of which improperly inflated income. Consider for a moment how DVI's fraud would be eventually incorporated into the market price and result in an economic loss to an investor that is causally related to the fraud.

11.      First, the company could make a truthful disclosure. This is the type of event that would meet the loss causation burden set forth by Dr. Lehn and Dr. Fischel. Alternatively, if Defendants do not make a truthful disclosure, then consider a chain of events that would result in revelation of the fraud and thereby "cause" the losses that are linked to the misrepresentations articulated in the Complaint. The logical and foreseeable consequence of hiding credit losses (as DVI is accused of doing) is that eventually actual cash collections will not comport with the accrued income on the firm's financial statements. If the company does not come clean, how will this behavior come to light? One symptom would be greater delinquencies. For DVI these delinquencies would restrict their ability to pledge the underlying collateral and thereby reduce their ability to borrow. However, DVI actively disguised this symptom by fraudulently pledging ineligible collateral and double-pledging collateral to its lenders.

12.      Another potential symptom of the hidden financial distress would be increased leverage. A firm that is overstating income and not collecting the expected amount of cash will have to borrow at a greater than expected rate. If the firm's portfolio and recorded revenue are growing fast enough, it is possible to mask this relationship for some time, but if revenue growth slows or stops (as happened with DVI), then the firm's leverage will increase unexpectedly and its need to borrow more will eventually signal an underlying problem. The increase in leverage at DVI over time (which led to events like credit rating downgrades) is thus inextricably tied to the ongoing fraud.

7

13.     Another symptom would be write-offs of bad loans.   A write-off is a recognition that cash will not be collected on a particular loan.  For a company disguising bad loans, the proper accounting would have been to take write-offs or establish greater reserves much earlier or to have recorded lower projected cash flows (gain on sale) to begin with.  A partial write-off can reduce the extent of the fraudulently reported income (and cause the stock price to fall) even if, at that point, there is no admission of fraud.

14.     In addition, without discovering the fraud, analysts or other market participants may express skepticism about a company because of puzzling trends.  For example, analysts covering DVI noted that it seemed to be underperforming even though its underlying industry (health care) was thriving.  These trends, which are a symptom of the underlying fraud, can also cause the market price to fall ahead of an admission of fraud.

15.     Finally, if the fraud is disguised long enough and can no longer be hidden through growth, the truth will be revealed as the firm runs out of cash to pay its liabilities.  This is exactly what we observe at DVI as it is eventually unable to make an interest payment on the Senior Notes.  Once the firm ran out of cash and could not pay its liabilities the firm was forced into bankruptcy and the subsequent investigation unveiled the fraud.

16.     Does it make any economic sense to claim that the price declines associated with these intermediate or "symptomatic" events were not "caused" by partial revelation of the fraud?  Of course not.  And if the intent of the securities laws is to hold wrongdoers responsible for the losses they cause, does it make sense to let the perpetrators of frauds who disguise it the longest avoid liability by simply letting these "symptoms" bring the price down instead of an earlier full-disclosure?  Not in my view.

17.     Thoughtful courts have seen it the same way. In a recent decision in the U.S. District Court for the Central District of California, *In re Countrywide Financial Corporation Securities Litigation*, the Court found that "showing loss causation is not precluded by a series of disclosures…"[8] In that case the defendants had attacked the plaintiffs' loss causation arguments because Countrywide's corrective disclosures had occurred "over an extended period of time and often in combination with alleged further misrepresentations that dampened the disclosures' price effects."[9]

18.     In another case in the U.S. District Court for the District of Columbia, *Freeland v. Iridium World Communications*, the plaintiff argued by invoking *Dura* that, "the Supreme Court stopped short of requiring plaintiffs to prove they sold after a complete, corrective disclosure resulting in a large price decline."[10] The Court agreed stating:

> "Indeed, reading *Dura* to require proof of a complete, corrective disclosure would allow wrongdoers to immunize themselves with a protracted series of partial disclosures. Several District Courts have, therefore, read *Dura* narrowly and this Court finds their reasoning to be persuasive."[11]

19.     In another case in the U.S. District Court for the Southern District of New York, *In re Winstar Communications*, the Court found:

> "Allegations that the market reacted negatively to an opinion or speculation which in fact exposes the falsity of defendants' representations can be sufficient to plead loss causation."[12]

20.     The Court further opined:

---

[8] In re Countrywide Financial Corp. Sec. Litig., -- F.Supp.2d --, 2008 WL 510024 at *52 (C.D.Cal. Dec. 1, 2008).

[9] Id. at *52-53

[10] Freeland v. Iridium World Comm'ns, 233 F.R.D. 40, 47 (D.D.C. 2006).

[11] Id.

[12] In re Winstar Comm'ns, 2006 WL 473885 at *14 (S.D.N.Y.).

"To require pleadings establish that when word exposing the falsity of
defendants' statements leaked into the market place, it took the form of a
factual revelation which was, at that time, verifiably truthful, would place
a prohibitively unreasonable burden on a plaintiff."[13]

21.     Finally, in a case in the U.S. District Court for the District of New Jersey, *In re*

*Bradley Pharmaceuticals, Inc. Securities Litigation*, defendants argued that a particular

disclosure was not genuinely "corrective" because it did not contain enough specific information

to correct the alleged misstatements on which plaintiffs were pleading and only referred to a non-

specific SEC inquiry and a request for certain documents concerning the company's revenue

recognition. That Court also disagreed with the defendant's "rigid and dogmatic" reading of

*Dura*, stating:

"In *Dura*, the Supreme Court only suggested that the plaintiffs needed to
have alleged in some fashion that 'the truth became known' before 'the
share price fell.' However, *Dura* did not address what type of events or
disclosures may reveal the truth…Nor did *Dura* explain how specific such
disclosure must be."[14]

22.     The Court further opined:

"Guided by a pragmatic understanding of *Dura*, the Court concludes that
Plaintiffs have adequately pled loss causation. The revelation of the "truth"
about the Deconamine sale did not take the form of a single, unitary
disclosure, but occurred through a series of disclosing events."[15]

23.     The decisions and opinions of the various courts cited above all directly refute Dr.

Lehn's view that in order to demonstrate loss causation Plaintiffs would have to show that DVI's

share price dropped after a revelation of the accounting improprieties at DVI. The relevant truth

about DVI entered the market through a series of partial corrective disclosures as I described in

detail in my Expert Report.

