# EXHIBIT 3

EXHIBIT 3

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In Re DVI Inc. Securities Litigation | **2:03-CV-05336-LDD**<br><br>**Hon. Legrome D. Davis, presiding** |

## REBUTTAL REPORT OF CHAD COFFMAN TO

## THE REPORT OF MR. NEIL DEMCHICK

**TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................................................ 1

II.    SUMMARY OF OPINIONS .............................................................................. 3

III.   MY OPINIONS REGARDING LOSS CAUSATION UNDER THE EVENT
BASED APPROACH ARE NOT DEPENDENT UPON DR. EPSTEIN'S 6% OPINION ............ 8

IV.    MR. DEMCHICK'S CRITICISMS DO NOT DISTURB MY APPLICATION OF
CONSTANT DOLLAR INFLATION ........................................................................ 10

V.     START OF THE CLASS PERIOD .................................................................. 13

VI.    INFLATION SPECIFIC TO D&T ................................................................... 16

VII.   LOSS CAUSATION AND CORRECTIVE DISCLOSURES ........................... 17

   A.   IDENTIFICATION OF CORRECTIVE DISCLOSURES ............................ 17

   B.   LOSS CAUSATION AND CONFOUNDING INFORMATION ................. 22

VIII.  UPDATED INFLATION AND DAMAGES CALCULATIONS ...................... 33

IX.    CONSIDERATION OF OTHER POTENTIALLY RESPONSIBLE PARTIES
AND OTHER AVAILABLE SOURCES OF RECOVERY ........................................... 35

i

## I.   INTRODUCTION

1.      My name is Chad Coffman. I am the President of Global Economics Group, a Chicago-based firm that specializes in the application of economics, finance, statistics, and valuation principles to questions that arise in a variety of contexts, including, as here, in the context of litigation.

2.      I filed a report in this matter dated October 1, 2008 ("Coffman Expert Report", "Expert Report", or my "Report") opining on materiality, loss causation and damages. Subsequently, I filed a rebuttal report dated December 17, 2008 ("Coffman Rebuttal Report", together with my Report are referred to as "Reports") in response to Dr. Daniel R. Fischel ("Fischel Report"), Dr. Kenneth Lehn ("Lehn Report"), and Mr. Terry Musika ("Musika Report"). I understand Mr. Musika passed away on December 18, 2012, and the Court has allowed a replacement expert. I understand that the replacement expert was only to cover topics addressed by Mr. Musika. I have been provided the report of Mr. Neil H. Demchick ("Demchick Report") which is the replacement report.

3.      Mr. Demchick noted that the Court Order-Memorandum entered February 20, 2013 limited his testimony to "the topics upon which Mr. Musika previously opined."[1] As will be described herein, many of the arguments raised by Mr. Demchick are new and fall outside the topics covered by Mr. Musika. Nevertheless, I have been asked by counsel for Plaintiffs in this matter to respond to all of the arguments raised by Mr. Demchick in the event the Court allows them to proceed.[2]

---

[1] Demchick Report at ¶1, citing the Order-Memorandum issued February 20, 2013.

[2] My purpose in submitting this additional Rebuttal Report to Mr. Demchick ("Additional Coffman Rebuttal Report") is not to rebut every argument raised in the Demchick Report, and my silence on

4.      I am aware that since the filing of my Reports, the Court ruled that based upon an interpretation of law, I will not be permitted to testify regarding the Insolvency Approach[3] to damages. As such, I confine my discussion to the Event Study Approach described in my Reports. Furthermore, I am aware of the Court's ruling(s) that four of the price declines I identified in my Report cannot sustain a finding of loss causation as a matter of law. As part of this Additional Coffman Rebuttal Report, I am also providing exhibits regarding inflation and damages that take into account the Court's prior rulings.

5.      My qualifications were detailed in my Reports. However, I note that since my Reports were filed, the name of my firm has changed from Winnemac Consulting to Global Economics Group, I have taken on additional management positions, and I have testified in a number of additional matters. These changes are reflected on my updated CV which is attached as **Appendix A**.

6.      The additional materials I have relied upon subsequent to my Reports are summarized in **Appendix B**. Global Economics Group is being compensated at an hourly rate of $500 per hour for my work on this matter and my compensation is in no way contingent on the outcome of this case or on the opinions offered.

---

certain minor issues contained therein should not be construed as implicit agreement with such criticisms. I reserve the right to respond to any criticisms not covered in this Rebuttal Report to Mr. Demchick at trial.

[3] Unless otherwise defined herein, capitalized terms will have the respective meanings given to them in my Reports.

## II.    SUMMARY OF OPINIONS

7.      The opinions I set forth in the Coffman Expert Report and the Coffman Rebuttal Report remain the same and are unaltered by my review of the new information in the Demchick Report. Furthermore, I have reached the following additional opinions:

i.      A number of Mr. Demchick's opinions concern whether or not Dr. Barry Epstein's opinion that DVI should have recorded at least a 6% reserve, or loan loss rate, against its managed portfolio is accurate ("6% Opinion").[4] First, the measurement of price declines caused by Corrective Disclosure Events[5] under my Event Based Approach does not rely in any way upon Dr. Epstein's 6% Opinion. As a result, even if certain of Mr. Demchick's arguments regarding Dr. Epstein's particular method for estimating the necessary loss reserve are well-founded, it does not disturb the causal relationship between Plaintiffs' allegations and the declines in DVI's securities under the Event Based Approach described in my Report.[6]

ii.     Furthermore, while Dr. Epstein's 6% Opinion provides additional support for my constant dollar artificial inflation approach for calculating *damages* under the Event Based Approach, it is not required for loss causation. Also, Dr. Epstein's opinion provides further support for my constant dollar approach even if the loss rate

---

[4] *See* "Expert Report of Barry Jay Epstein, Ph.D., CPA," dated October 3, 2008 (the "Epstein Report") and "Expert Rebuttal Report of Barry Jay Epstein, Ph.D., CPA," dated December 17, 2008 (the "Epstein Rebuttal Report").

[5] September 24, 2002, September 26, 2002, September 27, 2002, June 4, 2003, June 27, 2003, July 1, 2003, August 1, 2003, August 4, 2003, August 5, 2003, August 7, 2003, August 8, 2003, August 12, 2003, and August 14, 2003, hereafter the "Corrective Disclosure Events."

[6] Dr. Epstein's 6% Opinion provided a predicate for my "Insolvency Approach" which the Court ruled cannot sustain a finding of loss causation as a matter of law.

were as low as 3.8% (or lower for most of the Class Period) as opposed to 6% or higher.[7]

      iii.    Mr. Demchick's opinion that I have provided "no documentation" to support the beginning date for my damages analysis is new and makes no sense. First, the topic of the appropriate start date to perform a damages analysis was not raised by Mr. Musika. Second, as clearly identified in my Report, I assume that Plaintiffs will be able to prove that DVI was materially misstating its reported earnings, liquidity, and financial condition as of the beginning of the Class Period. Indeed, it is undisputed that by the beginning of the Class Period, DVI's liquidity situation was sufficiently dire that it resorted to pledging ineligible collateral to its lenders. Furthermore, Dr. Epstein opined that the accounting misstatements had occurred as of the beginning of the Class Period. Moreover, as described herein, the market impact of a corrective disclosure at the beginning of the Class Period would have been sufficient to capture all of the inflation from my Event Based methodology. Indeed, two Defendants' experts (Dr. Lehn and Dr. Fischel) performed damages analyses that used the same starting date for damages and the same constant dollar inflation assumptions I relied upon in my Report. Since there is no basis or rationale for starting the damages analysis prior to the Class Period, August 10, 1999 (the beginning of the Class Period) is the only logical date upon which to begin a damages analysis.

---

[7] This calculation excludes the four events the Court ruled could not sustain a finding of loss causation as well as the two positive earnings dates I had previously included in my artificial inflation calculations.

iv.    Mr. Demchick opines that I do not consider factors or evidence regarding the amount of inflation caused specifically by the alleged misrepresentations and omissions of D&T as opposed to other Defendants. I was asked to quantify the total amount of inflation in DVI securities as a result of Plaintiffs' allegations, not just those resulting from D&T-specific acts. Moreover, I was not asked to apportion the inflation by Defendant, nor does it make sense to do so. Furthermore, by way of example, if D&T, rather than allegedly committing securities fraud, had withheld its audit opinion (or issued an adverse opinion), it is foreseeable that DVI would have been unable to continue disguising the alleged fraud and the full truth would have come to light much more quickly. As a result, if D&T is found liable, it would be reasonable to conclude that there is but-for and foreseeable causation between D&T's misstatements and all of the artificial inflation after D&T's alleged misstatements and omissions.

v.    Mr. Demchick opines that I do not identify any "corrective disclosures of prior fiscal periods including related to (a) reduced Gain on Sale of Securitizations, (b) liability for repurchases from securitizations, or (c) loan loss reserves for DVI's retained interests from securitizations and on-balance sheet loans."[8] First, this subject reaches beyond the scope of Mr. Musika's opinions since the only argument in the Musika Report regarding the Corrective Disclosure Events I had identified was that "there is no explanation as to how each of the identified events represents a partial disclosure of the alleged fraud."[9] Mr. Musika did not address any specific disclosure

---

[8] Demchick Report at ¶19.

[9] Musika Report at ¶36.

5

or disclosure date, and did not complete an event study.[10] Therefore, Mr. Demchick is going well beyond Mr. Musika's "explanation" criticism, to which I responded at length in the Coffman Rebuttal Report,[11] to apparently adopting a theory of what is required for a "corrective disclosure." Indeed, Mr. Demchick, in referencing Dr. Lehn,[12] appears to be adopting Dr. Lehn's rigid criteria that there must be an admitted restatement of prior period financial statements for there to be loss causation. I responded to Dr. Lehn, and implicitly to the new argument by Mr. Demchick, at length in the Coffman Rebuttal Report by describing how one of the events explicitly identifies the discovery of improprieties in DVI's dealings with lenders (*i.e.*, August 14, 2003). Even Dr. Fischel, an expert for Defendants, acknowledged the presence of corrective information on two of the events I identified (*i.e.,* June 4, 2003 and August 14, 2003). For the remainder of the events, I described the rationale for considering the events as corrective even though they are not explicit admissions of wrongdoing. These events reflect "symptoms" of the underlying fraud – which is analogous to what some Courts have referred to as partial corrective disclosures or the "materialization of the undisclosed risk" theory.

vi.     Mr. Demchick opines that I do not consider other factors that may have caused the decline in the market price of DVI securities on the Corrective Disclosure Events. First, Mr. Musika did not address this topic. Mr. Musika only identified three non-public events that he describes as "intervening or superseding causal events" for

---

[10] Deposition of Terry L. Musika, March 3, 2009, pp.1123-1128.

[11] *See* Coffman Rebuttal Report ¶¶5-33.

[12] Demchick Report at ¶45d.

DVI's bankruptcy that were not related to the Corrective Disclosure Events, but rather were related to the ongoing various acts by Fleet National Bank, Merrill Lynch and Steven R. Garfinkel.[13] Mr. Musika did not identify or assert that any specific information on any given Corrective Disclosure Event purported to represent confounding information. In contrast, Mr. Demchick contends that certain publicly available information on certain corrective disclosures represents confounding information. Second, Mr. Demchick is simply incorrect that I do not consider other factors. As an initial matter, my Report explicitly excludes any decline caused by market or industry factors. Furthermore, Mr. Demchick's argument does not raise a question generally to a finding of loss causation because there are some events for which none of the Defendants' experts, including Mr. Demchick, have identified or asserted confounding information. Moreover, for almost all of the other disclosures, the information that Mr. Demchick identifies as "confounding" is not new (and thus cannot be the cause of the decline) or clearly represents corrective, rather than confounding information.

vii.    Mr. Demchick asserts that I do not consider other potentially responsible parties or other sources of recovery. Some of these assertions are consistent with Mr. Musika's report and I reincorporate my responses herein. Others are new, but are either incorrect or irrelevant.