---

[13] Id, at *15.

[14] In re Bradley Pharmaceuticals, Inc. Sec. Litig., 421 F.Supp.2d 822, 828 (D.N.J. 2006).

[15] Id. at 828-29.

24.     I use the remainder of this section to highlight several examples of events on which Dr. Lehn and Dr. Fischel opine there is no loss causation, and articulate why the loss causation burden is met. Rather than proceeding chronologically, I start with the event that best highlights the difference in methodology and then focus on several other selected events.

25.     August 14, 2003 – DVI announced that it intends to file for bankruptcy protection and it has discovered *apparent improprieties* related to misrepresentations in prior dealings *regarding the amount and nature of collateral pledged to lenders.*[16] This news led DVI's stock price to drop 63.5% and DVI's Senior Notes to drop 34.9%. Dr. Lehn astonishingly concludes, "…the information released on this day does not represent the correction of an alleged misrepresentation and therefore fails to meet the criteria for loss causation."[17] Dr. Lehn's own report lists one of the alleged misrepresentation as, "DVI engaged in 'double-pledging' collateral or pledging ineligible collateral…"[18] Dr. Lehn is attempting to conjure the illusion that a disclosure about DVI engaging in improprieties with respect to pledging of collateral is unrelated to the allegation DVI was engaged in improprieties with respect to pledging of collateral. In my view, this event meets even Dr. Lehn and Dr. Fischel's far too strict criteria for loss causation since there is a direct disclosure of improprieties related to the pledging of collateral. Dr. Fischel acknowledges that August 14, 2003 represents a corrective disclosure, "Mr. Coffman has not established that stock price declines on dates other than June 4, 2003 and August 14, 2003 were attributable to the alleged accounting irregularities."[19] The exclusion of August 14, 2003 as a corrective disclosure event in Dr. Lehn's opinion is telling because it suggests to me Dr. Lehn's

---

[16] "DVI to Seek Bankruptcy Protection," Business Wire. August 13, 2003, 5:10 PM.

[17] Lehn Report, pg. 26.

[18] Lehn Report, pg. 5.

[19] Fischel Report, pg. 12.

threshold for acknowledging a corrective disclosure is so far removed from common sense and the practical manner in which frauds come to light (and cause losses) as to render his methodology completely unreliable and uninformative.

26.     September 24, 2002 – Fitch downgraded DVI's Senior Unsecured Debt rating from "BB-" to "B+" and Piper Jaffray downgraded DVI to "Market Perform" from "Outperform". Fitch lowered its rating due to DVI's weak operating performance, DVI's asset growth exceeding its internal capital, increased encumbered assets and increased financial leverage.[20] The *Business Wire* article recounts Fitch's reasoning for the rating action as,

> "The Rating Outlook remains Negative as DVI faces significant challenges
> in reversing the trends in leverage and capitalization. As such, if current
> trends continue, the cushion available to unsecured debt holders may
> become further compromised. Fitch also notes that gain-on-sale revenue
> as a percentage of total revenue has risen sharply in fiscal year 2001 and
> the first nine months of fiscal year 2002."[21]

27.     In my view, the lowered rating of DVI's Senior Unsecured Debt along with the analysts' concerns regarding DVI's liquidity and the related drop of DVI's security prices are causally related to the fraudulent activities described in the Plaintiffs' Complaint. The downgrade of DVI's credit rating and the associated events of September 24, 2002 are the logical and foreseeable consequences of DVI hiding credit losses and engaging in the deceptive practices of 'rewriting', 'swapping', and 'buying out' impaired loans and leases in order to keep them from being reported as delinquent. As I described above, one of the consequences of fraudulently understating loan losses is that incoming cash flow will not keep pace with accrued income and, absent growth, will result in the need for greater than expected borrowing and

---

[20] "Fitch Lowers DVI's Sr Unsecured Debt To 'B+'; Outlook Remains Negative," Business Wire, September 24, 2002.

[21] "Fitch Lowers DVI's Sr Unsecured Debt To 'B+'; Outlook Remains Negative," Business Wire, September 24, 2002.

leverage – which is what the rating agencies are concerned with.  In addition, the rating agency cites the growing reliance on "gain on sale" accounting to DVI as a risk factor.  One of Plaintiffs' primary allegations and one of the primary opinions of Dr. Epstein stated in his expert report filed in the matter ("Epstein Report"), is that DVI inappropriately used gain on sale accounting and failed to record necessary liabilities to mask growing credit losses.  Therefore, in my view, the downgrade action and associated commentary are directly related to Plaintiffs' alleged fraud and thus the accompanying price decline on this partial revelation of the truth provides the requisite loss causation.

28.    Another way of looking at the same event is that a lowering of expectations and increased concerns regarding liquidity represents a subset of the information that would have come out if DVI had been completely truthful on September 24, 2002.  In other words, a full disclosure would have been far worse and more dramatic, but a lowering of the firm's credit rating and lowering of analyst expectations represents a partial corrective disclosure.