8.    The remainder of this report is organized as follows: **Section III** explains that my opinions regarding loss causation are not dependent on Dr. Epstein's 6% opinion. **Section IV** explains that Mr. Demchick's criticisms do not disturb my application of constant dollar

---

[13] Musika Report at ¶¶36-58.

inflation. **Section V** addresses why my analysis starts at the beginning of the Class Period.
**Section VI** explains why I calculate inflation per share generally and not the inflation
specifically applicable to D&T. **Section VII** reviews the Corrective Disclosure Events. **Section
VIII** updates my inflation and damages calculations. **Section IX** considers other potentially
responsible parties and other available sources of recovery.

### III.   MY OPINIONS REGARDING LOSS CAUSATION UNDER THE EVENT BASED APPROACH ARE NOT DEPENDENT UPON DR. EPSTEIN'S 6% OPINION

9.     A number of Mr. Demchick's opinions concern whether or not Dr. Epstein's
opinion that DVI should have recorded at least a 6% reserve against its managed portfolio is
accurate and how it would impact the causal link between Plaintiffs' allegations and losses
suffered by Class Members. For example, Mr. Demchick summarizes his opinion as follows:

> The Coffman Report fails to adequately consider the inappropriate conclusions
> reached by Dr. Epstein regarding DVI's requirement to have recorded a 6%
> Reserve on its entire managed portfolio beginning in 1999 as the causal link
> between any alleged liability and damages, and therefore has not established loss
> causation.[14]

10.     As worded, it is not entirely clear how to even interpret Mr. Demchick's opinion;
however, I take it to mean that Mr. Demchick is asserting that my loss causation opinion is
dependent on the accuracy of Dr. Epstein's opinion that DVI should have recorded a 6% reserve
against all its managed assets. To respond to this assertion appropriately, it is important to
consider how the 6% figure posited by Dr. Epstein enters into my loss causation and damages
analysis and how it does not.

---

[14] Demchick Report at ¶18.

11.    First, as stated in my Report, I assume Plaintiffs will be able to establish liability by demonstrating that DVI's financial statements were false and misleading throughout the Class Period.[15] Dr. Epstein's opinions, including but certainly not limited to the 6% Opinion, and his findings and conclusions regarding materially understated loan loss reserves on numerous DVI loans are evidence supporting such allegations.

12.    Second, my Event Based Approach demonstrates a causal link between new public disclosures that partially revealed the fraud and/or its symptoms and that resulted in statistically significant abnormal declines in the price of DVI securities. This analysis is not at all dependent on the accuracy of the 6% Opinion set forth in Dr. Epstein's report. Instead, it is dependent only on Plaintiffs' ability to prove liability for false and misleading statements, the accuracy of my event study analysis, and my interpretation of the events as revealing the fraud or its symptoms.

13.    The only way in which Dr. Epstein's 6% calculation explicitly entered the analysis in my Reports was as a partial predicate to my Insolvency Approach. Indeed, in describing the Event Based Approach I stated in my Report:

> Event-Based Approach – This approach is premised on the notion that, **regardless of whether DVI was insolvent**, the loss causation burden is only met for stock price declines that are causally related to the revelation of DVI's false and misleading statements.[16]

14.    As a result, my loss causation opinion under the Event Based Approach is not reliant upon Dr. Epstein's 6% Opinion.

---

[15] Coffman Expert Report at ¶7.

[16] Coffman Expert Report at ¶13 (emphasis added).

## IV.   MR. DEMCHICK'S CRITICISMS DO NOT DISTURB MY APPLICATION OF CONSTANT DOLLAR INFLATION

15.      The only way Dr. Epstein's 6% Opinion remains indirectly relevant to my analysis is in providing additional supporting evidence for my constant dollar inflation assumption when calculating *damages*. In other words, after having already established loss causation based on the removal of inflation on the Corrective Disclosure Events, the question is whether it is appropriate to carry that artificial inflation all the way back to the beginning of the Class Period (*i.e.*, suggesting damages would be the same for an early class period purchaser as a late class period purchaser, each of whom held those purchased shares through all the corrective disclosures).

16.      First, the constant dollar methodology is a standard approach often adopted by experts in this context. In fact, I note that neither Dr. Lehn nor Dr. Fischel disputed my use of constant dollar inflation, and in fact, adopted my constant dollar inflation methodology as part of their own alternative damages analyses. Mr. Musika never addressed the constant dollar issue in his report. Indeed, the use of a constant dollar approach is entirely consistent with *Dura* which allows damages due to price declines associated with events that reveal (in whole or in part) the concealed underlying truth.

17.      Second, as clearly identified in my Report, I assume that Plaintiffs will be able to prove that DVI was misstating its financial results, liquidity position, and financial condition as of the beginning of the Class Period.[17] Indeed, it is undisputed that by the beginning of the Class Period, DVI's liquidity situation was sufficiently dire that it resorted to pledging ineligible

---

[17] Coffman Expert Report at ¶29.

10

collateral to its lenders.[18] Furthermore, Dr. Epstein opines that the accounting misstatements had occurred as of the beginning of the Class Period. Thus, there are multiple sources that support application of a constant dollar approach to the beginning of the Class Period.

18.     The way Dr. Epstein's 6% Opinion provides additional economic evidence to support the constant dollar inflation approach is to demonstrate that disclosure of the understated loan losses would have caused a market reaction at least as large as the inflation implied by my Event Based Approach. For example, consider **Exhibit 1** which summarizes the inflation per share in DVI securities after eliminating the four event dates excluded at Summary Judgment.[19]

19.     Columns [2] and [3] of **Exhibit 1** show inflation per share and inflation per bond, respectively. Columns [4] and [5] reflect the total dollar value of inflation for each security, computed as the shares (or notes) outstanding multiplied by inflation per share (or per note). Column [6] shows the total dollar value of the inflation aggregated across both securities. **Exhibit 1** thus shows that as of the beginning of the Class Period, the total artificial inflation under my Event Based Approach is $199.13 million.

20.     Recall that in my original Report I used an Earnings Response Multiple and Dr. Epstein's 6% Opinion to demonstrate how disclosure of the understated loan losses would have been sufficient to eliminate DVI's market capitalization throughout most of the Class Period. Indeed, **Exhibit 2** recreates this analysis and shows that the expected market reaction is far greater than the implied artificial inflation from **Exhibit 1**. This provides further support for the

---

[18] Coffman Expert Report at ¶39; *See also* Garfinkel Affidavit, pp. 20, 23, 37-38; Examiner's Report, Exhibit 71.

[19] As will be explained in **Section VIII** (where I present my updated analysis of inflation and damages), since the Court ruled that DVI's unexpectedly negative earnings announcements were insufficient for proof of loss causation, to be consistent, I also adjust my inflation calculations to remove the impact of the unexpectedly positive earnings announcements on my inflation calculation.

constant dollar methodology by showing that at any point in time, a revelation of the understated loan losses would have caused a price reaction exceeding the inflation per share.

21.     These results are not dependent on Dr. Epstein's calculation to be at least 6%. In fact, **Exhibit 3** shows the minimum adjustment to DVI's loan loss reserves each quarter that fully explains the inflation in the DVI securities. The maximum value in any month is 3.8%, and for half the Class Period an adjustment of less than 3% will suffice to fully explain the inflation in the DVI securities. Thus, I do not rely heavily on Dr. Epstein's 6% calculation, as a much lower rate would not alter my conclusions and there is other evidence to support the constant dollar methodology.[20] Also, I note that neither the Demchick Report nor the Musika Report provides any guidance as to what an appropriate reserve percentage would be.

22.     I also note that this analysis is a direct response to another of Mr. Demchick's opinions that Mr. Musika had not raised. In particular, Mr. Demchick states:

> Based upon Mr. Coffman's methodology, he estimates the amount of inflation as $8.78 per share as of September 23, 2002, and then assumes that the same level of inflation is applicable back to the beginning of the Class Period, or August 10, 1999.[21]

23.     Mr. Demchick then questions how the inflation could be constant if the degree of misstatements was fluctuating over time.

---

[20] Paragraph 43 of the Demchick Report misleadingly asserts that Paragraph 90 of my Report implies that my Event Based Approach depends on Dr. Epstein's 6% Opinion and also on the opinion that DVI was insolvent but-for the fraud. The discussion herein makes clear that is not the case. In paragraph 90 of my Report, I was simply making the obvious point that if DVI were insolvent, that would provide more than enough support for applying constant dollar inflation. My statement implies that insolvency is a sufficient condition, but not a necessary condition.

[21] Demchick Report at ¶44.

This would assume that the same level of misrepresentation that existed in September 2002 and subject to corrective disclosure at that time existed for the entire prior three year period.[22]

24.     Mr. Demchick, in making an argument not raised in the Musika Report nor criticized in either the Lehn Report or Fischel Report, fails to understand the point I made in my Expert Report, that the artificial inflation per share I calculate is *limited* by the price declines I can attribute to disclosure of the fraud or its symptoms. As a result, while there might be a valid economic model that would have *higher* artificial inflation that also varies according to the size of the misstatements, the Event Based Approach and constant dollar inflation restrict the inflation based upon legal principals of loss causation. Thus, Mr. Demchick's inference that I "assume" the same level of misrepresentation throughout the Class Period is inaccurate.

25.     Mr. Demchick also states:

Second, even if I were to accept Dr. Epstein's estimate of 6% for the overall average loss rate for securitizations for 1998-2 through 2001-1 (which I do not), I disagree with Mr. Coffman's use of this percentage in his damages calculation.[23]

26.     Based on the discussion above, it is clear that I do not make direct "use of this percentage" in my damages calculation, and Mr. Demchick's assertion that I do is wrong and misleading.

## V.    START OF THE CLASS PERIOD

27.     The Demchick Report suggests that I have provided "no documentation" to support a beginning date for damages related to the Class Period which starts on August 10,

---

[22] Demchick Report at ¶44.

[23] Demchick Report at ¶42a.

1999.[24] This is not an argument raised in the Musika Report or any of the other expert reports. Nevertheless, I respond and describe how this assertion makes no sense.

28.     I plainly stated in the summary of opinions in my Expert Report that I assume that Plaintiffs would prove Defendants made false and misleading statements throughout the Class Period *(i.e.,* August 10, 1999 through August 13, 2003). This is a standard assumption made by damages experts in securities cases. As I explained in my Expert Report, "I assume Plaintiffs will be able to prove that Defendants were aware of, or should have been aware of, and had a duty to disclose that DVI's financial statements and public pronouncements regarding its financial condition were materially false and misleading."[25] I also take the Class Period – and thus the period over which Plaintiffs intend to prove liability – as a given. In other words, there is no basis for me to extend my damages analysis to cover purchases prior to the Class Period (even if one could assert false and misleading statements before the beginning of the Class Period). Thus, the only reason one would *not* start the damages analysis from the beginning of the Class Period is if there was a reason to believe liability began on a later date. In this matter, there is compelling evidence supporting the alleged fraud extended back at least as far as the beginning of the Class Period.

29.     First, Dr. Epstein opines that DVI's accounting irregularities, materially misstated financial statements, and D&T's false and misleading audit opinions had occurred as of the beginning of the Class Period.

30.     Second, DVI's former CFO, Steven Garfinkel, submitted an affidavit that indicated DVI's liquidity problems stemmed back to early September 1999 (*i.e.,* no more than a

---

[24] Demchick Report at ¶18.