29.    Dr. Lehn and Dr. Fischel incorrectly conclude this date is not a corrective disclosure.  Dr. Lehn states, "The information released on September 24, 2002 about a decline in DVI's credit rating does not involve the correction of an earlier misrepresentation.  Specifically, no information about accounting improprieties was released on this day."[22]  For reasons I have articulated above, as a matter of economics, a corrective disclosure need not be an admission of fraud, accounting impropriety or that a previous statement was false.  All that is required is that the new information cause a price decline that would have either occurred earlier or not at all "but for" the fraud and was a "foreseeable" consequence of the fraudulent behavior. Both Dr. Lehn and Dr. Fischel's reasoning incorrectly limit the standard of proving loss causation to a

---

[22] Lehn Report, pg. 20.

13

truthful disclosure and fail to recognize the alternative mechanisms through which DVI's financial truth could be released to the market.

30.    August 1, 2003 – August 5, 2003 – Over this 3-day trading period (August 2 and August 3 are non-trading days) DVI announced that it would not make a scheduled interest payment on its bonds, it had defaulted under its main bank facility, and that it was considering bankruptcy protection.  As described above, a foreseeable consequence of hiding credit losses is that cash collections will lag behind accrued income and, if material enough, lead to an unexpected announcement that the firm is out of cash.  This is precisely what happened at DVI. Indeed, the evidence suggests that DVI faced a liquidity crunch as of the beginning of the Class Period but was able to fraudulently conceal that information for nearly 4 years.[23]  In my view, the final revelation of this liquidity crisis is directly related to Plaintiffs' alleged misrepresentations and the attendant price declines are causally related to the fraud.  The event was a foreseeable consequence of Defendants' actions and would have occurred much earlier but-for the fraud.

31.    As with all the other days, Dr. Lehn evokes his standard mantra that

"…the information released on this date does not represent the correction of an alleged misrepresentation and therefore fails to meet the criteria for loss causation.  Specifically, no information about accounting improprieties was released on this day."[24]

32.    In my view, Dr. Lehn's failure to recognize DVI's liquidity crisis as related to the fraud just provides another example of how Dr. Lehn's loss causation standard is simply too narrow and does not reflect the reality of what occurred at DVI and how the market came to learn the truth.

---

[23] Garfinkel Affidavit, pg. 20.

[24] Lehn Report, pg. 22.

33.     I have used the above selected examples to identify the key difference between my Event Based Approach and that employed in the Lehn Report and Fischel Report – namely that we have a very different view of the types of events that can represent disclosure of the "truth" and why my view is more appropriate.

34.     Dr. Lehn goes into great detail in an attempt to demonstrate that the regression model I employ as part of my event study does not take into account "structural breaks." His criticism is that my methodology does not account for changes in the volatility of DVI's stock returns. He argues that these "technical" errors bias my analysis of which days are statistically significant and renders my analysis unreliable and unscientific. While I do not agree with Dr. Lehn's conclusions regarding my approach, I show that even if I were to adopt Dr. Lehn's event study, and only include statistically significant events, the resulting inflation per share during the Class Period is essentially identical to mine. **Exhibit R1** plots the inflation from my Expert Report and the inflation that would be implied by Dr. Lehn's event study. While there are some small differences, Exhibit R1 shows the results of my analysis are not sensitive to this criticism and that the selection of relevant event dates is what matters.

35.     Dr. Lehn also criticizes my inclusion of events with positive returns. He states, "As a purely theoretical matter, once alleged misrepresentations are corrected, there is no reasonable justification to believe the security could be re-inflated because of the same misrepresentation."[25] This view is an artifact of Dr. Lehn's view that only explicit admissions of fraud qualify as corrective disclosure. Once one relaxes this assumption, then the reasonable justification for including "inflation creating" dates is clear. For example, when DVI announces on October 28, 2002 that it is preparing a new $3 billion securitization, the market reacts in a

---

[25] Lehn Report, pg. 16.

positive and statistically significant way. I interpret this event as providing false reassurance to the market regarding DVI's financial condition. This announcement would not have had the same positive effect if DVI had previously disclosed its true financial condition, (thus attempting to put the proverbial genie back in the bottle) but in the context of a series of partial corrective disclosures, it is relevant and appropriate to adjust the inflation per share for this false reassurance.[26]

36.    With regard to my event study on the Senior Notes, Dr Lehn states, "The combination of different prices reported by different data providers and many days without any trading prices indicates that Mr. Coffman's use of the event-based approach to estimate damages for DVI's bondholders is unreliable. As a result of these data issues, I do not believe it is possible to perform a meaningful event study for DVI's Senior Notes."[27]  I disagree that the "data issues" cited by Dr. Lehn prevent a meaningful event study, and Dr. Lehn provides no foundation for his opinion. First, it is unclear in my mind, and unexplained in the Lehn Report, why the lack of trading on certain days prevents an analysis of price responses on other days. Second, Dr. Lehn's observation that from time to time there are price differences across data sources is neither surprising nor concerning. Each data source (NYSE vs. FIPS/TRACE) is reporting the result of actual, but separate, trading activity. Simple volatility can explain some of the differences across sources. From time to time one observes anomalous prices that could be the result of misreporting or the outcome of some special circumstance, but these few anomalies do not prevent a meaningful event study and there is no reason to believe they create any systematic bias in the analysis. Moreover, the results of the event study I perform are robust to multiple

---

[26] I also note that there are cases where there is an initial positive reaction to misrepresentations themselves. Dr. Lehn does not seem to acknowledge that this would need to be reflected as an increase in inflation on that date. My treatment is also analogous to that scenario.