[25] Coffman Expert Report at ¶7 (Quoted in Musika Report at ¶12).

few weeks after the start of the Class Period). Mr. Garfinkel also admitted that DVI lacked cash
to the extent it pledged ineligible collateral in order to get the funding it required under its
financing line.[26]

31.     Third, Dr. Epstein opined that had the truth of DVI's financial condition been
known to the market at the start of the Class Period, it would have forced DVI into bankruptcy
*which is, indeed, what ultimately happened when the truth was ultimately disclosed* at the end of
the Class Period and DVI was liquidated rather than reorganized.[27] I reviewed Dr. Epstein's
report and supported his viewpoint.

32.     Fourth, I discussed how an independent third party (*i.e.*,
PriceWaterhouseCoopers) reviewed DVI's fiscal year ended June 30, 1999 and 2000 financial
statements and concluded that DVI's allowance for loan losses was understated by more than
100% at least as far back as September 20, 2000.[28]

33.     Fifth, D&T's June 17, 2003 letter to the SEC revealed that D&T was questioning
DVI accounting for transactions going back to March 1999.[29]

34.     Finally, as described above, I conducted my own assessment of how the market
would have reacted to the disclosure of an increased reserve for loan losses, within the core of
DVI's business, during the Class Period, consistent with Dr. Epstein's opinions. As described
herein, the market impact of a corrective disclosure at the beginning of the Class Period would

---

[26] Coffman Expert Report at ¶39.

[27] *See* Coffman Expert Report at ¶¶29-36.

[28] Coffman Expert Report at ¶40.

[29] DT0106395-98 ("We indicated that the principal outstanding issues in our review related to certain
transactions occurring from March 1999 through October 2002 and the accounting for certain investments
resulting from such transactions which, to the best of our knowledge, continued to be held by the
Company through the date of our resignation.").

have been sufficient to capture all of the inflation from my Event Based Approach (even if appropriate loss percentages were as low as 3.8%). Since there is no rational basis for calculating damages prior to the Class Period, I assume liability starts from the beginning of the Class Period and begin my damages analysis at the start of the Class Period on August 10, 1999.

## VI.   INFLATION SPECIFIC TO D&T

35.     The Demchick Report suggests that I failed to "consider other factors either affecting or providing evidence related to the amount of inflation, if any, allegedly caused by the Alleged Acts of D&T."[30] As I clearly stated in my Report, I was asked to determine inflation and damages caused by Defendants as a whole. Specifically, I wrote:

> I have been asked by counsel for Plaintiffs in this matter to quantify the damages
> suffered by the Class under the assumption that Defendants are found liable in
> this matter under the Securities Exchange Act of 1934.[31]

36.     I addressed this issue in response to the Musika Report:

> Mr. Musika also suggests that I do not consider the "impact of multiple parties"
> and that I "fail to analyze the impact of numerous defendants in this matter." I was
> asked by counsel to calculate total damages to class members as a result of the
> alleged fraud and the methodologies employed in my Expert Report are
> appropriate for that purpose. My analysis is based on the presumption that
> Defendants are collectively responsible for the inflation I measure in the prices of
> DVI's common stock and Senior Notes. It is unnecessary to form an opinion
> regarding the relative contribution of any particular Defendant to the fraud,
> inflation or damages to answer the question I have been asked.[32]

37.     It was therefore outside my scope to partition inflation and damages among the individual Defendants, including D&T. More importantly, however, it would not make any sense

---

[30] Demchick Report, ¶19.

[31] Coffman Expert Report at ¶2.

[32] Coffman Rebuttal Report at ¶70.

to do so. Indeed, D&T was the acting auditor for DVI during the Class Period. If, for instance, D&T had, as Plaintiffs allege they should have done, withheld its audit opinion, issued an adverse opinion, and/or forced material financial statement adjustments earlier in the Class Period, then it was foreseeable that the truth regarding DVI's material misstatements would have become known to the market earlier and prevented the losses that were suffered by later investors in DVI. In other words, if D&T is found liable, it would be reasonable to conclude that there is but-for and foreseeable causation between D&T's misstatements and all of the artificial inflation after D&T's alleged misstatements and omissions.

## VII.   LOSS CAUSATION AND CORRECTIVE DISCLOSURES

### A. IDENTIFICATION OF CORRECTIVE DISCLOSURES

38.     The Demchick Report suggests that I do not adequately identify any "corrective disclosures" during the Class Period.[33] First, this topic is new, as it was not raised in the Musika Report, and thus, it is my understanding that it should not be included in the Demchick Report. Indeed, Mr. Demchick concedes that this was not in the Musika Report when he states "…even though covered more thoroughly in the expert report issued by Dr. Lehn dated November 17, 2008, Mr. Coffman has not demonstrated that the events that he identified as corrective disclosures in Exhibit 17 actually relate to the alleged prior misstatements."[34] Second, this criticism is not followed by any examples or explanation of this position with the exception of the reference to the Lehn Report. Despite my understanding that this topic falls outside what was addressed by Mr. Musika, I respond to Mr. Demchick's assertions below.

---

[33] Demchick Report at ¶19.

[34] Demchick Report at ¶45d.

39.     In the Coffman Rebuttal Report, I discussed at length the same criticism made in the Lehn Report with respect to the dates I deem as being corrective disclosures.[35] To begin with I addressed how one of the days I claim to be a corrective disclosure (*i.e.,* August 14, 2003) explicitly disclosed that DVI had discovered improprieties in its dealings with its lenders and that DVI would seek bankruptcy protection.[36] Indeed, as a result of this corrective disclosure, DVI's common stock dropped 63.5% and DVI's notes dropped 34.9%.[37] Defendants' expert Dr. Fischel[38] also concluded this was corrective information. Furthermore, Dr. Fischel also concluded the evidence is sufficient to treat D&T's resignation as DVI's auditors (*i.e.,* June 4, 2003) as corrective of the alleged misstatements and omissions when he stated: "Mr. Coffman has not established that stock price declines on dates *other than June 4, 2003 and August 14, 2003* were attributable to the alleged accounting irregularities."[39, 40]

40.     For the balance of the days I deemed as being Corrective Disclosure Events, I articulated that while these dates were not necessarily direct admissions of misstatements or omissions, they were nevertheless symptomatic of the underlying fraud and served as partial corrective disclosures of the underlying fraud. Indeed, I expressed this when I stated:

> ...without discovering the fraud, analysts or other market participants may express skepticism about a company because of puzzling trends. For example, analysts covering DVI noted that it seemed to be underperforming even though its underlying industry (health care) was thriving. These trends, which are a

---

[35] Coffman Rebuttal Report at ¶¶5-33.

[36] Coffman Rebuttal Report at ¶25.

[37] Coffman Rebuttal Report at ¶25.

[38] Retained by counsel for Thomas Pritzker and the Pritzker Organization, LLC to review my Report.

[39] Fischel Report at ¶28 (emphasis added).

[40] *See* Exhibit 17 of my Expert Report.

symptom of the underlying fraud, can also cause the market price to fall ahead of an admission of fraud.[41]

The downgrade of DVI's credit rating and the associated events of September 24, 2002 are the logical and foreseeable consequences of DVI hiding credit losses and engaging in the deceptive practices of 'rewriting', 'swapping', and 'buying out' impaired loans and leases in order to keep them from being reported as delinquent.[42]

Another potential symptom of the hidden financial distress would be increased leverage. A firm that is overstating income and not collecting the expected amount of cash will have to borrow at a greater than expected rate. If the firm's portfolio and recorded revenue are growing fast enough, it is possible to mask this relationship for some time, but if revenue growth slows or stops (as happened with DVI), then the firm's leverage will increase unexpectedly and its need to borrow more will eventually signal an underlying problem. The increase in leverage at DVI over time (which led to events like credit rating downgrades) is thus inextricably tied to the ongoing fraud.[43]

41.      In the Coffman Rebuttal Report I also explained why Dr. Lehn's view regarding

corrective disclosures in terms of loss causation was far too narrow.[44] For each of the Corrective

Disclosure Events, Dr. Lehn routinely stated that "the information released on this date does not

represent the correction of an alleged misrepresentation and therefore fails to meet the criteria for

loss causation. Specifically, no information about accounting improprieties was released on this

day."[45] This extremely narrow view that only direct admissions of fraud (in this case DVI's

accounting irregularities) are to be treated as corrective disclosures is inconsistent with Court

Opinions.[46] Indeed, this Court rejected that view on Summary Judgment:

---

[41] Coffman Rebuttal Report at ¶14.

[42] Coffman Rebuttal Report at ¶27.

[43] Coffman Rebuttal Report at ¶12.

[44] Coffman Rebuttal Report at ¶¶5-33.

[45] See, for instance, Lehn Report at ¶¶83, 87, and 90.

[46] Coffman Rebuttal Report at ¶¶17-23.

[D]isclosure of the fraud may be "indirect" through "disclosure of another event," though in such a situation, the plaintiff must "provide proof that the market recognized a relationship between the event disclosed and the fraud."[47]

42.     Courts have readily accepted partial corrective disclosures as being symptomatic of the ultimate fraud and as being actionable under what they may call "leakage" theory, or the "materialization of the undisclosed risk" theory, or "constructive corrective disclosure" theory. For instance, in *In re Vivendi Universal, S.A. Securities Litigation,* the Court articulated:

> …loss causation may also be shown by the "materialization of risk" method, whereby a concealed risk—here, a liquidity crisis—comes to light in a series of revealing events that negatively affect stock price over time. Unlike corrective disclosures, these events do not identify prior company statements as misleading, but they must reveal new information previously concealed and fall within the "zone of risk" concealed so that the events were foreseeable consequences of the fraud.[48]

> [I]f a company misrepresents fact A (we have plenty of free cash flow), which conceals risk X (liquidity), the risk can still materialize by revelation of fact B (a ratings downgrade), an indication of risk X (liquidity). . . . When fact B is revealed, the market need not be aware of fact A or that fact A had been previously misrepresented.[49]

43.     While my Expert Report did not use the specific term "materialization of undisclosed risk", the logic described in my Reports is entirely consistent with the logic articulated in *Vivendi* and cited by this Court.

44.     The *Vivendi* Court further established that days identified as corrective disclosures in that matter were sound because despite the fact that no admissions of fraud were made, the disclosures were nevertheless unexpected and material, and causally tied to prior positive

---

[47] September 3, 2010 Memorandum at p. 13.

[48] *In re Vivendi Universal, S.A. Securities Litigation* 02 Civ. 05571 (RJH) (HBP), Memorandum Opinion and Order dated February 22, 2011 at pp. 63-64.

[49] *In re Vivendi Universal, S.A. Securities Litigation* . 634 F. Supp. 2d at 367. Also quoted in the September 3, 2010 Memorandum at n. 13. *Dura* also makes reference to the fact that truthful information can "leak" out over time (*In re Dura Pharmaceuticals, Inc.*, 544 U.S. 336 at 342).

misrepresentations. This is analogous to the circumstances here in DVI. Specifically, the *Vivendi*

Court wrote:

> Here plaintiffs offered substantial evidence that the zone of risk—a liquidity
> crisis—would have been thought unlikely by shareholders who believed
> Vivendi's repeated assurances about its financial health. Moreover, even if one
> were to focus on specific events, such as the multiple rating downgrades or the
> sudden sale of treasury shares, the evidence could have led a reasonable jury to
> conclude that an investor would have considered the events on the nine days
> identified by [plaintiffs' expert] to be remote or highly unlikely in light of
> Vivendi's earlier fraudulent statements.[50]

45.    My responses to the Demchick Report mirror the views expressed in my rebuttal

to the Lehn Report and Fischel Report.[51] As with those reports, the Demchick Report views the

consideration of corrective disclosures far too narrowly.