[27] Lehn Report, pg. 17.

specifications and yield reasonable results.  Dr. Lehn's opinion that a meaningful event study of DVI's Senior Notes cannot be performed is unfounded.

## INSOLVENCY APPROACH

37.     The insolvency approach has three primary elements.  The first element is a quantification of the degree of misstatements of earnings in DVI's financial statements.  The second element is an estimate of how sensitive DVI's securities prices are to changes in earnings. I use these elements to reach the conclusion, along with other supporting evidence, that DVI was insolvent as of the beginning of the Class Period.  The final step is to calculate damages assuming inflation is the market price minus the "clean" price that would have prevailed had the market known DVI was insolvent.  I address the criticisms leveled at each element in turn.

38.     **Degree of Misstatements** - For quantification of the misstatement in DVI's earnings I rely on the conclusion of Dr. Epstein that DVI was experiencing a historical loss rate of at least 6% on its managed portfolio.  The Musika Report claims that my opinions concerning an understated DVI loan loss reserve are unsupported by and in direct contradiction with Plaintiffs' accounting expert Dr. Epstein.  This is incorrect.

39.     The Epstein Report states,

"DVI was repurchasing and substituting (or, equivalently, using techniques such as bogus prepayments secretly funded by DVI, Inc. itself), on average, slightly over 6% of the loans placed in the securitization trusts, in line with the delinquencies noted in the Prospectus Supplement"[28]

40.     Dr. Epstein then applies this 6% loss rate to securitizations from 1999-2002 and finds this reduces gain on sale by 88% during that period.[29]  Applying this 88% figure to all years, Dr. Epstein's analysis implies a total impact on retained earnings of $37.9 million as of

---

[28] Epstein Report, pg. 40.

[29] Epstein Report, pg. 51.

June 30, 1999 *for the off-balance sheet, or securitized portion of DVI's portfolio.* It should be
noted that this change in retained earnings already incorporates the impact of income taxes.

41.     Mr. Musika compares this $37.9 million figure from Dr. Epstein's report to the
$87.4 million difference in loan loss reserves on my Exhibit 11 and claims there is "no
relationship or reconciliation to the different amounts offered by Mr. Coffman versus Dr.
Epstein."[30] The comparison drawn by Mr. Musika is incorrect and misleading. First, Mr.
Musika is comparing Dr. Epstein's post-tax figure with my pre-tax figure. On Exhibit 14, Line 7
of my Expert Report I report the post-tax figure which is $52.5 million. The remaining
difference between Dr. Epstein's $37.9 million and my $52.5 million in after-tax change in loan
loss reserves is more than accounted for by the fact that I am applying the 6% assumption to *all
managed assets, not just off-balance sheet assets.* [31]

42.     As a result, it is inappropriate and unreliable for Mr. Musika to apply my ERC of
6.61 to Dr. Epstein's $37.9 million adjustment to retained earnings and claim, "DVI was clearly
solvent at the time."[32]

43.     My application of the 6% loan loss rate to all managed assets, rather than only
off-balance sheet assets, is supported by Dr. Epstein's opinion that loan losses for the on-balance
sheet portfolio would tend to be worse than the off-balance sheet portfolio. The logic of this is
clear. Setting aside delinquent loans that were repurchased out of the securitization, the on-
balance sheet loans will tend to be those that either will end up in a future securitization or those

---

[30] Musika Report, pg. 9.

[31] The remaining differences are accounted for by use of slightly different tax rates and the fact that Dr. Epstein uses
the 88% reduction in gain on sale during 1999-2002 (which was derived from the 6% loan loss assumption) as the
basis to project back to earlier years while I apply the 6% loan loss rate directly to 1999 managed receivables.

[32] Musika Report, pg. 9.

that are of such poor quality they could not be securitized previously. This would suggest they would have a worse loss experience, on average, than the off-balance sheet loans.

44.     Mr. Musika points out that the proposed adjustments in the Epstein Report are to "gain on sale accounting" whereas I use the 6% to implicitly restate loan loss reserves. Mr. Musika implies that this is somehow inconsistent. Mr. Musika states,

> "Nowhere does Dr. Epstein state that GAAP requires multiplying 6% times the total portfolio of on and off-balance sheet securitizations and recording such amount as an immediate increase to the loan loss reserve ... Consequently, Mr. Coffman derives a series of unsupported and nonsensical adjustments to DVI's loan loss reserve."[33]

45.     What Mr. Musika fails to appreciate is that, while each method implies different accounting treatment at the line item level, they imply the same impact on net income and therefore have the same economic interpretation in the context of my valuation. This is why I am able to reconcile my approach with Dr. Epstein's. My analysis is not, and need not be, an opinion about the proper GAAP treatment at a line item level.

46.     Mr. Musika asserts that my opinion that DVI was insolvent as of the beginning of the Class Period is "conceptually flawed and without adequate support."[34] I disagree and believe the evidence presented in my Expert Report is sufficient to conclude DVI would have been insolvent but-for the fraud. Mr. Musika states that the eventual bankruptcy does not provide support for my opinion that DVI was insolvent as of the beginning of the Class Period.[35] In my view, the fact that DVI went bankrupt upon disclosure of the truth is extraordinarily relevant and supportive of my opinion that DVI was insolvent from the beginning of the Class Period. Mr. Musika argues that I ignore all intervening events that may have impacted the price of DVI

---

[33] Musika Report, pg. 8.

[34] Musika Report, pg. 10.