46.    In a similar vein, Mr. Demchick also argues that I do not differentiate between

"prior period adjustments" and "the effect on future expected earnings."[52] He then states, "Based

upon general valuation theory, investors are less interested in historical results than on future

expected results." First, this is a new argument that was not previously raised by Mr. Musika or

any other expert. Second, Mr. Demchick apparently seeks to go beyond even the rejected

argument that a corrective disclosure must explicitly reveal "prior period adjustments," but that

even if it did, one must disaggregate between the adjustment itself and its impact on future

expectations. This makes no economic sense. If DVI's previous profitability was fraudulently

misstated, then future expectations are informed by that fraud. If the fraud is partially or fully

corrected, and there is a resetting of expectations based upon that new information, then the

---

[50] *In re Vivendi Universal, S.A. Securities Litigation* 02 Civ. 05571 (RJH) (HBP), Memorandum Opinion
and Order dated February 22, 2011, at pp. 65-66.

[51] Coffman Rebuttal Report at ¶¶5-33.

[52] Demchick Report at ¶44b.

resulting decline in price (after controlling for other factors) is causally related to the original misstatements and/or omissions. There is no relevant economic or causal distinction between the corrective information's prior period valuation impact versus the valuation impact from changes to expectations for future periods.

## B. LOSS CAUSATION AND CONFOUNDING INFORMATION

47. Mr. Demchick opines that I do not consider other factors that may have caused the decline in the market price of DVI securities on the Corrective Disclosure Events. This is a new argument introduced by Mr. Demchick as Mr. Musika discussed the general topic of alternative, superseding causes for illiquidity (his "superseding events"),[53] but did not discuss confounding information on the specific Corrective Disclosures. Indeed, Mr. Musika did not prepare an event study of the Class Period abnormal price drops, nor did he analyze any of the drops. Mr. Demchick's new claims are simply incorrect.

48. First, my Report explicitly excludes any decline caused by market or industry factors.[54] Second, for the vast majority of the corrective disclosures, Mr. Demchick either: (1) does not identify any confounding information; (2) identifies information that is corrective as confounding; or (3) identifies previously released information that could not have substantially

---

[53] Musika Report at ¶¶37-58.

[54] Separate from his opinions regarding loss causation, Section H of the Demchick Report titled "Loss Causation" provides citations to various sources defining loss causation or stating principles relating to loss causation. The purpose of this section is not clear and there is no explanation within this section describing how any of the principles cited are inconsistent with my analysis in this matter. In particular, Demchick paragraph 28, which references the Supreme Court's comments about how "all else equal" the passage of time between purchase and sale makes it more likely that non-fraud factors caused a loss is (1) never further referenced in the Demchick Report as being applicable to this case, and (2) less compelling in a case like DVI where the company's ability to continue operating is dependent on the continued concealment of the alleged material misstatements and omissions.

impacted the stock price. The list below summarizes Mr. Demchick's identification of
confounding information (if any) on these dates and my response in reverse chronological order:

- **August 14, 2003 (DVI's Bankruptcy and acknowledgement of improper dealings
  with lenders):** the allegedly confounding information identified by Mr. Demchick
  includes (1) DVI's bankruptcy announcement, and (2) Mr. Garfinkel's placement on
  administrative leave. DVI's ultimate bankruptcy was a belated acknowledgement that
  it had run out of liquidity as a result of a loan portfolio that was substantially impaired
  and not generating the cash flows investors expected. As described in my Report,
  DVI had been in a liquidity crisis as early as the beginning of the Class Period due to
  its concealed impaired loan portfolio which was not generating expected cash flows
  and had resorted to pledging ineligible collateral to lenders. Investors were unaware
  of this liquidity crisis *as a result of DVI's misrepresentations about its loan losses
  and D&T's failure to withhold a clean audit opinion, issue an adverse opinion,
  and/or force the Company to make appropriate financial statement adjustments*. Had
  the market been aware of the loan losses, it would have understood that DVI would
  be unable to continue to operate, would have had its funding cut off, and would have
  declared bankruptcy earlier, and therefore spared later investors from suffering the
  investment losses they did. In other words, the bankruptcy disclosed the underlying
  economic symptom (impaired loans and illiquidity) that was already present but
  masked by the misrepresentations and omissions. Thus, the price decline caused by
  the bankruptcy represents a correction of the underlying misrepresentations and
  omissions and is not "confounding" information. Likewise, Mr. Garfinkel's
  placement on administrative leave, even in the unlikely event that it contributed

23

substantially to the price decline, is directly related to the alleged fraud as I understand them. In short, there is no confounding information on this day and no need to disaggregate the price decline.

- **August 6, 2003 – August 13, 2003 (Period between when DVI announces it is "considering" bankruptcy protection and the actual bankruptcy announcement):** No confounding information identified by Mr. Demchick.[55]

- **August 5, 2003 (DVI has no remaining liquidity and is "considering" bankruptcy protection):** No confounding information identified by Mr. Demchick.

- **August 4, 2003 (Analyst reports and credit agencies downgrade DVI after missed interest payment):** No confounding information identified by Mr. Demchick.

- **August 1, 2003 (DVI misses interest payment on bonds and downgraded by Fitch):** Mr. Demchick identifies as confounding information (1) the missed interest payment and (2) a sentence in an analyst report stating "DVI's international business has continued to be a low return business that adds risk and complexity to DVI's business model."[56] As described in my Expert Report, and as a result of the same logic described above for DVI's ultimate bankruptcy, the missed interest payment is a partial disclosure of the liquidity crisis faced by DVI that had been disguised by the misrepresentations and omissions of DVI's loan portfolio failing to produce expected cash flows consistent with the relatively low level of loan loss reserves previously

---

[55] Contrary to Mr. Demchick's contention that securitization concerns were not addressed in any of the disclosures, on August 6, 2003, an analyst at Barclay's Capital said "However, if DVI is no longer a viable operating company or not the servicer of the debt, this asset substitution may not continue...[and] [u]nder such circumstances, the loss numbers for the pools backing the securitizations may start to increase, and the servicer will have to begin charging off delinquent leases." (*See* "DVI Securitizations Not in Same Boat as Parent Debt," *Dow Jones Newswires*, August 6, 2003, 4:58pm).

[56] Demchick Report, Exhibit E.

taken. Therefore, it reflects corrective, rather than confounding information. The sentence quoted above from the analyst report about DVI's international business provides no new information, as the same sentence is found in at least three prior reports from the same analyst, one of which is also cited by Mr. Demchick.[57] There is no new information about earnings in the international business and there is nothing new about the risk or complexity of this business discussed in the analyst report.

- **July 1, 2003 (DVI Asset-Backed Securities Placed on Ratings Watch Negative):**

  No confounding information identified by Mr. Demchick.[58]

- **June 27, 2003 (DVI 10-Q Rejected by SEC and Moody's Downgrade of DVI):**

  Mr. Demchick identifies the Moody's downgrades as confounding information.

  Moody's downgrade resulted from its analysis of how the SEC's rejection of DVI's

  10-Q could impact its liquidity:

  > The rating action results from the serious implications related to DVI's disclosure that the Securities and Exchange Commission has taken the position that DVI's March 31, 2003 Form 10-Q is deficient. As a result, DVI may be in default of certain covenants within its debt indentures or other financing agreements.

---

[57] *See* Demchick Report, Exhibit E, citing the same quote from U.S. Bancorp Piper Jaffray reports on June 30, 2003 and August 1, 2003. Also note that the same language can be found in two earlier reports from the same analyst group: "U.S. Equipment Business Solid, Making Proper Moves On Weak Segments," *Piper Jaffray,* February 14, 2003; and "DVI: EPS Below Forecast; Making Progress On Credit/Liquidity Issues," *Piper Jaffray,* May 13, 2003. Therefore, this statement in the August 1, 2003 report is not new information and cannot be considered confounding.

[58] Notably, contrary to Mr. Demchick's claim that securitization concerns were not addressed in any of the disclosures, both Moody's and Fitch placed DVI's nine $1.8 billion asset backed securitizations on "review for possible downgrade" and on "Ratings Watch Negative," respectively. Moody's noted "concern about the potential impact of DVI's financial instability on the performance of its securitization transactions" and that if DVI is replaced as servicer of the securitizations that it would not expect the new servicer "will repurchase and substitute delinquent leases and loans from the transactions as done to date by DVI." Fitch reiterated Moody's concerns about "DVI's ability to continue to support the medical equipment securitizations through substitutions and servicer advances." (Coffman Expert Report ¶83, including the articles cited in n. 49 and n. 50).

> Such a covenant default could lead to the cross-default and/or cross-acceleration of a number of DVI's debt obligations. Moody's believes that it would be difficult for DVI to manage such an occurrence, and this problem significantly raises the probability of default on its obligations.
>
> Furthermore, even if DVI is successful in defending its claim that it is not in default of such covenants, it is Moody's opinion that the firm will encounter serious difficulty in raising much-needed capital to support its business operations and refinance its maturing debt."[59]

This analysis and downgrade is a symptom of the underlying fraud because it partially discloses the underlying liquidity crisis at DVI that is being disguised by the material misrepresentations and omissions regarding DVI's substantially impaired loan portfolio. As a result, it represents corrective rather than confounding information, and there is no need to disaggregate the statistically significant price decline observed on this day.

- **June 4, 2003 (D&T Resigns as Auditor):** Mr. Demchick identifies the D&T resignation as confounding information. In my Expert Report, I opined that this constituted a corrective disclosure because contemporaneous news supported this conclusion. Specifically, I cited a Reuters article that reported: "DVI, in a statement, did not disclose the reasons for Deloitte's resignation, but the decline of the company's stock reflected investor concern about possible irregularities."[60] In the Coffman Rebuttal Report, I noted that "Dr. Fischel acknowledges that June 4, 2003 and August 14, 2003 are corrective disclosures."[61]

---

[59] "Moody's Downgrades DVI Senior Debt to Caa3 – Outlook is Negative," *Moody's Investor Service Press Release*, June 27, 2003.

[60] Coffman Expert Report at ¶78 citing "Healthcare Lender DVI Loses Its Auditor, Stock Hit," *Reuters News*, June 4, 2003, 4:41pm.

[61] Coffman Rebuttal Report at n. 3 referencing the Fischel Report at p. 14.

49.     The events described above – for which there is either no confounding information or the information identified by Mr. Demchick is either clearly corrective or clearly not new – account for the vast majority of the price declines in DVI securities to which I attribute loss causation. Specifically, for the Common Stock, the events discussed above account for $6.85 per share, or nearly 80% of the $8.70 per share declines on the Loss Causation Events I identify.[62] For the Notes, the dates described above account for $793.90 per note, or 85% of the $929.20 per note to which I attribute loss causation. As a result, Mr. Demchick's (and Dr. Lehn's) criticism regarding "confounding" information simply cannot disturb a finding of loss causation for a large fraction of the artificial inflation I estimate (or the damages that result from such inflation).[63]

---

[62] This is based upon the 14 disclosure events that were not excluded under the Courts' Summary Judgment ruling. With respect to May 13, 2003, a negative earnings announcement that the Court ruled I cannot testify about at trial, I continue to hold the opinion that the negative price movement on this date is, at least in part, causally related to the allegations. On this day, the Company missed earnings expectation, at least in part due to charges specifically taken with respect to Third Coast Capital – an account whose loan losses I understand Plaintiffs' allege had been understated throughout the Class Period. Furthermore, there were questions during DVI's conference call regarding how DVI's cash flows were going to line up with its ability to pay off or refinance DVI's bonds coming due and questioning why the Company had not already refinanced the bonds despite the market for debt being "red hot." These questions reflect ongoing concern with regard to DVI's liquidity position and whether its loan portfolio was impaired and the obligors unable to service the loans. To the extent these concerns contributed to the price decline on May 13, 2003, I would consider them corrective of the alleged fraud. *See*, for example, Fair Disclosure Financial Network Conference Call Transcript dated May 13, 2003 ("Can you sell some of those loans for cash servicing released if you needed it to? If you have liquidity reasons, could you sell those loans servicing released for cash?"); "DVI: EPS Below Forecast; Making Progress On Credit/Liquidity Issues," *Piper Jaffray*, May 13, 2003 ("DVI reported fiscal third quarter EPS of $0.20 versus our estimate of $0.32. The results included an after-tax loss of $2.2 MM from a combination of loss provisions and severance expenses related to a closed and a moved division (3rd coast and business credit")); Complaint at ¶90 ("We grew all income categories and ended the year with a substantial income benefit to be recognized from our venture leasing unit, Third Coast Capital").