[35] Musika Report, pg. 10.

securities, but that is simply not the case.  I show using my ERC analysis that the price impact of

the earnings misstatements alone as of the beginning of the Class Period (setting aside all other

issues in the complaint) was sufficient to wipe out DVI's market capitalization.  These two

pieces of evidence (the eventual bankruptcy and the ERC analysis) go hand-in-hand to show that

the mysterious "intervening events" referred to by Mr. Musika are incapable of showing DVI

was solvent as of the beginning of the Class Period.

47.     **Earnings Response Coefficient** - The second component of my insolvency analysis

is to estimate an Earnings Response Coefficient or (ERC) for DVI and apply it to the amount of mis-

stated earnings in each quarter during the Class Period to show that DVI would have been insolvent

throughout the Class Period.  An ERC measures the ratio of the price movement per share to the

earnings surprise per share.  For example, an ERC of 5 would imply that for every $0.01 per share in

earnings surprise, there would be a price change of $0.05 per share.

48.     In my Expert Report I described in detail the rationale for how I arrived at the 6.61

ERC applied in my analysis.  In short, I analyzed each of DVIs earnings announcements from the first

quarter of 1999 to the third quarter of 2003 to identify instances where DVIs announced earnings

surprised the market in a material fashion.  There were three cases where there was a material

earnings surprise.  I selected one of those three earnings surprises (9/27/02) as most comparable based

on direction, magnitude, and content.  The ERC for this earnings surprise was calculated by dividing

the total abnormal decline in market capitalization by the total earnings surprise.[36]  The resulting

ERC of 6.61 was applied to the earnings surprise that would have occurred if DVI had disclosed its

actual loss experience of 6%.

49.     Dr. Lehn and Dr. Fischel each level a number of criticisms at my approach - none

of which are persuasive.  Dr. Lehn's primary conclusion is that my approach is invalid because I

---

[36] See Exhibit 13 of my Expert Report.

did not follow the methodology employed by researchers in the academic literature (including the literature I cite in my Expert Report). In particular, he states,

> "In essence, Mr. Coffman's estimate of DVI's earnings response "coefficient" is not a coefficient from a regression model at all. It is based on a single data point, which makes it an anecdote, not a coefficient. This is unscientific and inconsistent with the very academic literature Mr. Coffman cites in his report."[37]

50. My methodology deviates from that employed in the academic literature that I cite because the question I am attempting to answer as an expert in the context of this litigation is fundamentally different than the research purpose of the cited studies. In particular, the studies I cite are interested in empirically estimating market-wide average ERCs and what cross-sectional variables explain variance in observed ERCs. Multiple regression techniques are utilized to evaluate these cross-sectional variables to determine if they impact ERCs and also to control for differences across firms. I cited the academic studies for the purpose of making clear that there is well-developed, peer-reviewed empirical research and valuation theory that underlies the concept of an ERC, not that there is a single method by which to calculate them. Dr. Lehn offers no authority to substantiate his claim that my methodology for calculating an ERC is unreliable.

51. For purposes of this matter, I am trying to establish the ERC for a single firm, during a particular period of time, with a particular magnitude and information content of the surprise. One clear lesson from the academic literature is that ERCs vary substantially across firms, industries, time periods, and depending on the direction and magnitude of the surprise. I certainly considered using a regression model, but in the end made the reasoned judgment that a more reliable approach in this matter was to analyze comparable earnings surprises for DVI. By

---

[37] Lehn Report, pg. 11.

looking at only DVI, I implicitly control for many of the factors identified in the academic literature and eliminate the need to use regression analysis.[38]

52.     Dr. Lehn's assertion that I rely on "one data point" is misleading.  While I make the judgment that one particular earnings surprise is most comparable to the event I am trying to model, I considered the universe of DVI's earnings releases from the first quarter of 1999 to the third quarter of 2003.  Exhibit 12 of my Expert report showed that for all but three of the earnings announcements, DVI announced earnings that did not deviate in a material way from consensus estimates and therefore do not serve as comparable announcements.  First, these small surprises do not have the type of information content or magnitude of surprise I am attempting to model.  Second, the surprises are so small that any small price reaction due to earnings will be drowned out by the inherent randomness in DVI's stock price returns.

53.     This is where I address one of Dr. Fischel's criticisms.  Namely he criticizes my ERC approach because 4 of the 12 DVI announcements exhibit price movements that are opposite of the direction of the "surprise".[39]  What Dr. Fischel fails to describe is that all four of these events have a "surprise" that is small ($.03 per share or less).  Thus, volatility alone can explain these "wrong" price movements.[40]  His criticism is therefore misleading and unfounded.

54.     Each of the three *material* earnings surprises result in price changes in the same direction as the surprise.  The fact that the implied ERC for each of these events is not uniform (a result which Dr. Fischel notes) is not unexpected in light of the academic literature cited in my

---

[38] I also note that using valuation multiples analogous to an ERC based on a limited set of comparable data points, if done reliably and thoughtfully, is an oft-accepted valuation technique in litigation.

[39] Fischel Report, pg. 10.

[40] For example, applying my ERC estimate of 6.61 to a $0.03 per share earnings surprise would result in a predicted price movement of $0.198.  Prior to the corrective disclosure period, when each of these small "surprises" occur, DVI is trading at over $10 per share and my event study shows that DVI has a root mean squared error of 2.54%. Therefore, the predicted price reaction of roughly $0.198 represents a price movement that is less than 1 standard deviation and such an effect will often be drowned out by the inherent randomness in DVI's stock returns.

Expert Report, the Lehn Report, and the Fischel Report. One consistent theme from this literature is that ERCs are not constant across direction of surprise or magnitude of surprise. This is precisely why I limit my analysis to what I consider the most comparable earnings announcement. As described in my Expert Report, in my view, only one of the three material earnings surprises is of the same direction, sufficient magnitude, and similar in content and context to the event I am attempting to model.