[63] Furthermore, Mr. Demchick does not dispute that the information I identified is what caused the declines in the security prices or that such declines were statistically significant.

50.     The only remaining events from my Event Based Approach not discussed above are the events of September 24, 2002 to September 27, 2002.[64] The Court has ruled that the earnings warning issued on September 25 cannot support a finding of loss causation.[65] Mr. Demchick also asserts that the other days during this period are confounded:

> Several of the disclosures noted by Mr. Coffman in Exhibit 17, at least during the later part of 2002, included significant negative commentary related to DVI's international loan exposure. These disclosures related to (1) increased exposure internationally and (2) charges to income due to international activity. It is likely that these disclosures were at least partially, if not fully, responsible for declines in the price of DVI common stock during that period and not due to corrective disclosure of any alleged misrepresentation.[66]

51.     With respect to the first day of this four-day window (September 24, 2002) these factors cannot be considered confounding. On this day, Fitch lowered DVI's credit rating, information that Mr. Demchick does not assert is confounding. In particular, for this day, Mr. Demchick focuses on two excerpts from a September 24, 2002 analyst report published by U.S. Bancorp Piper Jaffray:

> Our concerns primarily revolve around DVI's international and domestic diversification efforts, **but also include the core U.S. equipment business**.

---

[64] I also described in detail in my Report my belief that the statistically significant stock price decline on September 20, 2002 is also likely causally related to plaintiffs' allegations because there had been news of the bankruptcy of one of DVI's largest customers (for which plaintiffs' allege DVI should have taken substantial write-downs much earlier) in the days prior to September 20, 2002. On the September 27, 2002 conference call, DVI acknowledged it had been receiving calls with rumors regarding potential losses DVI might have to take as a result of the bankruptcy and its impact on DVI's liquidity position. To be conservative, and because I could not identify a specific publicly-available news item of new news on September 20, 2002, I have refrained from including this price decline in any of my inflation or damages calculations under the Event Based Approach.

[65] For the remainder of this discussion I treat the price decline on September 25, 2002 caused by the earnings warning as excluded from the case even though I continue to believe the price decline on this day is caused, at least in part, by the recognition of loan losses that plaintiffs assert should have been reflected earlier on DVI's financial statements and further market realization of DVI's poor liquidity situation, which had been allegedly concealed from the beginning of the Class Period.

[66] Demchick Report at ¶45a.

28

Our liquidity concerns are the fact that DVI had $155 million of debt due in 2004 **downgraded today by Fitch to B+ from BB- and the rating outlook remains negative**.[67]

52.      Beyond being a new argument that had not been advanced at all by Mr. Musika, on its face, the Piper Jaffray analyst report from which Mr. Demchick is quoting reflects that the minimum stock price for DVI during the last 52-week period was $8.40.[68] Careful inspection of DVI's price history shows that DVI never traded as low as $8.40 until minutes before the close on September 24, 2002.[69] The logical conclusion is that the U.S. Bancorp Piper Jaffray Report was filed at or after the market close on September 24, 2002, and therefore these statements (which are the only ones asserted by Mr. Demchick to be confounding) could not have contributed to the price decline on September 24, 2002. To the extent this analyst report impacted the market price of DVI Securities at all, the market reaction would have occurred on September 25, 2002 – a price movement which I now exclude as a result of the Court's prior ruling. As a result, this information cannot be considered confounding for any of the declines included herein.

53.      Moreover, to the extent the second statement caused any of the price decline, it is specific to new information about liquidity concerns and thus clearly corrective. With respect to the first statement regarding concern about DVI's international diversification efforts, I find it unlikely that this comment materially impacted the market price when compared against the

---

[67] Demchick Report, Exhibit E and "Downgrading and Reducing Estimates," *U.S. Bancorp Piper Jaffray*, September 24, 2002. Emphasized portions are the parts of the sentences Mr. Demchick omitted from his exhibit.

[68] "Downgrading and Reducing Estimates," *U.S. Bancorp Piper Jaffray*, September 24, 2002.

[69] Indeed, since the start of the Class Period, the price of DVI stock never dropped below $9 until 9/20/2002, two trading days before 9/24/2002. According to the NYSE TAQ database, the intraday low dropped to $8.50 on 9/20/2002 and 9/23/2002, and reached $8.40 at 3:53 p.m. EST on 9/24/2002.

more obvious missed earnings expectation, continued reaction to the credit rating downgrade, and worries about liquidity of the Company, which were clearly material.[70] Furthermore, I understand Plaintiffs position to be that DVI had understated losses in the international portfolio as well and that poor performance in that portfolio (and the concern it was generating) reflects corrective information as well. To the extent the latter is true, any price decline caused by this statement, if any, would not be confounding.

54.      With respect to September 26 and 27, 2002, Mr. Demchick – again advancing an argument not raised by Mr. Musika – asserts that the price declines on these days were caused, at least in part, by information related to DVI's international exposures. As stated in my Report, the new news released on September 26 is important for several reasons. First, the CIBC analyst report on September 26 explicitly reaffirms my interpretation of September 24, and that the price declines on that day were caused by liquidity concerns stemming from DVI's deteriorating portfolio. Second, the CIBC report, while mentioning charges and risks in the international portfolio (which I understand Plaintiffs assert were also misstated by DVI) also provides additional detail of the charges related to building of loan loss reserves that Plaintiffs assert had been understated throughout the Class Period, including substantial losses on DVI's Third Coast Capital portfolio. Finally, the CIBC Report noted that the earnings announcement was coming three weeks later than expected,[71] which provides additional support for my belief that the

---

[70] With respect to Mr. Demchick's contention that the disclosures failed to reveal concerns with respect to DVI's securitization accounting, that is simply not true. Fitch's September 24, 2002 announcement raised concerns with the sharp increase in gain on sale revenue and DVI's substitution of loans in its securitizations (Coffman Expert Report at ¶63 and n. 35). On September 27, 2002, several concerns were raised regarding DVI's accounting for contracts, the sizable amount of repurchases, and that the level of repurchases over the last two to three years was 6% (Fair Disclosure Financial Network Conference Call Transcript dated September 27, 2002).

[71] "It's Going to be a Messy Quarter, But Core Business Remains Strong," *CIBC World Markets*, September 26, 2002.

market price decline leading up to and including September 20, 2002 resulted from the market's concerns that there could be undisclosed problems with DVI's financial statements, accounting, and liquidity.[72]

55.    On September 27, 2002, DVI released further details of the earnings it had previewed on September 25, hosted a conference call with analysts, and there was an additional analyst report published discussing the information. On the conference call in particular, DVI provided new details regarding actions it had taken to avoid having to report losses in the past, including converting debt to equity in troubled companies – which ultimately required it to consolidate O2 Sciences, a bankrupt DVI customer that DVI controlled. In addition, the Company had to attempt to assuage investor concerns over liquidity issues, and questions regarding whether DVI's loans (and therefore potential loss) of $30 to $40 million to U.S. Diagnostics, another bankrupt DVI customer, would be recoverable through PresGar, the potential purchaser of U.S. Diagnostics at the time.[73] The total mix of information released,

---

[72] Financial economists, both in the literature and in the context of securities litigation, often rely on "multiple day windows" to measure the price response of new news. This is because there is often concern that the information began to "leak out" prior to the explicit disclosure of the information, or, as a result of the complexity of the information, it may take the market some time to absorb the full valuation impact of the information. This is especially true in the context of information that is clearly leaking out through delays rather than affirmative corrections (*e.g.*, the signal being sent by the delay of an earnings announcement). To be conservative, my calculations have not yet incorporated the impact of relying on such "multiple day windows" or including the price declines observed on or leading up to September 20, 2002, but the facts in this case can support doing so. For a discussion on the use of multiple day windows *see*, for example, Dmitry Krivin, et al., "Determination of the Appropriate Event Window Length in Individual Stock Event Studies," *NERA Economic Consulting,* November 4, 2003. *Also see*, A. Craig MacKinlay, "Event Studies in Economics and Finance," *Journal of Economic Literature*, Vol. 35, No. 1, March 1997 ("It is customary to define the event window to be larger than the specific period of interest. This permits examination of periods surrounding the event. In practice, the period of interest is often expanded to multiple days, including at least the day of the announcement and the day after the announcement. This captures the price effects of announcements which occur after the stock market closes on the announcement day."). In addition, Defendants' expert Lehn acknowledged reliance on multiple-day windows in his own event study work (Deposition of Kenneth M. Lehn, February 26, 2009 at pp. 368-373).

[73] Fair Disclosure Financial Network Conference Call Transcript dated September 27, 2002, pp. 6, 21-22.

despite including the alleged continued false and misleading statements that the Company had plenty of liquidity, resulted in an another statistically significant price decline. The fact that the information released also mentioned DVI's international exposures (which Plaintiffs also assert were impacted by the fraud) does not disturb the conclusion that the price decline on September 27, 2002 was substantially caused by new information causally related to Plaintiffs' claims including enhanced loan losses reserves and charges, significant loan repurchases from securitizations, the need to consolidate operations of a troubled customer, questions regarding DVI's potential losses on $30 to $40 million in loans to bankrupt USD, and enhanced liquidity concerns.

56.     Use of multi-day event windows to detect the value of newly-released information is commonplace in the event study literature. For example, Krivin, et al., (2003) find that announcements that are both an earnings announcement and the end of a Class Period have an average event window of 1.6 to 3.2 days, depending on the methods of measurement.[74] Also, MacKinlay (1997) states "It is customary to define the event window to be larger than the specific period of interest. This permits examination of periods surrounding the event. In practice, the period of interest is often expanded to multiple days, including at least the day of the announcement and the day after the announcement. This captures the price effects of announcements which occur after the stock market closes on the announcement day."[75]

---

[74] Dmitry Krivin, et al., "Determination of the Appropriate Event Window Length in Individual Stock Event Studies," *NERA Economic Consulting,* November 4, 2003.

[75] A. Craig MacKinlay, "Event Studies in Economics and Finance," *Journal of Economic Literature*, Vol. 35, No. 1, March 1997.

## VIII.    UPDATED INFLATION AND DAMAGES CALCULATIONS

57.    In light of the previous discussion and the Court's prior rulings, I have updated my calculations of inflation per share and damages. In particular, I have removed the abnormal price declines related to the September 25, 2002, May 13, 2003, June 6, 2003 and July 16, 2003 disclosures.[76] Under this scenario, class members who purchased DVI equity suffered damages of at least $40.9 million and class members who purchased DVI 9 7/8 Senior Notes suffered damages of at least $31.8 million. Total damages are therefore $72.8 million. **Table 1** and **Table 2** below summarize the inflation per share under this scenario, for equity and Senior Notes, respectively.[77]

---

[76] To be consistent with the Court's ruling I have also removed earnings announcements associated with a positive price reaction. At page 48 of the September 3, 2010 decision, the Court ruled that "DVI's earnings announcements on September 25, 2002 and May 13, 2003 are nothing more than a disclosure of DVI's true financial condition and do not relate to the alleged misrepresentations. An 'earnings warning [or announcement] *standing alone*, is not a 'corrective disclosure' because the resulting share price decline does not necessarily dissipate the particular price inflation caused by the alleged fraud.' *In re Motorola*, 505 F. Supp. 2d at 546-47 (emphasis in original) (collecting cases) (finding that earnings warning was not a corrective disclosure because, although evidence showed that defendants were aware of the truth concealed by the fraud, there is no evidence that these concerns "actually motivated" the warning); see also *In re Retek Inc.*, 621 F. Supp. 2d at 702 ('It is clear that the mere disclosure of disappointing earnings or reduced future guidance is not sufficient to reveal that prior financial statements contained misrepresentations.'); *In re AOL TW*, 503 F. Supp. 2d at 678."