55.     As a final comment, I note that while the Defense Reports attack the *method* by which I arrive at my ERC, none of them offer an opinion that the resulting *magnitude* of 6.61 is unreasonably high. Indeed, my estimated ERC is well below DVI's price-to-earnings multiple prior to the corrective disclosure period - which was roughly 10.[41] This provides a further common sense benchmark suggesting the magnitude of my ERC estimate is not unreasonably high. The price to earnings multiple serves as a benchmark for evaluating an ERC because the concepts are closely related. A price to earnings multiple reflects the average capitalization rate of total earnings while an ERC measures the marginal change in price to a marginal change in earnings.

56.     Before moving on to the third element of the insolvency model, I want to respond to Dr. Fischel's conclusion that my application of an ERC methodology (and apparently in his view any ERC methodology) is

> "…fundamentally flawed because there is no simple mechanical relationship between earnings surprises and stock prices. In fact, a recent study based on a comprehensive sample of composite earnings forecasts for a five-year period found that 43 to 45 percent of firms' earnings surprises are associated with stock returns of the opposite sign. See William Kinney, David Burgstahler and Roger Martin, "Earnings Surprise 'Materiality' as Measured by Stock Returns"[42]

---

[41] For purposes of this calculation I used trailing 12 month earnings and eliminated the effect of extraordinary items.

[42] Fischel Report pg. 9 (emphasis in original).

57.     Dr. Fischel's view that the results of the Kinney paper somehow invalidate ERC analysis or somehow break the theoretical link between earnings surprises and stock price movements is untenable.  First, this paper, along with many others, find, on average, a strong positive relationship between earnings surprises and stock price movements, which generally supports the notion of ERCs.  Second, the fact that a substantial portion of measured price reactions go in the "wrong" direction is not surprising given the methodology employed in the Kinney study.  First, the authors measure the price response over a 22 day period extending from 20 days prior to the earnings announcement and extending to one day after.  This allows many random movements into the calculation that are unrelated to earnings.  Second, their methodology does not control in any way for the information content of the announcement beyond current earnings.  In other words, the study does not account for the myriad of other facts or projections that might make up the information content of an earnings announcement.  Third, the study includes many immaterial surprises (where the magnitude of the surprise is sufficiently small that random price movements dominate).  Furthermore, there is substantial room for measurement error in the Kinney study.  In my experience extreme care needs to be employed when looking at actual vs. consensus earnings – especially when relying on commercially available databases such as First Call (as the Kinney study does).   For example – these databases may not record if a company issues a pre-announcement before its final announcement, thereby dampening the effect of the final announcement.  In addition, in my experience, these commercially available databases do not consistently account for extraordinary items, one-time write-offs that do not impact cash flows, or accurately reflect the content of analyst expectations.  These types of data problems, combined with the study design, suggest to me that Dr. Fischel's

24

reliance on the Kinney study as the underlying premise for rejection of ERC analysis is untenable.

58.     **Damages under the Insolvency Model** - Each of the Defense Reports reject my insolvency model on the grounds that the damages calculations include declines in DVI's stock price that are not the result of specific corrective disclosures.  I do not dispute that the damages I calculate under the Insolvency Model include price declines that are unrelated to corrective disclosures and are, at least in part, due to information releases that have nothing to do with the alleged fraud – such as the September 11, 2001 example cited in the Lehn Report.  What I want to discuss in this section is the rationale for why in the case of the equity securities of an insolvent company this is the right economic approach.

59.     To begin the discussion, I want to describe the rationale for *excluding* unrelated price declines in the typical case.  Table 1 below illustrates this rationale with an example.  Take a company that is trading at $10 per share based on a fraudulent misrepresentation and that if that fraudulent information were revealed to the market the price would fall to $7 per share.  Inflation is thus $3 per share.  Now assume there is an intervening non-fraud event that lowers the stock price by $1.  After the non-fraud related event, the stock trades at $9 and if the fraud were revealed it would trade at $6.   The economic rationale for excluding the $1 decline in price from damages is that an investor who purchased stock before the non-fraud event and sold it after the non-fraud event experienced a $1 loss that (a) did not reduce inflation, and (b) would have occurred regardless of the fraud.

## Table 1 - Solvent Firm

|        |                | Before Non-Fraud Event | After Non-Fraud Event | Change as a result of Non-fraud Event |
|--------|----------------|------------------------|-----------------------|---------------------------------------|
| [A]    | Observed Price | $10                    | $9                    | -$1                                   |
| [B]    | "True" Price   | $7                     | $6                    | -$1                                   |
| [A] - [B] | Inflation   | $3                     | $3                    | $0                                    |

For a <u>solvent</u> firm, a <u>non-fraud event</u> does <u>not</u> cause an economic loss because both the observed price and the true price falls by the same amount. In other words, because the inflation remains unchanged, there is no economic loss to the investor.

60.     Now take the same company and assume that it is insolvent as a result of fraud. Table 2 below illustrates this example. As in the previous example, before the fraud is revealed the stock trades at $10 per share and then falls to $9 per share on a non-fraud based event. The "true" price in this scenario is $0 both before and after the non-fraud event. In this case, therefore; the $1 decline in price associated with the non-fraud event (a) *reduces inflation* and (b) *would not have occurred but-for the fraud* because the "true" price is zero both before and after the non-fraud event. Thus, from an economic perspective, there is a causal link between the fraud and this loss. The underlying principle at work here is that limited liability for stockholders implies that non-fraud events impact inflation (and thus economic damages) differently for insolvent versus solvent companies.