[77] I will be prepared to offer updated tables at trial or after trial to reflect any further rulings by the Court, findings made by the jury, and/or to quantify the results of alternative scenarios that may be requested by counsel for Lead Plaintiffs as part of my testimony.

**Table 1 – Inflation per Share of Common Stock**

| Date Range | Inflation Per Share of Common Stock |
|---|---|
| August 10, 1999 - September 23, 2002 | $6.14 |
| September 24, 2002 - September 25, 2002 | $5.77 |
| September 26, 2002 | $5.48 |
| September 27, 2002 | $4.29 |
| September 30, 2002 - October 25, 2002 | $4.59 |
| October 28, 2002 - November 20, 2002 | $5.49 |
| November 21, 2002 - February 26, 2003 | $6.07 |
| February 27, 2003 - June 03, 2003 | $6.47 |
| June 04, 2003 - June 26, 2003 | $5.61 |
| June 27, 2003 | $4.08 |
| June 30, 2003 | $4.44 |
| July 01, 2003 - July 31, 2003 | $3.88 |
| August 01, 2003 | $2.21 |
| August 04, 2003 | $1.11 |
| August 05, 2003 | $0.65 |
| August 06, 2003 - August 07, 2003 | $0.71 |
| August 08, 2003 - August 13, 2003 | $0.50 |

**Table 2 – Inflation per Bond**

| Date Range | Senior Notes Inflation Per Note |
|---|---|
| August 10, 1999 - September 23, 2002 | $725.3 |
| September 24, 2002 - November 13, 2002 | $631.4 |
| November 14, 2002 - June 03, 2003 | $670.6 |
| June 04, 2003 - June 06, 2003 | $631.7 |
| June 09, 2003 - June 26, 2003 | $676.8 |
| June 27, 2003 | $499.1 |
| June 30, 2003 - August 01, 2003 | $575.6 |
| August 04, 2003 | $246.3 |
| August 05, 2003 - August 06, 2003 | $284.2 |
| August 07, 2003 | $220.1 |
| August 08, 2003 - August 11, 2003 | $198.9 |
| August 12, 2003 - August 13, 2003 | $106.0 |

## IX.  CONSIDERATION OF OTHER POTENTIALLY RESPONSIBLE PARTIES AND OTHER AVAILABLE SOURCES OF RECOVERY

58.     Mr. Demchick repeats the criticism of Mr. Musika that I do not consider other potentially responsible parties or other sources of recovery.[78] I responded to this in the Coffman Rebuttal Report and re-incorporate my response herein.

59.     First, Mr. Demchick asserts I do not consider that there are multiple defendants. My analysis is based on the presumption that Defendants are collectively responsible for the inflation I measure in the prices of DVI's common stock and Senior Notes. I was asked by counsel to calculate total damages to class members as a result of the alleged fraud and the methodologies employed in my Expert Report are appropriate for that purpose. It is unnecessary to form an opinion regarding the relative contribution of any particular Defendant to the fraud, inflation, or damages to answer the question I have been asked. Moreover, as described above, there is no reason to suggest that D&T's alleged misstatements only relate to a subset of the artificial inflation.[79] This argument applies directly to Mr. Demchick's specific assertion that I do not consider the role of Mr. Garfinkel.[80] If D&T had withheld its audit opinion and DVI had been forced to disclose the truth earlier, then later investors would not have purchased at an inflated price and suffered damages as the truth was revealed. Mr. Garfinkel's actions, which could only continue by D&T issuing "clean" audit reports, do not disturb the but-for causal relationship or the foreseeability between D&T's misstatements and investor losses. Moreover, it

---

[78] Demchick Report at ¶46.

[79] **Section VI** herein

[80] Demchick Report at ¶45c.

is my understanding that Dr. Epstein supports the position that D&T was aware of and facilitated the concealment of the material misstatements in DVI's financial statements during the Class Period; the result of which could lead to D&T being joint and severally liable, or at least held to a high percentage under a proportionate liability theory.

60.     Second, Mr. Demchick asserts that "evidence exists" that Fleet caused substantial damages to DVI and contributed to their bankruptcy.[81] However, Mr. Demchick does not even describe such "evidence," does not identify what stock price declines it may have caused, or how Fleet's actions are independent of the alleged fraud.

61.     Third, Mr. Demchick raises the possibility of "other sources of recovery to DVI"[82] that could serve as alternative sources of recovery for class members. First, it is my understanding that under DVI's court-approved liquidation plan, DVI's common stock was cancelled in the bankruptcy and cannot receive any recovery.[83] Second, my analysis measures the damages suffered by investors as a result of the disclosure of the corrective information. Market prices at the time of the corrective information would have taken into account anticipated recoveries and only to the extent there are recoveries specifically for the purpose of compensating for such declines should there be an offset to recoveries by Class Members. Furthermore, there is also no chance of "double counting" between recoveries in bankruptcy and recoveries in this matter because securities claims of Noteholders and Interest-holders (*e.g.*, stock holders) were cancelled pursuant to section 5.5 and 5.8 of the Bankruptcy Plan.

---

[81] Demchick Report at ¶46.

[82] Demchick Report at ¶¶2, 20, 46.

[83] "First Amended Joint Plan of Liquidation of DVI, Inc., et al., Chapter 11, Case Nos. 03-12656 through 03-12658 (MFW)," dated October 8, 2004, Article 5.

62.     To summarize, my role was to estimate the amount of aggregate damages suffered by class members resulting from the alleged misstatements and omissions. I was not asked to analyze whether there are other avenues by which class members can recover their losses which would result in the need to offset a potential recovery in this matter. I am not aware of the need for any such offsets and none of the issues raised by Mr. Demchick suggest the need for an offset.

Respectfully Submitted on June 24, 2013

Chad Coffman

Exhibit 1

Inflation Excluding September 25, 2002, May 13, 2003, June 6, 2003, July 16, 2003, and Positive Earnings Announcement Dates

| Date Range [1] | Equity Inflation Per Share [2] | Senior Notes Inflation Per Note [3] | Equity Inflated Capitalization [4] | Senior Notes Inflated Capitalization [5] | Total Inflated Capitalization [6] |
|---|---|---|---|---|---|
| August 10, 1999 -- September 23, 2002 | $6.14 | $725.30 | $86.70 | $112.42 | $199.13 |
| September 24, 2002 -- September 25, 2002 | $5.77 | $631.42 | $85.49 | $97.87 | $183.36 |
| September 26, 2002 | $5.48 | $631.42 | $81.26 | $97.87 | $179.13 |
| September 27, 2002 -- September 29, 2002 | $4.29 | $631.42 | $63.60 | $97.87 | $161.47 |
| September 30, 2002 -- October 27, 2002 | $4.59 | $631.42 | $68.02 | $97.87 | $165.89 |
| October 28, 2002 -- November 13, 2002 | $5.49 | $631.42 | $81.44 | $97.87 | $179.31 |
| November 14, 2002 -- November 20, 2002 | $5.49 | $670.64 | $81.45 | $103.95 | $185.40 |
| November 21, 2002 -- February 26, 2003 | $6.07 | $670.64 | $90.05 | $103.95 | $194.00 |
| February 27, 2003 -- June 3, 2003 | $6.47 | $670.64 | $98.07 | $103.95 | $202.02 |
| June 4, 2003 -- June 8, 2003 | $5.61 | $631.67 | $85.01 | $97.91 | $182.92 |
| June 9, 2003 -- June 26, 2003 | $5.61 | $676.80 | $85.01 | $104.90 | $189.92 |
| June 27, 2003 -- June 29, 2003 | $4.08 | $499.10 | $61.82 | $77.36 | $139.18 |
| June 30, 2003 | $4.44 | $575.59 | $67.44 | $89.22 | $156.66 |
| July 1, 2003 -- July 31, 2003 | $3.88 | $575.59 | $58.95 | $89.22 | $148.16 |
| August 1, 2003 -- August 3, 2003 | $2.21 | $575.59 | $33.59 | $89.22 | $122.80 |
| August 4, 2003 | $1.11 | $246.26 | $16.92 | $38.17 | $55.09 |
| August 5, 2003 | $0.65 | $284.21 | $9.91 | $44.05 | $53.96 |
| August 6, 2003 | $0.71 | $284.21 | $10.85 | $44.05 | $54.90 |
| August 7, 2003 | $0.71 | $220.08 | $10.85 | $34.11 | $44.96 |
| August 8, 2003 -- August 11, 2003 | $0.50 | $198.88 | $7.65 | $30.83 | $38.48 |
| August 12, 2003 -- August 13, 2003 | $0.50 | $105.96 | $7.65 | $16.42 | $24.07 |
| August 14, 2003 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |

Note: Figures in column [6] above may not correspond exactly with figures in Exhibits 2 and 3, line [10] because of changes in shares outstanding at quarter ends during a given date range above. Positive earnings announcement dates are October 31, 2002, and February 14, 2003.

Exhibit 2

## DVI Reported and Adjusted Loan Loss Reserves and Estimated Market Impact of Full Disclosure ($ In Millions)

| Balance Sheet as of: / Earnings Announcement Date | 6/30/99 8/11/99 | 9/30/99 11/9/99 | 12/31/99 2/11/00 | 3/31/00 5/5/00 | 6/30/00 8/24/00 | 9/30/00 11/7/00 | 12/31/00 2/9/01 | 3/31/01 5/9/01 | 6/30/01 8/17/01 | 9/30/01 11/8/01 | 12/31/01 2/14/02 | 3/31/02 5/14/02 | 6/30/02 9/27/02 | 9/30/02 11/1/02 | 12/31/02 2/14/03 | 3/31/03 5/13/03 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [1] Managed Net Financed Assets | $1,661.8 | $1,814.2 | $1,891.2 | $1,937.6 | $1,992.0 | $2,000.0 | $2,100.0 | $2,200.0 | $2,273.2 | $2,400.0 | $2,500.0 | $2,600.0 | $2,664.8 | $2,657.0 | $2,733.0 | $2,761.0 |
| [2] Adjusted Loan Loss Reserve Rate | 6.0% | 6.0% | 6.0% | 6.0% | 6.0% | 6.0% | 6.0% | 6.0% | 6.0% | 6.0% | 6.0% | 6.0% | 6.0% | 6.0% | 6.0% | 6.0% |
| [3] Adjusted Loan Loss Reserve | $99.7 | $108.9 | $113.5 | $116.3 | $119.5 | $120.0 | $126.0 | $132.0 | $136.4 | $144.0 | $150.0 | $156.0 | $159.9 | $159.4 | $164.0 | $165.7 |
| [4] Reported Loan Loss Reserve | $12.3 | $13.5 | $14.7 | $14.2 | $14.3 | $17.4 | $16.4 | $15.4 | $15.9 | $16.7 | $17.0 | $17.0 | $25.6 | $26.7 | $22.5 | $20.1 |
| [5] Reported Loan Loss Reserve Rate | 0.7% | 0.7% | 0.8% | 0.7% | 0.7% | 0.9% | 0.8% | 0.7% | 0.7% | 0.7% | 0.7% | 0.7% | 1.0% | 1.0% | 0.8% | 0.7% |
| [6] Difference between Reported and Adjusted Loan Loss Reserve | $87.4 | $95.3 | $98.8 | $102.1 | $105.2 | $102.6 | $109.6 | $116.6 | $120.5 | $127.3 | $133.0 | $139.0 | $134.3 | $132.7 | $141.4 | $145.5 |
| [7] Post-Tax Impact on Earnings - Assuming 40% Tax Rate | $52.5 | $57.2 | $59.3 | $61.2 | $63.1 | $61.6 | $65.8 | $70.0 | $72.3 | $76.4 | $79.8 | $83.4 | $80.6 | $79.6 | $84.9 | $87.3 |
| [8] Earnings Response Coefficient | 6.61 | 6.61 | 6.61 | 6.61 | 6.61 | 6.61 | 6.61 | 6.61 | 6.61 | 6.61 | 6.61 | 6.61 | 6.61 | 6.61 | 6.61 | 6.61 |
| [9] Aggregate Valuation Impact [8]*[7] | $346.7 | $378.1 | $391.8 | $404.8 | $417.3 | $406.9 | $434.8 | $462.6 | $477.7 | $504.9 | $527.6 | $551.2 | $532.4 | $526.4 | $560.9 | $577.2 |
| [10] Estimated Inflation of Senior Notes and Common Stock | $199.1 | $199.6 | $199.6 | $199.7 | $199.7 | $199.6 | $199.6 | $200.2 | $200.3 | $200.4 | $200.4 | $201.1 | $161.5 | $179.3 | $196.0 | $202.1 |
| [11] Revised Inflation after Valuation Impact [10]-[9] | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |

Sources: Analyst Reports covering DVI, DVI's 10-Q & 10-K SEC Filings, and Dr. Epstein Report.