### Table 2 – Insolvent Firm

|  |  | Before Non-Fraud Event | After Non-Fraud Event | Change as a result of Non-fraud Event |
|---|---|---|---|---|
| [A] | Observed Price | $10 | $9 | -$1 |
| [B] | "True" Price | $0 | $0 | $0 |
| [A] - [B] | Inflation | $10 | $9 | -$1 |

For an **insolvent** firm, a **non-fraud event** causes an economic loss because while the observed price falls, the true price cannot fall further. In other words, the loss would not have occurred but-for the fraud and the non-fraud event results in a decline in inflation and thus an economic loss to the investor.

61.     The open question is whether the loss causation requirements articulated in *Dura* and other case law preclude application of these clear economic principles. In my view they do not. Recall that the logic of the *Dura* case resulted from the notion that it is not enough to show a stock was inflated. The Supreme Court clearly articulated that the plaintiff must show that the investor suffered an "economic loss" as a result of the fraud. In my view, as a matter of economics, "economic loss caused by the fraud" is synonymous with a reduction of inflation. As my example above demonstrates, in the context of a company that is truly insolvent, corrective disclosures are not required to generate losses related to the fraud.

62.     I recognize that certain language in *Dura* implies the exclusion of non-fraud related events from damages. For example, the *Dura* opinion states:

> "When the purchaser subsequently resells such shares, even at a lower price, that lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events which taken separately or together account for some or all of the lower price"[43]

---

[43] 544 U.S. 336, 342-43 (2005).

63.     What is not clear to me, however, is that the Court contemplated the economic difference between the typical case and a fraud that conceals insolvency in drafting this particular language.

64.     Nothing in the Defense Reports undermines the underlying economic rationale for the Insolvency Approach.  The Defense Reports criticize my Insolvency Approach on the grounds it includes losses that are not related to corrective disclosures.  If one accepts the underlying economic theory, these criticisms are irrelevant.

### DAMAGE CALCULATIONS

65.     **FIFO/LIFO** - Dr Lehn criticizes my use of the first-in, first-out ("FIFO") inventory method for matching trades in the claims data.  His criticism is that use of FIFO is arbitrary and that a last-in, first-out ("LIFO") often results in lower damages. There is no theoretical basis for rejecting FIFO, and I understand that Courts have accepted FIFO as an inventory method in matters involving securities litigation.  I also note that selection of LIFO would be equally "arbitrary" and the fact it often results in lower damages does not make it more reliable.  My choice of FIFO was driven by the fact that when I received the claims data from the claims administrator they had already matched the trades on a FIFO basis.  While I see no basis for changing methods, I have computed alternative damages using the LIFO method and report them on Exhibit R2.

66.     **Gains from Pre Class Period Holdings** - Dr. Fischel notes that the damages calculations in my Expert Report do not incorporate gains resulting from sales during the Class Period of shares purchased prior to the Class Period.[44]  I understand Plaintiffs' legal position to be that these gains are irrelevant as a matter of law under the theory that shares purchased prior

---

[44] The Lehn Report does not raise this same issue as a shortcoming of the damages analysis in my Expert Report.

to the Class Period are not part of the Class and not relevant to the case or the calculation of damages. If Plaintiffs prevail on their theory, then my damages calculations are appropriate. In the event the Court finds that these gains should be accounted for, I have incorporated into Exhibit R2 alternative damage calculations that incorporate these gains under both the LIFO and FIFO method.

67. **Damaged Shares** - Dr. Lehn offers an opinion that,

> "...Mr. Coffman's attempt to estimate the number of damaged shares in this matter is based on an unscientific method that has no support in the academic literature. More generally, in my opinion, no method of estimating the number of shares damaged by alleged securities fraud has been validated scientifically in the academic literature."[45]

68. Dr. Lehn's criticism is perplexing given that with the exception of a small subset of damages for DVI common stock, the number of damaged shares in my analysis is not "estimated". I primarily rely on actual claims submitted by Class Members that have been approved by the Claims Administrator. Indeed, 100% of the damages for the Senior Notes are based on actual claims data and 87% of the damages related to the stock are based on actual claims for which there is no "estimate". I provided the logical reasoning behind my estimates for the remaining 13% of stock damages in my Expert Report. Dr. Lehn does not articulate any rationale as to why the remaining stock damages are unreliable. I note it is rare to have actual claims data for purposes of estimating aggregate damages and Courts have accepted estimates of damaged shares in the past.

69. **Musika's Double Counting Claim** - Mr. Musika opines that I don't consider the "impact of multiple recoveries" with the implication that I am somehow double-counting

---

[45] Lehn Report, pg. 4.

damages or not taking into account alternative venues for recovery.[46]  His analysis and implication are incorrect.  The first example he identifies is that Senior Note Holders may be able to recover in the DVI bankruptcy proceeding or from other suits filed by the Liquidating Trustee. What Mr. Musika fails to consider is that any anticipated recoveries from these suits are reflected in the market price of the Senior Notes.  Therefore, the damages I report do not include those anticipated recoveries.  Mr. Musika then claims that some of the Senior Note Holders can recover in the WM High Yield Fund et. al matter.  In the data I received from the claims administrator, the trading of any parties that can recover in the WM High Yield Fund case were marked as "OPT OUTs" and specifically excluded from my damages calculation.

70.     Mr. Musika also suggests that I do not consider the "impact of multiple parties" and that I "fail to analyze the impact of numerous defendants in this matter."[47]  I was asked by counsel to calculate total damages to class members as a result of the alleged fraud and the methodologies employed in my Expert Report are appropriate for that purpose.  My analysis is based on the presumption that Defendants are collectively responsible for the inflation I measure in the prices of DVI's common stock and Senior Notes.  It is unnecessary to form an opinion regarding the relative contribution of any particular Defendant to the fraud, inflation or damages to answer the question I have been asked.