Exhibit 3
DVI Reported and Adjusted Loan Loss Reserves and
Estimated Market Impact of Full Disclosure ($ In Millions)

| Balance Sheet as of: Earnings Announcement Date | 6/30/99 8/11/99 | 9/30/99 11/9/99 | 12/31/99 2/11/00 | 3/31/00 5/5/00 | 6/30/00 8/24/00 | 9/30/00 11/7/00 | 12/31/00 2/9/01 | 3/31/01 5/9/01 | 6/30/01 8/17/01 | 9/30/01 11/8/01 | 12/31/01 2/14/02 | 3/31/02 5/14/02 | 6/30/02 9/27/02 | 9/30/02 11/7/02 | 12/31/02 2/14/03 | 3/31/03 5/13/03 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [1] Managed Net Financed Assets | $1,661.8 | $1,814.2 | $1,891.2 | $1,937.6 | $1,992.0 | $2,000.0 | $2,100.0 | $2,200.0 | $2,273.2 | $2,400.0 | $2,500.0 | $2,600.0 | $2,664.8 | $2,657.0 | $2,733.0 | $2,761.0 |
| [2] Adjusted Loan Loss Reserve Rate | 3.8% | 3.5% | 3.4% | 3.3% | 3.2% | 3.4% | 3.2% | 3.0% | 2.9% | 2.8% | 2.7% | 2.6% | 2.5% | 2.7% | 2.6% | 2.6% |
| [3] Adjusted Loan Loss Reserve | $62.5 | $63.8 | $65.0 | $64.5 | $64.7 | $67.7 | $66.7 | $65.9 | $66.4 | $67.2 | $67.5 | $67.7 | $66.3 | $71.9 | $72.0 | $71.1 |
| [4] Reported Loan Loss Reserve | $12.3 | $13.5 | $14.7 | $14.2 | $14.3 | $17.4 | $16.4 | $15.4 | $15.9 | $16.7 | $17.0 | $17.0 | $25.6 | $26.7 | $22.5 | $20.1 |
| [5] Reported Loan Loss Reserve Rate | 0.7% | 0.7% | 0.8% | 0.7% | 0.7% | 0.9% | 0.8% | 0.7% | 0.7% | 0.7% | 0.7% | 0.7% | 1.0% | 1.0% | 0.8% | 0.7% |
| [6] Difference between Reported and Adjusted Loan Loss Reserve | $50.2 | $50.3 | $50.3 | $50.3 | $50.4 | $50.3 | $50.3 | $50.5 | $50.5 | $50.5 | $50.5 | $50.7 | $40.7 | $45.2 | $49.4 | $51.0 |
| [7] Post-Tax Impact on Earnings - Assuming 40% Tax Rate | $30.1 | $30.2 | $30.2 | $30.2 | $30.2 | $30.2 | $30.2 | $30.3 | $30.3 | $30.3 | $30.3 | $30.4 | $24.4 | $27.1 | $29.7 | $30.6 |
| [8] Earnings Response Coefficient | 6.61 | 6.61 | 6.61 | 6.61 | 6.61 | 6.61 | 6.61 | 6.61 | 6.61 | 6.61 | 6.61 | 6.61 | 6.61 | 6.61 | 6.61 | 6.61 |
| [9] Aggregate Valuation Impact [8][7] | $199.1 | $199.6 | $199.6 | $199.7 | $199.7 | $199.6 | $199.6 | $200.2 | $200.3 | $200.4 | $200.4 | $201.1 | $161.5 | $179.3 | $196.0 | $202.1 |
| [10] Estimated Inflation of Senior Notes and Common Stock | $199.1 | $199.6 | $199.6 | $199.7 | $199.7 | $199.6 | $199.6 | $200.2 | $200.3 | $200.4 | $200.4 | $201.1 | $161.5 | $179.3 | $196.0 | $202.1 |
| [11] Revised Inflation after Valuation Impact [10]-[9] | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |

Sources: Analyst Reports covering DVI, DVI's 10-Q & 10-K SEC Filings, and Dr. Epstein Report.

APPENDIX A

CHAD W. COFFMAN, CFA

Global Economics Group, LLC
140 South Dearborn Street, Suite 1000
Chicago, IL 60603
Office:      (312) 470-6500
Mobile:    (815) 382-0092
Email:      ccoffman@globaleconomicsgroup.com

## EMPLOYMENT:

### Global Economics Group, LLC
President (2008 - Current)

Global Economics Group specializes in the application of economics, finance, statistics, and valuation principles to questions that arise in a variety of contexts, including litigation and policy matters throughout the world. With offices in Chicago, Boston, San Francisco and Atlanta, Principals of Global Economics Group have extensive experience in high-profile securities, antitrust, labor, and intellectual property matters.

### Market Platform Dynamics, LLC
Chief Financial Officer & Chief Operating Officer (2010 – Current)

Market Platform Dynamics is a management consulting firm that specializes in assisting platform-based companies profit from industry disruption caused by the introduction of new technologies, new business models and/or new competitive threats.  MPD's experts include economists, econometricians, product development specialists, strategic marketers and recognized thought leaders who apply cutting-edge research to the practical problems of building and running a profitable business.

### Chicago Partners, LLC
Principal (2007 – 2008)
Vice President (2003 – 2007)
Director (2000 – 2003)
Senior Associate (1999 – 2000)
Associate (1997 – 1999)
Research Analyst (1995 – 1997)

## EDUCATION:

**CFA**    Chartered Financial Analyst, 2003

**M.P.P.**  University of Chicago, 1997
Masters of Public Policy, with a focus in economics including coursework in Finance, Labor Economics, Econometrics, and Regulation

**B.A.**     Knox College, 1995
Economics, Magna Cum Laude
Graduated with College Honors for Paper entitled "Increasing Efficiency in Water
Supply Pricing: Using Galesburg, Illinois as a Case Study"
Dean's List Every Term
Phi Beta Kappa

## SELECTED EXPERIENCE:

Experience in Securities and Valuation Cases:

- Expert consultant for Citigroup/Salomon Smith Barney in various matters related to Jack
  Grubman's analyst coverage of various companies. This included supporting multiple experts at
  high-profile arbitration where plaintiffs claimed $900 million in damages. Arbitration panel
  returned a verdict in favor of client (reported in Wall Street Journal).

- Expert damages consultant in dozens of 10b-5 and Section 11 securities litigation, including, but
  not limited to:
  - WorldCom
  - Enron
  - Tyco
  - Parmalat
  - Sears
  - Atlas Air
  - UnumProvident
  - XL Capital
  - Household Finance/HSBC
  - Dynegy
  - Anicom

- Expert consultant in multiple cases involving market timing and/or late-trading. Developed models
  to estimate market timing profits.

- Served as neutral expert for mediator (Judge Daniel Weinstein) in multiple 10(b)-5 securities cases
  as well as futures manipulation case.

- Expert consultant for the American Stock Exchange (AMEX) where I evaluated issues related to
  multiple listing of options. Performed econometric analysis of various measures of option spread
  using tens of millions of trades.

- Expert consultant to large hedge fund that owned bonds in WorldCom. Responsible for directing
  analysis that led to favorable settlement of their claim in the bankruptcy.

- Performed detailed audit of CDO valuation models employed by a banking institution to satisfy
  regulators – non-litigation matter.

- Played significant role in highly-publicized internal accounting investigations of two Fortune 500 companies.  One led to restatement of previously issued financial statements and both involved SEC investigations.

- Testifying expert in the matter of <u>Kuo, Steven Wu v. Xceedium Inc, Supreme Court of New York, County of New York, Index No. 06-100836</u>.  Filed report re: the fair value of Mr. Kuo's shares.  Case settled at trial.

- Testifying expert in the matter of <u>Pallas, Dennis H. v. BPRS/Chestnut Venture Limited Partnership and Gerald Nudo, Circuit Court of Cook County, Illinois, County Department, Chancery Division</u>. Filed report re: fair value of Pallas shares.  Report: July 9, 2008. Deposition August 6, 2008. Court Testimony February 11, 2009.

- Testifying expert in <u>Washington Mutual Securities Litigation, United States District Court, Western District of Washington, at Seattle, No. 2:08-md-1919 MJP, Lead Case No. C08-387 MJP</u>. Filed declaration August 5, 2008 re: plaintiffs' loss causation theory.  Filed expert report April 30, 2010.  Filed rebuttal expert report August 4, 2010.

- Testifying expert in <u>DVI Securities Litigation, Case No. 2:03-CV-05336-LDD, United States District Court for the Eastern District of Pennsylvania</u>. Filed expert report October 1, 2008 re: damages. Filed rebuttal expert report December 17, 2008. Deposition January 27, 2009.

- Testifying expert in <u>Syratech Corporation v. Lifetime Brands, Inc. and Syratech Acquisition Corporation, Supreme Court of the State of New York, Index No. 603568/2007</u>. Filed expert report October 31, 2008.

- Expert declaration in <u>Jacksonville Police and Fire Pension Fund, et al. v. AIG, Inc., et al., No. 08-CV-4772-LTS; James Connolly, et al. v. AIG, Inc., et al., No. 08-CV-5072-LTS; Maine Public Employees Retirement System, et al. v. AIG, Inc., et al., No. 08-CV-5464-LTS; and Ontario Teachers' Pension Plan Board, et al. v. AIG, Inc., et al., No. 08-CV-5560-LTS, United States District Court, Southern District of New York</u>. Filed declaration February 18, 2009.

- Expert declaration in <u>Connetics Securities Litigation, Case No. C 07-02940 SI, United States District Court for the Northern District of California, San Francisco Division</u>. Filed expert report March 16, 2009.

- Testifying expert in <u>Boston Scientific Securities Litigation, Master File No. 1:05-cv-11934 (DPW), United States District Court District of Massachusetts</u>.  Filed expert report August 6, 2009. Deposition October 6, 2009.

- Expert declaration in <u>Louisiana Sheriffs' Pension and Relief Fund, et al. v. Merrill Lynch & Co., Inc., et al., Case Number 08-cv-09063, United States District Court, Southern District of New York</u>. Filed declaration October, 2009.

- Testifying expert in <u>Henry J. Wojtunik v. Joseph P. Kealy, John F. Kealy, Jerry A. Kleven, Richard J. Seminoff, John P. Stephen, C. James Jensen, John P. Morbeck, Terry W. Beiriger, and Anthony T. Baumann</u>. Filed expert report on January 25, 2010.