---

[46] Musika Report, pg. 6.

[47] Musika Report, pg. 6.

Respectfully Submitted on December 17, 2008

Chad Coffman

## Appendix A

### List of Documents/Data Considered

<u>Expert Reports</u>
- Expert Report of Daniel R. Fischel, November 17, 2008
- Expert Report of Kenneth M. Lehn, November 17, 2008 (With Backup Exhibits, Data, Programs and Documents KML000001 – KML0002164)
- Expert Report of Terry L. Musika, November 17, 2008
- Expert Report of Barry Jay Epstein, October 3, 2008 (With Backup Exhibit File "Fin Analysis Copy.doc")

<u>Court Documents</u>
- Countrywide Financial Corporation Securities Litigation, United States District Court, Central District of California, Case 2:07-cv-05295-MRP-MAN, December 1, 2008
- Parker Freeland et al. v. Iridium World Communications, Ltd., et al., United States District Court, District of Columbia, 233 F.R.D 40, January 9, 2006
- Winstar Communications, Jefferson Insurance Company of New York, et al., v. William J. Rouhana, Jr,; Nathan Kantor; Richard J. Uhl; and Grant Thornton LLP, United States District Court, S.D. New York, WL 473885 (S.D.N.Y), February 27, 2006.
- Bradley Pharmaceuticals, Inc. Securities Litigation, United States District Court, D. New Jersey, 421 F. Supp.2d 822, March 23, 2006.
- Affidavit of Stephen R. Garfinkel, March 26th, 2007
- Dura Pharmaceuticals, Inc., et al., Petitioners, v. Michael Broudo, et al., Supreme Court of the United States, 544 U.S. (2005) Opinion of the Court, No. 03-932, April 19, 2005

<u>DVI Claims Data</u>
- Proof of Claims Data and Release Forms received from Counsel
- Claims database work product provided by Strategic Claims Services

<u>DVI News</u>
- News articles downloaded from Factiva for DVI, Inc. and other related companies
- News search results from Factiva for DVI, Inc. from 1/1/1999 to 12/31/2003 (804 articles)
- Additional news search results from Factiva for DVI, Inc. and other related companies for stock and/or bond significant days

<u>Academic Articles</u>

- Collins, Daniel W. and S.P. Kothari, "An Analysis of Intertemporal and Cross-Sectional Determinants of Earnings Response Coefficients," Journal of Accounting and Economics, 11 (1989), 143-181
- William Kinney, David Burgstahler and Roger Martin, "Earnings Surprise 'Materiality' as Measured by Stock Returns," 40 J. Accounting Research (December 2002), 1297-1329



**Exhibit R1**
**DVI Common Stock Price and Inflation Per Share**
**8/10/99 to 8/13/03**

Sources: Center for Research in Security Prices, Bloomberg, Lehn Report

Notes: The Inflation per share based on Dr. Lehn's Event Study model uses his regression model results and calculates inflation based on the resulting statistically significant dates I have identified as corrective disclosures.

## Exhibit R2
## DVI Inc. Common Stock and
## 9 7/8 Senior Notes Damages (in millions)

| | First-In First-Out (FIFO) | | Last-In First-Out (LIFO) | |
| --- | --- | --- | --- | --- |
| Grouping | Damages: Gross of PreClass Gains | Damages: Net of PreClass Gains | Damages: Gross of PreClass Gains | Damages: Net of PreClass Gains |
| **Common Stock - Insolvency Inflation** | | | | |
| Claimants | $81.1 | $69.5 | $78.1 | $70.6 |
| Institutions Without A Claim Filed | $7.6 | $7.5 | $7.5 | $7.5 |
| Flero Services | $1.3 | $1.3 | $1.3 | $1.3 |
| Damages based on the net selling activity of the observed groups after April 30, 2003 | $2.5 | $2.5 | $2.5 | $2.5 |
| Damages from other unobserved purchasers | N/A | N/A | N/A | N/A |
| Total | $92.5 | $80.8 | $89.4 | $82.0 |
| **Common Stock - Event Based Inflation** | | | | |
| Claimants | $46.4 | $40.7 | $45.1 | $41.7 |
| Institutions Without A Claim Filed | $4.9 | $4.9 | $4.9 | $4.9 |
| Flero Services | $1.2 | $1.2 | $1.2 | $1.2 |
| Damages based on the net selling activity of the observed groups after April 30, 2003 | $2.7 | $2.7 | $2.7 | $2.7 |
| Damages from other unobserved purchasers | N/A | N/A | N/A | N/A |
| Total | $55.3 | $49.5 | $53.9 | $50.5 |
| **Senior Notes - Event Based Inflation** | | | | |
| Claimants | $33.5 | $30.3 | $30.3 | $30.2 |
| Damages from other unobserved purchasers | N/A | N/A | N/A | N/A |
| Total | $33.5 | $30.3 | $30.3 | $30.2 |
| **Total Common Stock and Senior Notes Damages** | | | | |
| Insolvency Inflation | $126.0 | $111.1 | $119.7 | $112.2 |
| Event Based Inflation | $88.8 | $79.8 | $84.2 | $80.7 |
| Additional Damages if September 20, 2002 is included as a corrective disclosure (Event Based Inflation) | $14.1 | $11.3 | $13.4 | $11.4 |

Sources: Center for Research in Security Prices, FactSet, Strategic Claims Services, Flero Services' September 4, 2003 SEC Filing 13-D