- Testifying expert in <u>REFCO Inc. Securities Litigation, Case No. 05 Civ. 8626 (GEL), United States District Court for the Southern District of New York</u>. Filed expert report February 2, 2010. Filed rebuttal expert report March 12, 2010. Deposition March 26, 2010.

- Expert declaration in <u>New Century Securities Litigation, Case No. 07-cv-00931-DDP, United States District Court Central District of California</u>. Filed declaration March 11, 2010.

- Testifying expert in <u>Louisiana Municipal Police Employees' Retirement System, et. al. v. Tilman J. Fertitta, Steven L. Scheinthal, Kenneth Brimmer, Michael S. Chadwick, Michael Richmond, Joe Max Taylor, Fertitta Holdings, Inc., Fertitta Acquisition Co., Richard Liem, Fertitta Group, Inc. and Fertitta Merger Co, C.A. No. 4339-VCL, Court of Chancery of the State of Delaware</u>. Filed expert report April 23, 2010.

- Testifying expert in <u>Edward E. Graham and William C. Nordlund, individually and d/b/a Silver King Capital Management v. Eton Park Capital Management, L.P., Eton Park Associates, L.P. and Eton Park Fund, L.P. Case No. 1:07-CV-8375-GBD, Circuit Court of Shelby County, Alabama</u>. Filed rebuttal expert report July 8, 2010.  Deposition September 1, 2010. Filed supplemental rebuttal expert report August 22, 2011.

- Testifying expert in <u>Moody's Corporation Securities Litigation. Case No. 1:07-CV-8375-GBD), United States District Court for the Southern District of New York</u>.  Filed rebuttal expert report August 23, 2010. Deposition October 7, 2010. Filed rebuttal reply report November 5, 2010. Filed expert report May 25, 2012.

- Testifying expert in <u>Minneapolis Firefighters' Relief Association v. Medtronic, Inc., et al. Civil No. 08-6324 (PAM/AJB), United States District Court, District of Minnesota</u>. Filed expert report January 14, 2011.

- Testifying expert in <u>Schering-Plough Corporation/ENHANCE Securities Litigation Case No.2:08-cv-00397 (DMC) (JAD), United States District Court, District of New Jersey</u>. Filed declaration February 7, 2011. Filed expert report September 15, 2011. Filed rebuttal expert report October 28, 2011. Filed declaration January 30, 2012. Deposition November 15, 2011 and November 29, 2011.

- Testifying expert in <u>Fannie Mae 2008 Securities Litigation, Master File No. 08 Civ. 7831 (PAC), United States District Court for the Southern District of New York</u>. Filed expert report July 18, 2011.

- Testifying expert in <u>Bank of America Corp. Securities, Derivative, and Employee Retirement Income Security Act (ERISA) Litigation, Master File No. 09 MDL 2058 (PKC), United States District Court for the Southern District of New York</u>.  Filed expert report August 29, 2011. Filed rebuttal expert report September 26, 2011. Filed expert report March 16, 2012. Filed rebuttal expert report April 9, 2012. Filed rebuttal expert report April 29, 2012. Deposition October 14, 2011 and May 24, 2012.

- Testifying expert in <u>Toyota Motor Corporation Securities Litigation, Case No. 10-922 DSF (AJWx), United States District Court, Central District of California</u>. Filed expert report February 17, 2012. Deposition March 28, 2012. Filed rebuttal expert report August 2, 2012. Filed declaration re: Plan of Allocation, January 28, 2013.

- Testifying expert in <u>The West Virginia Investment Management Board and the West Virginia Consolidated Public Retirement Board v. The Variable Annuity Life Insurance Company, Civil No. 09-C-2104, Circuit Court of Kanawha County, West Virginia</u>. Filed expert report June 1, 2012. Deposition June 19, 2013.

- Testifying expert in <u>Aracruz Celulose S.A. Securities Litigation, Case No. 08-23317-CIV-LENARD, United States District Court, Southern District of Florida</u>. Filed expert report July 20, 2012. Deposition September 14, 2012. Filed rebuttal expert report October 29, 2012. Filed declaration re: Plan of Allocation, May 20, 2013.

- Testifying expert in <u>In Re Computer Sciences Corporation Securities Litigation, CIV. A. No. 1:11-cv-610-TSE-IDD, United States District Court, Eastern District of Virginia, Alexandria Division</u>. Filed expert report November 9, 2012. Filed supplemental report February 18, 2013. Filed rebuttal expert report March 25, 2013. Deposition March 27, 2013.

- Testifying expert in <u>In Re Weatherford International Securities Litigation, Case 1:11-cv-01646-LAK, United States District Court for the Southern District of New York</u>. Filed expert report April 1, 2013. Deposition April 26, 2013.

- Testifying expert in <u>In Re: Regions Morgan Keegan Closed-End Fund Litigation, Case 2:07-cv-02830-SHM-dky, United States District Court for the Western District of Tennessee Western Division</u>. Court testimony April 12, 2013.

- Testifying expert in <u>City of Roseville Employees' Retirement System and Southeastern Pennsylvania Transportation Authority, derivatively on behalf of Oracle Corporation, Plaintiff, v. Lawrence J. Ellison, Jeffrey S. Berg, H. Raymond Bingham, Michael J. Boskin, Safra A. Catz, Bruce R. Chizen, George H. Conrades, Hector Garcia-Molina, Donald L. Lucas, and Naomi O. Seligman, Defendants, and Oracle Corporation, Nominal Defendant, C.A. No. 6900-CS, Court of Chancery of the State of Delaware</u>. Filed expert report May 13, 2013. Filed rebuttal expert report June 21, 2013.

- Testifying expert in <u>In Re BP plc Securities Litigation, No. 4:10-md-02185, Honorable Keith P. Ellison, United States District Court for the Southern District of Texas, Houston Division</u>. Filed expert report June 14, 2013.

- Testifying expert in <u>In Re Celestica Inc. Securities Litigation, Civil Action No. 07-CV-00312-GBD, United States District Court for the Southern District of New York</u>. Filed expert report June 14, 2013.

- Testifying expert in <u>In Re Dendreon Corporation Class Action Litigation, Master Docket No. C11-01291JLR, United States District Court for the Western District of Washington at Seattle</u>. Filed declaration re: Plan of Allocation, June 14, 2013.


<u>Experience in Labor Economics and Discrimination-Related Cases:</u>

- Expert consultant for Cargill in class action race discrimination matter in which class certification was defeated.

- Expert consultant for 3M in class action age discrimination matter.

- Expert consultant for Wal-Mart in class action race discrimination matter.

- Expert consultant for Novartis regarding various labor related issues.

- Expert consultant on various other significant confidential labor economics matters in which there were class action allegations related to race and gender.

- Expert consultant for large insurance company related to litigation and potential regulation resulting from the use of credit scores in the insurance underwriting process.

- Testifying expert in <u>Shirley Cohens v. William Henderson, Postmaster General, C.A 1:00CV-1834 (TFH) United States Postal Service. United States District Court for the District of Columbia.</u>– Filed report re: lost wages and benefits.

- Testifying expert in <u>Richard Akins v. NCR Corporation</u>.  Before the American Arbitration Association – Filed report re: lost wages.

- Testifying expert in <u>Maureen Moriarty v. Dyson, Inc., Case No. 09 CV 2777, United States District Court for the Northern District of Illinois, Eastern Division</u>. Filed expert report October 12, 2011. Deposition November 10, 2011.

<u>Selected Experience in Antitrust, General Damages, and Other Matters:</u>

- Expert consultant in high-profile antitrust matters in the computer and credit card industries.

- Expert consultant for plaintiffs in re: Brand Name Drugs Litigation.  Responsible for managing, maintaining and analyzing data totaling over one billion records in one of the largest antitrust cases ever filed in the Federal Courts.

- Served as neutral expert for mediator (Judge Daniel Weinstein) in allocating a settlement in an antitrust matter.

- Expert consultant in Seminole County and Martin County absentee ballot litigation during disputed presidential election of 2000.

- Expert consultant for sub-prime lending institution to determine effect of alternative loan amortization and late fee policies on over 20,000 customers of a sub-prime lending institution. Case settled favorably at trial immediately after the testifying expert presented an analysis I developed showing fundamental flaws in opposing experts calculations.

**TEACHING EXPERIENCE:**

KNOX COLLEGE, Teaching Assistant - Statistics, (1995)
KNOX COLLEGE, Tutor in Mathematics, (1992 - 1993)

**PUBLICATIONS:**

Coffman, Chad and Mary Gregson, "Railroad Construction and Land Value." *Journal of Real Estate and Finance*, 16:2, pp. 191-204 (1998).

Coffman, Chad, Tara O'Neil, and Brian Starr, Ed. Richard D. Kahlenberg, "An Empirical Analysis of the Impact of Legacy Preferences on Alumni Giving at Top Universities," *Affirmative Action for the Rich: Legacy Preferences in College Admissions*; pp. 101-121 (2010).

**PROFESSIONAL AFFILIATIONS:**

Associate Member CFA Society of Chicago
Associate Member CFA Institute
Phi Beta Kappa

**AWARDS:**

1994  Ford Fellowship Recipient for Summer Research.
1993  Arnold Prize for Best Research Proposal.
1995  Knox College Economics Department Award.

**PERSONAL ACTIVITIES:**

Pro bono consulting for Cook County State's Attorney's Office.
Pro bono consulting for Cook County Health & Hospitals System – Developed method for hospital to assess real-time patient level costs to assist in improving care for Cook County residents and prepare for implementation of Affordable Care Act.

# Appendix B

# Documents Relied Upon

In addition to the documents relied upon for this report referenced below, I also rely upon all of the documents I cited in the Appendix A of my Expert Report and Appendix A of the Coffman Rebuttal Report.

## Court Documents

- Expert Report of Barry Jay Epstein, dated October 3, 2008.
- Expert Rebuttal Report of Barry Jay Epstein, dated December 17, 2008.
- Memorandum, filed September 3, 2010.
- Memorandum, filed January 4, 2013.
- Expert Report of Neil H. Demchick, dated May 3, 2013.
- Order-Memorandum, filed February 20, 2013.
- First Amended Joint Plan of Liquidation of DVI, Inc., et al., Chapter 11, Case Nos. 03-12656 through 03-12658 (MFW), dated October 8, 2004, Article 5.

## Court Decisions and Securities Law

- *In re AOL TW*, 503 F. Supp. 2d.
- *In re Motorola*, 505 F. Supp. 2d.
- *In re Retek Inc.*, 621 F. Supp. 2d.
- *In re Vivendi Universal, S.A. Securities Litigation* 634 F. Supp. 2d.
- *In re Vivendi Universal, S.A. Securities Litigation* 02 Civ. 05571 (RJH) (HBP), Memorandum Opinion and Order dated February 22, 2011.
- *In re Dura Pharmaceuticals, Inc.*, 544 U.S. 336.

## News Articles, Press Releases and Analyst Reports

- News articles, press releases and analyst reports including, but not limited to:
  - "Moody's Downgrades DVI Senior Debt to Caa3 – Outlook is Negative," *Moody's Investor Service Press Release*, June 27, 2003.

o  "DVI Securitizations Not in Same Boat as Parent Debt," *Dow Jones Newswires*, August 6, 2003.

o  "It's Going to be a Messy Quarter, But Core Business Remains Strong," *CIBC World Markets*, September 26, 2002.

**Securities Data**

- NYSE TAQ data for August 1999 - August 2003.

**Bates Stamped Documents**

- DT0106395-98.

**Academic Articles**

- Krivin, Dmitry, et al., "Determination of the Appropriate Event Window Length in Individual Stock Event Studies," NERA Economic Consulting, November 4, 2003.

**Depositions**

- Deposition of Terry L. Musika, March 3, 2009.
- Deposition of Kenneth M. Lehn, February 26, 2009.